## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ZACHARY SUCCOW, SAMUEL TOWNE; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PAMELA JO BONDI, in her official capacity; RONNELL HIGGINS, in his official capacity; MARGARET A. KELLEY, in her official capacity; PAUL J. NARDUCCI, in his official capacity; JOHN BUCHERATI, in his official capacity; PATRICK DALEY, in his official capacity; <br><br> Defendants. | CIV. NO. 3:25-cv-250 <br><br><br> February 18, 2025 <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

The Plaintiffs — Zachary Succow; Samuel Towne; Connecticut Citizens Defense League, Inc. ("CCDL"); and Second Amendment Foundation, Inc. ("SAF")—respectfully submit this memorandum of law in support of their emergency motion for a temporary restraining order and preliminary injunction.

Federal and Connecticut laws each prohibit any adult between the ages of 18 and 20 years old from acquiring, possessing, or carrying handguns and handgun ammunition. Those laws, facially and as-applied to the Plaintiffs in this case, violate the U.S. Constitution's Second Amendment and the Fifth and Fourteenth Amendment's Equal Protection guarantees.

Nothing in the Second Amendment's text denies its protection to adult citizens who are under the age of 21. Our nation's historical tradition also overwhelmingly supports the

possession of firearms by individuals between the ages of 18 and 20. In numerous similar cases across the country, government defendants have failed to muster any historical tradition supporting the denial of Second Amendment rights to individuals simply because they are ages 18 to 20. Thus, the federal and Connecticut laws that deny 18-20-year-olds their Second Amendment rights are unconstitutional.

Likewise, the Equal Protection guarantees of the Fifth and Fourteenth Amendments do not permit the Defendants to engage in age-based discrimination to deny fundamental constitutional rights. Such classifications draw strict scrutiny, and the Defendants will not be able to show either a compelling government interest or that the laws at issue in this case are narrowly tailored. Thus, the federal and Connecticut laws that deny 18-20-year-olds their Second Amendment rights are unconstitutional on Equal Protection grounds.

For these reasons as explained herein, the Plaintiffs respectfully ask the Court to issue an emergency temporary restraining order and a preliminary injunction enjoining the Defendants from enforcing 18 U.S.C. § 922(b)(1), 18 U.S.C. 922(c), 18 U.S.C. §924(a)(1)(D), and 27 C.F.R. § 478.99(b)(1) (collectively, the "federal handgun ban") and Conn. Gen. Stat. § 29-28(b) Conn. Gen. Stat. § 29-34(b), Conn. Gen. Stat. § 29-34(b), and Conn. Gen. Stat. § 29-36f (collectively, the "Connecticut handgun ban"). Given the clear violations of the Plaintiffs' constitutional rights, they request that the Court issue the temporary restraining order on an *ex parte* basis, or at the earliest possible time that all parties can be heard.

## BACKGROUND

**I.    The Federal Handgun Ban:**

18 U.S.C. § 922(b)(1) makes it

unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver-- (1) any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age….

18 U.S.C. § 922(b)(1). A violation of this law carries up to five years' incarceration and a fine.

In addition, 18 U.S.C. § 922(c) prohibits licensed importers, licensed manufacturers, and licensed dealers from selling firearms "to a person who does not appear in person at the licensee's business premises… only if" the person swears under oath that he or she is twenty-one or older.

Federal regulations confirm the plain text of this statute:

A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver (1) any firearm or ammunition to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 18 years of age, and, if the firearm, or ammunition, is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age….

27 C.F.R. § 478.99(b)(1)

Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") guidance prohibits Federal Firearms Licensees ("FFLs") to "sell, deliver or otherwise transfer a handgun or handgun ammunition to any person the transferor knows or has reasonable cause to believe

3

is under the age of 21." **Exhibit A - Minimum Age for Gun Sales and Transfers.**[1]  The same guidance, however, does not prohibit a non-FFL from transferring a handgun to someone under 21 years old: "Handguns: Under federal law, unlicensed persons may not sell, deliver or otherwise transfer a handgun or handgun ammunition to any person the transferor knows or has reasonable cause to believe is under the age of 18, except under certain exceptions." *Id.* Other guidance confirms that non-FFLs may transfer handguns to 18-20-year-olds without violating federal law:

> An individual between 18 and 21 years of age may acquire a handgun from an unlicensed individual who resides in the same state, provided the person acquiring the handgun is not otherwise prohibited from receiving or possessing firearms under federal law. A federal firearms licensee may not, however, sell or deliver a firearm other than a shotgun or rifle to a person the licensee knows or has reasonable cause to believe is under 21 years of age.
>
> There may be state or local laws or regulations that govern this type of transaction. Contact the office of your State Attorney General for information on any such requirements.

## Exhibit B – ATF Q&A On Handgun Acquisition.

Collectively, these federal statutes and regulations (the "federal handgun ban") categorically ban any adult under the age of twenty-one from lawfully purchasing a handgun and handgun ammunition from federally licensed retailers.

## II.    The Connecticut Handgun Ban:

Conn. Gen. Stat. § 29-35(a) prohibits any person from carrying a pistol or revolver – except when the person is within his house, on land leased or owned by him, or in his place of business – without a valid Connecticut pistol permit. A violation is a felony, and carries

---

[1] Retrieved from: https://www.atf.gov/resource-center/minimum-age-gun-sales-and-transfers

one-year mandatory minimum sentence of incarceration – absent a finding of mitigating circumstances. Conn. Gen. Stat. § 29-37(b).

Conn. Gen. Stat. § 29-28(b) establishes a two-step system for the issuance of pistol permits:

1. First, a person must apply to their local chief of police, chief town executive official, or resident state trooper for a temporary state pistol permit.

2. Once a person receives that temporary state pistol permit from the appropriate local authority, they must then apply to Defendant Higgins for a state pistol permit within sixty days of receiving the temporary state pistol permit.

Conn. Gen. Stat. § 29-28(B), however, prohibits the issuance of any permit to anyone under the age of 21: "No state or temporary state permit to carry a pistol or revolver shall be issued under this subsection if the applicant… (10) is less than twenty-one years of age." Conn. Gen. Stat. § 29-28(b).

Likewise, Conn. Gen. Stat. § 29-36f establishes a pistol eligibility certificate that enables individuals to obtain the certificate to purchase pistols and revolvers and to keep them for home defense—but limits such certificates to individuals aged twenty-one or older: "A person who is twenty-one years of age or older may apply to the Commissioner of Emergency Services and Public Protection for an eligibility certificate for a pistol or revolver." Conn. Gen. Stat. § 29-36f(a).

Connecticut's laws barring 18-20-year-olds from acquiring handguns are more restrictive than their federal contemporaries. Connecticut law prohibits any person from purchasing or receiving any pistol or revolver,

unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, a valid permit to sell firearms at retail issued pursuant to subsection (a) of section 29-28 or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f or is a federal marshal, parole officer or peace officer.

Conn. Gen. Stat. § 29-33(b).   A violation is a felony that carries a two-year mandatory minimum sentence of incarceration and a $5,000 fine. Conn. Gen. Stat. § 29-33(j).

Conn. Gen. Stat. § 29-34(b) categorically prohibits anyone under the age of 21 from obtaining a pistol or revolver except in one narrow circumstance:

No person shall sell, barter, hire, lend, give, deliver or otherwise transfer to any person under the age of twenty-one years any pistol or revolver, except that a pistol or revolver may be temporarily transferred to any person only for the use by such person in target shooting or on a firing or shooting range, provided such use is otherwise permitted by law and is under the immediate supervision of a person eligible to possess a pistol or revolver.

*Id.* A violation is a felony that carries a two-year mandatory minimum sentence of incarceration and a $5,000 fine. *Id.*

Reading these state statutes together (the "Connecticut handgun ban"), the only way a person under 21 may lawfully obtain a handgun in Connecticut is to be at a shooting range, and to have an authorized person over 21 to hand it to him or her, to be retained only until target practice is over.

