# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

ZACHARY SUCCOW, ET AL : No. 3:25-cv-00250-SVN
*Plaintiff* :
:
v. :
:
PAMELA J. BONDI, ET AL :
*Defendants* : MARCH 3, 2025

## State Defendants' Opposition to Plaintiffs' Application for a Temporary Restraining Order

Plaintiffs Zachary Succow, Samuel Towne, Connecticut Citizens Defense League, Inc., and Second Amendment Foundation, Inc. claim to be harmed by the age-based restrictions in General Statutes §§ 29-28(b), 29-34(b), and 29-36f and seek to enjoin those laws, immediately. (*See* ECF No. 4, ¶ 2.) Plaintiffs' manufactured assertion of an immediate irreparable harm is not enough to support such extraordinary relief. Plaintiffs have not met their burden to show that a temporary restraining order is appropriate at all—let alone before any party has prepared an appropriate record addressing the merits of a complicated constitutional claim. Therefore, Defendants Ronnell Higgins, Margaret A. Kelley, and Paul J. Narducci (the State Defendants) respectfully request that Plaintiffs' application for a temporary restraining order (ECF No. 4) be denied.[1]

## I.    Background.

Connecticut's pistol permit and handgun eligibility certificate licensing system

---

[1] As of the morning of March 3, 2025, the State Defendants have not been served with process. State Defendants file the instant brief pursuant to the Court's order (ECF No. 28, *Nagala, J.*), but reserve the right to raise any appropriate defense under Rule 12(b) and do not waive any such defense.

1

is implemented through a complex statutory scheme and involves coordination between the Connecticut State Police (CSP) and local authorities in each of Connecticut's 169 towns and cities. *See* Conn. Gen. Stat. § 29-28; Decl. of Detective Brindiana Warenda (Warenda Decl.) attached as Exhibit A, ¶¶ 5-6.  The licensing system is also one of Connecticut's most critical public health protections.  Enjoining the age-based restrictions in this scheme is not an isolated change—it would impact the entire licensing system, to the severe detriment of the public interest and public health.

The licensing process generally begins with General Statutes § 29-28(b), which enables an individual to apply to their local authority—meaning "either the chief of police, chief executive officer, or designated resident state trooper or state police officer, as applicable" of the jurisdiction where the individual lives—for a temporary state permit to carry a handgun. The local authority may then "issue a temporary state permit . . . provided such authority shall find that such applicant intends to make no use of any pistol or revolver . . . other than a lawful use and that such person is a suitable person to receive such permit," as well as subject to numerous other criteria, including the restriction on issuing a permit to an applicant younger than 21. *Id.* To make those findings, the local authority must review the application, conduct a criminal background check, and investigate the applicant's suitability, as necessary. *Id.* The local authority must inform the applicant of its decision approving or denying the application within eight weeks. Section 29-28a(b)(1). Once the local authority has approved and issued a temporary state permit (enabling the applicant

to legally obtain a handgun), the local authority forwards the original application to the Commissioner of Emergency Services and Public Protection (the Commissioner), who, in turn, may issue a state permit to carry to the individual applicant. Section 29-28a(b).

Section 29-36f separately enables an individual to apply to the Commissioner for an eligibility certificate, which allows the individual to receive or possess a pistol or revolver. Section 29-34(b) prohibits individuals from providing a pistol or revolver to individuals younger than 21 except in limited, temporary circumstances.

## II.    Standard for TRO seeking a mandatory injunction.

Plaintiffs cannot meet the elevated standard necessary to disrupt the status quo and enjoin the State Defendants' actions taken in the public interest pursuant to the existing licensing scheme. "To obtain a preliminary injunction that will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (citation and quotation marks omitted). "The movant must also show that the balance of equities supports the issuance of an injunction." *Id.*, 280. "Where the movant seeks a mandatory injunction (one that will alter the status quo) rather than a prohibitory injunction (one that maintains the status quo), the likelihood-of-success standard is elevated: the movant must show a clear or

3

substantial likelihood of success." *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005).  Here, the higher standard applies.

