**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ZACHARY SUCCOW, ET AL | : | No. 3:25-cv-00250-SVN |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| PAMELA J. BONDI, ET AL | : | |
| *Defendants* | : | OCTOBER 16, 2025 |

## State Defendants' Opposition to Plaintiffs' Motion for Injunctive Relief

### Table of Contents

I.    Introduction ................................................................................................ 1

II.    Background ................................................................................................. 2

   A.    The Plaintiffs. ..................................................................................... 2

   B.    Connecticut's firearm permitting regulations for a person under age 21. .... 3

III.    Standard of Review ................................................................................... 5

IV.    Law & Argument ...................................................................................... 5

   A.    The *Bruen-Rahimi* Test Delineates the Scope of the Second Amendment. .. 5

   B.    Minors Were Not Covered by the Plain Text of the Second Amendment
Until Sometime After the Founding-Era. ..................................................... 5

   C.    The Relevant Historical Tradition of Firearm Regulation Requires
Considering Principles and Analogues from the Founding and Reconstruction
Eras.  7

   D.    Connecticut's Age Restrictions on Handguns Fit Comfortably Within the
History and Tradition of Regulating Firearms. ............................................. 9

     1.    The laws of domestic relations and age of majority established principles in
support of a regulatory tradition restricting minors' ability to exercise legal
rights on their own. .......................................................................... 11

     2.    Founding-era analogues prohibited minors from possessing firearms
outright or made possession subject to a parent or guardian's authority. ......... 21

     3.    Analogous age restriction laws were enacted throughout the 19th century to
protect against the dangers posed by minors with handguns. ........................ 23

     4.    Connecticut's age restriction laws impose a burden comparable to the
founding era and 19th century analogues. ............................................... 29

     5.    Connecticut's age restrictions and the historical analogues all burden the
rights of minors to protect them from danger. ........................................... 31

E.    Plaintiffs' selective history cannot be reconciled with the well-understood principles of regulation and statutory interpretation in use since the founding-era.    36

    1.    Plaintiffs cannot succeed on their facial challenge because, consistent with founding-era principles, the age restriction laws are plainly legitimate as to individuals under 18. ................................................................................. 36

    2.    Plaintiffs' analogues are entitled to little, if any, weight in ascertaining the history and tradition of regulation of minors possessing handguns..................... 37

    3.    The weight of Circuit authority provides strong support here. ..................... 46

V.    Conclusion ................................................................................................ 48

    CERTIFICATE OF SERVICE ........................................................................ 49

**Attachments**

1. Briefing Statement
2. Declaration of Professor Robert J. Spitzer
3. *Saunders Glover & Co. v. Admr. Of Ott*, 12 S.C.L. (1 McCord) 572 (1822)
4. Declaration of Professor Brennan Gardner Rivas
5. Declaration of Dr. Laurence Steinberg

## I. Introduction

Connecticut's age restriction statutes, General Statutes §§ 29-28(b)(10), 29-34(b), and 29-36f ("the age restriction laws"), which prohibit individuals under age 21 from purchasing or carrying handguns, fit comfortably with our Nation's history and tradition of regulating minors' access to firearms—a history and tradition that has been applied consistently for over 200 years. These statutes were enacted with the benefit of common sense and science, share the same justifications as the historical analogues of the 18th and 19th centuries, and burden the rights of minors in the same way. "Taken together," these founding and reconstruction era restrictions are more than enough to establish that Connecticut's restrictions are consistent with the principles underlying our Nation's history of firearm regulation. *United States v. Rahimi*, 602 U.S. 680, 698 (2024).

The Court should uphold Connecticut's age restriction statutes as constitutional for several reasons. **First**, the age restriction laws derive from principles underpinning our Nation's history of regulating minors and handguns. There was a comprehensive common law tradition, embraced by the states and persisting throughout the eighteenth and nineteenth centuries, that granted parents and authorities acting *in loco parentis* total power over minors and dependents, including the power to prohibit the possession and carry of firearms. **Second**, Defendants have identified more than one hundred ordinances, regulations, and laws regulating the ability of minors to obtain and carry firearms, including near dead ringers to the statutes challenged here, which totally restricted a minor's ability to

1

obtain or carry a handgun. The statutory restrictions reflect an unbroken and unchallenged regulatory tradition that existed at the time of the founding and continued into the early-twentieth century. **Third**, the age restriction laws embrace the same principles underpinning that regulatory tradition and are analogous to historic laws in both how and why they burden a minor's right to bear arms. **Fourth**, any argument against the age restrictions is inconsistent these regulatory principles as a matter of history and statutory interpretation.

Therefore, applying the history and tradition of the right to bear arms as required by the Supreme Court, consistently with other Circuits that have upheld similar age restriction laws, and based on Plaintiffs' failure to demonstrate any entitlement to permanent injunctive relief here, Defendants Ronnell Higgins, Margaret A. Kelley, and Paul J. Narducci (State Defendants) oppose Plaintiffs' motion for permanent injunctive relief. The Court should enter judgment for the State Defendants at the conclusion of the evidentiary hearing.

## II. Background

### A. The Plaintiffs.

The two individual plaintiffs, Zachary Succow and Samuel Towne, claim to be injured by the age restriction laws because they are under the age of 21 and wish to apply for a license to carry a handgun but are prohibited from doing so by §§ 29-28(b)(10), 29-34(b), and 29-36f. The two organization Plaintiffs, Connecticut Citizens Defense League, Inc. (CCDL) and Second Amendment Foundation, Inc. (SAF) claim that Succow and Towne are members of both organizations and bring the same challenge based on an assertion of associational standing.

2

A motion to dismiss CCDL and SAF is pending. (ECF No. 53.) Even so, at this stage of the case, the individual and organization Plaintiffs' standing to bring these claims remain subject to proof with actual evidence now that the case has proceeded to the permanent injunction phase, just as any other element of their cause of action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The State Defendants reserve the right to challenge the individual and organization Plaintiffs' standing at the close of evidence. (*See* Order at ECF No. 70 ("At this juncture, the Court intends to decide the motions to dismiss and the motion for a preliminary injunction together")).

## B. Connecticut's firearm permitting regulations for a person under age 21.

As a general matter, no one may carry a handgun in public in Connecticut without a permit or eligibility certificate. General Statutes § 29-35 (setting forth general prohibition and several exceptions that depend on the circumstances of where and in what capacity the handgun is being carried). In turn, an individual cannot purchase a handgun without either a permit or an eligibility certificate. General Statutes § 29-33(b).[1] An individual under age 21 cannot be issued or apply for a

---

[1] General Statutes § 29-33(b) provides: "No person may purchase or receive any pistol or revolver unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, a valid permit to sell firearms at retail issued pursuant to subsection (a) of section 29-28 or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f or is a federal marshal, parole officer or peace officer."

handgun permit or eligibility certificate. General Statutes §§ 29-28(b)(10),[2] 29-36f(a).[3] With narrow exceptions not applicable here, no one may sell or transfer a handgun to a person under age 21. General Statutes § 29-34(b).[4] The carry of handguns is subject to one of the numerous statutory exceptions to the default "age of majority." *See* General Statutes § 1-1d ("Except as otherwise provided by statute . . . 'age of majority' shall be deemed to be eighteen years").

There are numerous exceptions to the age requirements. A person under age 21 can legally possess a handgun under certain limited circumstances, including on their own property or someone else's property with that person's permission, or under appropriate supervision. General Statutes §§ 29-34(b); 29-35(a)(1). An under-21-year-old can also possess and carry a handgun if they work in law enforcement, are a member of the armed forces, or as otherwise specified by statute. General Statutes § 29-35(a)(3). Additionally, a person can apply for a long gun eligibility certificate and can purchase a long gun once they reach age eighteen. General Statutes §§ 29-37a;

---

[2] General Statutes § 29-28(b)(10) provides, in relevant part: "No state or temporary state permit to carry a pistol or revolver shall be issued under this subsection if the applicant: . . . is less than twenty-one years of age."

[3] General Statutes § 29-36f(a) provides: "Any person who is twenty-one years of age or older may apply to the Commissioner of Emergency Services and Public Protection for an eligibility certificate for a pistol or revolver."

[4] General Statutes § 29-34(b) provides: "No person shall sell, barter, hire, lend, give, deliver or otherwise transfer to any person under the age of twenty-one years any pistol or revolver, except that a pistol or revolver may be temporarily transferred to any person only for the use by such person in target shooting or on a firing or shooting range, provided such use is otherwise permitted by law and is under the immediate supervision of a person eligible to possess a pistol or revolver. Any person violating any provision of this subsection shall be guilty of a class C felony . . . ."

29-37p.

## III. Standard of Review

"To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

## IV. Law & Argument

### A. The *Bruen-Rahimi* Test Delineates the Scope of the Second Amendment.

This Court should uphold the age restriction laws as consistent with the Second Amendment. "Like most rights . . . the right secured by the Second Amendment is not unlimited." *Rahimi*, 602 U.S. at 690 (internal quotation marks omitted); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 625, 627 (2008). Because the right is "not unlimited," courts use a "two-step framework" to assess the constitutionality of firearms regulations: "first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk v. James*, 120 F.4th 941, 968 (2d Cir. 2024) (*quoting Bruen*, 597 U.S. at 19).

