## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| ZACHARY SUCCOW, SAMUEL TOWNE; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC., | |
| Plaintiffs, | CIV. NO. 3:25-cv-250-SVN |
| v. | |
| PAMELA JO BONDI, in her official capacity; RONNELL HIGGINS, in his official capacity; MARGARET A. KELLEY, in her official capacity; PAUL J. NARDUCCI, in his official capacity; JOHN BUCHERATI, in his official capacity; PATRICK DALEY, in his official capacity; | November 7, 2025 |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANT BONDI'S SECOND MOTION TO DISMISS AND REPLY TO OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF** |
| Defendants. | |

On October 21, 2025, Defendant Bondi filed a second motion to dismiss in this case, which she has also submitted as serving as her opposition to the Plaintiffs' motion for a preliminary injunction. As the Plaintiffs show below, Bondi's arguments should be rejected.

### RELEVANT BACKGROUND

Plaintiffs Zachary Succow (age 19) and Samuel Towne (age 20) are law-abiding Connecticut adults who meet every qualification to purchase, keep, and bear handguns under federal and Connecticut law, except for their age. Dkt. 49, ¶¶ 31-51. Along with the Second Amendment Foundation and the Connecticut Citizens Defense League, they filed this action on February 18, 2025 challenging the federal and Connecticut laws that prohibit them from purchasing, keeping, and bearing handguns for all lawful purposes. Dkt. 1. They also filed an

emergency motion for a temporary restraining order and a preliminary injunction seeking to enjoin enforcement of the relevant federal and Connecticut laws. Dkt. 4.

The Court denied the Plaintiffs' emergency motion for a temporary restraining order on February 21, 2025 and convened a status conference on February 25, 2025 to set a briefing schedule on the TRO. Dkt. 16. The Court then denied the Plaintiffs' motion for a temporary restraining order and requested a schedule from the parties regarding the preliminary injunction. Dtk. 34.

The parties filed a joint status report on March 28, 2025. Dkt. 35. The Plaintiffs objected to any consolidation of the preliminary injunction and the permanent injunction proceedings because of the ongoing denial of their Second Amendment rights, and they asked the Court to set a briefing schedule that would have their preliminary injunction motion heard as soon as possible. Dkt. 35, pp. 3-6. The Defendants proposed the consolidation of the preliminary injunction and the permanent injunction hearings. Dkt. 35, pp. 1-2. They cited contested issues of fact and law and the need to prepare an adequate defense. Dkt. 35, pp. 6-8.

On May 6, 2025, the Court adopted the Defendants' proposal and consolidated the preliminary injunction hearing with the permanent injunction hearing. Dkt. 48. It set an initial response date of June 13, 2025 for the Defendants to respond to the Plaintiffs' amended complaint. Dkt. 48.

Defendant Bondi filed a motion to dismiss on June 13, 2025. Dkt. 57. The Plaintiffs opposed Bondi's motion to dismiss on July 7, 2025. Dkt. 60. On September 22, 2025, the

Court entered an order deferring resolution of the pending motions to dismiss until it decides the Plaintiffs' motion for a preliminary injunction.

## LEGAL STANDARD

Dismissal is not appropriate under Fed. R. Civ. 12(b)(6) if "a complaint [] contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face….' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A trial court must "draw all reasonable inferences in [the non-movant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). "*Twombly* does not require heightened fact pleading of specifics," *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007); instead, it "require[s] enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

The standard for a permanent injunction is the same as that for a preliminary injunction except that the plaintiffs must establish actual success, rather than merely a likelihood of success on the merits. *Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007). In addition to actual success on the merits, the Plaintiffs must show irreparable harm and that the public interest would not be disserved by the issuance of an injunction. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010); *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010).

