**ATTACHMENT B**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ZACHARY SUCCOW, ET AL | : | No. 3:25-cv-00250-SVN |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| PAMELA J. BONDI, ET AL | : | |
| *Defendants* | : | DECEMBER 9, 2025 |

### State Defendants' Proposed Findings of Fact & Conclusions of Law

In support of their case-in-chief, State Defendants intend to rely on the factual and legal arguments raised in the opposition brief to Plaintiff's motion for preliminary injunction and supporting declarations, as well as the reply. (ECF Nos. 88 through 88-5, 96.) Those proposed findings of fact and conclusions of law are broadly described below. State Defendants further adopt codefendant Bucherati's Findings of Fact and Proposed Conclusions of Law. State Defendants reserve the right to propose additional findings of fact and conclusions of law, based on the presentation of evidence at trial, as appropriate.

*Proposed Findings of Fact*

1.  Compared to adults, minors under age twenty-one are "more impulsive, more likely to engage in risky and reckless behavior, more influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations." Steinberg Decl., ¶ 10.

1

2. Indeed, "many aspects of psychological and neurobiological immaturity characteristic of individuals between the ages of 14 and 17 . . . are also characteristic of those between ages 18 and 20." Steinberg Decl., ¶ 10.

3. Adolescents and people in their early 20s are uniquely impulsive and insensitive to risk, including with firearms. Steinberg Decl., ¶¶ 19, 24.

4. This tendency is "evidenced by studies of age differences in risk-taking . . . as well as participants' reports of involvement in both health-related risk-taking (e.g., smoking, drinking while driving, having unprotected sex) and antisocial risk-taking (e.g., fighting, stealing, vandalizing)[.]" Steinberg Decl., ¶ 19.

5. Moreover, "adolescents and individuals in their early 20s are less able than older individuals to control their impulses and consider the future consequences of their actions and decisions." Steinberg Decl., ¶ 20.

6. "The combination of heightened attentiveness to rewards and still-maturing impulse control makes middle and late adolescence a time of greater risk-taking than any other stage of development." Steinberg Decl., ¶ 23.

7. Statistically, "arrests for violent crime increase over the course of adolescence, peak in the late teens and early 20s[.]" Steinberg Decl., ¶ 31; see also, Spitzer Decl., ¶¶ 31-32.

8. "[S]uicidal ideation and attempted suicide are higher during late adolescence and young adulthood, including during ages 18 to 20, than any other period of life. Firearms were used in more than half of all suicide attempts." Steinberg Decl., ¶ 32.

2

9. "[N]umerous studies have documented that rates of deliberate self-injury, which . . . also peak in middle and late adolescence." Steinberg Decl., ¶ 33.

10. "[B]inge drinking and 'high-intensity drinking' (drinking twice as much as that considered binge drinking) is more frequent during the late teens and early 20s than at any other age." Steinberg Decl., ¶ 34.

11. "Intoxication is a particularly significant contributing factor to homicide and physical assault at all ages, especially in incidents involving personal confrontations, and even more so in those involving firearms. The psychological immaturity of individuals between 18 and 20, relative to those 21 and older, especially with respect to self-control, exacerbates the dangers of intoxication." Steinberg Decl., ¶ 34.

12. As demonstrated by ongoing cycles of violence, with firearm homicides and mass shootings being perpetrated disproportionately by under-21-year-olds, the dangers presented by armed minors are well-known. *See* Spitzer Decl., ¶ 30.

13. Ultimately, scientific consensus confirms that "there is good reason to place limits on the permitting of handguns to individuals who are between 18 and 20, as they are members of an age group that is especially at risk for violence, suicide, nonsuicidal self-injury, and excessive drinking." Steinberg Decl., ¶ 38.

14. In the 18th and early 19th centuries, minors "mostly lived with their parents in circumstances where they did not possess the means, ability, or right to obtain firearms on their own." Spitzer Decl., ¶ 29.

3

15. In the 19th century, the United States transformed from a largely rural society to largely urban one. Spitzer Decl., ¶ 28.

16. Industrialization led to an increased lethality of weapons and proliferation of repeating firearms across the nation. Rivas Decl., ¶ 11.

17. Unlike the muzzle-loaded arms of the founding era, by the 1830s manufacturers had begun developing handguns that were quick to fire and easy to conceal.  Rivas Decl., ¶ 13.