## III.    The Plaintiffs:

### A. Zachary Succow:

Plaintiff Zachary Succow is a 19-year-old United States citizen who lives in Seymour, Connecticut. **Exhibit C – Declaration of Zachary Succow, ¶¶ 2-3.** He is a member of Plaintiffs Second Amendment Foundation and the Connecticut Citizens Defense League. *Id.* at ¶ 4.

Succow started shooting firearms at 8 or 9 years of age under the supervision of his father who taught him how to handle firearms safely and responsibility. *Id.* at ¶ 5. Except for his age, he meets all of the federal and Connecticut requirements to obtain a Connecticut handgun eligibility certificate and a Connecticut pistol permit. *Id.* at ¶¶ 7-8.

Succow intends to obtain a handgun and ammunition for self-defense and all other lawful purposes immediately. *Id.* at ¶ 9. To do so, he intends to apply for a Connecticut state pistol permit and any temporary permits necessary to obtain it. *Id.* at ¶ 10.

Succow cannot legally carry a rifle or shotgun for self-defense in public because he has no practical way to conceal either while preserving its effective utility for self-defense. *Id.* at ¶ 12. He will not carry a firearm openly because doing so would violate Connecticut's open carry laws. *Id.* at ¶ 11.

**B. Samuel Towne:**

Plaintiff Samuel Towne is a 19-year-old United States citizen who lives in Norwich, Connecticut. **Exhibit D – Declaration of Samuel Towne, ¶¶ 2-3.** He is a member of Plaintiffs Second Amendment Foundation and the Connecticut Citizens Defense League. *Id.* at ¶ 5.

Towne has completed all of the safety training associated with obtaining a Connecticut long gun eligibility certificate. *Id.* at ¶ 6. Prior to that, he received firearms safety training during his time in the Boy Scouts. *Id.* at ¶ 7. Except for his age, Towne meets all of the federal and Connecticut requirements to obtain a Connecticut handgun eligibility certificate and a Connecticut pistol permit. *Id.* at ¶¶ 8-9.

Towne intends to obtain a handgun and ammunition for self-defense and all other lawful purposes immediately. *Id.* at ¶ 9. To do so, he intends to apply for a Connecticut state pistol permit and any temporary permits necessary to obtain it. *Id.* at ¶ 12. Towne, in particular, does not feel safe in the City of Norwich and other Connecticut towns that he visits. *Id.* at ¶ 11.

Towne cannot legally carry a rifle or shotgun for self-defense in public because he has no practical way to conceal either while preserving its effective utility for self-defense. *Id.* at ¶ 14. He will not carry a firearm openly because doing so would violate Connecticut's open carry laws. *Id.* at ¶ 13.

### C. Connecticut Citizens Defense League, Inc. (CCDL)

CCDL is a non-profit educational foundation, incorporated under the laws of Connecticut, with its principal place of business in Seymour, Connecticut. Dkt. 1, ¶ 25. It works to preserve Second Amendment rights through legislative and grassroots advocacy, outreach, education, research, publication, legal action, and programs focused on the constitutional right to keep and bear arms. *Id.* CCDL has over 41,000 members and supporters nationwide, with more than ninety-five percent of its members and supporters being residents of Connecticut. *Id*. CCDL represents its members and supporters—which include individuals seeking to exercise their right to acquire, possess, and carry firearms for personal protection. *Id.* CCDL brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public to enjoin the Defendants unconstitutional enforcement of the laws that are the subject of this case. *Id.* at ¶ 28.

### D. Second Amendment Foundation, Inc. (SAF)

SAF is a non-profit educational foundation incorporated under the laws of the State of Washington with its principal place of business in Bellevue, Washington. Dkt. 1, ¶ 30. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. *Id.* SAF has over 700,000 members and supporters nationwide, including many members in Connecticut. *Id.*

The purpose of SAF includes education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms under the Second Amendment, and the consequences of gun control. *Id.* at ¶ 31. SAF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. *Id.* at ¶ 31. Many of SAF's individual Connecticut members have been adversely and directly harmed and injured by Defendants' enforcement of the laws complained of herein. *Id.* at ¶ 31.

## LEGAL STANDARD

To obtain a preliminary injunction under Fed. R. Civ. P. 65, the moving party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (cleaned up). Additionally, the moving party must show "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (cleaned up).

Districts courts within the Second Circuit apply the same legal standard governing preliminary injunctions to temporary restraining orders. *See Lazor v. University of Connecticut*, 560 F. Supp. 3d 674, 677 (2021).

## ARGUMENT

## I.    The Plaintiffs Demonstrate That They Will Likely Succeed On The Merits.

*New York Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), rejected the interest-balancing approach circuit courts adopted in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), and established a new "test rooted in the Second Amendment's text, as informed by history." 597 U.S. at 19; *see also Antonyuk v. James,* 120 F.4th 941, 963-64 (2d Cir. 2024). *Bruen*'s two-step framework requires courts to consider, at the first step, whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct." *Id.* "To overcome that presumption, '[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Antonyuk*, 120 F.4th at 964 (quoting *Bruen*, 597 U.S. at 24) (alterations in original). "Stated differently, 'the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Id.* (quoting *Bruen*, 597 U.S. at 19).

## A. The Second Amendment's plain text undoubtedly protects 18-20-year-old citizens' right to acquire, possess, carry, and use handguns and handgun ammunition for self-defense and all other lawful purposes.

The Second Amendment's plain text provides as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.

The Second Circuit has held that *Bruen*'s first step and Second Amendment's plain text require courts to consider three issues: (1) "whether the conduct at issue is protected," (2) "whether the weapon concerned is in common use," (3) and "whether the affected individuals are ordinary, law-abiding, adult citizens and thus part of the people whom the Second Amendment protects."[2] *Antonyuk*, 120 F.4th at 981. The Plaintiffs easily carry their burden on each of these issues.

> **1. The Second Amendment's plain text protects a right to keep and bear arms as well as to purchase them.**

*Heller*, *McDonald*, and *Bruen* clearly established that the Second Amendment's plain text protects a right to keep and bear arms, including in public. *District of Columbia v. Heller*, 554 U.S. 570, 581-92 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); *Bruen*, 142 S.Ct. at 2134. The right to keep and bear arms includes "ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (recognizing an ancillary Second Amendment right "to acquire and maintain proficiency in their use"). This includes "the ability to acquire arms" because "the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." *Teixeira*, 873 F.3d at 677-78 (cleaned up).

---

[2] Plaintiffs CCDL and SAF, through the undersigned, have other pending cases before this Court and the Second Circuit that contest whether *Antonyuk*'s formulation of the textual inquiry is correct. In those cases, Plaintiffs CCDL and SAF argue that "common use" is not part of the Second Amendment's textual inquiry but properly belongs in the historical inquiry. In future cases, Plaintiffs CCDL and SAF may also take the position that the term "people" as used in the Second Amendment is not limited to United States citizens. For the purposes of this case though, the Plaintiffs prevail even under *Antonyuk*'s formulation of the textual inquiry.

As recently as 2023 in a similar case involving a challenge to the federal laws at issue in this case, the federal government advanced an argument that the Second Amendment's plain text does not include a right to purchase arms. *Fraser v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 672 F.Supp.3d 118, 127-28 (E.D. V.A. 2023). The district court properly rejected that argument as ignoring the meaning of the term "infringed." Modern dictionaries define "infringe" as "to encroach upon in a way that violates law or the rights of another." *Id.* at 128 (cleaned up). Modern dictionaries also define "encroach" as "to enter by gradual steps or by stealth into the possessions or rights of another" and "to advance beyond the usual or proper limits." *Id.* at 128-29 (cleaned up). "Those words have possessed the same meaning since the sixteenth century and the Founders would have understood them in the same way." *Id.* at 129 & n.9. Thus, the term "infringed" means the Second Amendment's textual protections comfortably cover the right to purchase arms so the "people" protected by its text can keep and bear them. *Id.* at 129.