In light of that elevated standard, a temporary restraining order that would alter the status quo, like the order Plaintiffs seek, is generally denied as a matter of course. "The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (quotation marks and citation omitted); *see, e.g.*, *Goldstein v. Hochul*, 2022 U.S. Dist. LEXIS 243665, at *7 (S.D.N.Y. Sep. 30, 2022) (denying TRO that sought to enjoin a law that had been in effect for a month); *Jack's Egg Farm, Inc. v. GMTC Food Services, LLC*, 2023 U.S. Dist. LEXIS 26624, at *1-2 (E.D.N.Y. Feb. 16, 2023) (denying TRO that would alter status quo); *Gillums v. Semple*, 2018 U.S. Dist. LEXIS 115772, at *15-16 (D. Conn. July 12, 2018) (same). Plaintiffs offer no reason that would support a different result here.

### III.    Plaintiffs have not—and cannot—meet the elevated likelihood-of-success on the merits factor required for a TRO.

Consistent with the Court's order, (ECF No. 28, *Nagala, J.*), the State Defendants will not provide substantive analysis of the merits issue here. However, because Plaintiffs' arguments rely on an incorrect recitation of the merits factors for this type of preliminary injunction, some clarification of the standard is necessary. (See ECF No. 4-1, p. 9). Plaintiffs erroneously cite a less restrictive TRO standard from *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010), which relieves the movant's burden of demonstrating

4

"a likelihood of success on the merits" if they can instead to show "serious questions on the merits and a balance of hardships decidedly favoring the moving party." That is not the appropriate standard in this case. Rather, because Plaintiffs are seeking a mandatory injunction that would affect government action taken in the public interest, Plaintiffs can only succeed on their request for a TRO by demonstrating "a clear or substantial likelihood of success" on the merits. *See Hoblock*, 422 F.3d at 97. Plaintiffs' obviously flawed, one-sided presentation of the legal issues, which the State Defendants have not had the opportunity to rebut, is not an appropriate basis for a TRO. Therefore, Plaintiffs' application should be denied based on the merits factor, without any need to consider the others. However, for the sake of completeness and in light of the Court's order, the State Defendants discuss the remaining factors.

## IV.    The Preliminary Injunction Factors Favor the State Defendants.

An assessment of the claimed harms, public interest, and provable equities weighs totally in favor of the State Defendants. Regardless of Plaintiffs' claimed harms, an order enjoining General Statutes §§ 29-28(b)(10)[2], 29-34(b), 29-36f would not provide the ultimate relief they seek: the ability to obtain or possess a handgun. However, such an order would profoundly strain the firearm permitting system and

---

[2] At the Feb. 25, 2025 status conference, Plaintiffs' counsel represented that Plaintiffs are only seeking to enjoin Conn. Gen. Stat. § 29-28(b)(10), as opposed to the entirety of subsection (b), which prohibits convicted felons and other violent criminals, among others, from applying for a pistol permit. See § 29-28(b)(1)-(b)(9).  But that is not what is alleged in their papers, Plaintiffs filings refer to the entirety of subsection (b). A broader challenge that would seek to enjoin subsection (b) as to all of the currently restricted categories of applicants would be inappropriate for many reasons only some of which are addressed herein.  State Defendants request leave to address all of those concerns if this Court is in fact considering entering injunctive relief on all of subsection (b), which Plaintiffs appear to have disavowed.

harm the public interest in the efficient and effective operation of the firearm licensing scheme.

### a. Plaintiffs' "irreparable harms" are profoundly overstated.

Plaintiffs should not be heard to complain that they will suffer immediate irreparable harm without a TRO. "[A]n allegation of a constitutional violation is not a magic wand that can be waved to conjure up irreparable harm." *Stallworth v. Joshi*, 2017 U.S. Dist. LEXIS 219931, at *22 (S.D.N.Y. Nov. 22, 2017). "[I]rreparable harm exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024). "To demonstrate a likelihood of irreparable harm, the plaintiff bears the burden of showing that 'the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages.'" *Carter v. Sewell*, 2023 U.S. Dist. LEXIS 194682, at *2 (S.D.N.Y. Oct. 31, 2023) (quoting *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir. 1995)). That is true "[e]ven in cases involving alleged constitutional injuries[.]" *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 50 (N.D.N.Y. 2024) (collecting cases). Indeed, "the mere allegation of a constitutional infringement itself does not constitute irreparable harm." *New York State Firearms Assn. v. Nigrelli*, 2023 U.S. Dist. LEXIS 222331, at *4-5 (W.D.N.Y. Sep. 21, 2023) (quoting *Lore v. City of Syracuse*, U.S. Dist. LEXIS 26942, 2001 WL 263051, at *6 (N.D.N.Y. Mar. 9, 2001)). That presumption is triggered only when the deprivation "'is convincingly shown and

6

that violation carries non-compensable damages.'" *Id.* (quoting *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012)).