### B. Minors Were Not Covered by the Plain Text of the Second Amendment Until Sometime After the Founding-Era.

At step one, Plaintiffs bear the initial burden of demonstrating that "the Second Amendment's plain text covers" the *specific* conduct that Plaintiffs seeks to engage in, here, the possession and carry of handguns by a minor. *Bruen*, 597 U.S. at

5

24; *see Antonyuk*, 120 F.4th at 981. If Plaintiffs establish that their specific intended conduct—to obtain and carry pistols despite being under the age of 21—is covered by the Second Amendment's plain text, then the conduct is "presumptively protect[ed]," and only then will the Court proceed to the next step. *See Bruen*, 597 U.S. at 24.

For the purposes of this case, Defendants do not contest that handguns are protected "arms." *Heller*, 554 U.S. at 628-29.  Likewise, courts have generally either held, or assumed without deciding, that individuals ages 18-20 are members of "the people" today. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 435-38 (3d Cir. 2025); *McCoy v. BATFE*, 140 F.4th 568, 575 (4th Cir. 2025); *Reese v. ATF*, 127 F.4th 583, 590-95 (5th Cir. 2025); *Worth v. Jacobson*, 108 F.4th 677, 688-92 (8th Cir. 2024); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114-16 (10th Cir. 2024); *NRA v. Bondi*, 133 F.4th 1108, 1130 (11th Cir. 2025).

However, Plaintiffs have not demonstrated when minors were first considered among the people whose rights were protected. This is an important consideration, because "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*. . . . The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Bruen*, 597 U.S. at 34 (internal citation omitted). The Second Amendment, when it was ratified in 1791, "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. As of 1791, minors were not "members of the political community," included among "the people." *NRA*, 133 F.4th at 1130.  Indeed, at that time, minors did not have more than the right to receive maintenance from their parents, 1 William Blackstone, Commentaries on the Laws of England, at *447-48 (Chicago: Callaghan

6

and Cockroft, 1871) (1765)[5], and could not exercise "adult" rights except as described under the common law and consistent with their status as dependents. The status of 18–20-year-olds has undoubtedly changed since then, most notably with the passage of the Fourteenth Amendment, which expanded the rights of "[a]ll persons born or naturalized in the United States." But then (and for the most part, even now), states retained the power to set the age of majority.

Plaintiffs have not demonstrated *when* minors came within the scope of the Second Amendment and should be required to as part of their burden at step one. Even so, based on the assumption that minors are among "the people" whose rights are protected today, applying step two of the *Bruen-Rahimi* test establishes that the age restriction laws are constitutional.

### C. The Relevant Historical Tradition of Firearm Regulation Requires Considering Principles and Analogues from the Founding and Reconstruction Eras.

At step two, the government bears the burden to demonstrate that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.  In *Rahimi*, the Supreme Court explained that this burden requires the government to demonstrate only that "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." 602 U.S. at 692 (emphasis added).  The government need not identify "a dead ringer" or a "twin" for the challenged regulation for it to fit within this tradition of regulation. *Id.*  Rather, a challenged regulation is lawful under *Bruen* if "'relevantly similar'"

---

[5] Available at: https://repository.law.umich.edu/books/100.

laws exist in our Nation's regulatory tradition. *See id.* (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id*. A challenged law survives attack if it imposes a "*comparable* burden on the right of armed self-defense and . . . that burden is *comparably* justified" when compared to historical analogues. *Bruen*, 597 U.S. at 29 (emphasis added). Even where a modern law is not identical to a founding or reconstruction-era law, a "shared principle" between the modern laws and historic laws "is sufficient." *Rahimi*, 602 U.S. at 704 (Sotomayor, J. concurring).

The Second Circuit requires considering historical laws encompassing the founding period and ratification of the Second Amendment in 1791, as well as the reconstruction period and ratification of the Fourteenth Amendment in 1868. *Antonyuk*, 120 F.4th at 974. Here, the government has adduced evidence of both close analogues at the time of founding and societal and technological developments which occurred since founding that concretized the need for the age-restrictions.

Significantly, historical analogues need not exist "in significant numbers." *Frey v. City of New York*, __ F.4th __, 2025 U.S. App. LEXIS 24303, *12-13 (2d Cir. Sep. 19, 2025). Since "[l]egislatures past and present have not generally legislated to their constitutional limits," the absence of "positive legislation from a particular time or place" does not necessarily mean that the legislators "deemed such regulation inconsistent with the right to bear arms." *Id.* at *12 (*quoting Antonyuk*, 120 F.4th at 969). "There are many reasons why the historical record may not evidence statutory prohibitions" that are wholly unrelated to the legislators' thoughts about their

legality, such as lack of "political demand" or if the restrictions were simply unnecessary. *Antonyuk*, 120 F.4th at 969-70. There is no "use or lose it" axiom for the exercise of legislative power in the Second Amendment context. *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring).

Requiring numerous historical analogues is "especially" inappropriate "where there is a lack of constitutional dispute regarding [the historical] regulation" because the absence of such disputes is strong evidence the regulation was believed to be lawful. *Frey*, 2025 U.S. App. LEXIS 24303 at *13; *see Bruen*, 597 U.S. at 30 (holding that, despite "relatively few" historical examples of firearm prohibitions in sensitive places, the Court could "assume it settled" that such restrictions were lawful because it was "aware of no disputes regarding the lawfulness of such prohibitions"); *Antonyuk*, 120 F.4th at 1022 (applying methodology to historical restrictions in parks).

### D. Connecticut's Age Restrictions on Handguns Fit Comfortably Within the History and Tradition of Regulating Firearms.

Applying the *Bruen-Rahimi* methodology here, Connecticut's age restrictions are constitutional. Since the founding, there is a long history and tradition of legislatures "categorically disarm[ing] groups whom they judged to be a threat to the public safety," *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting), even without a particularized finding that an individual member of that group is dangerous. *Zherka v. Bondi*, 140 F.4th 68, 78-79 (2d Cir. 2025). Infants, a class encompassing 18-to-20-year-olds that has historically been recognized as dangerous to themselves and others, are one such group. At the founding, minors lacked the capacity to exercise any rights of their own, including any right to bear

arms. Then during Reconstruction, dramatic societal and technological changes made firearms more dangerous and readily available to minors, which caused a surge in youth crime and gun violence. Responding to these unprecedented societal concerns, governments across the country broadly imposed restrictions on minors' access to firearms, many of which effectively disarmed minors completely.

Connecticut's age restriction laws follow a 200-year tradition of regulations on minors. These include: (1) common law restrictions reflecting a minor's incapacity to exercise legal rights of their own; (2) over 110 laws setting general age restrictions on weapons from the founding-era through the 20th century, Declaration of Robert J. Spitzer ("Spitzer Decl."), ¶¶ 20, 22 and Ex. C[6] (listing laws by state); (3) over 12 laws that made minor's ability to obtain a firearm for militia service contingent on a parent or guardian in the founding and antebellum eras, *id.*, ¶ 51[7]; (4) over 20 laws that prohibited the sale or transfer of a handgun to a minor, Declaration of Brennan Rivas ("Rivas Decl."), ¶ 23[8]; and (5) at least 4 statutes and over 70 university rules that prohibited minors from possessing arms or handguns, outright. *Id.*, ¶ 24; Spitzer

---

[6] The specific laws are cited throughout Professor Spitzer's Declaration. The relevant language of those analogues is reprinted, alphabetically by state, in Exhibit C to the Spitzer Declaration.

[7] Each militia law, along with the relevant text of each law, is cited in the Spitzer Declaration and reprinted in footnotes.

[8] The specific analogues are cited throughout Professor Rivas's Declaration. The relevant language of those analogues is accessible online at the Duke Center for Firearms Law Repository of Historical Gun Laws: Repository of Historical Gun Laws | Duke Center for Firearms Law.

Decl., ¶¶ 42-44 and Ex. E[9]. "Taken together," these founding and reconstruction-era laws firmly establish that Connecticut's restrictions are consistent with the "principles" underlying the Nation's history of firearm restrictions. *Rahimi*, 602 U.S. at 698. Indeed, many of the State Defendants' historical analogues are not merely "relevantly similar" to Connecticut's restrictions but are "dead ringers," which is more than what *Bruen-Rahimi* requires.

1. **The laws of domestic relations and age of majority established principles in support of a regulatory tradition restricting minors' ability to exercise legal rights on their own.**

The age restriction laws are consistent with the principles underpinning the regulatory tradition governing minors and handguns. Courts have correctly relied on these principles of infancy as expressed in contract law to reach that conclusion, *see McCoy*, 140 F.4th at 575; *NRA*, 133 F.4th at 1123, but it bears emphasis that contract law is only one area of law that restricted minors based on of the principles of infancy. Before turning to contract law, a broader view of the common law and the limitations it placed on minors is instructive.

Minors are historically recognized as a class of people whose rights and privileges could be restricted *as to all things*. "[T]he rule that minors had not 'arriv[ed] at years of discretion' and lacked legal capacity applied during the [f]ounding era to all individuals under the age of 21." *NRA*, 133 F.4th at 1129, *citing* 1 Blackstone, at *452-53. Indeed, "laws from seventeenth century England, the

---

[9] The university rules are cited in the Spitzer Declaration. The relevant text of each rule is reprinted in Exhibit E to that declaration.

American Colonies, and the early United States, establish that it has long been permissible to regulate firearms possession through legislative proscription on a class-wide basis, without a particularized finding that the individuals disarmed pose a threat to society." *Zherka*, 140 F.4th at 78-79.