## ARGUMENT

**I.    Defendant Bondi Cannot Justify The Challenged Federal Laws By Lumping Them Together With Other Laws She Thinks Are Constitutional.**

Defendant Bondi opens her argument by discussing irrelevant regulatory burdens posed by the Gun Control Act of 1968. Dkt. 91-1, pp. 6-7. She highlights such inapposite prohibitions as the felon prohibitor, the illegal alien prohibitor, the domestic violence prohibitor, and the mental illness prohibitor. *Id.* This case, however, is not about any of those prohibitors, and they simply have no relevance to this case. The Plaintiffs challenge the constitutionality of 18 U.S.C. § 922(b)(1), 18 U.S.C. § 924(a)(l)(D), 18 U.S.C. § 922(c), and 27 C.F.R. § 478.99(b)(1) – all of which operate to prohibit adults between the ages of 18 and 21 from purchasing handguns and handgun ammunition at retail and from federal firearms licensees (FFLs).

Bondi ultimately acknowledges and concedes what is actually relevant in this case: that 18 U.S.C. § 922(b)(1) does bar law abiding 18-20-year-old adults from *purchasing* handguns and handgun ammunition at retail and from federal firearms licensees. Dkt. 91-1, p. 7. She also acknowledges that federal law does not prohibit 18-20-year-olds from *possessing* handguns and handgun ammunition. *Id.* (citing 18 U.S.C. § 922(x)(2)). Lastly, Bondi concedes that 18 U.S.C. § 922(b)(1), 18 U.S.C. § 924(a)(l)(D), 18 U.S.C. § 922(c), and 27 C.F.R. § 478.99(b)(1) implicates the Second Amendment. *Id.* at p. 9.

These are the issues relevant in this case, not inapposite prohibitions of felons, illegal aliens, domestic abusers, or the mentally ill. Justification by inapt association is not the constitutional standard, and the Court should ignore any attempt by Bondi to justify by association the federal handgun purchase ban.

4

II.     **Bondi Concedes That The Second Amendment's Plain Text Protects The Plaintiffs' Proposed Conduct.**

Bondi acknowledges that *NYSRPA v. Bruen*, 597 U.S. 1 (2022) established a two-part test for analyzing Second Amendment challenges. Dkt. 91-1, p. 8. She also acknowledges that, if the Second Amendment's plain text covers an individual's proposed conduct, the Second Amendment presumptively protects that conduct, and the burden then shifts to the government to justify its law from our nation's history and tradition. *Id.* at p. 8. Bondi then concedes that the Plaintiffs' proposed conduct – the purchase of handguns and handgun ammunition from FFLs at retail and elsewhere – is protected by the Second Amendment's plain text: "The federal defendant does not dispute that the conduct at issue here is implicated by the Second Amendment…." *Id.* at p. 9.

The Court should accept Bondi's concessions and proceed to the historical analysis instructed by *Bruen*.

III.    **Bondi Does Not Explain Whether She Is Claiming An Unprecedented Societal Concern And, If She Is, What The Basis For It Is.**

Bondi jumps straight to nuanced historical reasoning under *Bruen* without demonstrating that she is entitled to it. Dkt. 91-1, pp. 8-9, 13 (arguing for nuanced analogical reasoning). This case presents a straightforward historical case under *Bruen*. 597 U.S. at 26 ("In some cases, that [historical] inquiry will be fairly straightforward").

*Bruen* explained what type of cases were straightforward:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is

> unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

597 U.S. at 26-27.

The Supreme Court pointed to *District of Columbia v. Heller*, 554 U.S. 570 (2008) as exemplifying "this kind of straightforward historical inquiry:"

> One of the District's regulations challenged in *Heller* "totally ban[ned] handgun possession in the home." *Id.*, at 628, 128 S.Ct. 2783. The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities—and it employed a regulation—a flat ban on the possession of handguns in the home—that the Founders themselves could have adopted to confront that problem. Accordingly, after considering "founding-era historical precedent," including "various restrictive laws in the colonial period," and finding that none was analogous to the District's ban, Heller concluded that the handgun ban was unconstitutional. *Id.*, at 631, 128 S.Ct. 2783; *see also id.*, at 634, 128 S.Ct. 2783 (describing the claim that "there were somewhat similar restrictions in the founding period" a "false proposition").

*Bruen*, 597 U.S. at 27.