18. Industrial production of handguns grew significantly to accommodate military demands during the Civil War, and continued afterwards. Rivas Decl., ¶ 13.

19. "[S]toked by military surpluses, manufacturers' investment in mass production, and their adoption of highly effective marketing techniques," an expanding civilian market for firearms emerged. Rivas Decl., ¶ 13.

20. Moreover, people seeking to purchase a handgun could do so much more easily because market was no longer limited to local shops. Rivas Decl., ¶ 29.

21. As the costs of producing and transporting goods decreased, nation-wide sales, and distribution networks made all products, and specifically deadly weapons like handguns, "more easily accessible to customers than they had ever been before." Rivas Decl., ¶ 29.

22. That expanding market, in turn, created more opportunities for firearm manufactures to market specifically to minors and for minors to acquire firearms. Rivas Decl., ¶¶ 19, 21.

23. Minors working outside the home became more likely to keep their own wages and able to purchase deadly weapons, including handguns, regardless of whether their parents approved. Rivas Decl., ¶ 21.

24. Minors could "easily get their hands on" firearms and other deadly weapons at "pawn shops, gun stores, and hardware stores across the country." Rivas Decl., ¶ 21.

25. Juvenile crime also increased throughout the 19th century. Rivas Decl., ¶ 12.

26. The effects of "slavery, poverty, urbanization, ethnic tension, labor conflict, and political corruption" fueled rising rates of homicide and violence. Rivas Decl., ¶ 12.

27. The Civil War "worsened" that trajectory, marking the start of a period of "horrific violence, turmoil, and political instability that divided Americans against one another on the basis of race, class, geography, and politics." Rivas Decl., ¶ 12.

28. Rapid urbanization disrupted families, resulting in overcrowding and an increase in crime, including crimes committed by children. Spitzer Decl., ¶ 28.

29. Newspapers throughout the country described fatal accidents and careless shootings involving minors, and decried "the wretched practice of carrying concealed weapons" among boys. Rivas Decl., ¶ 22.

30. Societal and technological changes in the 19th century led to a proliferation of laws regulating minors and firearms. Spitzer Decl., ¶ 30.

5

31. These laws were intended "to protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds." Spitzer Decl., ¶ 30.

32. In many cases, "regulating the point of sale was the most effective means of restricting minors' access to handguns." Rivas Decl., ¶ 33.

33. Businesses that flouted the law risked not just the immediate criminal consequences, but also regulatory consequences like financial penalties or loss of license. Rivas Decl., ¶ 35.

*Proposed Conclusions of Law*

1. Connecticut's age restriction statutes, General Statutes §§ 29-28(b)(10), 29-34(b), and 29-36f, share the same justifications as the historical analogues of the 18th and 19th centuries, and burden the rights of minors in the same way, and so are consistent with the principles underlying our Nation's history of firearm regulation. *See United States v. Rahimi*, 602 U.S. 680, 698 (2024); Spitzer Decl., ¶¶ 20, 22, 42-44 and Exhibits C and E; Rivas Decl., ¶¶23, 24.

2. Plaintiffs fail to demonstrate when under-21-year-olds came within the scope of the Second Amendment and so fail to meet their burden at step one of the *Bruen-Rahimi* test. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

3. State Defendants have met their burden to demonstrate that the challenged laws are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

4. The Second Circuit requires considering historical laws encompassing the founding period and ratification of the Second Amendment in 1791, as well as the reconstruction period and ratification of the Fourteenth Amendment in 1868. *Antonyuk v. James*, 120 F.4th 941, 974 (2d Cir. 2024).

STATE DEFENDANTS,

RONNELL HIGGINS, MARGARET A. KELLEY AND PAUL J. NARDUCCI

WILLIAM TONG, ATTORNEY GENERAL

BY:    */s/Blake T. Sullivan*
       Blake T. Sullivan (ct30289)
       Timothy J. Holzman (ct30420)
       James M. Belforti (ct30449)
       Assistant Attorney General
       Office of the Attorney General
       Special Litigation Section
       165 Capitol Avenue, 5th Floor
       Tel.: (860) 808-5020
       Fax: (860) 808-5347
       Blake.Sullivan@ct.gov
       Timothy.Holzman@ct.gov
       James.Belforti@ct.gov

7