The individual Plaintiffs' proposed conduct, and similar conduct by CCDL and SAF members, falls squarely within these textual protections. Each of the individual Plaintiffs intends to acquire, keep, and bear handguns for self-defense and all other lawful purposes. **Exhibit C, ¶ 9; Exhibit D, ¶¶ 10-11** . Except for their age, they meet every current state and federal requirement to lawfully do so. Thus, the Court should conclude that their proposed conduct is protected by the Second Amendment's plain text.

### 2. *Heller* clearly established that handguns are in common use.

*Heller* plainly established that "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of

their use is invalid." 554 U.S. at 629. Nothing has changed since. In fact, *Bruen* itself noted that no party disputed the fact "that handguns are weapons 'in common use' today for self-defense." 142 S.Ct. at 2134. Thus, the Court should find that handguns are in common use.

### 3. The individual plaintiffs and all similarly situated members of CCDL and SAF are part of the "people" protected by the Second Amendment.

*Antonyuk* interpreted Supreme Court precedent to hold that, if "the affected individuals are ordinary, law-abiding, adult citizens…," they are "part of 'the people' whom the Second Amendment protects."[3] 120 F.4th at 981. The Plaintiffs easily satisfy this requirement as well as the easier and more encompassing requirements articulated in *Heller*.

*Heller* held that the term "the people" "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. Thus, there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

To support this conclusion, *Heller* analyzed the use of the phrase "right of the people" in the Constitution as a whole. *Id.* at 579-81. It found that each use of the phrase in the first eight Amendments of the Bill of Rights "unambiguously refer[red] to individual rights, not 'collective rights,' or rights that may be exercised only through participation in some corporate

---

[3] In addition to their anticipated future positions articulated in footnote 1, Plaintiffs CCDL and SAF also may take a position in future litigation that *Antonyuk* incorrectly placed "ordinary" and "law-abiding" in the textual inquiry. The Second Amendment's plain text contains no language that permits disarmament of anyone included in *Heller*'s definition of "the people." Instead, government must justify disarmament regulations in *Bruen*'s history and tradition prong. While the placement of this inquiry could make a huge difference in, for instance, a felon disarmament case – *see, e.g., Range v. Attorney General United States*, 124 F.4th 218 (3rd Cir. 2024), it makes no difference in this case because all of the individual plaintiffs are ordinary, law-abiding citizens.

body." *Id.* at 579 (citing the First Amendment's Assembly-and-Petition Clause and the Fourth Amendment's Search-and-Seizure Clause in addition to the Second Amendment). It contrasted the context of the three usages of the phrase in the First, Second, and Fourth Amendments – a guarantee of individual rights – to the context of the three usages of the phrase in the Preamble, Article I, § 2, and the Tenth Amendment – "the people's" collective exercise or reservation of powers, not rights. *Id.* at 579-80. Moreover, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. Thus, *Heller* found that the Constitution's guarantee of rights to "the people" only referred to individual rights – nothing else. *Id.* at 580.

*Heller* then defined "the people" by borrowing its definition of the term in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990):

> " '[T]he people' seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

The Plaintiffs bear no greater burden than their burden to show that they are part of the national community. Because they are United States citizens, legally entitled to the privileges of their citizenship, no non-frivolous argument exists to dispute that they are part of "the people" as *Heller* defined the term. **Exhibit C, ¶ 3; Exhibit D, ¶ 3**.

Other circuit decisions are in accord. In *Worth v. Jacobson*, 108 F.4th 677, 689 (8th Cir. 2024), the Eighth Circuit affirmed the unconstitutionality of Minnesota's 18- to 20-year old

handgun ban and rejected Minnesota's argument that 18- to 20-year olds are not part of "the people" because, at common law, individuals did not have rights until they turned 21 years old. *Worth* held that 18- to 20-year olds "are members of the political community under *Heller*'s 'political community' definition." 108 F.4th at 689. It criticized Minnesota's argument on the common law vesture of rights as "bordering on the frivolous" because 18- to 20-year olds are adults in modern society, which comports with the original meaning of the term "the people." *Id.* at 690-692 (cleaned up).

The Tenth Circuit issued a similar analysis in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) even though it vacated a preliminary injunction enjoining enforcement of Colorado's minimum firearms purchase age of 21. Colorado advanced an argument that 18- to 20-year-olds were not part of the political community at the Founding. *Rocky Mountain Gun Owners*, 121 F.4th at 115. After a survey of constitutional provisions which the plaintiff enjoyed, the Tenth Circuit held that the plaintiff was part of "the people," reasoning that the opposite conclusion would deny 18- to 20-year-olds "First and Fourth Amendment protections…" too. *Id.* at 116.

The Third Circuit reached the same conclusion in *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428 (3rd Cir. Jan. 13, 2025). It affirmed a preliminary injunction enjoining Pennsylvania officials from enforcing three statutes – which together effectively banned 18- to 20-year-olds from carrying firearms outside their homes during a state of emergency. *Lara*, 125 F.4th at 431. The Third Circuit rejected the Pennsylvania State Police Commissioner's argument that "18-to-20-year-olds are not among 'the people' protected by the Second Amendment." *Id.* at 435. Starting with *Heller*, *Lara* recognized the strong presumption that the

right to keep and bear arms belongs to all Americans. *Id.* at 435-36. It rejected the Commissioner's argument that the fact 18- to 20-year-olds were considered minors in the Founding Era, they are not part of "the people" today: "[The Commissioner's argument] supposes that the initial step in a *Bruen* analysis requires excluding individuals from "the people" if they were so excluded at the founding. That argument conflates *Bruen*'s two distinct analytical steps." *Id.* at 437. "If, at step one, we were rigidly limited by eighteenth-century conceptual boundaries, 'the people' would consist solely of white, landed men, and that is obviously not the state of the law." *Id.* In addition, "it does not follow that, just because individuals under the age of 21 could not exercise certain legal rights at the founding, they were excluded ex ante from the scope of 'the people.'" *Id.* "One can be included as a member of that class and still not be allowed to carry a gun. For example, as then-Judge Barrett explained before *Bruen*, '[n]either felons nor the mentally ill are categorically excluded from our national community.'" *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting)). "But '[t]hat does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess.'" *Id.* (quoting *Kanter*, 919 F.3d at 453). Finally, "consistency has a claim on us. It is undisputed that 18-to-20-year-olds are among "the people" for other constitutional rights such as the right to vote …, freedom of speech, the freedom to peaceably assemble and to petition the government …, and the right against unreasonable searches and seizures…." *Id.* (citations omitted) "*Heller* cautions against the adoption of an inconsistent reading of 'the people' across the Constitution." *Id.* Thus, the

Third Circuit held "that 18-to-20-year-olds are, like other subsets of the American public, presumptively among 'the people' to whom Second Amendment rights extent." *Id.* at 438.

Most recently, the Fifth Circuit followed its sister circuits in concluding that 18- to 20-year-olds are part of "the people" in *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, ___ F.4th ___, No. 23-30033, 2025 WL 340799 (5th Cir. Jan. 30, 2025). That case (like this one) involved a challenge to 18 U.S.C. §§ 922(b)(1) and (c)(1), "which together prohibit Federal Firearms Licensees from selling handguns to eighteen-to-twenty-year-old adults." *Id.* at *1. Just like the government defendants in *Worth*, *Polis*, and *Lara*, the federal government argued that 18- to 20-year-olds are not among "the people." *Id.* at *5. "This argument is based largely on the common law's recognition of 21 years as the date of legal maturity at the time of the founding, and the fact that legislatures have long established minimum age requirements for various activities." *Id.* Like the Tenth, Eight, and Third Circuits, the Fifth Circuit rejected that argument: "There are no age or maturity restrictions in the plain text of the Amendment, as there are in other constitutional provisions.… This suggests that the Second Amendment lacks a minimum age requirement." *Id.* (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93-100 (2012) (discussing the "omitted-case canon—the principle that what a text does not provide is unprovided")). "Moreover, in the unamended Constitution and Bill of Rights, the phrase 'right of the people' appears in the First Amendment's Assembly-and-Petition Clause, the Fourth Amendment's Search-and-Seizure Clause, and the Ninth Amendment." *Id.* "All of these references confer 'individual rights' and undoubtedly protect eighteen-to-twenty-year-olds as much as twenty-one-year-olds. In fact, with modifications, the rights they confer extend to younger minors." *Id.* The Fifth Circuit

further considered the government's argument that "the people" only means those who had full political rights, such as the right to vote, at the Founding, to be "incompatible with Second Amendment precedent, nonsensical when considered against the backdrop of American suffrage, and contradicted by the history of firearm use at the founding." *Id.* at *6.