### i. Manufactured urgency undermines any claim of irreparable harm.

Critically, in light of Plaintiffs' posture, that "'presumption of irreparable harm is inoperative if the plaintiff has delayed' in moving for temporary injunctive relief." *Carter*, 2023 U.S. Dist. LEXIS 194682,, at *3 (*quoting Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). Far from demonstrating any urgency in acting to address an "irreparable harm," Plaintiffs waited more than a year after turning 18 before commencing this lawsuit. Zachary Succow waited over thirteen months before suing to challenge these laws. Samuel Towne waited over seventeen months. In the Second Circuit, "delays of as little as ten weeks" have been found "sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction." *Weight Watchers Int'l., Inc. v. Luigino's Inc.*, 423 F.3d 137, 144 (2d Cir. 2005); *see also Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (collecting cases); *Carter*, 2023 U.S. Dist. LEXIS 194682 at *2 (denying TRO in Second Amendment case due to 8-month delay in filing). Even where plaintiffs allege constitutional injury, a delay of nearly a year to seek relief is enough for a court to apply the doctrine of laches to deny a preliminary injunction. *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 50 (N.D.N.Y. 2024) (collecting cases and observing that 364-day delay would have supported finding of laches to deny preliminary injunction). Plaintiffs' delay of more than a year in seeking this

7

relief not only rebuts the presumption of irreparable harm, but supports applying the doctrine of laches to deny relief regardless of the presumption.

The comments of Plaintiffs' counsel at the hearing on February 25, 2025, only underscore the lack of immediacy. Plaintiffs' counsel candidly described a two-year search for plaintiffs to challenge these laws before Succow and Towne agreed. Thus, whatever late-found urgency caused Succow and Towne to bring this lawsuit, it is not the stuff of a TRO (or even a preliminary injunction).

### ii. Any harm from having to wait to possess and carry a handgun has an adequate remedy at law.

Plaintiffs' alleged harms are the product of two distinct factors: (1) not being allowed *to apply* for a pistol permit or eligibility certificate based on age, and (2) not being permitted *to obtain or carry a handgun in public* until their application is approved by a local authority. Even if the challenged statutes were enjoined and Plaintiffs were allowed to apply for a pistol permit or eligibility certificate, they still cannot obtain and carry a handgun. *See Antonyuk v. James*, 120 F.4th 941, 979 (2d Cir. 2024) (describing the distinction between injuries that flow from New York's pistol permit application criteria as opposed injuries from an eligibility determination). Without conceding that the first factor could be a considered an irreparable harm for the purposes of the TRO or preliminary injunction, the second factor is the ultimate harm Plaintiffs seek to remedy. And that harm is neither immediate nor irreparable. Rather, it is the same "harm" any other applicant could claim while they wait for a local authority to act on their application, regardless of their age. And it is remedied once the local authority approves the permit. Thus,

8

assuming, *arguendo*, that not being allowed to possess a handgun renders Plaintiffs as "defenseless" as they claim, (see ECF No. 4-1, p. 38), it is not a sufficient basis for this Court to enter a TRO.

Even if Plaintiffs could plausibly claim to be harmed while they wait for a local authority to approve a permit, it would not be immediate injury caused by the State Defendants. Rather, the wait time is a function of several unchallenged statutes that control the licensing system, as well as the operational burdens a local authority must contend with as any given application is processed.  That process takes weeks, if not months. (See Warenda Decl., ¶ 24.) Pursuant to General Statutes § 29-28(b)(1)(B), before applying Plaintiffs would still have to register for and attend an approved firearms safety course, which typically takes two to four weeks.[3] (*Id.*) Pursuant to § 29-28(b), upon receiving the application, the local authority is obligated to conduct a criminal background check, determine whether the applicant is suitable to receive a permit, and confirm that none of the other statutory restrictions listed in subsection (b)(2)-(b)(9) are present. Pursuant to General Statutes § 29-28a(b)(1), the local authority has up to eight weeks to process the application and issue its decision. Although the time may vary depending on the jurisdiction, under the current statutory scheme, it typically takes over two months for an individual to obtain a pistol permit. (See Warenda Decl., ¶ 24.)