### i. *Minors in the founding era were members of a dependent and strictly regulated class.*

Connecticut's statutory age-restrictions on the purchase and carry of handguns are rooted in historical principles, namely, laws governing the dependent private classes of people and laws governing the age of majority. As a result of those overlapping laws, minors were one of several classes of people—along with African Americans (enslaved and free before the Civil War) and servants—whose liberties could be restricted based solely on their status. Spitzer Decl., ¶ 19.

"The Founders' generation shared [that] view that minors lacked the reason and judgment necessary to be trusted with legal rights." *NRA*, 133 F.4th at 1117. "Gouverneur Morris warned that these individuals 'want prudence' and 'have no will of their own.'" *Id.* (quoting 4 The Writings of James Madison 119 (Gaillard Hunt ed., 1903) (Constitutional Convention, August 7, 1787)). Thomas Jefferson wrote that "'infants' [were] akin to 'maniacs,' 'drunkards,' and others who 'cannot take care of themselves.'" *Id.* (*quoting* Letter from Thomas Jefferson to Samuel Smith (May 3, 1823)). And John Adams explained, with respect to voting, that minors "were not 'fit to be trusted by the [p]ublic' because of their lack of '[j]udgment' and '[w]ill.'" *Id.* (*quoting* Letter from John Adams to James Sullivan (May 26, 1776)).

Those views found application in a comprehensive legal regime, based on a

minor's dependent status and age, within which their liberties were subject to near total restraint. Those restraints could be imposed on an individual minor by anyone empowered to act *in loco parentis*, including the government. In addition to the limitations imposed by a minor's dependent status, minors were regulated as a class by the legislatively-determined age of majority, when minors could exercise "adult" rights and interact with the outside world.

### ii. The laws of domestic relations empowered parents or authorities acting in loco parentis to restrict a minor's liberties, including the ability to obtain or carry arms.

Until an infant reached the age of majority, an authority could totally control and deprive a minor's liberty, including any ability to obtain or carry arms. At the founding, minors were "governed not as adults, but as 'infants.'" Spitzer Decl., ¶ 21. The laws of infancy then, as now, were part of the laws of domestic relations, which was reserved to the states. *See, e.g.*, *In re Burrus*, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."); *United States v. Bainbridge*, 24 F. Cas. 946, 949 (Cir. Ct. Mass, 1816)[10] (parents' rights to the custody and services of their children, are subject to the "municipal rules of the state," and may be altered "as the wisdom or policy of the times may dictate, unless the legislative power be controlled by some constitutional prohibition."); 1 Blackstone, at *453 (age of majority subject to common law age of discretion or other age established by law). "[E]very aspect" of a minor's life was shaped by their status as a dependent

---

[10] Justice Joseph Story decided this case as part of his responsibilities riding circuit.

of "a parent, guardian, or the state." Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049, 3069 (2024).

Per Blackstone, the one articulated *right* an infant possessed was a right to receive maintenance from their parent. 1 Blackstone, at *447-48 ("And thus children will have the perfect *right* of receiving maintenance from their parents" [emphasis in original]). That right did not extend far. Parents owed their infant child a corresponding duty to provide for the infant's maintenance, as well as separate duties to provide their education and protection.[11] *Id*. But that duty of maintenance was limited to providing "necessaries." *Id.*, at *449. An infant's right to necessaries did not encompass a right to a handgun.

As an "infant," a minor was subject to the power of the authority upon whom they were legally dependent, beginning with the minor's father. During that time, "[b]y the common law, the father has a right to the custody of his children during their infancy." *Bainbridge*, 24 F. Cas. at 949. During that time, "[p]arents 'ha[d] the benefit' and 'receive[d] the profits' of their children's labor. *NRA*, 133 F.4th at 1117 (*quoting* 1 Blackstone, at *453). Until age 21, a minor was subject to the "empire of the father," which "continues even after his death; for he may . . . appoint a guardian to his children." 1 Blackstone, at *453; 2 James Kent, Commentaries on American

---

[11] The power and reciprocal duty of a guardian and ward were the same as that of a parent and child. 1 Blackstone, at *462.

Law *233 (12th ed. 1873)[12] ("T[he] necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years.")

The "empire of the father" corresponded with certain long-recognized restraints on an individual's liberty, regardless of age. At common law, proper restraints on liberty divided into two classes: public, derived from "the duties and obligations of the citizen to society and his fellow-citizen," and private, springing from "the helpless or dependent condition of individuals in the various relations of life." Cooley, A Treatise on the Constitutional Limitations 418-19 (4th ed. 1878) [13]. The private class, in turn, comprehensively laid out the relationships where the liberties of dependents—minors—were subject to the parent or other authority acting *in loco parentis*: parent-child, guardian-ward, master-apprentice, teacher-pupil. *Id.*, at 420; see also, 1 Blackstone, at *421 (dividing "rights and duties in private economical relations" into four categories: master and servant, husband and wife, parent and child, and guardian and ward).

Within the private class of restraints on liberty, the common law clearly delineated the rights and duties of an authority and its dependent, beginning with a

---

[12] Available at: [#7 - Commentaries on American law v.2. - Full View | HathiTrust Digital Library](#). Chancellor James Kent was a prominent legal scholar and judge whose Commentaries on American Law were published throughout the 19th century and relied on extensively in judicial opinions. Oliver Wendell Holmes, Jr., editor of the 12th edition, was later a justice of the U.S. Supreme Court.

[13] Available at: [https://repository.law.umich.edu/books/70](https://repository.law.umich.edu/books/70). Thomas Cooley was "the most famous" legal scholar of the late-19th century, whose work was discussed in *Heller* by both the majority opinions, *Heller*, 554 U.S. at 618, and the dissent, *id.*, at 707 (Stevens, dissenting). Cooley also edited the 1871 edition of Blackstone's Commentaries cited herein.

parent and child. "The father of an infant, being obliged by law to support his child, has a corresponding right to control his actions and to employ his services during the continuance of legal infancy." Cooley's Const. Lim., at 420. But a minor's legal incapacity remained in place even when their parents were unavailable. If a child was orphaned, the parent-child relationship was replaced with guardian and ward. "The guardian has a power of control over his ward, corresponding in the main to that which the father has over his child," including over a ward's property *Id.*, at 420-21. If a minor entered an apprenticeship, whether by choice or binding, the master assumed authority *in loco parentis*: "the power to control the apprentice is assimilated to that of the parent by the statute law." Cooley's Const. Lim., at 421; 1 Blackstone, at *428-29 (describing master and servants). That dynamic also extended to students. "The relation of teacher and scholar places the former more nearly in the place of the parent . . . . While the pupil is under his care, he has a right to enforce obedience to his commands law fully given in his capacity of teacher, even to the extent of bodily chastisement or confinement." Cooley's Const. Lim., at 421; 1 Blackstone, at *453 ("He may also delegate part of his parental authority to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz.: that of restraint and correction, as may be necessary to answer the purposes for which he is employed.")

Finally, the government's separate parental authority over minors as dependents was unquestioned. *See, e.g.*, *Farnham v. Pierce*, 141 Mass. 203, 204 (1886) ("It is a provision by the Commonwealth, as parens patrioe, for the custody and care

of neglected children, and is intended only to supply to them the parental custody which they have lost.") (citing cases); *Ex parte Crouse*, 4 Whart. 9, 11 (Pa. 1839) (legislature acts as parens patriae, or common guardian of the community). Thus, the government, acting as the minor's legal guardian, was empowered to compel minors be bound as servants or apprentices until age 21 if they did "not hav[e] any visible livelihood[.]" 1 Blackstone, at *425; 2 Kent's Commentaries, at *262.

As a regulatory principle, the laws of domestic relations afforded parental authority wide discretion to control the actions of minors both inside and outside the home. Consistent with that principle, a parental authority's power over an individual minor was exercised in several different ways, including by preventing a minor from possessing a firearm.

### iii. Age of majority laws strictly limited a minor's ability to exercise "adult" rights outside of parental control.

In addition to the laws of domestic relations, a minor's ability to act outside of the control of parental authority, including the ability to obtain a firearm, was regulated through age of majority laws. At common law, the age of majority started at twenty-one years. Spitzer Decl., ¶¶ 12-13; 1 Zephaniah Swift, A System of the Laws of the State of Connecticut 213 (1795). The age of majority, and the scope of a minor's privileges and disabilities, was subject to legislative control. 1 Blackstone, at * 453 (parent's control over an infant and when the minor can exercise discretion is subject to control of the law); James Schouler, A Treatise on the Law of Domestic Relations

(4th Ed. 1889)[14] (Schouler's Domestic Relations), § 391 ("All persons are infants, in legal contemplation, until they have arrived at majority. The period of majority differs in different States and countries; but this general principle remains the same."); Tapping Reeve, The Law of Baron and Femme, at 227 (2nd ed. 1846)[15] (Reeve's Domestic Relations) ("ANY person, male or female, under the age of twenty-one years, is an infant. Such persons are in a situation very different from adults, both as it respects their contracts and their liability to punishment for crimes".) These privileges and disabilities "secure[d] [minors] from hurting themselves by their own improvident acts." 1 Blackstone, at *464.

Thus, consistent with the age of majority laws, a minor could undertake certain acts, even as the general legal significance of infancy remained. For instance, a minor could: at age 14 decide to marry (with a parent's consent), choose a guardian, or dispose of personal property by will; at age 17 discharge the duties of an executor. 1 Blackstone, at *463. A minor could also hold certain ministerial offices and be made liable to do duty in the militia at an age determined by the legislature. *See Moore v. Graves*, 3 N.H. 408, 410-12 (1826) (citing treatises and statutes). However, a minor did not have access to the courts: an infant could not be sued except under the

---

[14] Available at https://books.google.com/books?id=zwc9AAAAIAAJ. James Schouler was a lawyer and historian whose treatises were referenced extensively in judicial opinions through the late 19th and 20th centuries.