However, without explanation, Bondi jumps straight into a nuanced historical reasoning analysis without demonstrating that she is entitled to circumvent a straightforward historical inquiry. Dkt. 91-1, pp. 8-9, 13 (arguing for nuanced analogical reasoning). To the contrary, nuanced historical reasoning is only appropriate in "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 27. This case implicates neither.

Rather, Bondi's identified concerns – minors' lack of judgment and discretion and dependence on their parents – are certainly not new, and were well known to the Founding Fathers. Dkt. 91-1, p. 12. In fact, the entire crux of Bondi's historical argument is demonstrating how the Founding generation regulated minors' lack of judgment and discretion and made them dependent on their parents or legal guardians. Dkt. 91-1, pp. 9-13.

6

Thus, the Court should reject Bondi's invitation to engage in nuanced analogical reasoning because she has failed to demonstrate that she is entitled to it.

## IV. Bondi Fails To Justify The Federal 18-20-Year-Old Handgun Purchase Prohibition From Our Nation's History And Tradition.

Bondi's appeal to history falls flat on two fronts. First, she fails to identify a single Founding Era law that prohibited any adult who had reached the age of majority from purchasing handguns or handgun ammunition because of concerns about their maturity. Second, even assuming the appropriateness of considering Founding Era laws governing minors when the Plaintiffs here are not minors, Bondi's analogues fail *Bruen*'s "how" and the "why" metrics.

Under *Bruen*'s straightforward approach, Bondi's failure to identify a single Founding Era law that prohibited any adult who had reached the age of majority from purchasing handguns or handgun ammunition because of age-based concerns about their maturity is fatal to her historical analysis. Such a tradition simply did not exist in the Founding Era, but was actually antithetical to the Founding Era way of life, which required all able-bodied men (including certain minors) to obtain, keep, and bear their own arms for service in the militia. *See* Dkt. 4-1, pp. 22-26. Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 n.46 (1983) ("From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 14, 16, or 18 through 45, 50, or 60 (depending on the colony)"); David Kopel & Joseph Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 533 (2019) (reviewing over 250 colonial and Founding Era militia laws and finding that the most common age for militia duty was 16 to 50 years). National proposals for

the federal government to arm 18-20-year-olds because of their perceived lack of resources encountered stiff opposition in Congress and quickly died because Congress could not stomach the notion that the federal government could control the arms borne by 18-20-year-olds:

> Representative Wadsworth warned that supporters of the federal arming proposal seemed to be suggesting that large segments of the population would be armed by the government, with the attendant dangers: "At first it appeared to be intended for the benefit of poor men who were unable to spare money enough to purchase a firelock: but the gentleman from Delaware (Mr. Vining) had mentioned apprentices and young men in their non-age: he would be glad to know whether there was a man within these walls, who wished to have so large a proportion of the community by the United States, and liable to be disarmed by the government, whenever it should be thought proper." Masters could be expected to furnish arms to their apprentices. As to other young men, "their parents would rather give them guns of their own, than let them take others from the U.S. which were liable to be taken away at the very moment they were most wanted."

Kopel and Greenlee, at 592-93 (quoting 14 Documentary History of the First Federal Congress: Debates in the House of Representatives 62 (1992)).

Despite being on notice, Bondi raises no objection to this strong historical evidence that 18-20-year-olds were considered responsible enough to keep and bear arms by the Founding generation even if, unlike the Plaintiffs, they were considered minors for other legal obligations. In fact, Bondi neglects to discuss this issue entirely. Avoiding inconvenient historical evidence does not justify a law under *Bruen*; it dooms it. The historical record contains no evidence that 18-20-year-olds were prohibited from purchasing, possessing, or bearing handguns in the Founding Era. Instead, it supports the conclusion that 18-20-year-olds were expected and required to obtain, possess, and bear arms – their own personal arms -- in the Founding Era.

Thus, the Court should conclude that Bondi has failed to carry her historical burden under *Bruen*'s straightforward analysis and declare 18 U.S.C. § 922(b)(1), 18 U.S.C. § 924(a)(l)(D), 18 U.S.C. § 922(c), and 27 C.F.R. § 478.99(b)(1) are unconstitutional.