Here, there is little need to reiterate what *Worth*, *Polis*, and *Lara*, and *Reese* all treated as hardly arguable against the backdrop of *Heller*, *Bruen*, and *United States v. Rahimi*, 144 S.Ct. 1889 (2024): that 18- to 20-year-olds are among "the people" for purposes of *Bruen*'s first step.

For purposes of *Antonyuk*, the Plaintiffs are ordinary, law-abiding citizens who meet every qualification to purchase, keep, and bear handguns except for their age. *See generally* **Exhibits C and D**. Thus, the Court should conclude that the Plaintiffs are part of "the people" protected by the Second Amendment.

### 4. The federal and Connecticut handgun bans infringe on the Plaintiffs' Second Amendment rights.

The federal and Connecticut handgun bans unquestionably infringe on the Plaintiffs' Second Amendment rights for purposes of the Second Amendment's plain text.

Start with the federal handgun ban. The federal handgun ban effectively prohibits Federal Firearms Licensees (FFLs) from selling, delivering, or transferring a handgun or handgun ammunition to any person under 21 years old. In other words, it is impossible for the Plaintiffs to acquire handguns at retail like every other adult citizen. Instead, the federal handgun ban forces them to find them to find other private citizens to sell them handguns. This makes it extremely difficult for them to access the same market of choices that persons older than 21 have, and it also makes it more difficult for them to acquire handguns.

Unconditionally, unqualifiedly prohibiting a group of persons from purchasing firearms from authorized sellers, simply because of their age, is by definition neither a condition nor a qualification. "[T]he right to 'keep and bear arms' surely implies the right to purchase them." *Reese*, 2025 WL 340799, *4 (citing *Luis v. United States*, 578 U.S. 5, 26, 136 S. Ct. 1083, 1097, 194 L.Ed.2d 256 (2016) (Thomas, J., concurring) ("Constitutional rights ... implicitly protect those closely related acts necessary to their exercise."); *Teixeira*, 873 F.3d at 677 ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.")). Since the federal handgun ban imposes an unequal and heavy burden on the Plaintiffs' ability to obtain the handguns they would choose for self-defense, there is no question that it infringes on their Second Amendment rights.

The Connecticut handgun ban mounts a frontal assault on the Plaintiffs' Second Amendment rights. Conn. Gen. Stat. § 29-35 prohibits anyone from carrying a handgun in public without a state-issued pistol permit. Because the Connecticut handgun ban prohibits anyone under the age of 21 from obtaining a Connecticut pistol permit, it completely deprives the Plaintiffs of their right to carry handguns in public for self-defense – a right clearly recognized in *Bruen*.

The Connecticut handgun ban also prohibits anyone – licensed retailers and private citizens alike – from transferring or selling handguns to anyone under the age of 21. It also prohibits individuals under the age of 21 from obtaining a pistol eligibility certificate, thus denying the Plaintiffs even the limited ability to obtain handguns for home defense. This eviscerates the Plaintiffs' right to keep handguns in their homes for self-defense – a right clearly recognized in *Heller*.

Thus, there is no question that the Connecticut handgun ban infringes on the Plaintiffs'

Second Amendment rights.

### B. The Defendants will not satisfy their burden to show well-established and representative historical analogues to the federal and Connecticut handgun bans.

Government defendants have pushed back on Second Amendment claims such as the

one that the Plaintiffs have brought here by arguing that the historical common law set the

age of majority at 21. *See* Part I.A.3. Not only does this argument lack textual support in the

Second Amendment, but it also oversimplifies just how complicated the age of majority was

at common law and how nuanced it remains today. Most importantly for purposes of a *Bruen*

historical analysis, the historical evidence demonstrates an affirmative *requirement* for 18- to 20-

year-olds and others to bear arms, and lacks any widespread tradition of prohibiting them from

acquiring, keeping, or bearing arms.

From before the Founding and through the Reconstruction Era, individuals under the

age of 21 were generally considered minors in the common law's eyes rather than the modern

standard of 18. *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* 451 (Oxford,

Clarendon Press 1765) ("So that full age in male or female, is twenty one years ... who till that

time is an infant, and so styled in law."); 1 Zephaniah Swift, *A System of the Laws of the State Of

Connecticut* 213 (Windham, John Byrne pub. 1795) ("Persons within the age of 21, are, in the

language of the law denominated infants, but in common speech – minors."); *Infant, Black's

Law Dictionary* (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of

twenty-one years[.]") (quoting John Indermaur, *Principles of the Common Law* 195 (Edmund H.

Bennett ed., 1st Am. ed. 1878)). Blackstone, however, acknowledged the age of full legal

adulthood is "merely arbitrary" and was as high as the age of 25 years in previous traditions. 1 William Blackstone, *Commentaries* at 452.

But, under the common law (and throughout our nation's history), age requirements were "different for different purposes." *Id.* at 451. For instance, the common law permitted males to take oaths of allegiance at 12, exercise legal discretion in choosing a guardian (females had a similar right), and serve as executors at age 17 (same for females). *Id.* Likewise, the law permitted unrestricted capital punishment for anyone fourteen years old or above. *Id.* at 452.

Thus, the arbitrary and inconsistent nature of the age of majority at common law and its numerous exceptions fail to establish any tradition of prohibiting 18- to 20-year-olds from acquiring, keeping, and bearing handguns. Instead, the Defendants must point to a more specific "historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

Such a tradition does not exist. In fact, a far different tradition, one that affirmatively *required* 18-to 20-year-olds to keep and bear arms, existed through most of our nation's history.

"From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 14, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 n.46 (1983). Broadly speaking, in the colonial and Founding Eras, "the most common age for militia duty was 16 to 50 years. The maximum often went as high as 60. The minimum was sometimes 18, and never higher (except for one 19-year period in Virginia)." David Kopel & Joseph Greenlee, *The Second*

*Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 533 (2019) (reviewing over 250 colonial and Founding Era militia laws).

A state-by-state (colony-by-colony) review of Kopel and Greenlee's comprehensive work confirms this Founding Era tradition. *Id.*

New Jersey required 16 to 20-year-olds to be part of the militia from its first militia act in 1704 until 1792 when it raised the minimum age to 18 to conform with the federal militia law. *Id.* at 536-539 (reviewing numerous New Jersey militia laws). In 1780, New Jersey articulated a requirement that members of the militia, including 16 to 20-year-olds equip themselves with firearms. *Id.* at 537-38 (quoting 1780 N.J. Laws 42-43).

From at least 1654 to 1793 when it raised the minimum age of 18 to align with federal law, Maryland required 16 to 20-year-olds to be part of the militia. *Id.* at 540-44. Maryland required militia members to provide and keep their own weapons regardless of age from its earliest militia laws. *Id.*

North Carolina employed a more complicated scheme in its earliest militia laws. Its earliest law in 1664 required all individuals between 17 and 60 bear arms. *Id.* at 544. It also provided additional land grants for every armed person above the age of 14. *Id.* In 1715, North Carolina began to standardize its militia acts and required every man between 16 and 60 to provide themselves with firearms and ammunition. *Id.* at 545. Until it raised the minimum militia age to 18 in 1785, North Carolina required 16-20-year-olds to provide themselves with firearms and ammunition and serve in the militia. *Id.* at 544-48 (reviewing North Carolina militia enactments).