Any "injury" to a plaintiff's Second Amendment rights that occurs while an application is processed is not irreparable—to the contrary, it is resolved once the

---

[3] It is not clear from the individual Plaintiffs' declaration that they have done so.

local authority approves the application and issues the permit. If mere delay were sufficient to establish a Second Amendment harm redressable by a preliminary injunction, then every jurisdiction's permitting, training, and background check requirements would be at risk of a facial challenge. That cannot be the case. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 80 (2022) (Kavanaugh, J., concurring) (noting that shall-issue licensing regimes, which may impose numerous requirements on applicants before issuing a permit, are constitutionally permissible, subject to an as-applied challenge).

In the meantime, the fact the Plaintiffs cannot possess or carry a handgun, standing alone, is not the type of irreparable harm that would justify special treatment by this Court.

### b. The public interest would be seriously harmed by a TRO.

In contrast to Plaintiffs' tenuous harms, an injunction would impose immediate, irreversible harms on the state and local authorities, as well as the Connecticut residents who rely on an effective handgun licensing scheme. The regulation of firearms is one of Connecticut's most critical and effective tools in protecting public health. This is especially so for the health of Connecticut's children. According to a John Hopkins study analyzing gun deaths in Connecticut, firearms were the fifth leading cause of death among children and teens ages 1-17 from 2018 to 2022. *See* John Hopkins Bloomberg School of Public Health, Center for Gun Violence Solutions, available at https://publichealth.jhu.edu/sites/default/files/2024-

10/v3-01.035-CGVS-State-Factsheets-CT.pdf. (last viewed March 1, 2025)[4]. And gun violence disproportionately affects young men in Connecticut. *Id.* ("Young Black males ages 15-34 make up 2% of the state's population but accounted for 29% of all gun homicide deaths in 2022."). The impact of even one additional gun injury or gun death in Connecticut is devastating and can cost into the millions per individual injury or a survivor family. *See* Everytown for Gun Safety, *"Economic Cost of Gun Violence | Everytown Research & Policy" available at* https://*everytownresearch.org/report/the-economic-cost-of-gun-violence/* (last viewed March 1, 2025).

A TRO would seriously jeopardize this important public health licensing system by creating: (1) confusion throughout the firearms licensing system; (2) serious operational burdens on CSP and local police departments; and (3) delays in processing the pistol permit and eligibility certificate applications of individuals who are otherwise eligible to obtain and possess a handgun. (Warenda Decl., ¶ 5.) The Court should ignore Plaintiffs' attempts to diminish or argue away those harms.

*First*, a TRO would cause confusion throughout the system, increasing the risk that mistakes are made in permitting decisions. Because of Connecticut's decentralized licensing system, CSP and all 169 Connecticut towns would have to significantly alter the process and standards they use in the licensing, carrying and

---

[4] The same John Hopkins study indicated that although Connecticut had the 6th lowest gun death rate in the country in 2022—a fact attributable to its strong gun laws—the overall gun death rate in Connecticut increased 3% in 2022 compared to 2021. And from 2013 to 2022, the gun death rate increased 57%. In 2021, there were at least 43 domestic violence-related homicides in Connecticut. 42% were by firearm.

purchasing process for firearms in Connecticut. And because there is no challenge to these statutes beyond the age restrictions, this Court is not in a position to offer guidance on how to reconcile the effect of a TRO on the licensing system, writ large. Thus, the state's Special Licensing Firearms Unit (SLFU) would have to create new guidance to educate local authorities about accepting applications from 18-20 year olds and distribute it to all 169 municipalities in Connecticut. (*Id.*, ¶ 11.) These significant changes would go into effect without any guidance from the legislature and without the lead-time that SFLU typically has to anticipate and minimize likely implementation problems. (*Id.*, ¶¶ 16-19.)

However carefully such guidance is developed, confusion is inevitable. For instance, the SFLU would have to explain how to conduct federally mandated enhanced background checks of these applicants' juvenile criminal history and mental health records, pursuant to the Bipartisan Safer Communities Act, 136 Stat. 1313, Public Law No. 117-159, a process the local authorities have not previously had to conduct. (Warenda Decl., ¶ 11.) Individuals aged 18-20 are generally recent high school graduates—and sometimes current high schoolers. Many local officials, who are often elected officials and not law enforcement officers, may not know how to investigate the suitability of an 18-20 year-old to carry a pistol in their town. (*Id.*, ¶¶ 12-13.) Thus, SFLU will be presented with difficult questions on how to assess the suitability of an 18-20 year-old applicant and it will take time to develop clear, lawful and appropriate guidance on how to process such applicants. (*Id.*, ¶¶ 11-12.)