[15] Available at http://www.archive.org/details/lawofbaronfemmeo00reev. Tapping Reeve was a law professor and Chief Justice of the Connecticut Supreme Court whose Law of Baron and Femme, first published in 1816, was one of the most commonly cited treatises on domestic relations in the 19th century.

protection of a guardian and could only bring suit through a guardian or next friend. 1 Blackstone, at *464. An infant could not be punished for a capital offense before age 7, was entitled to a rebuttable presumption of innocence depending on whether they could discern good and evil until age 14, after which they could be punished for capital offenses. *Id.* Other than those express exceptions, a minor could not independently exercise "adult" rights outside a parent's control.

Critically, as other courts addressing challenges to age restrictions have recognized, minors generally lacked the capacity to contract. *McCoy*, 140 F.4th at 575-76; *NRA*, 133 F.4th at 1118-19; 1 Blackstone, at *464. To the extent a minor entered into a contract, it was voidable at the minor's privilege. Reeve's Domestic Relations, at *227. There were very few instances where a minor could enter into a contract, and even those retained a minor's status as a dependent. For instance, a minor could contract to bind themselves into servitude or apprenticeship. 2 Kent's Commentaries, at *262 (citing Laws of New York of 1788, at 621; Statutes of Connecticut of 1838, at 413). A minor could also sign a contract to enlist in service of the U.S. military. *Bainbridge*, 24 F. Cas. at 951. Consistent with a minor's right to education, they could also contract for "good teaching and instruction whereby he may profit himself afterwards." 1 Blackstone, at *466. Finally, consistent with a minor's right to maintenance, when a minor was no longer under the care of a parent, master, or guardian, they could contract for "necessaries," which were limited to "meat, drink, apparel, physic and such other necessaries." 1 Blackstone, at *465-66; see also Reeve's Domestic Relations, at *228.

19

The privileges and disabilities of infants were discussed extensively in the common law, but not in terms of any "right to bear arms" that may have existed past the age of majority. Rather, the only discussion of infants and handguns concerned the "necessaries" an infant could or could not obtain. And by the antebellum period, the law was clear: "necessaries" did not include pistols or powder. *Saunders Glover & Co. v. Admr. Of Ott*, 12 S.C.L. (1 McCord) 572 (1822)[16]. That unquestioned holding, excluding "pistols and powder" from the category of necessaries, continued in the reconstruction and the 20th century, even as handguns became more common. *See McKanna v. Merry*, 61 Ill. 177, 179 (1871) ("The courts have generally excluded from the term 'necessaries,' horses, saddles, bridles, pistols, liquors, fiddles, chronometers, etc."); *Johnson v. Newberry*, 267 S.W. 476, 480 (Tex. 1924) (same).

The common law generally operated to restrain the liberty of minors through the immediate authority of parents, and then guardians, masters, teachers, and the government acting *in loco parentis*. Governments could separately impair or expand the liberties of minors as a class by setting the age of majority for particular acts and offices. Even if the common law was silent about a particular issue, like whether a minor could obtain or possess a firearm, it did not mean that minors had the right to do so. *Antonyuk*, 120 F.4th at 969-70. To the contrary: the laws of domestic relations

---

[16] This decision is not available on Lexis. A copy is included as Attachment 3. The author of that opinion, Justice Huger, previously served as a brigadier general of State troops, and served as a United States Senator from 1843-45. *See* Huger, Daniel Elliott, BIOGRAPHICAL DIRECTORY OF THE UNITED STATES CONGRESS, https://bioguide.congress.gov/search/bio/H000917. To the extent that his military service would have made him aware of any duty a minor had to arm themselves, his opinion indicates that it did not make pistol or powder "necessary" as a matter of law.

and age of majority laws presumed that minors could not exercise any "adult" rights, except in a few instances, and never with regards to handguns. These principles have underpinned the laws regarding minors and firearms since the founding era.

### 2. Founding-era analogues prohibited minors from possessing firearms outright or made possession subject to a parent or guardian's authority.

Consistent with the broad authority of the common law, at least two categories of historic laws from the founding era explicitly regulated a minor's possession of arms: university rules and militia laws that made a minor's service in a militia (including any obligation to bear arms) subject to parental control.

First, with university rules, the common law was clear that "[t]he relation of teacher and scholar places the former more nearly in the place of the parent[.]" Cooley's Const. Lim., p. 421. Thus, colleges in the colonial and founding eras, acting *in loco parentis*, assumed unquestioned authority over students. Spitzer Decl., ¶ 39 (footnote and quotation marks omitted). Under that authority, campus prohibitions on firearms were common, if not ubiquitous. *Id.*, ¶ 45. The prohibitions also applied regardless of whether the college was public or private: beginning in 1655 and up through the late 19th century, firearms restrictions were imposed by at least 15 state university systems and at least 54 private colleges. *Id.*, ¶ 41. In other words, the firearms prohibition could be imposed by state actors as well as private ones. See *id.*, ¶ 43 (describing the University of Virginia's restriction, enacted by a Board of Visitors including Thomas Jefferson and James Madison, among others). Ultimately, the college rules were "a microcosm of societal attitudes concerning the rights (or lack of rights) pertaining to young people" and, given the widespread understanding that

students were subject to the authority of universities, indicated that an authority's power *in loco parentis* included the power to prohibit dependents from carrying firearms. *Id.*, ¶ 36.

Second, the militia laws, though enacted for a distinct purpose and pursuant to different sources of authority, were but one more exercise of the government's power to adjust the age of majority for a specific purpose and to compel an individual to assume a dependent status in service of the public interest. Courts explicitly recognized that militia laws and enlistment laws could only be enacted with the rights of parents and capacity of minors, in mind. *Bainbridge*, 24 F. Cas. at 951-52. Thus "whenever the rights of parents were intended to be saved, a special proviso was uniformly introduced for that purpose." *Id.*, at 952.

Of course, the militia laws did just that. "[M]ilitia members under 21 were treated as minors," and "arming obligations for militia members under 21 usually belonged to their parents or guardians." Spitzer Decl., ¶ 46. The states enacted their own militia laws in conformity with the federal Militia Act of 1792, and all of the state militia laws required special consideration for enrolled militia members consistent with their status as minors. *Id.*, ¶ 50. A minor was not liable for providing their own arms because the common law left them with no means or ability to obtain a firearm independent of their parent or guardian. Instead, nearly all of the states placed the legal liability for arming militiamen under age 21 onto parents, masters, guardians, or local governments—not on the minors, themselves. *Id.*, ¶ 51.

The militia laws had to be interpreted narrowly in derogation of the common

law. *Bainbridge*, 24 F. Cas. at 949-52. Taken together, "[t]hat common-law regime restricted minors' ability to purchase firearms. The state statutes that obligated parents to provide firearms for minors' militia service confirm that minors had limited access, and the many university regulations that restricted firearm possession by students confirm that minors' access was a matter of parental consent." *NRA*, 133 F.4th at 1129. Thus, founding-era practice and tradition was to strictly control minors' access to firearms. That practice and tradition expanded with time.

> **3. Analogous age restriction laws were enacted throughout the 19th century to protect against the dangers posed by minors with handguns.**

The historical analysis does not end in the founding era.  Because 1791, 1868, and "the adjacent and intervening periods" are all "fertile ground" to "seek evidence of our national tradition of firearm regulation," *Antonyuk*, 120 F.4th at 974, the Court must "continue [its] march through history" and consider evidence from the Reconstruction Era. *Frey*, 2025 U.S. App. LEXIS 24303 at *18.  Indeed, following the founding era, societal and technological changes made legislation limiting the ability of minors to possess handguns more urgent. Consistent with the principles underlying the age of majority and dependency, state and municipal governments did just that. Reconstruction era history only serves to reenforce our nation's history and tradition of regulating minors' access to firearms.

> *i.  **Minors with handguns were increasingly dangerous because of industrial, technological, commercial, and societal changes.***

Throughout the 18th and early 19th centuries practical constraints, as well as legal constraints, operated to restrict minors access to firearms.  This is because

minors "mostly lived with their parents in circumstances where they did not possess the means, ability, or right to obtain firearms on their own." Spitzer Decl., ¶ 29. Additionally, the country operated on a credit economy, not cash, and minors, because of their incapacity to contract, could not access credit. *McCoy*, 140 F.4th at 575-76; *NRA*, 133 F.4th at 1118-19. That started to change in the 19th century as our nation transformed from a largely rural society to largely urban one. Spitzer Decl., ¶ 28. Industrialization led to an increased lethality of weapons and proliferation of repeating firearms across the nation. Rivas Decl., ¶ 11. Unlike the "muzzle-loaded arms from the Founding Era [that] were ill-suited to impulsive acts of violence," *Pinales v. Lopez*, 765 F. Supp. 3d 1024, 1043 (D. Haw. 2025), by the 1830s manufacturers had begun developing handguns that were quick to fire and easy to conceal. Rivas Decl., ¶ 13.