Even if the Court uses the nuanced approach, Bondi still failed to carry her historical burden because she only appeals to Founding Era laws governing minors, and her construction of those laws strips them of the historical context that dooms her argument. *Bruen*'s nuanced approach requires Bondi to identify a well-established and representative historical analogue to 18 U.S.C. § 922(b)(1), 18 U.S.C. § 924(a)(l)(D), 18 U.S.C. § 922(c), and 27 C.F.R. § 478.99(b)(1). 597 U.S. at 29-30. Courts must examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense" and "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified…." *Id.* at 29.

Bondi relies entirely on Founding Era laws of majority. Without identifying a single Founding Era law that prohibited minors from possessing firearms, Bondi claims that the government's general power to regulate the conduct, rights, and privileges of minors to a greater extent than it could adult citizens justifies today's federal handgun purchase ban.

This argument encounters a fatal threshold problem: 18-20-year-olds are not minors under modern law. Except for three states – Alabama (19),[1] Nebraska (19),[2] and Mississippi (21)[3], every other state, including Connecticut, sets the age of majority at 18. Conn. Gen. Stat. § 1-1d. In other words, there is a national consensus that individuals reach sufficient maturity

---

[1] AL Code § 26-1-1(a).
[2] Nebraska Rev. Stat. § 43-2101(1).
[3] MS Code § 1-3-27.

at the age of 18 to declare them legal adults entitled to the full privileges of citizenship. Thus, the modern consensus of a lower age of majority cannot be set aside as cavalierly as Bondi attempts. *Bruen* cautioned courts that, in a nuanced inquiry, the Second Amendment does not work only one way – e.g., justifying regulations for problems unknown at the Founding. 597 U.S. at 28-29. The Second Amendment also provides protections in new circumstances – e.g., protecting arms unimaginable at the Founding. *See Heller*, 554 U.S. at 582. This command does not permit the Court to trap the age of majority "in amber." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). Instead, the Court must take today's national consensus as to the age of majority as it stands: individuals who turn 18 have reached the age of majority.

Bondi's attempt to justify the federal handgun purchase ban by invoking the Founding Era age of majority relies on the perceived community decision to make the age of majority the benchmark for judging maturity. Dkt. 91-1, pp. 9-10 ("English law set the age of majority at 21 years of age because of the relative lack of maturity and judgment of younger individuals") (quoting *NRA v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025). This community judgment used the same rationale to deny the right to vote as Defendant Bondi argues that John Adams observed. Dkt. 91-1, p. 10.

Of course, our nation has since rejected John Adams' view about 18-20-year-olds' suitability to vote through the 26th Amendment. It has also replaced the prevailing Founding Era views regarding youthful maturity – as evinced by 47 states lowering their ages of majority to 18. This national consensus about the proper modern age of maturity is not one the Court has the power to overrule. The Court should reject any invitation to implicitly do so when it comes to the fundamental constitutional right to keep and bear arms.

Beyond this, Bondi's claim that "minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor" lacks historical support. Dkt. 91-1, p. 12. She fails to identify a single historical case or law that supports her proposition. For good reason. None exist.

Instead, Bondi ignores that the Founding Era common law drew a distinction between contract formation and contract enforceability. *See, e.g.*, *Shelby v. Smith's Heirs*, 9 Ky. 504, 512 (1820) ("Chancery will enforce contracts that are fair and certain, and it will often rescind them for mistake and fraud; but it will never make new contracts, or new model and add to those already made by the parties."); *Cochran v. Cummings*, 4 U.S. (250,) 250 (Pa. 1802) (declaring an already-formed contract "fraudulent and void" because the contract was procured through "a gross misrepresentation of facts, relating to the subject of [the] contract"). Nothing in Founding Era contract law prohibited minors, as a legal matter, from forming contracts or buying goods on credit. *See Soper v. President & Fellows of Harv. Coll.*, 18 Mass. 177, 183 (1822) (recognizing that, while "[t]he common law renders void any promise made by an infant, the consideration of which is not for necessaries," merchants "will nevertheless give credit to them, and minister to their pleasures and dissipation, relying upon the honor of ingenuous young men to discharge debts so incurred"). In fact, *Soper* lamented that the only remedy to prohibit minors from forming credit contracts was legislation that did not exist. *Id.* at 183-84. Instead, a minor who formed a credit contract could choose to void it. *See* 2 James Kent, *Commentaries on American Law* 191–93 (1827).