22

South Carolina enacted its first militia law in 1703 before it formally separated from North Carolina and required 16 to 20-year-olds to serve in the militia and to provide their own firearms and ammunition. *Id.* at 548. Its subsequent enactments kept the minimum age for militia service and obtaining and keeping arms at 16 years old until 1784 when it raised the minimum age to 18. *Id.* at 548-551 (reviewing South Carolina militia laws).

New Hampshire began its tradition of militia laws in 1687 by setting the minimum age for its militia requirement at 16. *Id.* at 551. Like other colonies, New Hampshire required militia members to provide their own weapons. *Id.* at 551-52. This tradition – the minimum age of 16 and the self-provision of arms – endured until 1792 when the minimum age was raised to 18 (the self-provision of arms requirement remained unaffected). *Id.* at 551-55. New Hampshire then reversed course in 1795 and lowered the minimum age back to sixteen in 1795. *Id.* at 555.

Delaware's first militia law derived from a 1671 New York law that set the minimum age at 16. *Id.* at 555-56. It passed its first militia statute in 1740 setting the minimum age at 15. *Id.* at 556. A year later, it raised the minimum age to 17. *Id.* This minimum age remained in effect until 1778 when the minimum age was raised to 18. *Id.* at 556-57. Like most colonies, Delaware generally maintained a tradition of requiring militiamen or their parents to supply their own arms. *Id.* at 555-559. Its 1793 militia act, however, contained a carveout that exempted men under the age of 21 from the requirement of self-providing arms and ammunition or serving in the militia, except during times of rebellions or invasions. *Id.* at 558.

Pennsylvania's militia history is complicated by its Quaker tradition. When it was governed by New York, it was subject to a 1671 militia law that required everyone 16 to 60 to

serve in the militia and to provide their own arms and ammunition. *Id.* at 559-560. This law endured until 1681 when the English Crown granted the colony to William Penn, whose pacifist Quaker government allowed the militia laws to expire. *Id.* at 560. In 1755, Pennsylvania reversed course and formalized volunteer militias while respecting the Quakers' religious convictions of pacifism. *Id.* at 560-61. After decades of attempting to accommodate conscientious objectors, Pennsylvania enacted a compulsory militia law in 1777 setting the minimum age at 18. *Id.* at 562. Pennsylvania continued to grapple with its militia requirements and the conscientious objector issue after this law, but its minimum age remained the same. *Id.* at 562-64. Like Delaware, it adopted a carveout that exempted men under the age of 21 from mandatory militia service in peacetime. *Id.* at 563-64.

New York set the minimum militia requirement age at 16 in 1665 and imposed a requirement that militia members were to provide their own firearms and ammunition. *Id.* at 564. In 1691, New York lowered the minimum age to 15 until it raised it back to 16 in 1702. *Id.* at 565. This minimum age endured until New York aligned its laws with federal law in 1793 and raised the minimum age to 18. *Id.* at 567.

Rhode Island established its militia in 1673 and set the minimum age for required service at 16. *Id.* at 568. Like many of its sister colonies, it required all militia members to provide their own arms and ammunition. *Id.* at 568. The minimum age of 16 endured until Rhode Island aligned with federal law and raised the minimum age to 18. *Id.* at 568-570.

Vermont asserted its independence from New York and New Hampshire in 1777. *Id.* at 570. In 1779, it enacted a militia statute that required all males from 16 to 50 to bear arms.

*Id.* at 572. Vermont, like New Hampshire, did not alter its laws to align with the age requirements of the federal militia law. *Id.* at 570-73.

Viriginia's early colonial tradition is hardly clear because its laws often did not articulate age ranges. Some, however, did. In 1645, it adopted a law that permitted the drafting of men from 16 to 60 to fight Indians. *Id.* at 575. In 1676, it linked the minimum age to taxation, which necessarily covered 16- to 20-year-olds (considered taxable at the time). *Id.* at 575. Virginia's first comprehensive militia act, adopted in 1705, required all males between 16 and 60 to serve in the militia and provide their own arms. *Id.* at 577. This tradition was briefly interrupted by Virginia's 1738 militia act, which set the minimum age at 21. *Id.* at 579. Viriginia reversed course in 1757 though and set the minimum age at 18. *Id.* at 579. After the American Revolution began, Virginia set the minimum militia age at 16. *Id.* at 580. This endured until 1784 when it was switched back to 18. *Id.* at 582. It did not change thereafter. *Id.* at 582-83.

Massachusetts required every person 18 and older to come to assemblies with self-provided firearms and ammunition as early as 1637. *Id.* at 584. In 1645, it adopted a statute that required all individuals between 10 and 16 years old to receive instruction in the use of weapons. *Id.* at 584. The tradition of militia members being 16 and older endured and was noted by British officers in the early days of unrest in the colonies. *Id.* at 585.

In 1791, Georgia required all males between 16 and 50 to serve in the militia and provide their own arms. *Id.* at 587.

Connecticut did not lag behind. In 1637, it adopted a law that required all persons above 16 to bear arms. *Id.* at 588. This tradition endured through the Founding Era. *Id.* at 588-89.

The ratification of Article I, § 8, Cl. 15 & 16 of the Constitution made militia duty a subject of national policy. The ratification of the Second Amendment by the First Congress further underscored that militia duty had national policy importance. In view of these principles, the Second Congress promptly exercised its power to organize the militia by enacting the first federal militia act, which provided that "every free able-bodied white male citizen… *who is or shall be of the age of eighteen years*, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." 1 Stat. 271 (emphasis added).

The first Militia Act provides extraordinarily powerful evidence that Second Amendment rights vested at age 18. "[M]any of the members of the Second Congress were also members of the First, which has drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570. Their understanding was apparent by their consideration of Secretary of War Henry Knox's proposal to engage in intensive training of males aged 18 to 20 as "the advanced corps." 1 Annals of Cong. app. 2146, 2153-54. Knox's plan implied that these 18- to 20-year-olds would be armed by the federal government. *Id.* at 2145-46. The prospect of the federal government arming 18- to 20-year-olds drew stiff opposition from Congress because representatives believed that doing so would also give the federal government the unacceptable power to disarm 18- to 20-year-olds:

> Representative Wadsworth warned that supporters of the federal arming proposal seemed to be suggesting that large segments of the population would be armed by the government, with the attendant dangers: "At first it appeared to be intended for the benefit of poor men who were unable to spare money

> enough to purchase a firelock: but the gentleman from Delaware (Mr. Vining) had mentioned apprentices and young men in their non-age: he would be glad to know whether there was a man within these walls, who wished to have so large a proportion of the community by the United States, and liable to be disarmed by the government, whenever it should be thought proper." Masters could be expected to furnish arms to their apprentices. As to other young men, "their parents would rather give them guns of their own, than let them take others from the U.S. which were liable to be taken away at the very moment they were most wanted."

Kopel and Greenlee, at 592-93 (quoting 14 Documentary History of the First Federal Congress: Debates in the House of Representatives 62 (1992)).

In sum, there was universal agreement during the Founding Era that 18- to 20-year-olds had both the right and the duty to keep and bear arms. *See United States v. Miller*, 307 U.S. 174, 179 (1939) (recognized that militia membership presupposed personal firearm possession because "When called for service these men were expected to appear bearing arms supplied by *themselves*") (emphasis added).

The undersigned could locate only two pre-Civil War laws which prohibited anyone from giving a pistol to a minor. 1856 Ala. Acts 17; 1856 Tenn. Pub. Acts 92. The scope of the Alabama statute, however, remains elusive because it prohibits giving a minor an "air gun or pistol." 1856 Ala. Acts 17. It is silent as to whether a minor could be given a more traditional firearm. Neither statute, however, defined the age of a minor or prohibited giving a minor a rifle or a shotgun. In any event, the existence of two isolated statutes of this nature falls far short of establishing the national and representative historical tradition that *Bruen* requires.