*Second*, a TRO would impose serious operational burdens on CSP and local law

enforcement. Suspending the age-restrictions would add thousands of individuals aged 18-20 to the pool of people eligible to apply for a permit or eligibility certificate.[5] Thus, changes to the law, even if temporary, would increase the operational burden on the SLFU and local authorities as their existing staff and officers are required to undertake a number of new tasks to process a larger pool of applicants, in addition to their ordinary duties. (Warenda Decl., ¶ 21.) For instance, juvenile records may be more relevant when an applicant is between the ages of 18 and 20. (*Id.*) These individuals may also be more likely to live in a household with others with a wide range in age, such as younger siblings. However, records about relevant past conduct of this age cohort are often subject to confidentiality and privacy restrictions, so it would take more time for the local authority to acquire them, assuming they can do so at all. (*Id.*) The inability to conduct a thorough or proper suitability investigation of 18-20 year-olds' pistol permit applicants could conflict with the local authorities' duties under the BPSCA and compromise public safety by potentially allowing someone to get a pistol permit who is not truly suitable to have one. (*Id.*) Additionally, these changes may necessitate costly technological changes to the SLFU database and fingerprinting systems. (*Id.*, ¶ 22.)

*Third,* a TRO enjoining the age restriction would burden the local authorities and delay approval of permits for otherwise qualified individuals over age 21. (Warenda Decl., ¶ 23.) As described above, if 18-20 year-olds are able to apply for a

---

[5] Based on available U.S. Census Bureau Data, there were approximately 150,000 Connecticut residents ages 18-20 in 2023. Tables available online at S0101: Age and Sex - Census Bureau Table (last accessed Feb. 26, 2025). Even assuming, for the sake of argument, there are fewer 18-20 year-olds in 2025, the number is still substantial.

temporary state pistol permit, it would likely increase the operational burdens on local authorities tasked with approving or denying such an individual's application. (*Id.*, ¶ 25.) Additionally, expanding the pool of potential applicants to 18-20 year-olds would likely result in an increase in pistol permit applications submitted to any given local authority. (*Id.*) Each of these factors would increase the time it takes for the local authority to approve or deny any application, meaning that it would take longer for any applicant to ultimately obtain a pistol or revolver than it would have if the challenged laws remained in effect. (*Id.*) Thus, some of the harms from waiting to obtain a handgun that these age 18 to 20 Plaintiffs seek to relieve would be passed on to the applicants over age 21.

Finally, Plaintiffs argue that there would be no harm from a TRO even if Defendants prevailed on the final merits because the Plaintiffs would surrender any handguns they obtain. That is absurd. *Bruen* test aside, Plaintiffs' contention disregards the legitimate public safety interests the enjoined laws were meant to serve when enacted. Critically, if the Court entered a TRO based on a finding that Plaintiffs were substantially likely to prevail on the merits of their facial constitutional challenge, thousands of individuals could potentially obtain a permit and handgun while the TRO is in effect. Relatedly, Plaintiffs propose that *all* of the individuals who may obtain pistol permits and handguns and are still under age 21 would surrender them, and Plaintiffs apparently assume that the constitution would present no obstacle to the government's efforts to recover any permits and handguns that are retained unlawfully. Doubtful.  Moreover, Plaintiffs do not address the

14

magnitude of the harm that could never be undone at the end of this litigation if an 18-20 year old in Connecticut acquires a firearm and uses it improperly or fails to handle or store it properly.  Those harms are truly irreparable and this Court ought not risk them.

## Conclusion

For the foregoing reasons, Plaintiffs fail to meet the elevated standards necessary to enjoin the government from enforcing these long-standing laws in support of the public interest. Therefore, the State Defendants respectfully ask the Court to deny Plaintiffs' application for a temporary restraining order.

STATE DEFENDANTS,

RONNELL HIGGINS, MARGARET A. KELLEY AND PAUL J. NARDUCCI

BY:   */s/Blake T. Sullivan*
Blake T. Sullivan (ct30289)
Timothy J. Holzman
James M. Belforti
Assistant Attorney General
Office of the Attorney General
Special Litigation Section
165 Capitol Avenue, 5th Floor
Tel.: (860) 808-5020
Fax: (860) 808-5347
Blake.Sullivan@ct.gov
Timothy.Holzman@ct.gov
James.Belforti@ct.gov

15

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/Blake T. Sullivan
Blake T. Sullivan
Assistant Attorney General