Industrial production of handguns grew significantly to accommodate military demands during the Civil War, but, despite slumping government demand, continued afterwards. Rivas Decl., ¶ 13. "[S]toked by military surpluses, manufacturers' investment in mass production, and their adoption of highly effective marketing techniques," an expanding civilian market for firearms emerged. *Id.* Moreover, people seeking to purchase a handgun could do so much more easily because market was no longer limited to local shops. *Id.*, ¶ 29. As the costs of producing and transporting goods decreased, nation-wide sales, and distribution networks made all products, and specifically deadly weapons like handguns, "more easily accessible to customers than they had ever been before." *Id.*

That expanding market, in turn, created more opportunities for firearm manufactures to market specifically to minors and for minors to acquire firearms. Rivas Decl., ¶¶ 19, 21. Minors working outside the home became more likely to keep their own wages and able to purchase deadly weapons, including handguns, regardless of whether their parents approved. *Id.*, ¶ 21. Minors could now "easily get their hands on" firearms and other deadly weapons at "pawn shops, gun stores, and hardware stores across the country." *Id.*, ¶ 21.

Juvenile crime was on the rise, too. "As a general rule, the [19th Century] was significantly more violent than the preceding one." Rivas Decl., at ¶ 12. The effects of "slavery, poverty, urbanization, ethnic tension, labor conflict, and political corruption" fueled rising rates of homicide and violence. *Id.* The Civil War "worsened" that trajectory, marking the start of a period of "horrific violence, turmoil, and political instability that divided Americans against one another on the basis of race, class, geography, and politics." *Id.* This societal turmoil led to "'an increased number of youth on the streets' who in turn 'became involved in juvenile crime.' Stated differently, '[r]apid urbanization disrupted families, resulting in overcrowding and an increase in crime, including crimes committed by children.'" Spitzer Decl., ¶ 28. Heightened concerns about newly-armed youths rippled through the nation. Newspapers throughout the country described fatal accidents and careless shootings involving minors, and decried "the wretched practice of carrying concealed weapons" among boys. Rivas Decl., ¶ 22.

### ii. 19th century legislatures responded by broadly preventing minors from obtaining and possessing handguns.

In response to those unprecedented societal concerns, "governments were entitled to address those changes, consistent with the common law principles defining the rights of minors and access to dangerous and unusual weapons." Spitzer Decl., ¶ 29. And governments did. From 1763 through 1859, laws that restricted minors' ability to access and use firearms were enacted in ten states. Spitzer Decl., ¶ 20; *id.*, Exhibit C (state-by-state list of historical laws). From there, restrictions on minors' possession and use of weapons proliferated, with over 100 laws restricting minors' access to firearms enacted between 1861 and 1933, across 46 states. Spitzer Decl., ¶¶ 22-23; *id.*, Ex. C. These "[p]ost-ratification interpretations and applications by government actors," liquidated the founders understanding of the right. *See Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring).

"The rise in laws restricting minors' access to weapons arose because of the proliferation of mass produced, cheaper firearms, which spread to minors in rapidly growing urban areas in the latter part of the nineteenth century and contributed to rising juvenile crime." Spitzer Decl., ¶ 30. These laws were intended "to protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds." *Id.*

While some laws set age restrictions on firearms at 18 (or younger), the most common age limit by far was age 21. Spitzer Decl., ¶ 23. The age limits varied based on the nature of the restriction, for instance, with higher age limits on the age for carrying concealable weapons and lower age limits for hunting or possessing less

lethal "toy guns". *Id.*, ¶ 25.

Several states and territories enacted laws that banned the possession of a handgun by a minor, outright. Rivas Decl., ¶ 24 (citing laws in Wisconsin,[17] Arizona,[18] Nevada,[19] and Kansas[20]). Other states enacted laws prohibiting all forms of sale or provision of deadly weapons to minors, including by their parents. *Id.*, ¶ 23 (citing laws in Alabama,[21] Tennessee,[22] Ohio,[23] and Kansas[24]); *see also NRA*, 133 F.4th at 1121 (citing laws from 15 States, territories, and the District of Columbia that "prohibited selling, loaning, or giving dangerous weapons, including pistol, to individuals under the age of 21," and noting that, "of those jurisdictions, only four excepted parents or guardians from their prohibitions"). While the prohibition was placed on the seller rather than the minor, that was not because lawmakers perceived any constitutional problem with penalizing minors for possessing arms.  Rather,

---

[17] Wisc. 1883 ch. 329 p. 290, §1; *see also Evans v. Waite*, 83 Wis. 286 (1892) (minor violating statute was strictly liable for any injuries caused by handgun).

[18] Ariz. 1867 21-22 "An Act to prevent the improper use of Deadly Weapons and Indiscriminate use of Fire Arms in the Towns and Villages of the Territory.", with amendments at Ariz. 1875 101-102 and Ariz. 1883 ch. 36 §3 p. 66; *Arizona – Revised Statutes and Penal Code* (1887), 720, §611; 726, §662.

[19] Nev. 1881 ch. 114 "An Act to Prohibit the Carrying of Concealed Weapons by Minors."; Nev. 1885 ch. 51 "An Act to amend an Act entitled 'An Act to prohibit the carrying of concealed weapons by minors,' approved March 4, 1881."

[20] Kan. 1883 ch. 105 p. 159, §2; Kan. 1867 ch. 12, p. 25; Kan. 1881 ch. 37, p. 92, §23.

[21] Alab. 1856 ch. 26 p. 17.

[22] Tenn. 1856 ch. 81 p. 92 §2.

[23] Ohio 1880 S.B. 80 p. 79

[24] Kan. 1883 ch. 105 p. 159.

"regulating the point of sale was the most effective means of restricting minors' access to handguns." *Id.*, ¶ 33. Businesses that flouted the law risked not just the immediate criminal consequences, but also regulatory consequences like financial penalties or loss of license. *Id.*, ¶ 35. Thus, laws prohibiting the transfer of a handgun to a minor and penalizing the seller were common. *Id.*, ¶ 25 (citing laws in twenty-two states[25]).

The 19th century saw a dramatic need for, and increase in, weapons laws, including laws pertaining to minors. Spitzer Decl., ¶ 27. Notably, founding-era principles still provided a basis for a parent, guardian, or master to control their dependents' access to weapons. *See* Rivas Decl., ¶ 19. Similarly, states retained the power to define the age of majority. And handguns, which *at the time* were restricted as "deadly" weapons regardless of the bearer's age, *id.*, ¶¶ 16-17, had already been and continued to be excluded from the "necessaries" to which a minor could claim a right as a matter of law. *Saunders Glover & Co.*, 12 S.C.L. 572; *McKanna*, 61 Ill. at 179; *Johnson*, 267 S.W. at 480. Age-based restrictions in the 19th century were uncontroversial, and, as evidenced by the proliferation of those restrictions throughout the country and into the 20th century, extraordinarily popular. Importantly, these laws liquidated the understanding that governments could

---

[25] Alab. 1856 ch. 26 p. 17; Tenn. 1856 ch. 81 p. 92 §2; Ind. 1875 ch. 40 p. 59; Geo. 1876 ch. 128 p. 112; Miss. 1878 ch. 46 p. 175; Ohio 1880 S.B. 80 p. 79; Penn. 1881 ch. 124 p. 111; Dela. 1881 ch. 548 p. 716; Flor. 1881 ch. 3285 p. 87; Ill. 1881 "Criminal Code" §2 p. 73; Mary. 1882 ch. 424 p. 656; W. V. 1882 ch. 135 §7 p. 421; Kan. 1883 ch. 105 p. 159; MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,' "; Wisc. 1883 ch. 329 p. 290; Iowa 1884 ch. 78 p. 86; Okla. 1890 ch. 25 art. 47 §3 p. 496; Lou. 1890 ch. 46 p. 39; Va. 1890 ch. 152 p. 118; Wyo. 1890 ch. 73 §97 p. 140; N. C. 1893 ch. 514 p. 468; Tex. 1897 ch. 154 p. 221.

prevent minors from obtaining and possessing handguns, consistent with the Second Amendment.

### 4. Connecticut's age restriction laws impose a burden comparable to the founding era and 19th century analogues.

Connecticut's age restrictions on a minor's ability to possess and carry a handgun impose a "comparable burden" to the laws and rules existing in the 18th and 19th centuries. *See Bruen*, 597 U.S. at 29. As discussed above, the regulatory tradition of restraint on a minor's possession and carry of firearms stemmed from two principles: (1) a minor's status as a dependent, as reflected in the laws of domestic relations; and (2) a minor's incapacity, as imposed by the legislated age of majority. Under those doctrines, a minor was subject to the power of parental authority and that authority could totally deprive the minor of liberty. In turn, the minor depended on the authority's consent to exercise rights and deal with others in society. *NRA*, 133 F.4th at 1118 ("We draw two lessons from the legal treatment of minors at the Founding. First, minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor. Second, minors were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society.").

As a result, at common law, the scope of disarmament could effectively be total: If a parent chose not to provide a minor with a firearm, the minor had no right to demand it from their parent, 1 Blackstone, at *447-48, nor ability to obtain it as a "necessary" elsewhere, 1 Blackstone, at *465-66. Minors fared no better as dependents outside of direct parental control: the university rules, exercising

29

authority *in loco parentis*, prohibited *all firearms*, not just handguns. Spitzer Decl., ¶¶ 41, 45. The militia laws likewise operated in consideration of the laws of domestic relations, and largely left parents or guardians liable to decide whether to arm a dependent minor. *Id.*, ¶¶ 46, 50, 51. The militias themselves strictly regulated how a minor could possess and use a firearm, subject to the rules of military discipline and orders of superior officers. *Id.*, ¶ 49.