These principles extended to minors purchasing goods such as firearms on credit. For instance, in *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572 (1822), a minor purchased a

pistol and powder on credit, and the court rejected the merchant's attempt to collect payment. The court did not discuss, in any fashion, any law – statutory or common – that prohibited a minor from purchasing a pistol and powder.

Bondi's inapt analogies bear no resemblance to the "how" and "why" of today's federal handgun purchase ban.

Start with "how." The common law's rule against enforcing credit contracts for items that were not necessaries did not bar minors from purchasing handguns and handgun ammunition like the federal handgun ban does. It only prohibited merchants from judicially enforcing credit contracts as a general matter, which incidentally included judicially enforcing credit contracts for handguns and handgun ammunition. In other words, the rule did not operate as a complete ban or even a limited restriction on the ability of 18-20-year-olds (minors, at the time) to purchase handguns and handgun ammunition. Any restriction flowing from this rule was strictly incidental to the rule's main objective: prohibiting the enforcement of credit contracts.

Consider next "why." *Soper* explained that Massachusetts's statutory adoption of the common law rule with specific focus on the livery stable keepers was intended to protect minors from unscrupulous merchants who would "minister to their pleasures and dissipation, relying upon the honor of ingenuous young men to discharge debts so incurred." 18 Mass. At 183. *Soper* further explained that the law was as much for the protection of parents as minors: "youth are exposed to temptations which it is difficult for them to resist, and thus parents are brought to expense, besides suffering the loss of their hopes in the education of their children." *Id.* at 183-84. In other words, both the common law and the Massachusetts statute,

"which may be considered as passed in aid of the common law, being founded in similar principles," did not prohibit 18-20-year-olds from purchasing firearms because they were deemed too immature to possess them. *Id.* at 184. Neither the common law nor the Massachusetts law barred 18-20-year-olds or minors from purchasing anything. Instead, both simply prohibited them from purchasing anything but necessities on credit because society deemed young men too irresponsible to properly manage credit without ruining themselves and their parents. Founding Era society never drew the conclusion that 18-20-year-olds were too irresponsible to purchase or possess firearms.

That is a far cry from the federal handgun purchase ban being challenged here, which bars 18-20-year-olds, including responsible adults such as Zachary Succow and Samuel Towne,[4] from purchasing handguns and handgun ammunition from the same places that their fellow citizens can. The differences between the "how" and "why" of Bondi's cited laws and today's federal handgun purchase ban are far too divergent to render the Founding Era common law rule prohibiting enforcement of credit contracts with minors as a suitable analogue to the adult 18-20-year-old federal handgun purchase ban.

In sum, Defendant Bondi's claim is just that – a claim without historical support. She does nothing to identify for the Court any Founding Era laws that prohibited even minors (and the Plaintiffs are not minors) from purchasing handguns and ammunition. That is fatal to her historical arguments, and the Court should reject them.

---

[4] The Court will have the opportunity to assess Mr. Succow and Mr. Towne itself at the trial it has scheduled on January 12, 2026, but suffice it to say, both have been subjected to rigorous depositions in this case and have borne themselves respectfully and maturely – more so than many adult witnesses do in judicial proceedings.

**V.     The Combined Force Of Text And History Overcome Bondi's Historical Arguments.**

Even if the Court divines a historical tradition of age-based restrictions on firearms purchases, Bondi still fails to carry her burden to overcome the Second Amendment's text and history.

*Bruen* clarified that, "to the extent later history contradicts what the [Second Amendment's] text says, the text controls." 597 U.S. at 36. "Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36 (cleaned up).

*Heller* explained that one of the Second Amendment's primary purposes was "to prevent elimination of the militia." 554 U.S. at 599 ("It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified"). The "militia" that the Second Amendment refers to is not the "organized militia" but "the Militia comprised [of] all males physically capable of acting in concert for the common defense." *Heller*, 554 U.S. at 595-96 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (cleaned up). "It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599.