The undersigned have located three other laws from the Reconstruction Era (1865-1877) that prohibited the transfer of weapons such as pistols, dirks, bowie knives, etc. to those who had not attained a minimum age. 1873 Ky. Acts 359; 1875 Ind. Acts 86; 1876 Ga. Laws

112. Of these, only the Kentucky and Georgia laws used the term "minor" to describe the class of prohibited persons. Indiana prohibited the transfer of weapons and ammunition to "any person, under the age of twenty-one years." 1875 Ind. Acts 86. Lastly, Kentucky's law only prohibited the sale of a deadly weapon to a minor and did not prohibit a minor from being given weapons or possessing them. 1873 Ky. Acts 359.

In other words, it took more than 80 years after the ratification of the Second Amendment for a single state to prohibit the transfer of weapons and ammunition to anyone under 21. This also stands as a far cry from the well-established and representative historical analogue that *Bruen* requires.

Even assuming that post-Reconstruction history is relevant,[4] the few somewhat analogous laws from the relevant periods the undersigned could locate[5] provide scant support

---

[4] "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S.Ct. at 2136. Courts must not give "postenactment history more weight than it can rightly bear." *Id.* at 2136. "[B]ecause post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Id.* at 2137 (cleaned up). Thus, *Bruen* instructs courts to treat "mid- to late-19th century" evidence as "mere confirmation" of what early history has established. *Id.* at 2137.

[5] While some other state laws may on first blush appear temptingly similar, a closer analysis clearly shows they either do not touch or even approach the conduct challenged here, or their enactment dates are far removed from the relevant periods prescribed by *Bruen*. For example:

- Mississippi enacted an 1878 law that prohibited students of any university, college or school from carrying weapons concealed in any form. 1878 Miss. Laws 175–76. This law, however, appears to be more of a locational restriction than a general prohibition on the carrying or possession of firearms by anyone of a certain age.

- Missouri enacted an 1883 law that prohibited the sale or transfer of firearms to minors without parental consent. Mo.Rev.Stat. § 1274 (1879). Kansas also enacted a similar prohibition in 1883. 1883 Kan. Sess. Laws 159. Wisconsin enacted a broader prohibition that prohibited not only the transfer of handguns to minors, but also the carrying of

for any longstanding tradition of preventing individuals from effectively defending themselves with handguns simply because they are under 21-years-old.

Ultimately, the Defendants cannot carry their historical burden here. "Post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 142 S.Ct. at 2137 (cleaned up). *Heller* established that the Second Amendment announced "the purpose for which the right was codified: to prevent the elimination of the militia." *Heller*, 554 U.S. at 595, 599. It did so by guaranteeing an individual right to acquire, keep, and bear arms to all person "physically capable of acting in concert for the common defense." *Heller*, 554 U.S. at 595 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (cleaned up). As the discussion above shows, that guarantee unquestionably included a right for 18 to 20-year-olds to acquire, keep, and bear arms. Thus, the Defendants cannot carry their historical burden here, and the Court should conclude that the Plaintiffs have demonstrated a likelihood of success on the merits.

### C. There Is No Historical Tradition Of Banning Legal Adults From Acquiring, Keeping, And Bearing Arms.

If the Court entertains some doubt as to the historical guarantee of Second Amendment rights to 18 to 20-year-olds, the Defendants still cannot overcome their burden

---

handguns by minors. 1883 Wis. Sess. Laws 290.  Like the previously discussed Reconstruction laws, these laws are silent about a specific age.

- Maryland and Louisiana enacted laws prohibiting the transfer of handguns to minors under the age of twenty-one years. 1882 Md. Laws 656; 1890 La. Acts 39. These laws, however, post-date the ratification of the Second and Fourteenth Amendments by decades and are outliers for their age restrictions.

Even if these laws were relevant to the case at bar – which they are not -- invoking these isolated instances falls far short of establishing a long-standing national tradition.

to show that they can categorically prohibit legal adults from acquiring, keeping, and bearing handguns for self-defense and all other lawful purposes. Nothing in our nation's history permits any government to disarm adults who enjoy all of the rights and privileges of adult citizenship.

At 18 years old, all U.S. citizens, including the individual Plaintiffs and all similarly situated members of CCDL and SAF, enjoy, *inter alia*, the following rights, responsibilities, and opportunities of citizenship:

- Voting – U.S. Const. Amend. XXVI;

- Fully exercising the freedoms of speech, assembly, and petitioning of the government under the First Amendment;

- Enjoying the full panoply of liberty protections and rights guaranteed by the Third, Fourth, Fifth, Sixth, Seventh, and Eighth Amendments;

- Enjoying the unenumerated rights and liberties guaranteed by the Fourteenth Amendment;

- The right to enter into contracts;

- The opportunity (and were the draft reinstated, the obligation) to serve in the United States military as well as the militias and guards of the several states.

Federal law recognizes all able-bodied males between 17 and 45 years of age as members of the "militia of the United States." 10 U.S.C. § 246. All male citizens between 18 and 26 are required to register with the Selective Service system for military service if a draft becomes necessary. 50 U.S.C. § 3802(a).

Connecticut law provides similar responsibilities and opportunities[6]:

> All male citizens and all male residents of the state who have declared their intention to become citizens of the United States, between the ages of eighteen and forty-five years, not exempt by law, shall be subject to military duty and designated as the militia. All female citizens and all female residents of the state who have declared their intention to become citizens of the United States, between the ages of eighteen and forty-five years, may enlist voluntarily in any women's unit of the armed forces of the state.

Conn. Gen. Stat. § 27-1.

Lastly, Connecticut law specifically recognizes that anyone over the age of 18 is a legal adult:

> Except as otherwise provided by statute, on and after October 1, 1972, the terms "minor", "infant" and "infancy" shall be deemed to refer to a person under the age of eighteen years and any person eighteen years of age or over shall be an adult for all purposes whatsoever and have the same legal capacity, rights, powers, privileges, duties, liabilities and responsibilities as persons heretofore had at twenty-one years of age, and "age of majority" shall be deemed to be eighteen years.

Conn. Gen. Stat. § 1-1d.

In short, 18 to 20-year-olds enjoy full recognition and privileges as legal adults in our society. They are free to leave the protection of their parents and make their own way in the world. The Second Amendment entitles them to the means necessary to protect themselves as independent members of our communities. There is no historical basis to deny them their

---

[6] Connecticut is not alone. For example, Louisiana includes all "able-bodied persons between the ages of seventeen and sixty-four residing in this state and who are not exempt by the laws of the United States of America or of this state… [in] the militia of Louisiana…" and subjects them to "military duty." LA.R.S. § 29:3(A). So does California, which makes "all able-bodied male citizens… between the ages of eighteen and forty-five…" part of its militia. Cal. Mil. and Vet. Code §§ 121, 122.

Second Amendment rights because they are no longer minors in the law's eyes. Thus, the

Court should find that the Plaintiffs have demonstrated a likelihood of success on the merits.

**D. The federal and Connecticut handgun bans violate the Equal Protection guarantees of the Fifth and Fourteenth Amendments by discriminating against 18 to 20-year-olds with respect to their fundamental right to keep and bear arms for self-defense and other lawful purposes.**

"Under the Equal Protection Clause, claims that the government has discriminated

based on age are typically subject to rational basis review because age is not a suspect

classification." *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 158

(2d Cir. 2023) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 470 1991). "Where an age-based

'classification impermissibly interferes with the exercise of a fundamental right or operates to

the peculiar disadvantage of a suspect class,' however, strict scrutiny applies." [7] *Id.* (quoting

*Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976)). "Under strict scrutiny, the government

must adopt 'the least restrictive means of achieving a compelling state interest,'" *Americans for*

*Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464,

478 (2014)).