Analogues from the 19th century treated handguns similarly, including outright prohibitions on possession, carry, and transfer. Rivas Decl., ¶¶ 23-25. Even if our nation's founding era history and tradition of firearms regulation of minors did not contain "dead ringers"—which it does—*Bruen* does not demand this level of mirroring anyway. *Rahimi*, 602 U.S. at 692. Since prohibiting minors from purchasing firearms "necessarily implicates their ability to possess and carry them," restrictions on purchase are "historical analogues relevantly similar to laws regulating the ability of [minors] to possess or carry firearms." *Picon v. United States*, No. 23-CF-0344, 2025 D.C. App. LEXIS 308, at *19 (Sep. 4, 2025) (upholding law requiring applicants for license to carry firearms in public to be over 21); *Pinales*, 765 F. Supp. 3d at 1030 (upholding statutes "that require people to be 21 years or older to acquire, own, or—in effect—possess firearms").  Plus, those historical laws proscribed the sale not because the legislatures perceived any constitutional issues with proscribing carry or possession, but simply because "regulating the point of sale" was seen as "the most effective means of restricting minors' access to handguns." Rivas Decl., ¶ 33. The focus on sellers reflected policy, not constitutional, concerns.

As a practical matter, regardless of whether a law criminalized possession or sale, the effect was the same: minors could be totally disarmed of handguns, consistent with history and tradition. In light of those regulatory principles and compared to the historical analogues Connecticut's age restrictions, which in certain respects impose fewer restrictions than the analogues, impose a comparable burden on a minor's right to bear arms. See Spitzer Decl., ¶ 23.

### 5. Connecticut's age restrictions and the historical analogues all burden the rights of minors to protect them from danger.

Just as Connecticut's age restrictions burden the rights of minors comparably to historical analogues, they are also comparably justified: to protect minors from hurting themselves or others. *See Bruen*, 597 U.S. at 29. As with any other age-of-majority law, that justification for age-restrictions on minors was obvious as a matter of common sense in the 18th and 19th centuries. In the 20th century, the centuries-old societal concerns about the harms minors posed to themselves and others in nearly all activities, and especially with respect to handguns, were validated by science.

### i. Common sense concerns about the unique dangers posed by minors with firearms have supported age restriction laws since the founding era.

In the 18th and 19th centuries, the legal status of minors and distinctions between adults and adolescence were grounded in observation and common sense without the benefit of modern brain science, see Declaration of Laurence Steinberg ("Steinberg Decl."), ¶ 11, but were no less important to society. An infant's legal privileges and disabilities "secure[d] [minors] from hurting themselves by their own improvident acts." 1 Blackstone, at *464. The common law accomplished this by

ensuring that minors, as a dependent class, were guaranteed maintenance, education, and protection. 1 Blackstone, at *447-48; Cooley's Const. Lim., p. 420-21. Moreover, minors could be shielded from the consequences of their poor decisions under contract and criminal law. 1 Blackstone, at *464; Reeve's Domestic Relations, at *227. But parental authority operated to protect them from danger.

As the 19th century went on, industrialization, urbanization led to a proliferation of affordable firearms, especially handguns, and created more opportunities for minors to acquire and use them outside the traditional boundaries of authority. Rivas Decl., ¶¶ 19, 21; see also *NRA*, 133 F.4th at 1139 (11th Cir. 2025) (Rosenbaum, J., concurring) ("Industrialization and 'the loss of fathers and older brothers' in the Civil War resulted in less family 'control' over Under-21s"). Faced with an increase in juvenile crime and societal outrage, legislatures across the country enacted the age-based restrictions "to protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds." Spitzer Decl., ¶¶ 28, 30.

In the 20th century, the importance and rationale of age-based restrictions on the purchase and sale of handguns was unchanged. Early 20th century legislatures continued to enact age restriction laws. Spitzer Decl., ¶¶ 22-23. As the years went on, the Gun Control Act of 1968 "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). To that end, the Gun Control Act criminalized the sale or delivery of handguns or ammunition by licensed dealers to individuals under

age twenty-one. 18 U.S.C. § 922(b)(1) and (c); *see Bruen*, 597 U.S. at 73 (Alito, J., concurring) ("Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U. S. C. §§922(x)(2)-(5), and bars the sale of a handgun to anyone under the age of 21, §§922(b)(1), (c)(1)"). The legislative history of the Act explained that "[i]n contributing to our ever-increasing crime rates, juveniles account for some 49 percent of the arrests for serious crimes in the United States and minors account for 64 percent of the total arrests in this category." S. REP. NO. 90-1097, at 77 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2165. Thus, common sense concerns about the dangers posed by armed minors underscored the need for legislation.

### ii. Modern behavioral science validated those common-sense concerns.

Science further confirms the wisdom of Connecticut's laws. Compared to adults, minors under age twenty-one are "more impulsive, more likely to engage in risky and reckless behavior, more influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations." Steinberg Decl., ¶ 10; *see also NRA*, 133 F.4th at 1148 (Rosenbaum, J., concurring). Indeed, "many aspects of psychological and neurobiological immaturity characteristic of individuals between the ages of 14 and 17 . . . are also characteristic of those between ages 18 and 20." Steinberg Decl., ¶ 10.

Adolescents and people in their early 20s are uniquely impulsive and

insensitive to risk, including with firearms. Steinberg Decl., ¶¶ 19, 24. This tendency is "evidenced by studies of age differences in risk-taking . . . as well as participants' reports of involvement in both health-related risk-taking (e.g., smoking, drinking while driving, having unprotected sex) and antisocial risk-taking (e.g., fighting, stealing, vandalizing)[.]" *Id.*, ¶ 19. Moreover, "adolescents and individuals in their early 20s are less able than older individuals to control their impulses and consider the future consequences of their actions and decisions." *Id.*, ¶ 20. "The combination of heightened attentiveness to rewards and still-maturing impulse control makes middle and late adolescence a time of greater risk-taking than any other stage of development." *Id.*, ¶ 23.

Several documented forms of risk-taking are particularly alarming if under 21-year-olds have greater access to handguns. First, statistically, "arrests for violent crime increase over the course of adolescence, peak in the late teens and early 20s[.]" Steinberg Decl., ¶ 31; see also, Spitzer Decl., ¶¶ 31-32. Second, "suicidal ideation and attempted suicide are higher during late adolescence and young adulthood, including during ages 18 to 20, than any other period of life. Firearms were used in more than half of all suicide attempts." Steinberg Decl., ¶ 32. Third, "numerous studies have documented that rates of deliberate self-injury, which . . . also peak in middle and late adolescence." *Id.*, ¶ 33. Finally, "binge drinking and 'high-intensity drinking' (drinking twice as much as that considered binge drinking) is more frequent during the late teens and early 20s than at any other age." *Id.*, ¶ 34. "Intoxication is a particularly significant contributing factor to homicide and physical assault at all

ages, especially in incidents involving personal confrontations, and even more so in those involving firearms. The psychological immaturity of individuals between 18 and 20, relative to those 21 and older, especially with respect to self-control, exacerbates the dangers of intoxication." *Id.*, ¶ 34.

Departures from a presumptive age-of majority are typical when, based on the needs of society and circumstances known to lawmakers at the time, an age-restriction should be raised or lowered in the best interests of young people. As demonstrated by ongoing cycles of violence, with firearm homicides and mass shootings being perpetrated disproportionately by under-21-year-olds, the dangers presented by armed minors are well-known. *See* Spitzer Decl., ¶ 30, *see also NRA*, 133 F.4th at 1152-53 and n. 11 (Rosenbaum, J., concurring) (describing 7 mass shootings and the high rate of overall firearm crime perpetrated by minors). Ultimately, scientific consensus confirms that "there is good reason to place limits on the permitting of handguns to individuals who are between 18 and 20, as they are members of an age group that is especially at risk for violence, suicide, nonsuicidal self-injury, and excessive drinking." Steinberg Decl., ¶ 38.

The founding-era justifications for age restriction laws never went away, and additional justifications continued to reveal themselves as time went on, underscoring the necessity of regulation. Connecticut's age-restrictions share the same justifications as the historical analogues, and burden the rights of minors in the same way. The Court should uphold Connecticut's laws restricting the carry and purchase of handguns by individuals under age twenty-one.

### E. Plaintiffs' selective history cannot be reconciled with the well-understood principles of regulation and statutory interpretation in use since the founding-era.

Based on the record at bar, State Defendants are entitled to judgment. Nevertheless, Plaintiffs' arguments will be addressed briefly.

#### 1. Plaintiffs cannot succeed on their facial challenge because, consistent with founding-era principles, the age restriction laws are plainly legitimate as to individuals under 18.

Plaintiffs' arguments are directed to a narrow subset of 18-20-year-olds, but they seek to enjoin enforcement of General Statutes §§ 29-28(b)(10), 29-34(b), and 29-36f, in their entirety. But Connecticut's age-restriction laws apply to all individuals under 21, not just the narrow class of "18-20-year-olds" whose interests Plaintiffs seek to assert. "[F]acial challenges are the most difficult to mount successfully." *Antonyuk*, 120 F.4th at 983 (quotation marks omitted); *see also Nastri v. Dykes*, 3:23-cv-56 (VAB) (ECF No. 94, p. 50) (upholding Connecticut's prohibition on carry of firearms in state parks and forests). To prevail, Plaintiffs "must establish that no set of circumstances exists under which the [law] would be valid, or show that the law lacks a plainly legitimate sweep." *Antonyuk*, 120 F.4th at 983 (quotation marks omitted).