The Supreme Court also mandated caution in the use of the Second Amendment's prefatory clause. The preservation of the citizen militia was the reason that the Second Amendment was codified, but it does not limit the components of the right that the Second Amendment protects. *Id.* at 599. *Heller* describes self-defense as "the *central component* of the

right itself." *Id.* at 599. Thus, the appropriate use of the Second Amendment's prefatory clause is to illuminate "the balance struck by the founding generation" and "to apply [it] faithfully… to modern circumstances." *Bruen*, 597 U.S. at 29 n.7; *see also id.* at 26 ("The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense…. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.") (cleaned up).

This caution has given courts pause in how they use the Second Amendment's prefatory clause in Second Amendment analysis, but it does not compel them to write the clause entirely out of Second Amendment analysis. Rather, it requires them to use it. How? The answer will inevitably be case-specific, but, in this case, it requires the Court to weight more heavily the historical inclusion of 18-20-year-olds among the militia.

Because one of the Second Amendment's announced purposes was to prevent the government from rendering militias ineffective, Founding Era militia laws shed light on whom was considered physically capable of participating in the common defense and should thus be protected from disarmament.

Founding Era militia laws, including laws that endured from well before 1791, considered those within a wide age range to be physically capable of serving in the militia. Dkt. 4-1, pp. 21-27 (discussing laws and ranges). These laws ultimately resulted in a national consensus in a federal militia act that set the minimum age for militia service at 18. *More effectually to provide for the National Defence by establishing an Uniform Militia throughout the United*

*States*, 1 Stat. 271 (1792) (Uniform Militia Act) (UMA). These militia laws also compelled personal firearms acquisition, possession, and use, including by 18-20-year-olds.

These laws make clear, as a Second Amendment textual matter, that 18-20-year-olds cannot be disarmed or prohibited from purchasing, keeping, and bearing the same arms as their fellow citizens.

*Heller* also makes clear that the availability of other options is not relevant:

> It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Heller*, 554 U.S. at 629. This principle applies both to other weapons and other methods of purchase that do not involve purchasing a handgun and handgun ammunition from an FFL at retail.

Bondi's only meaningful answer to this historical tradition is that parents were required to arm 18-20-year-olds who were obligated in the militia because minors could not purchase firearms. Dkt. 91-1, p. 12. Her proposition, however, simply does not follow from the Congressional debates and the Founding Era militia statutes that contain such a requirement. The obligation of parents to arm 18-20-year-olds did not flow from a legal prohibition on minors purchasing firearms, but rather from minors' lack of financial resources to do so:

> Representative Wadsworth warned that supporters of the federal arming proposal seemed to be suggesting that large segments of the population would be armed by the government, with the attendant dangers: "At first it appeared to be intended for the benefit of poor men who were unable to spare money enough to purchase a firelock: but the gentleman from Delaware (Mr. Vining) had mentioned apprentices and young men in their non-age: he would be glad to know whether there was a man within these walls, who wished to have so large a proportion of the community by the United States, and liable to be disarmed by the government, whenever it should be thought proper." Masters could be expected to furnish arms to their apprentices. As to other young men, "their parents would rather give them guns of their own, than let them take others from the U.S. which were liable to be taken away at the very moment they were most wanted."

Kopel and Greenlee, at 592-93 (quoting 14 Documentary History of the First Federal Congress: Debates in the House of Representatives 62 (1992)).

If there was a widespread tradition of prohibiting minors from purchasing firearms during the Founding Era because of contract law restrictions, it would have made its way into Congressional debates over the proposal to federally supply arms to 18-20-year-olds. It did not. Bondi does nothing to explain this gap in the historical record. Nor could she. It is out of touch with our nation's historical tradition and what the common law actually was at the time.

Thus, the Court should conclude that the Second Amendment's text and the historical inclusion of 18-20-year-olds in the militia are dispositive and declare the federal handgun ban unconstitutional.