In this case, the federal and Connecticut handgun bans unquestionably interfere with

the Plaintiffs' fundamental Second Amendment rights to obtain and keep handguns for self-

---

[7] In *Ramos v. Town of Vernon*, 353 F.3d 171 (2003), the Second Circuit applied intermediate scrutiny to a curfew law which discriminated against persons under 18 by restricting their fundamental right to travel. However, the court chose to apply intermediate, rather than strict, scrutiny only because the affected persons were *children*. *See id.* at 176-80 (discussing differing analytical approaches to minors' rights). "Because the curfew limits the constitutional right to free movement within the Town of Vernon at certain hours of the night, we assume that were this ordinance applied to adults, it would be subject to strict scrutiny." *Id.* at 176. Thus, *Ramos* does not alter the conclusion that strict scrutiny applies in this case, where the class of persons against whom the federal and Connecticut handgun bans discriminate based on age are adults, not minors.

defense in their homes – *Heller*, 554 U.S. at 636 – and to obtain and carry handguns for self-defense in public – *Bruen*, 142 S.Ct. at 2134, 2156. Until the Defendants prove otherwise by historical evidence, the Second Amendment presumptively guarantees the Plaintiffs' right to do so. *Id.* at 2135.

It does not fall to the Plaintiffs to guess what the Defendants' interests are here, but such claims are not so compelling as to justify categorically depriving an entire class of law-abiding adults of their fundamental constitutional right to bear arms. For instance, if the Defendants argue that they have a compelling interest in restricting the ability of 18- to 20-year-olds to obtain handguns by assuming the psychological immaturity of 18- to 20-year-olds, *Rahimi* has already rejected the proposition that adults may be disarmed because they are not "responsible." *Rahimi*, 144 S.Ct. at 1903. Nor is potential psychological immaturity. "Since time immemorial, teenagers have been, well, teenagers. The 'general societal problem' of teenage impetuousness and rashness far proceeded the Founding…. Yet, that fact notwithstanding…, the Founders [did not deal] with this problem in a 'distinctly similar' way to the [federal and Connecticut handgun bans]." *Fraser v. Bureau Alcohol, Tobacco, Firearms and Explosives*, 672 F.Supp.3d 118, 145 (E.D.V.A. 2023) (cleaned up). In other words, psychological immaturity has never been a compelling justification to categorically disarm an entire category of law-abiding adults based solely on their age.

Furthermore, national statistics will not show that 18 to 20-year-olds are markedly more likely to commit violent crime than any category of persons who are permitted to possess handguns. For example, in 2016, FBI statistics indicated 10.3% of persons arrested for violent crimes were between 18 and 20, 14.7% were between 21 and 24, 16.9% were between 25 and

29, and 13.6% were between 30 and 34. *See* FBI, 2016 Crime in the United States, Table 20, https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/tables/table-20 (last visited Feb. 16, 2025). Violent crime rates fell off dramatically after age 40. *Id.* In other words, 18 to 20-year-olds are statistically less likely to commit violent crimes than any other age demographic prior to 40. But no U.S. jurisdiction discriminates against 22-year-olds' right to bear arms, let alone 30-year-olds' or 39-year-olds'. Thus, there is simply no statistical data to justify a claim that 18 to 20-year-olds pose a greater danger to public safety than their fellow adult citizens.

Other demographic disparities exist. Well over half of all violent-crime arrestees were white, while the percentage of black of African American arrestees was disproportionately high compared to the population. *See* FBI, 2016 Crime in the United States, Table 21, https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21 (last visited Feb. 16, 2025). The strongest demographic predictor of violent crime is probably sex, with men committing about 90% of such crimes. Orjan Falk *et al*, *The 1% of the Population Accountable for 63% of all violent crime convictions*, Soc. Psychiatry Psy. Epid., Vol. 49, Issue 4, pp. 559-571, at p. 560 (Oct. 2013) ("Among known risk factors for being convicted of a violent crime, male sex is the most prominent; men commit about 90 % of violent crimes").[8] Yet no one even tries to discriminate between males' and females' right to bear arms. The Plaintiffs do not believe the Defendants would argue to this Court that firearms

---

[8]    Accessed    through    NIH,    National    Library    of    Medicine, https://pmc.ncbi.nlm.nih.gov/articles/PMC3969807/#:~:text=Among%20known%20risk %20factors%20for,crimes%20%5B1%2C%203%5D (last visited Feb. 16, 2025).

regulations may lawfully discriminate based on either race or sex without offending equal protection. So why is age any different?

The answer is age is not any different. Not when it comes to a fundamental right. As shown above, the same fundamental right to keep and bear arms for lawful purposes (and centrally for self-defense) belongs to 18 to 20-year-olds as much as to 40-year-olds, and as much as it belongs to white persons and black persons and to men and to women.

In sum, the Defendants must establish a compelling interest specific to 18 to 20-year-olds to prevail in a strict scrutiny analysis, not a generalized claim of public safety interests. They cannot do so, and that is fatal in a strict scrutiny analysis.

Even assuming *arguendo* the Defendants can establish a compelling interest, the federal and Connecticut bans must be narrowly tailored to survive strict scrutiny. For a myriad of reasons, they are not. First, "[t]he vast majority of violent crimes are perpetrated by a small number of persistent violent offenders, almost all males, who have an early onset of violent criminality and display substance use problems, personality disorders, and nonviolent criminality." Falk, at 569. Yet the challenged bans effectively disarm both males and females who are not criminals, are law-abiding citizens who enjoy positions of trust in the community, do not have substance-abuse problems, and are without personality disorders. They do not target or seek to address any of the most important predictors of violence, and there is no apparent reason why background checks, firearms training, and other precautionary measures which do target these factors would not mitigate public safety risks the Defendants may claim are associated with people in this specific age group, as such measures presumably do for people 21 years of age and above. As in *Worth*, the Defendants here likely cannot show "any

support for the claim that 18 to 20-year-olds, who are otherwise eligible for a public-carry permit, 'pose [such] a credible threat to the physical safety of others' that their 'Second Amendment right may ... be burdened.'" *Worth*, 108 F.4th at 694 (quoting *Rahimi*, 602 U.S. at 700).

In sum, the federal and Connecticut handgun bans lack any interest so compelling as to justify the infringement on the Plaintiffs' Second Amendment rights, and such bans are not narrowly tailored. Thus, the Court should enjoin the Defendants from enforcing the federal handgun ban and Connecticut handgun ban on Equal Protection grounds until the Court decides this case on the merits.

## IV.    The Plaintiffs Will Continue To Suffer Irreparable Harm Absent A Temporary Restraining Order And A Preliminary Injunction.

To show irreparable harm, the Plaintiffs must show that, absent a preliminary injunction, they will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.* at 118-19. Courts, however, will presume that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

There is no question that the Plaintiffs are entitled to the presumption of irreparable harm. They claim a constitutional right to keep and bear handguns for self-defense and all other lawful purposes. The federal and Connecticut handgun bans categorically prohibit the

Plaintiffs and all similarly-situated 18 to 20-year-olds from being able to lawfully obtain handguns to exercise their Second Amendment rights.

As discussed above, the Supreme Court has repeatedly established that the Second Amendment guarantees an individual right to keep and bear arms. *Bruen*, 142 S.Ct. at 2127; *Heller*, 554 U.S. at 592. Indeed, the Supreme Court has found that individual right to be a fundamental constitutional right. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The burden now falls squarely on the Defendants to justify the bans as being consistent with a well-established and representative historical tradition of limiting that right. They cannot do so.

The Plaintiffs would also meet the standard for irreparable injury notwithstanding the presumption of irreparable harm. The federal and Connecticut handgun bans and Connecticut's prohibition on the open-carrying of firearms (Conn. Gen. Stat. § 29-35) prohibits them, as a practical matter, from carrying firearms to defend themselves outside of their homes. Every day that passes that they cannot do so without facing criminal consequences is an injury that money cannot remedy. A monetary remedy is likely unavailable to the Plaintiffs due to the broad scope of qualified immunity. Declaratory and injunctive relief is their only available remedy. The Plaintiffs should not be required to wait for it, especially in a case where the Defendants bear the burden of proving the constitutionality of their conduct, a burden the Defendants simply cannot meet in this case.