Despite Plaintiffs' expansive request for injunctive relief, there is no meaningful argument that could support a facial challenge to the age-restriction laws, which apply to all individuals under age 21, not just 18-20-year-olds. Plaintiffs do not even attempt to argue for a different conclusion because admitting that an infant can be prohibited from carrying or purchasing a firearm at any age would require acknowledging some principle that would have supported the regulation of minors and firearms at the founding. Instead, Plaintiffs reject any principle that

could support a regulatory tradition for younger minors. But Plaintiffs' argument avoids the full implications of their position, which, if correct, would mean that age is *never* a valid basis for disarming anyone. That contention flies in the face of common sense and our nation's history and tradition of firearm regulation. *See McCoy*, 140 F.4th at 581 (Heytens, J., concurring) ("plaintiffs . . . arguments for why 18-year-olds have a constitutional right to buy handguns suggest that younger people do too—a startling result that the plaintiffs seek to obscure and for which they offer no defense.")

As explained above, the laws of domestic relations and the age of majority control the inquiry, and undoubtedly support the application of the age restriction laws to minors younger than 18. The reasons that individuals under age 18 can be constitutionally disarmed are the same as the reasons individuals under age 21 can be constitutionally disarmed—because it is consistent with history and tradition. Because Connecticut's age restriction laws are constitutional with respect to under-18-year-olds, Plaintiffs' facial challenge must fail. *See Rahimi*, 602 U.S. at 692.

For these same reasons, and as discussed further below, the Court should not credit the selective history and constitutional doctrine Plaintiffs rely on to support Plaintiffs Succow and Towne's as-applied challenge.

## 2. Plaintiffs' analogues are entitled to little, if any, weight in ascertaining the history and tradition of regulation of minors possessing handguns.

Plaintiffs attempt to hold up the militia laws of the colonial and founding eras, and specifically the federal Militia Act of 1792, as evidence of an implied right to bear

handguns.[26] That argument fails for three reasons: First, it is incompatible with the rules of statutory interpretation. Second, it ignores founding era society's understanding and disregard of militia duties. Finally, other constitutional doctrines identified by Plaintiffs that impact age restrictions are irrelevant to the history and tradition of firearm regulation.

### i. *Militia laws should not be applied in derogation of the common law principles that restrained minors.*

First, the common law principles that severely restricted minors' access to firearms were well-established by the time the federal Militia Act and its state equivalents were enacted. Courts applying the common law flatly rejected any contention that a minor had a "right" to a handgun. The only "right" a minor had was to maintenance, and, relatedly, the provision of necessaries. *See* 1 Blackstone, at *447-49. The colonial and state militia laws, which were construed narrowly in derogation of the common law, demonstrated, at most, that an infant, may, subject to their status as infants and dependents, bear arms in defense of the state. *See NRA*, 133 F.4th at 1127. The militia laws were an exception to the common law that did not even apply to all 18-to-20-year-olds.  "Many state laws set the age of militia service at 21[.]" *McCoy*, 140 F.4th at 578 (citing statutes from Ohio, Virginia, New Jersey, and

---

[26] Plaintiffs' recitation of colonial and founding-era militia laws largely paraphrases a law review article by David Kopel & Joseph Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019). But the Kopel & Greenlee article was written before *Bruen* was decided, and so without regard to the *Bruen-Rahimi* framework and its analogical reasoning. Apart from attempting to create an untethered "right" of minors to bear arms based on militia laws, alone, the article ignores whether minors were members of "the people" in the founding era and does not contend with the principles described in section IV(D)(1), *supra*, which support regulating minors and their access to handguns.

Georgia). A minor's legal capacity to keep and bear arms remained subject to the conditions contained within the militia statutes, namely, that they had to be within the statutory age range and that it was the responsibility of a parent or guardian to arm them.[27] Spitzer Decl., ¶¶ 50, 51, 57.

There is no way to reconcile the limitations that the common law imposed on minors with Plaintiffs' interpretation of the militia laws here. Plaintiffs' argument that the militia laws established an implicit, unencumbered right to handguns *sub silentio* violates a core tenet of statutory interpretation. *See United States v. Texas*, 507 U.S. 529, 534 (1993) ("statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."). Whatever public duty they reflected, the militia laws were subject to the same narrow construction as any other statute passed in derogation of the common law. Thus, the public duty imposed on minors by the militia laws was considered a "slight interference" with the rights of parents to custody and control over their children. *Bainbridge*, supra, 24 F. Cas. at 949. There was no legal basis to extend the militia laws to imply some legal privilege on minors outside of their militia duties. Especially one that could be exercised

---

[27] The Kopel & Greenlee article mentions these conditions without recognizing their significance in the scheme of domestic relations. *See* 43 S. ILL. U. L.J. at 539 (describing a domestic limitations exception in the militia laws of New Jersey in 1799), at 541 (Maryland in 1658), at 546 (North Carolina in 1770), at 552-55 (New Hampshire in 1754, 1773, 1780, and 1792), at 557-559 (Delaware in 1778, 1782, 1790, 1793 and 1799), at 560-564 (Pennsylvania in 1676, 1755, 1777 and 1793); at 564 (New York in 1665); at 568-69 (Rhode Island in 1673, 1756, and 1779); at 579 (Virginia in 1738); and at 585-87 (Massachusetts in 1788, 1632 and 1681). Plaintiffs' brief does not mention these conditions, at all.

independently of a parent's right to custody and control.

Moreover, it is not even clear that "arms" to be supplied to the militia included handguns, which were regulated separately from long guns, as "deadly weapons" up through the 19th century. Rivas Decl., ¶¶ 16-17. Handguns were not included among the "arms" that most men enrolled in the militia were obligated to provide. Rather, the Militia Act distinguished "pistols" from "arms" generally, and only certain soldiers were directed to have them.[28] That different treatment of "arms" and "pistols" was reflected in other federal militia enactments, as well. *Compare* "An Act authorizing the President of the United States to raise a Provisional Army," May 28, 1798, chap. 47, § 12 (allowing the president to provide "arms and accoutrements" to a militia "appearing to be unavoidably deficient") *with* § 13 (authorizing president to purchase and deposit "pistols with holsters" to supply "any corps of cavalry which shall be called into the actual service of the United States"); see also "An Act providing Arms for the Militia throughout the United States," July 6, 1798, chap. 65 (authorizing President to purchase "stands of arms" that could "be delivered to the militia, when called into the service of the United States.") There is no reason to interpret a

---

[28] Militia Act of 1792, § 1, provided, in relevant part, that "each and every free, able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia . . . . And it shall at all times hereafter by the duty of every such captain or commanding officer of a company to enrol [sic] every such citizen . .  and shall without delay notify such citizen of the said enrollment . . . . That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock . . . ; and shall appear so armed . . . when called out to exercise, or into service . . . ." Notably, the act distinguished the type of arms militiamen were obligated to supply based on rank and position. Section 4 provided that, within the cavalry, commissioned officers and dragoons were volunteers selected from the brigade at the discretion of the commander-in-chief of the state, and were to be armed with "a pair of pistols."

founding era legislature's mention of "arms" as including "handguns."

The fact that the Militia Act, at most, provided that minors could access long guns under confined circumstances and distinguished "arms" from handguns is yet another reason why the Militia Act fails to support Plaintiffs' claim that individuals under 21 should be permitted to carry handguns.[29]

### ii. The Militia Act of 1792 does not evidence a right for a minor to obtain or carry a handgun.

Even assuming the limitations imposed by minors through state domestic relations laws and the Militia Act's plain language can be ignored—they cannot—Plaintiffs' interpretation of the militia laws still does not evidence an unconstrained constitutional right by minors to obtain and carry handguns.

That certain States may have imposed a *duty* on minors to carry arms in the highly regulated context of militia service sheds no light whatsoever on whether minors had an unfettered, constitutional *right* to carry outside of those narrow circumstances. *NRA*, 133 F.4th at 1127. Indeed, "one can easily draw the opposite conclusion" from duty-to-carry statutes—"that [w]hen the government imposes such a duty it assumes that it has the power to regulate the public carrying of weapons; whether it forbids them or commands them, the government is *regulating* the practice of public carrying." *Koons v. Attorney Gen. N.J.*, Nos. 23-1900, 23-2043, 2025 U.S. App. LEXIS 23361, at *74-75 (3d Cir. Sep. 10, 2025) (refusing to rely on historical laws requiring residents to carry arms to church as evidence of a right to carry in

---

[29] Of course, Connecticut's age restrictions allow minors to purchase and possess long guns, and would be consistent with the plain language of the Militia Act, anyway.

41

sensitive locations) (emphasis in original and internal quotation marks omitted). *See* Spitzer Decl., ¶ 49 (describing limitations on an individual's use of arms and other rights during militia service). Either way, "[g]iven the ambiguity inherent in statutory duties to bear arms," they do not "evidenc[e]" the sort of "limitless license to carry weapons" that Plaintiffs are claiming here. *Koons*, 2025 U.S. App. LEXIS 23361, at *74-75.