## VI. Dismissal Of The Plaintiffs' Alternative Claim For Relief Is Not Appropriate On A Motion To Dismiss.

Dismissing the Plaintiffs' alternative claim for relief pertaining to use of the National Instant Criminal Background Check System (NICS) is not appropriate on a motion to dismiss because it requires the Court to draw inferences against the Plaintiffs. Dkt. 91-1, pp. 13-16 (asking the Court to dismiss it). The Plaintiffs alleged ample facts to demonstrate that it is

federal law that prohibits Defendant Higgins from using NICS to vet sales of firearms, including handguns, between two private parties.

In the majority of other states, private parties who are not FFLs may transfer firearms to other non-FFLs without an FFL being involved. Dkt. 49, ¶ 85. These transfers are known as "private party transfers." Connecticut law, however, requires private parties to apply to the Connecticut State Police for permission to engage in a private party transfer. Conn. Gen. Stat. § 29-33(c). It also requires the Connecticut State Police to perform a NICS check prior to approving a private party transfer. Conn. Gen. Stat. § 29-33(c). On September 11, 2023, the Connecticut State Police issued guidance in which it announced that it would no longer process private party transfers because the FBI – a federal agency under Bondi's control – would not authorize NICS checks for private party transfers unless an FFL is involved. Dkt. 49, ¶ 95.

28 C.F.R. § 25.6 governs access to NICS for purposes of vetting firearms transactions under the Brady Act. Because federal law only requires FFLs to conduct a NICS check for a firearms transaction, the regulation only establishes a process for FFLs or POCs[5] making the request on behalf of an FFL. 28 C.F.R. § 25.6(a) – (i). Any other access to NICS is governed by 28 C.F.R. § 25.6(j), which limits such uses to:

> (1) Providing information to Federal, state, tribal, or local criminal justice agencies in connection with the issuance of a firearm-related or explosives-related permit or license, including permits or licenses to possess, acquire, or transfer a firearm, or to carry a concealed firearm, or to import, manufacture, deal in, or purchase explosives;

---

[5] POC stands for Point of Contact, which means "a state or local law enforcement agency serving as an intermediary between an FFL and the federal databases checked by the NICS." 28 C.F.R. § 25.2

(2) Responding to an inquiry from the Bureau of Alcohol, Tobacco, Firearms, and Explosives in connection with a civil or criminal law enforcement activity relating to the Gun Control Act (18 U.S.C. Chapter 44) or the National Firearms Act (26 U.S.C. Chapter 53); or,

(3) Disposing of firearms in the possession of a Federal, state, tribal, or local criminal justice agency.

Bondi's argument that the Plaintiffs have not alleged sufficient facts to show that the federal government is prohibiting the Connecticut State Police from using NICS for private party transfers is simply not true. The Plaintiffs specifically alleged that the Connecticut State Police ended Connecticut private party transfers because the FBI would not permit use of NICS unless an FFL is involved.[6] Dkt. 49, ¶ 95. That is a specific allegation that federal actors are prohibiting use of NICS for private party transfers.

If the Plaintiffs have the right to keep and bear handguns and handgun ammunition for all lawful purposes, but not the right to purchase handguns and handgun ammunition from an FFL, they still must have a means to exercise the right. The only way to do so is through private party transfers. Any dispute between the FBI and the Connecticut State Police over the appropriate use of NICS for private party transfers is not for the Plaintiffs to resolve.

Bondi could have easily resolved this issue with a single line in her brief: "The federal government does not prohibit the use of NICS for private party transfers." But tellingly, she did not, and she has not contested or disputed as false in any way the Connecticut State Police's announcement that the FBI was not permitting the use of NICS for private party transfers.

---

[6] This allegation also makes quick work of Bondi's challenge to the Plaintiffs' standing, which focused on the lack of federal conduct. Dkt. 91-1, p.15 n.4.

Instead, Bondi attempts to muddy the issue. She claims that federal law does not require private party transfers to be vetted through NICS. That is true, but it does not change the fact that federal law prohibits 18-20-year-olds from purchasing handguns and handgun ammunition from FFLs. It also does not change the fact that Connecticut law requires all firearms transfers to pass a NICS check and that the FBI is prohibiting Connecticut from using NICS for private party transfers.