## V.     The Balance Of Hardships Tips Decidedly In Favor Of The Plaintiffs.

The federal and Connecticut handgun bans categorically prohibit the Plaintiffs from obtaining, keeping, and carrying handguns – "the most popular weapon chosen by Americans

for self-defense in the home….” *Heller*, 554 U.S. at 629; *see also Bruen*, 142 S.Ct. at 2143 (stating that handguns “are, in fact, the quintessential self-defense weapon”) (quoting *Heller*, 554 U.S. at 629). Because Conn. Gen. Stat. § 29-35(a)(2) prohibits anyone from carrying a firearm with the intent to display it, it is impossible, or at the very least impracticable, for the Plaintiffs to carry a rifle or shotgun for self-defense. **Exhibit C, ¶¶ 11-12, Exhibit D, ¶¶ 13-14.** It is also unclear what weapons are available for the Plaintiffs to carry publicly in light of Connecticut’s broad prohibition against the carrying of “dangerous or deadly weapon[s] or instrument[s]….” *See* Conn. Gen. Stat. § 53-206(a).

Thus, collectively, the federal and Connecticut handgun bans – in conjunction with these other statutes – render the Plaintiffs defenseless, and there simply is no obligation for police or other government officials to protect them. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989). That is the precise, severe hardship that the Second Amendment guards against.

The Defendants may argue that issuing a temporary restraining order and a preliminary injunction would create substantial hardships for them if they prevail on the ultimate merits of this case. That would simply not be the case.

First, Connecticut law contains two provisions that allow Defendant Higgins to revoke Connecticut pistol permits and pistol eligibility certificates. Conn. Gen. Stat. §§ 29-32, 29-36i. Those provisions require holders of those permits and certificates to surrender them within 5 days. Conn. Gen. Stat. §§ 29-32, 29-36i.

Second, Connecticut law directs Defendant Higgins to develop a protocol for the surrender pistols, revolvers, and other firearms when a person becomes ineligible to possess

them. Conn. Gen. Stat. § 29-36n. Defendant Higgins and his predecessors have developed, and currently employ such a protocol.

Two of the undersigned (Attorneys Atkinson and Fishbein) have aided clients in surrendering their pistol permits and firearms to Connecticut law enforcement on multiple occasions when they became ineligible to do so pursuant to this protocol. On at least one occasion, Attorney Atkinson has aided a client in surrendering his pistol permit and handguns to the Connecticut State Police in compliance with a direct order of this Court. *See United States v. Trovoy Dixon*, No. 3:24-cr-00050-VDO, Dkt. 5, p. 2 (D.Conn. Mar. 8, 2024).

In the event that the Defendants prevail on the final merits of this case after the Court issues preliminary relief, the individual Plaintiffs would surrender any permits or certificates and handguns that they have acquired to the Connecticut State Police as soon as possible, and the undersigned would help the Plaintiffs to do so. Plaintiffs CCDL and SAF would also notify their 18 to 20-year-old members to do so, and the undersigned would be available to assist as needed. Moreover, the Defendants will have the ability to halt firearms sales to 18 to 20-year-olds and to revoke their permits independent of any action taken by the Plaintiffs. Thus, there would not be any undue administrative burdens, nor any inability to reverse the effects of preliminary injunctive relief, should such reversal become necessary.

The balance of hardships, therefore, weighs decidedly in the Plaintiffs' favor.

## VI. The Public Interest Will Be Served By A Temporary Restraining Order And A Preliminary Injunction.

The Second Amendment is not a "second class right" and the Supreme Court has made it abundantly clear that lower courts shall no longer treat it as such. *McDonald*, 561 U.S. at 780. Courts can no longer interest balance away the people's Second Amendment rights. The

Supreme Court stated in *Bruen* that "[t]he Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (cleaned up) (emphasis in original). Thus, the U.S. Constitution "demands" courts' "unqualified deference" to the Plaintiffs' Second Amendment rights. *Id.* at 2131.

As such, the public has no interest in any law that completely bars the Plaintiffs from exercising their Second Amendment rights. Rather, the public interest – as expressed throughout our nation's history and tradition – has been to encourage, and even require, the Plaintiffs and similarly-situated 18 to 20 year olds, to keep and bear arms.

Issuing a temporary restraining order and a preliminary injunction will restore Second Amendment rights to the Plaintiffs, will not endanger public safety, and will be consistent with the historical expressions of our nation's public interest. Thus, the public interest favors emergency relief in this case.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully ask the Court to issue an emergency temporary restraining order and a preliminary injunction enjoining the Defendants from enforcing 18 U.S.C. § 922(b)(1), 18 U.S.C. 922(c), 18 U.S.C. §924(a)(1)(D), and 27 C.F.R. § 478.99(b)(1) (collectively, the "federal handgun ban") and Conn. Gen. Stat. § 29-28(b) Conn. Gen. Stat. § 29-34(b), Conn. Gen. Stat. § 29-34(b), and Conn. Gen. Stat. § 29-36f (collectively, the "Connecticut handgun ban"). Given the clear violations of the Plaintiffs' constitutional rights, they request that the Court issue the temporary restraining order on an *ex parte* basis or at the earliest possible time that all parties can be heard.

Dated: February 18, 2025                    Respectfully submitted,

                                            _//s// Doug Dubitsky_____
                                            Doug Dubitsky, Esq.
                                            (ct21558)
                                            LAW OFFICES OF DOUG DUBITSKY
                                            P.O. Box 70
                                            North Windham, CT 06256
                                            Telephone: 860.933.9495
                                            Facsimile: 866.477.1120
                                            Email: doug@lawyer.com


                                            _//s// Craig C. Fishbein_____
                                            Craig C. Fishbein, Esq.
                                            (ct25142)
                                            FISHBEIN LAW FIRM, LLC
                                            100 South Main Street
                                            P.O. Box 363
                                            Wallingford, Connecticut 06492
                                            Telephone: 203.265.2895
                                            Facsimile: 203.294.1396
                                            E-mail: ccf@fishbeinlaw.com

                                            _//s// Cameron L. Atkinson_____
                                            Cameron L. Atkinson, Esq.
                                            (ct31219)
                                            ATKINSON LAW, LLC
                                            122 Litchfield Rd., Ste. 2
                                            P.O. Box 340
                                            Harwinton, CT 06791
                                            Telephone: 203.677.0782
                                            Email: catkinson@atkinsonlawfirm.com

                                            *Attorneys for the Plaintiffs*

## CERTIFICATION REGARDING SERVICE

The undersigned has attempted to identify counsel for each of the Defendants. He has been partially successful.

The following counsel – identified by the Defendants they represent – have been forewarned of this filing and will be served ECF-stamped copies of this pleading by email immediately following its filing:

*For Defendants Ronnell Higgins, Margaret A. Kelley, and Paul J. Narducci*

James Belforti, Esq.
Terrence O'Neill, Esq.
Janelle Medeiros, Esq.
Connecticut Attorney General's Office
110 Sherman Street,
Hartford, CT 06105
860-808-5450
james.belforti@ct.gov
terrence.oneill@ct.gov
janelle.medeiros@ct.gov

*For Defendant John Bucherati:*

Richard J. Buturla, Esq.
Berchem Moses, PC
75 Broad Street
Milford, CT 06460
203-783-1200
rburturla@berchemmoses.com

*For Defendant Patrick Daley:*

Michael Driscoll, Esq.
Colonese Law, LLC
55 Main Street, Ste. 340
Norwich, CT 06360
860-892-7208
MED@coloneselaw.com

The undersigned spoke with Jason Lynch, a trial attorney from the U.S. Department of Justice, approximately a week before this case was filed and received instructions to contact the U.S. Attorney's Office for the District of Connecticut with notice of this filing. The undersigned has been unable to get in touch with their civil office, and, to notify Defendant Bondi, he will mail an ECF-stamped copy of this pleading to the U.S. Attorney's Office for the District of Connecticut by overnight mail on February 19, 2025 since the Post Office is closed at the time of filing.

/s/ Cameron L. Atkinson /s/