Furthermore, in practice the Militia Act did not correspond to a societal expectation that anyone had a right or obligation to bear arms. There is "no evidence that the duties described in the militia statutes corresponded with a broad societal practice of arming minors." Spitzer Decl., ¶ 57. To the contrary, it was obvious as early as 1794 that the states felt little compulsion to enforce this or any militia duty, regardless of a militiaman's age. *See* Letter from George Washington to the U.S. Senate and House of Representatives (19 November 1794), Founders Online, National Archives[30] ("the militia-laws have exhibited such striking defects, as could not have been supplied but by the zeal of our Citizens. Besides the extraordinary expence and waste, which are not the least of the defects, every appeal to those laws is attended with a doubt on its success."); see also, Kreidberg & Henry, *History of Military Mobilization in the United States Army 1775-1945*, DEPT. OF THE ARMY PAMPHLET NO. 20-212, p. 31 (Nov. 1955) ("The lack of teeth in the act and failure to provide Federal standardization and supervision for it doomed it to impotence"). In other words, the Militia Act of 1792 was not even strong evidence of society's belief

---

[30] https://founders.archives.gov/documents/Washington/05-17-02-0125

about the value of militia service, let alone a right to bear arms at age eighteen or during infancy. Its value as a historical analogue is negligible and it certainly is not sufficient to overcome the overwhelming historical record establishing the tradition of strictly regulating minors' access to firearms at the time of founding.

Plaintiffs' attempt to downplay the reconstruction era laws (they mention only a fraction of them) by arguing that they were not passed for "more than 80 years after the ratification of the Second Amendment" in 1791. ECF No. 4-1 at 28. But that does not work for several reasons. First, there were several founding-era rules and laws that confirmed the limits on a minor's ability to bear arms. Spitzer Decl., ¶¶ 20, 42-44, 51. Second, even if those laws did not exist, under Second Circuit precedent, "1868" and any "adjacent . . . periods" are "fertile ground" to "seek evidence of our national tradition of firearm regulation." *Antonyuk II*, 120 F.4th at 974. Thid, any purported absence of affirmative statutory proscriptions at the founding says nothing about their constitutionality because there was no need for statutory proscriptions at the founding. *Antonyuk II*, 120 F.4th at 969-70 ("[r]easoning from historical silence" is "risky" because "[t]here are many reasons why the historical record may not evidence statutory prohibitions," such as if the behavior is already "governed by custom" or "universal practice"). As such, a "more nuanced approach" to the historical inquiry is required, anyway. *Bruen*, 597 U.S. at 27.

The drastic societal changes that prompted antebellum and reconstruction-era restrictions were "unprecedented" and thus could not have been considered at the founding. *Bruen*, 597 U.S. at 27. Minors were already effectively prohibited from

acquiring or carrying arms outside their parents' supervision by virtue of laws of domestic relations and age of majority. Nor was there any concern about youth gun violence at that time because minors—like virtually all Americans—lived at home and worked on the family farm. And when the efficacy of those common-law limitations faded by the reconstruction era, and urbanization and the proliferation and increased lethality of firearms created unprecedented concerns regarding youth gun violence, statutes stepped in to do the work. *See Pinales*, 765 F. Supp. 3d at 1043-44 (such changes qualified as "unprecedented societal concerns" under *Bruen*).

Thus, from the founding through the reconstruction eras, states limited minors' ability to purchase and carry firearms. While *Bruen* does not require historical analogues "in significant numbers," *Antonyuk*, 120 F.4th at 971, the State Defendants produced more than 100. As these laws were being enacted, the principles of regulation espoused by Blackstone in the founding-era remained at the core of legal scholarship and practice, as reflected by Kent's and Reeve's treatises in the antebellum period and Cooley's and Schouler's treatises in the reconstruction era, among numerous others. These regulatory principles were applied consistently and never used to question the validity of laws restricting minors and handguns. And because those restrictions were wholly uncontroversial, the Court may "assume it settled" that they were lawful. *Bruen*, 597 U.S. at 30.

### iii.Modern age-based regulations in other contexts do not inform the right incorporated by the Second Amendment.

The constitutional rights of eighteen-year-olds in the present day have no bearing on the contours of the right to bear arms as it existed in 1791 and 1868.

Whatever relevance constitutional developments occurring after 1791 may have to our modern understanding of the constitution, Plaintiffs cannot rely on constitutional doctrine that did not exist in the founding-era to explain the founding-era understanding of whether minors could obtain and carry handguns consistent with the Second Amendment.

"The written laws of the Founding era must be understood in the light of that predominant common-law regime." *NRA*, 133 F.4th at 1128. For instance, modern voting rights, which Plaintiff holds up as evidence of 18-20 year-olds' inclusion in the political community, is irrelevant to their status in 1791. Under-21-year-olds did not earn the right to vote in federal elections until 1971, with ratification of the 26th Amendment to the U.S. Constitution, which lowered the voting age to 18. But it required a constitutional amendment to make this change. *See Oregon v. Mitchell*, 400 U.S. 112, 118 (1970) (federal statute lowering the voting age to 18 was unconstitutional as pertaining to state and local elections). And the 26th Amendment, pointedly, did not otherwise lower the age of majority, which was a power left to the states. *See* March 23, 1971 Congressional Record, p. 7568 (rejecting proposed amendment that would have lowered the age of majority to 18).

Modern constitutional doctrine cannot be retrofitted to support Plaintiffs' interpretation of the Second Amendment. States define the age at which minors can exercise "adult" rights. *See* Conn. Gen. Stat. § 1-1d (permitting exceptions to the general age of majority). "[E]ven where there is an invasion of protected freedoms the power of the state to control the conduct of children reaches beyond the scope of its

authority over adults." *Ginsberg v. New York*, 390 U.S. 629, 638 (1968) (cleaned up). Consistent with that power, states retain broad discretion to restrict (or not restrict) activities based on age, subject to other constitutional provisions, for instance, the equal protection clauses. *See, e.g.*, *United States v. Skrmetti*, 145 S. Ct. 1816, 1829 (2025) (age-based classification are subject to rational basis review under the equal protection clause). But Plaintiffs chose not to pursue an equal protection challenge here. They should not be allowed to contort the Second Amendment to subvert founding and modern-era constitutional principles that control the rights of minors.

### 3. The weight of Circuit authority provides strong support here.

Finally, the caselaw considering restrictions on minors' ability to purchase and possess firearms provides strong support for the State Defendants' position. Most courts considering such restrictions have found them to be constitutional. *McCoy*, 140 F.4th at 568; *NRA*, 133 F.4th at 1111; *Pinales*, 765 F. Supp. 3d at 1024; *Picon*, 2025 D.C. App. LEXIS 308; *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) (upholding age-based restriction on purchase under step one). And the courts that have held otherwise did so largely based on a methodological approach to the *Bruen-Rahimi* test that does not apply in the Second Circuit—that the historical inquiry should be pegged to 1791, and not 1868.[31]  Those courts thus discounted the significance of the Reconstruction Era laws as coming too late, despite acknowledging that they otherwise may be considered relevantly similar and thus

---

[31] The Supreme Court declined to resolve this question in both *Bruen* and *Rahimi*.  597 U.S. at 38; 602 U.S. at 692 n.1.

entitled to substantial weight.  *See Lara*, 125 F.4th at 441 (holding that the right "should be understood according to its public meaning in 1791," and thus that Reconstruction Era restrictions thus "do not provide as much insight"); *Reese*, 127 F.4th at 599 (noting that "19th century laws . . . appear to be 'relevantly similar' to the current handgun purchase ban," but "were passed too late in time"); *Worth*, 108 F.4th at 696 ("it is questionable whether the Reconstruction-era sources have much weight" because the right is "pegged" to the public understanding in "1791").

But the Second Circuit rejected the 1791-only approach. When it comes to challenges to state statutes, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 120 F.4th at 972. In so doing, the Second Circuit explicitly "part[ed] ways" with the Third Circuit. *Id.* So while *Lara*, *Reese*, and *Worth* considered only evidence around 1791 to the exclusion of 1868, the Second Circuit does not permit that approach to historical analysis. Thus, even if there is "discrepancy" between the two periods—and here there is not—"1791 and 1868 are both fertile ground . . . to seek evidence of our national tradition of firearm regulation." *Id.*; *see also Frey*, 2025 U.S. App. LEXIS 24303 *17 (when a "dearth of similar Founding-era laws does not help us discern with clarity" the scope of the right, courts must "continue [their] march through history," and that "[l]ater history might instead definitively showcase either the existence or lack of a strong national tradition").

But even the Eleventh Circuit, which does not pin interpretation of the right to bear arms to 1868, like the Second Circuit does, still rejected a 1791-only approach

as incompatible with *Bruen* and *Rahimi. See NRA*, 133 F.4th at 1128 ("The recent contrary decision of our sister circuit—which ignored how the common-law regime restricted minors' access to firearms—also fails to persuade us"). The Eleventh Circuit's sound reasoning and supports the constitutionality of age restriction laws.

Second Circuit precedent is dispositive here. This Court should not follow the Circuit opinions to the contrary.

**V. Conclusion**

The 200-year history and tradition of regulating a minor's ability to obtain and carry a handgun demonstrates that Connecticut's age restriction laws are constitutional. For the foregoing reasons, Plaintiffs' motion for permanent injunctive relief must be denied and, at the conclusion of any evidentiary hearing, judgment should enter for the State Defendants.

STATE DEFENDANTS,

RONNELL HIGGINS, MARGARET A. KELLEY AND PAUL J. NARDUCCI

WILLIAM TONG
ATTORNEY GENERAL

BY:    */s/Blake T. Sullivan*
       Blake T. Sullivan (ct30289)
       Timothy J. Holzman (ct30420)
       James M. Belforti (ct30449)
       Assistant Attorney General
       Office of the Attorney General
       165 Capitol Avenue, 5th Floor
       Tel.: (860) 808-5020
       Fax: (860) 808-5347
       Blake.Sullivan@ct.gov
       Timothy.Holzman@ct.gov
       James.Belforti@ct.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Blake T. Sullivan*
Blake T. Sullivan
Assistant Attorney General