Bondi's reliance on *McRorey v. Garland*, 99 F.4th 831, 839 (5th Cir. 2024) is unpersuasive. *McRorey* rejected a claim that delays in background checks for firearms purchases from FFLs were unconstitutional. In analyzing the plaintiffs' claim that the background system was being put to abusive ends because of lengthy delays, *McRorey* held that the law did not prohibit the FFLs from transferring a firearm if the background checks took more than 10 business days. *Id.* at 839. The Fifth Circuit found that this independent choice to do so broke the chain of constitutional causation. *Id.* at 839.

The facts are inherently different here though. 28 C.F.R. § 25.6(j)(1) invites state and local law enforcement to use NICS for decisions pertaining to "the issuance of a firearm-related… permit or license, including permits or licenses to possess, acquire, or transfer a firearm…." On its face, this regulation permits, and even invites, the Connecticut State Police to use NICS to vet private party transfers. Connecticut had previously relied on that promise to require all of its private party transfers to be vetted through NICS. The Connecticut State Police, however, have publicly stated that the FBI will no longer allow them to do so. Dkt. 49, ¶ 95.

20

It does not break the chain of constitutional causation when the federal government invites state governments to use its resources for public safety purposes, state governments react by mandating the use of federal resources for public safety purposes, and the federal government then prohibits that which it has previously invited. This is especially true where, in the context of this case, the federal government's actions essentially deny the Plaintiffs any avenue to exercise their Second Amendment right to keep and bear handguns and handgun ammunition for self-defense.

Thus, the Court should find that the Plaintiffs have stated an adequate claim for alternative relief.

## **CONCLUSION**

For the foregoing reasons, all those contained in the Plaintiffs' briefing, and those adduced and presented at trial, the Plaintiffs respectfully request that the Court declare 18 U.S.C. § 922(b)(1), 18 U.S.C. 922(c), 18 U.S.C. §924(a)(1)(D), and 27 C.F.R. § 478.99(b)(1) (collectively, the "federal handgun ban") and Conn. Gen. Stat. § 29-28(b) Conn. Gen. Stat. § 29-34(b), Conn. Gen. Stat. § 29-34(b), and Conn. Gen. Stat. § 29-36f (collectively, the "Connecticut handgun ban") unconstitutional and issue a permanent injunction enjoining their enforcement.

Dated: November 14, 2025                 Respectfully submitted,

                                         _//s//   Doug Dubitsky_____
                                         Doug Dubitsky, Esq.
                                         (ct21558)
                                         LAW OFFICES OF DOUG DUBITSKY
                                         P.O. Box 70
                                         North Windham, CT 06256
                                         Telephone: 860.808.8601
                                         Facsimile: 866.477.1120
                                         Email: doug@lawyer.com


                                         _//s//   Craig C. Fishbein_____
                                         Craig C. Fishbein, Esq.
                                         (ct25142)
                                         FISHBEIN LAW FIRM, LLC
                                         100 South Main Street
                                         P.O. Box 363
                                         Wallingford, Connecticut 06492
                                         Telephone: 203.265.2895
                                         Facsimile: 203.294.1396
                                         E-mail: ccf@fishbeinlaw.com

                                         _//s//   Cameron L. Atkinson_____
                                         _//s//   Audrey J. Lynn_____
                                         Cameron L. Atkinson, Esq.
                                         (ct31219)
                                         Audrey J. Lynn, Esq.
                                         (ct31814)
                                         ATKINSON LAW, LLC
                                         122 Litchfield Rd., Ste. 2
                                         P.O. Box 340
                                         Harwinton, CT 06791
                                         Telephone: 203.677.0782
                                         Facsimile: 203.672.6551
                                         Email: catkinson@atkinsonlawfirm.com
                                                 ajatkinson@atkinsonlawfirm.com


                                         _Attorneys for the Plaintiff_

## <u>CERTIFICATION OF SERVICE</u>

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<u>/s/ Cameron L. Atkinson /s/</u>