## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ZACHARY SUCCOW, ET AL | : | No. 3:25-cv-00250-SVN |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| PAMELA J. BONDI, ET AL | : | |
| *Defendants* | : | |

### DECLARATION OF ROBERT J. SPITZER

I, Robert J. Spitzer, the undersigned, declare as follows:

1. I have been asked to render an opinion on the history of, and concerns related to, firearms restrictions pertaining to those under the age of 21.

2. This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

3. I have been retained by the Connecticut Office of the Attorney General to render expert opinions in this case. I am being compensated at a rate of $500 per hour for consultations, research, writing and editing, and $750 per hour for any deposition or trial testimony.

### BACKGROUND AND QUALIFICATIONS

4. I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an Adjunct Professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University. A copy of my curriculum vitae is attached to this Declaration as Exhibit A.

5. I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for forty years. My first publication on the

1

subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, policy, and criminology. The ninth edition of the book was published in 2024 by Routledge Publishers.  My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023, 2025), both deal extensively with historical gun laws. I have been reading, studying, and writing about historic gun laws for over ten years. I am frequently interviewed and quoted in the national and international media on gun-related matters. I have co-authored amicus briefs and declarations in numerous cases, a list of which is attached to this Declaration in Exhibit B.

## I.     OVERVIEW OF OPINIONS

6.  Connecticut's laws restricting individuals younger than 21 from acquiring and possessing handguns are consistent with history and tradition, as reflected in the common law principles relating to the intersection of (a) minors and (b) dangerous weapons, as well as legislation that relied on those principles to address significant societal changes in the 19th century.

7. The broadly accepted age of majority during the eighteenth and nineteenth centuries, which distinguished an individual's rights as a minor from an individual's rights as an adult, was 21. Governments were empowered to restrict minors from exercising adult rights on the basis of their age, including, critically, a minor's ability to own and possess handguns.

---

[1] Robert J. Spitzer, "Shooting Down Gun Myths," *America* (June 8, 1985), 468–69.

2

8. Multiple historic legal principles underlie these restrictions. First, it was widely understood that minors lacked the capacity to make certain decisions for themselves or enter into contracts and that such decisions were properly left to minors' parents or other authorities acting *in loco parentis.*, This fact was reflected by and in college and university codes of conduct, which further support the fact that those under 21 were treated as minors with correspondingly limited rights. Second, legal principles were emphatic that certain categories of individuals could be prevented from possessing arms, and that all individuals could be prevented from possessing dangerous and unusual weapons.

9. Legislative prohibitions on minors purchasing or possessing handguns throughout the nation furthered those common law principles, designed in response to unprecedented societal changes as they appeared and developed in the 19th century.

10. Finally, militia laws at the time of the founding were consistent with the common law as it regulated minors and firearms. A detailed examination of old state militia laws from the period of the 1790s demonstrates that 18- to 20- year-olds subject to militia service were treated as minors under state laws, not as adult militia members age 21 and older. Thus, even that evidence demonstrates the "minor" status of militia members under 21, as state militia laws shifted the legal burden for obtaining arms for militia service from militiamen below the age of 21 to their parents, employers, guardians, or local governments. Additionally, pistols were not considered military grade firearms and were not in common use at the time.[2]

## II.    HISTORICAL RESTRICTIONS ON MINORS' ACCESS TO WEAPONS

11. As legal scholar Vivian Hamilton notes in her study of the definition of adulthood in the

---

[2] Kevin Sweeney, "An Eighteenth-Century Gun Culture Shaped by Constraints," *Second Thoughts Blog,* Duke Center for Firearms Law, September 6, 2023, https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints

United States, "[t]he immediate historical origins of the U.S. age of majority lie in the English common law tradition. The American colonies, then the United States, adopted age twenty-one as the near universal age of majority. The U.S. age of majority remained unchanged from the country's founding well into the twentieth century."[3] From the colonial era in America through the adoption of the Constitution, through the nineteenth century and even up until 1971—when the voting age was changed from 21 to 18 with the 26th Amendment—the generally recognized age of majority (i.e. adulthood) was 21. The right to vote, for example, was generally set at 21 by the time of the Revolutionary period and thereafter in the U.S.[4]

### A. Minors and Common Law

12. Authoritative state common law legal manuals from the Founding period reinforce this point. For example, the legal guide for Connecticut from 1795 by the noted jurist and legal scholar Zephaniah Swift, *A System of the Laws of the State of Connecticut,* stated flatly that "The Period when children arrive to full age, are capable of acting for themselves, and are liberated from the government of their parents, is at the age of twenty-one years, being the same, both males and females."[5] According to the similarly influential jurist and legal scholar William Waller Hening in his legal manual for Virginia from 1795, *The New Virginia Justice,* the

---

[3] Vivian E. Hamilton, "Adulthood in Law and Culture," *Tulane Law Review* 91(November 2016): 64.

[4] John Adams noted as much, for example, in the 1770s. Joseph J. Ellis, *The Cause: The American Revolution and its Discontents, 1773-1783* (NY: W.W. Norton, 2021), 69. The minimum voting age of 21 was not reduced until Georgia became the first state to do so in 1943. "The Voting Age," *CQ Researcher,* https://library.cqpress.com/cqresearcher/document.php?id=cqresrre1944090900

[5] Zephaniah Swift, *A System of the Laws of the State of Connecticut,* 2 vols. (Windham: John Byrne, 1795), II, 206. Swift also wrote in the same work: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech, minors." II, 213. Swift was a lawyer, jurist, Connecticut state legislator, and member of Congress. Among other accomplishments he compiled the first authorized edition of the Laws of the United States of America. He was called "the pioneer in the development of an American common law distinct from England." "Zephaniah Swift's First Legal Texts in America," State of Connecticut Judicial Branch, Law Library Services, https://www.jud.ct.gov/lawlib/history/swift.htm

definition of adulthood was the following: "By infant, or minor, is meant any one who is under the age of 21 years."[6] The noted Pennsylvania jurist John Reed, author of the first comprehensive compilation of the laws of that state, wrote in 1831 "that full age in male or female is twenty-one years, which age is completed on the day preceding the anniversary of a person's birth, who until that time is an *infant,* and so styled in law."[7]

13. Similarly, *Black's Law Dictionary* notes that "infancy" (the traditional term "infants" applied to those now labeled minors) is defined as "the state of a person who is under the age of legal majority,—at common law, twenty-one years. . . ."[8] As the constitutional scholar James Kent noted in his classic *Commentaries*, "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years. The age of twenty-one is the period of majority for both sexes . . . .The age of twenty-one is probably the period of absolute majority throughout the United States. . . ."[9] And as the noted legal historian Holly Brewer explains in her award-

---

[6] William Waller Hening, *The New Virginia Justice* (Richmond, VA: T. Nicolson, 1795), 258. Hening was "a Virginia lawyer, legal editor, and representative to the Virginia House of Delegates" who "steadily contributed to legal literature as an author or editor." His *New Virginia Justice* "was a handbook for magistrates that incorporated Virginia laws since the Revolution." "The New Virginia Justice, Comprising the Office and Authority of a Justice of The Peace, in the Commonwealth of Virginia," W&M Law Library, https://lawlibrary.wm.edu/wythepedia/index.php/New_Virginia_Justice

[7] John Reed, *Pennsylvania Blackstone; Being a Modification of the Commentaries of Sir William Blackstone, Numerous Alterations and Additions, Designed to Present an Elementary Exposition of the Entire Laws of Pennsylvania,* 3 vols. (Carlisle, PA: George Fleming, 1831), II, p. 249. See also pp. 251-53 detailing other limitations on the rights of those under 21. Reed was President Judge of Pennsylvania's Ninth Judicial Circuit, and helped found and then headed Dickinson Law School in 1834.

[8] Henry C. Black, *Black's Law Dictionary,* 6th ed. (St. Paul, MN: West Publishing Co., 1991; first pub. 1890), 536. *Merriam Webster's Dictionary of Law* defines "infant" as "a person who is not of the age of majority." (Springfield, MA: Merriam-Webster, 1996), 243.

[9] James Kent, *Commentaries on American Law,* 4 vols., 8th ed. (NY: William Kent, 1854), II, 248. Kent's *Commentaries* arose from lectures he delivered at Columbia law school beginning in 1794 and were first published in 1826. The definition of adulthood as starting at 21 appears in Kent's first edition: *Commentaries on American Law* (NY: O. Halsted, 1827): II, 171.

winning book, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority*, the universally understood age of adulthood at this time was 21,[10] a fact reflected in the aforementioned legal guides and laws of the 1790s, including those of Swift, Hening, and Reed. For example, those under 21 could not enter into contracts with narrow exceptions.[11] As Megan Walsh and Saul Cornell noted: "Under common law, and under later statutory revisions of the common law, minors enjoyed few rights that could be asserted in court; the law subsumed the legal identity of minors almost entirely within their parents, guardians, or masters, with a few well-defined exceptions."[12] Writing in the late nineteenth century in his book on infants (minors) and the law, the respected legal commentator Lewis Hochheimer noted that "Full age, at common law, is twenty-one years. . . . A person below that age is, in legal designation, an infant or minor."[13] He further observed that the "exercise of the power and duty of the government to secure to infants its protection and care" extended to "[s]pecific regulations and prohibitions, designed for the protection of their [infants'] morals and health and the security of their persons, such as those relating to the sale of liquors or dangerous weapons. . . ."[14]

14. Concerns over the prospect of minors obtaining ready access to firearms were often expressed in the nineteenth century, especially in the latter half of that century.[15] Voicing a

---

[10] Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (Chapel Hill, NC: University of North Carolina Press, 2005), 132 and *passim*. Brewer is the Burke Chair of American Cultural and Intellectual History and Associate Professor at the University of Maryland.

[11] Brewer, *By Birth or Consent*, Ch. 7. See also Megan Walsh and Saul Cornell, "Age Restrictions and the Right to Keep and Bear Arms, 1791-1868," *Minnesota Law Review* 108(2024): 3049-3120.

[12] Walsh and Cornell, "Age Restrictions and the Right to Keep and Bear Arms," 3064.

[13] Lewis Hochheimer, *The Law Relating to the Custody of Infants*, 3rd ed. (Baltimore: Harold B. Scrimger, 1899), 1.

[14] Hochheimer, *The Law Relating to the Custody of Infants,* 3-4.

[15] Patrick J. Charles, *Armed in America* (Amherst, NY: Prometheus Books, 2018), 156, 404-5.

typical sentiment of the time, the Supreme Court of Tennessee said this in an 1878 decision: "we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime, but wise and salutary in all its provisions."[16] At the time, the legal age for purchasing or owning a firearm in Tennessee was 21.[17]

15. These old legal guides and court cases underscore the ubiquitous common law definition of adulthood as starting at age 21. They also demonstrate that an array of other legal restrictions applied to those under 21. As the account to come shows, this common law understanding was also reflected in statutory law during this time.

### B. Minors and Statutory Law

16. Historic weapons laws in America relating to minors (i.e., those who have not reached the age of majority) were numerous and prolific, dating from the 1700s through the early 1900s. At least 45 states and the District of Columbia enacted laws to keep guns and other dangerous weapons (usually including fighting knives, types of clubs, and various explosives, sometimes including ammunition) out of the hands of minors, though the age limits set in these laws sometimes varied according to specifics discussed below. See Exhibit C and D, listing historic laws.

17. Notably, some of the laws to be discussed are municipal laws. These municipal laws are significant three reasons: first, social and public safety problems arising from weapons typically appeared first in places where large numbers of people congregated and lived—i.e., cities and towns. These problems multiplied in the nineteenth century as the U.S. transitioned from an

---

[16] *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878), https://cite.case.law/tenn/69/714/.

[17] *NRA v. Bondi,* 61 F.4th 1317, 1326 (11th Cir. 2023) citing *Warwick v. Cooper*, 37 Tenn. 659, 660 (Tenn. 1858).

overwhelmingly rural nation to a majority urban one. Second, given that municipalities are legal creatures of state governments, localities' ability to enact these or other laws presumes that they did so as allowable public policy under state law. Third, the initial enactment and spread of municipal regulations often led to subsequent enactment of similar state-wide regulations.

18. The contents of these laws pertaining to minors and weapons establish three important principles: (i) that the laws went to great lengths to keep guns (mostly handguns, but sometimes any guns) and other weapons out of the hands of minors; (ii) that the definition of who constituted a minor varied some during this time and according to the specific type of weapons restriction, but that the age of maturity for these weapons laws was most commonly set at 21; and (iii) that the category of minors (under 21) was a class not entitled to anything like gun rights.

19. Moreover, while the specific regulatory mechanisms across the states varied some, they generally encompassed provisions to criminalize the act of transmitting guns (whether through sale, gift, trade, or the like) and usually other weapons (primarily fighting knives and clubs) to minors whether by private individuals or commercial dealers. Some of the laws stipulated that those under the given age could have weapons in their possession with parental consent or supervision. Some of the provisions also extended to barring minor possession or ignition of gunpowder, firework-type explosives, including percussion caps, and the like. The inferior legal status of minors is punctuated by the fact that some of these laws also included other categories of people who were viewed as not entitled to full rights, including African Americans (enslaved and free before the Civil War), servants, those of "unsound mind," those who were intoxicated, convicts, and drug addicts. Some of these restrictions—most notably, those applying to African Americans—are abhorrent in the modern context, but it would be a mistake to ignore them.

8

Rather, the fact that minors were often included in a similar prohibited category of person underscores the fact that minors were treated in the same category as others with far more limited legal rights.

20. At least 18 laws were enacted in 10 states pertaining to minors and weapons before 1861. The earliest law, enacted in New York City in 1763, said that "if any Children, Youth, apprentices, Servants, or other persons, do fire and discharge any gun, pistol, leaden-gun, rockets, crackers, squibs, or other fire works, at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk, such person so offending shall forfeit for every such offense, the sum of forty shillings. . . ."[18] In 1803, the New York City enacted a provision to hold parents accountable for any unlawful firearm discharge by a minor.[19] The city enacted a similar measure in 1859.[20] Other early laws and ordinances pertaining to minors and weapons were enacted in Delaware (1812),[21] Virginia (1813),[22] South Carolina (1817),[23] New Jersey (1822),

---

[18] Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 11, Image 12 (1763) available at The Making of Modern Law: Primary Sources. 1763. Ordinances of the City of New York, § VI. See also A Law for the Better Preventing of Fire, no. 4, § 6, N.Y., LAWS, STATUTES, ORDINANCES AND CONST. ETC. (1763 John Holt).

[19] Edward Livingston, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty of the City of New-York, in Common-Council Convened, for the Good Rule and Government of the Inhabitants and Residents of Said City Page 83-84, Image 84-85 (1803) available at The Making of Modern Law: Primary Sources. 1803. Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1.

[20] D. T. Valentine, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York: Revised A. D. 1859 Adopted by the Common Council Page 235, Image 243 (1859) available at The Making of Modern Law: Primary Sources.

[21] Act of Feb. 4, 1812, 195 Del. Laws 522 (1812), Sec. 2.

[22] An Act to Restrain the Unnecessary Use of Fire Arms, §§ 1–3, Mayor, Recorder, and Common Council of Leesburg, Virginia (Leesburg, Virginia) (1813).

[23] Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation

[24] D.C. (1829), [25] Connecticut (1835), [26] Delaware (1845), [27] Kentucky (1853, [28] 1859/1860[29]),

Alabama (1856), [30] and Tennessee (1850, [31] 1856, 1858, [32] 1859[33]). See Exhibits C and D.

21. All of these early laws, whether pertaining to minors and firearms discharge or measures

to penalize making firearms available to minors, make clear that they are governed not as adults,

---

Thereto Page 61-61, Image 61-62 (1823) available at The Making of Modern Law: Primary Sources. 1817.

[24] An Ordinance to Prevent the Firing of Guns and Pistols within the Island of Burlington, §§ 1-4, BURLINGTON, NEW JERSEY, CHARTER AND BY-LAWS OF THE CITY (D. Allinson 1824) (Law Passed 1822).

[25] WASHINGTON, D.C., LAWS OF THE CORPORATION OF THE CITY, ch. 98, §§ 1-3 (Way & Gideon 1829); CHAP. 98.

[26] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835. Chapter 26.

[27] Act of January 29, 1845, ch. 12, § 2, 1845 Del. Laws 9, 10 (S. Kimmey), CHAPTER XII.

[28] Oliver H. Strattan, City Clerk A Collection of the State and Municipal Laws, in Force, and Applicable to the City of Louisville, Ky. Prepared and Digested, under an Order from the General Council of Said City by Oliver H. Strattan and John M. Vaughan, City Clerks, which Includes the State Constitution and City Charter, with Notes of Reference Page 175, Image 176 (1857) available at The Making of Modern Law: Primary Sources. 1853.

[29] 1859 Ky. Acts 245, An Act to Amend an Act Entitled "An Act to Reduce to One of the Several Acts in Relation to the Town of Harrodsburg," § 23; 1860 Ky. Acts 245, AN ACT to amend an act, entitled "An act to reduce into one the several acts in relation to the town of Harrodsburg, Ch. 33, § 23.

[30] 1856 Ala. Acts 17, To Amend the Criminal Law, §1.

[31] John M. Lea, The Revised Laws of the City of Nashville, with the Various Acts of Incorporation and Laws Applicable to the Town and City of Nashville, and a List of the Different Boards of Mayor and Aldermen, and Other Officers of Said City from the Year 1806 to 1850, Inclusive Page 68, Image 69 (1850) available at The Making of Modern Law: Primary Sources.

[32] Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-71 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. 1856; The Code of Tennessee Enacted by the General Assembly of 1857-8, 871 (Return J. Meigs & William F. Cooper eds. 1858). Chapter 9, Article II, Selling Liquors or Weapons to Minors or Slaves; Page 871; 1858.

The laws excepted guns for hunting or while traveling.

[33] MEMPHIS, DIGEST OF THE CHARTERS AND ORDINANCES OF THE CITY, art. 9, §§ 1-6 (Saunders, Oberly, & Jones 1860) (Law Passed 1859); ARTICLE IX. [Adopted September 15th, 1859.] SHOOTING GALLERIES.

but as "infants" under the control of their parents, exercising *in loco parentis* authority over their children. These early laws both reflected and presaged the effort to keep dangerous weapons out of the hands of minors in populated areas, and because of their minor status, to hold their parents, guardians, or employers legally responsible for any of the minors' illegal actions.

22. Following the Civil War, restrictions on minors' possession and use of weapons proliferated. In all, from 1861 to 1880, 12 states enacted 15 laws pertaining to minors and weapons. From 1881 to 1900, 32 states and the District of Columbia enacted 50 laws. From 1855 to 1900, at least 19 states and the District of Columbia also adopted laws that set 21 as the age of maturity.[34] From 1901 to 1933, 24 states enacted 35 laws pertaining to minors and weapons (some states enacted multiple laws across these time periods). See Exhibits C and D.

23. In terms of age limits (see Table 1 below), while they ranged from a low of 12 to a high of 21, the latter was also, by far, the most commonly set age of majority. Of the 108 laws counted in Table 1 that set a numerical age limit (not including the 20 laws that did not give a numerical age in the laws' text or for which no known case law provided for one), 46 of them (43%) set the age of majority at 21 (and in one case 20). When the laws concerning 21-year-olds are broken down by decades, 4 of them (9%) came before 1861; 18% of them were enacted from 1861-1880; 49% of them were enacted in the period from 1881-1900; and 24% during the period from 1901 to 1933.

24. The next most common age was 16 (21%), followed by age 18 (13%). The lower age limits tended to have other qualifiers, like the age at which children could have a gun or go hunting but subject to parental supervision. Listed below are the respective ages of majority that

---

[34] Two Kentucky localities enacted two laws in 1859 and 1860 setting 21 as the relevant age limit, as ruled in a Kentucky court, cited in *NRA v. Bondi* 61 F.4th 1317, App. 1, 11 (11th Cir. 2023), vacated, rehearing granted *en banc*, 2023 U.S. App. LEXIS 17960 (11th Cir. Fla., July 14, 2023).

appear in those laws for which the age was stated or could be discerned.[35] Given that American law regarding the generalized legal status of children was in flux in the nineteenth century (see below), as were the circumstances giving rise to laws regulating guns and minors, there is in fact a surprising degree of agreement about the ages pertaining to weapons as described here. This is especially notable given that during this time the nation transitioned from an overwhelmingly rural nation (where children working on a farm, for example, was an accepted practice) to an industrial nation by the end of the nineteenth century, when children working in factories and mines, for example, dramatically increased but was also increasingly abhorrent to society.

**TABLE 1**
**WEAPONS LAWS RESTRICTIONS FOR MINORS BY AGE LIMIT\***

| AGE | 21 | 20 | 18 | 17 | 16 | 15 | 14 | 13 | 12 | Unknown |
|---|---|---|---|---|---|---|---|---|---|---|
| NUMBER OF LAWS | 45 | 1 | 14 | 1 | 23 | 11 | 7 | 1 | 5 | 20 |

\*Source: Exhibits C and D. Laws that did not designate a numerical age in their text or that could not be ascertained are in the column "Unknown."

25. As noted, the age set also varied depending on the nature of the restriction (higher age limits on the age for carrying concealable weapons, for example, or lower age limits for those allowed to hunt or have dangerous but less lethal "toy guns"[36]). For example, an 1867 Tennessee law punished anyone "who sells, loans or gives to any minor a pistol, bowie-knife, dirk,

---

[35] Note that a few laws list multiple ages for different types of restrictions within the same law.

[36] Catie Carberry, "The Origin of Toy Guns in America," Duke Center for Firearms Law, July 18, 2019, https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/

Arkansas toothpick, hunter's knife, or like dangerous weapon" to anyone under 21, but made exceptions for "a gun for hunting or weapon for defense in traveling. . . ."[37]

26. What was not in flux, however, was the principle that minors, however defined, were not afforded the same rights as adults, including any right to have a gun or other dangerous weapon (absent *in loco parentis*).[38]

27. The dramatic increase in weapons laws pertaining to minors in the course of the nineteenth century is most readily explainable by understanding the profound changes in American state and society during this time-period. At the start of the nineteenth century, over 90% of the population in the U.S. was engaged in agriculture.[39] The typical Americans lived and worked on subsistence family farms in sparsely populated rural areas. Under those circumstances, children mostly lived at home, under the care of their parents, and participated in farm work from an early age. Children had no access to what we would now call "disposable income," much less anything resembling a "right" to obtain firearms on their own. Indeed, at the start of the 1800s the economy was "based primarily on small-scale farming and local commerce. . . ."[40]

---

[37] William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. 1867.

[38] For example, an 1859 Kentucky state law for the town of Harrodsburg made it illegal to "sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor" except for the minor's parent or guardian. 1859/1860 Ky. Acts 245. An 1883 Missouri law made it a crime to make available to any minor any of the weapons listed in the law if done "without the consent of the parent or guardian of such minor. . . ." 1883 Mo. Laws 76.

[39] Statistical Reporting Service, "The Story of U.S. Agricultural Estimates," U.S. Department of Agriculture (Washington, D.C.: GPO, April 1969), 1, https://www.nass.usda.gov/About_NASS/pdf/The%20Story%20of%20U.S.%20Agricultural%20Estimates.pdf

[40] George Brown Tindall and David E. Shi, *America: A Narrative History* 6th ed., 2 vols. (NY: W.W. Norton, 2004), I, 444.

28. By the end of the 1800s, however, the nation had "matured into a far-flung capitalist marketplace entwined with world markets" that "generated changes in every other area of American life, from politics to the legal system, from the family to social values. . . ."[41] The once primarily rural society "became [by the end of the 1800s] a highly structured, increasingly centralized, urban-industrial society buffeted by the imperatives of mass production, mass consumption, and time-clock efficiency."[42] With the rise of urbanization and industrialization that characterized the industrial revolution came a concomitant rise in, and ruthless exploitation of, child labor outside of the home, especially in industrial and manufacturing sectors that ultimately led to the proliferation of child labor laws, minimum wage laws, and compulsory education requirements, among many other changes.[43] Urbanization also led to "an increased number of youth on the streets" who in turn "became involved in juvenile crime."[44] Stated differently, "[r]apid urbanization disrupted families, resulting in overcrowding and an increase in crime, including crimes committed by children."[45]

29. The fewer number of restrictions earlier, in the eighteenth century, was not based on a different public understanding of limited legal rights for minors in the eighteenth century as compared with the nineteenth century.[46] Rather, there were relatively few statutes concerning

---

[41] Tindall and Shi, *America,* I, 444-45.

[42] Tindall and Shi, *America,* II, 802.

[43] Tindall and Shi, *America,* II, 822-24, 974-76. See also Michael Schuman, "History of child labor in the United States," *Monthly Labor Review,* U.S. Bureau of Labor Statistics, January 2017, https://www.bls.gov/opub/mlr/2017/article/history-of-child-labor-in-the-united-states-part-1.htm

[44] Lyle Therese A. Hilotin-Lee, "History of the Juvenile Justice System," *FindLaw,* August 28, 2023, https://www.findlaw.com/criminal/juvenile-justice/development-of-the-juvenile-justice-system.html

[45] Michele Deitch, "Ch. 1 Historical Perspective," National Institute of Corrections, https://info.nicic.gov/dtg/node/9

[46] Saul Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record," *Yale Law and Policy Review* (Fall 2021), https://ylpr.yale.edu/inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-

minors and firearms in the eighteenth and early nineteenth centuries because minors, in addition to being subject to numerous common law restrictions, mostly lived with their parents in circumstances where they did not possess the means, ability, or right to obtain firearms on their own (aside from parents or guardians who might intentionally or unwittingly make weapons available to them).[47] When massive societal changes altered these circumstances, governments were entitled to address those changes, consistent with the common law principles defining the rights of minors and access to dangerous and unusual weapons.

30. It is no surprise that weapons laws regarding minors proliferated, especially in the latter half of the nineteenth century. The rise in laws restricting minors' access to weapons arose because of the proliferation of mass produced, cheaper firearms, which spread to minors in rapidly growing urban areas in the latter part of the nineteenth century and contributed to rising juvenile crime. This, in turn, resulted in an array of legal enactments to address the problem, such as the spread of anti-concealed carry weapons laws, among other enactments.[48] As is true of other firearms and weapons laws, these social problems led to the vast majority of states adopting an array of laws to protect minors and society, including measures to keep guns and other weapons from children in the course of the 1800s. As these data and discussion make clear, states enacted laws to protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds. That power was extensively exercised.

---

record#:~:text=Professor%20Cornell's%20Remark%20offers%20a,into%20an%20originalist%20legal%20framework

[47] See Section IV of this Declaration.

[48] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 63-67; Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 133-86; Alexander DeConde, *Gun Violence in America* (Boston: Northeastern University Press, 2001), 105-18.

31. Connecticut's present day age restrictions on the possession of firearms by minors are consistent with those historic societal concerns. Additionally, considerable contemporary data and analysis supports and confirms the understanding that young people are more likely to be perpetrators of violent crime.[49] As one recent study has noted: "One of the most robust relationships in criminology is between age and crime: criminal offending increases in adolescence, peaks in the late teens or early 20s, and then continually decreases. This relationship is the foundation for the well-known 'age-crime curve,' which underlies predictions and risk assessments about future offending."[50] Indeed, "general trends from state and FBI data show people ages 18 to 20. . . are likelier to commit deadly shootings than other age groups."[51]

32. For example, while those between the ages of 18 and 20 compose less than 4 percent of the population, they are responsible for more than 15 percent of manslaughter arrests and homicides.[52] A U.S. Department of Justice study spanning the period from 1980 to 2008 reported

---

[49] Charles Puzzanchera, "Trends in Youth Arrests for Violent Crimes," U.S. Department of Justice, Juvenile Justice Statistics, August 2022, https://ojjdp.ojp.gov/publications/trends-in-youth-arrests.pdf.

[50] Magnus Lofstrom, et al., "Are Younger Generations Committing Less Crime?" Public Policy Institute of California, September 2023, https://www.ppic.org/publication/are-younger-generations-committing-less-crime/. See also "The Age-Crime Curve," Pinkerton.com, July 12, 2022, https://pinkerton.com/our-insights/blog/age-crime-curve

[51] Samantha Putterman, "Ask PolitiFact: What does the data show on deadly shootings by 18-to-20-year-olds?" *Politifact,* February 6, 2024, https://www.politifact.com/article/2024/feb/06/ask-politifact-what-does-the-data-show-on-deadly-s/

[52] "Crime in the U.S. 2019," U.S. Department of Justice, Federal Bureau of Investigation, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38#:~:text=Arrests%2C%20by%20Age%2C%202019%20In%202019%2C%2093.0%20percent,88.9%20percent%20of%20per-sons%20arrested%20for%20property%20crimes "Age and Sex Composition in the United States: 2021," U.S. Census Bureau, https://www.census.gov/data/tables/2021/demo/age-and-sex/2021-age-sex-composition.html

that those between the ages of 18 and 24 consistently had the highest rate of homicide.[53] In 2019, according to FBI data, the age that committed the largest number of homicides that year was 19, followed by those age 18.[54] According to the gun safety organization Everytown, "Data show that 18- to 20-year-olds commit gun homicides at triple the rate of adults 21 and older."[55]

33. It is well understood that society has traditionally assumed a greater obligation to protect and guide its young. As the account above demonstrates, that concern has been reflected in American law for centuries.

## III.    HISTORICAL WEAPONS RESTRICTIONS ON COLLEGE CAMPUSES

34. Another category of laws and rules bears on the larger idea that minors under 21 were not accorded anything akin to "gun rights" as adults in history. This category pertains to the legal status of college students. As historian Saul Cornell noted: "College was one of the very few circumstances where minors lived outside of their parents' or a guardian's direct authority. As a matter of law, minors attending college traded strict parental authority for an equally restrictive rule of in loco parentis."[56]

35. Admittedly, college education in the modern era is far more widespread and democratized. As of 2022, over 37 percent of Americans have at least a four year college

---

[53] Alexia Cooper and Erica L. Smith, "Homicide Trends in the United States, 1980-2008," Bureau of Justice Statistics, U.S. Department of Justice, November 2011, 4, https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf

[54] FBI, Crime in the United States, 2019, Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38

[55] "How Can We Prevent Gun Violence in American Schools?" Everytown for Gun Safety, June 6, 2023, https://everytownresearch.org/report/how-can-we-prevent-gun-violence-in-schools/

[56] Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment." See also Brian Jackson, "The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform," *Vanderbilt Law Review* 44(October 1991): 1135-64; Steven J. Novak, *The Rights of Youth: American Colleges and Student Revolt, 1798-1815* (Cambridge, MA: Harvard University Press, 1977), 103-5 and passim. Even during this period, a college education was generally four years in length, and attracted students in their teens (10).

degree.[57] In 1870, the newly created federal Department of Education (then a sub-cabinet

department) reported that 9000 college degrees had been awarded as of that year.[58] Also in 1870,

about 63,000 students were then enrolled in institutions of higher learning.[59] Yet the fact that few

Americans attended college in the eighteenth and nineteenth centuries compared to the present

era does not undercut the significance of college rules restricting students' access to firearms and

other weapons.

36. As discussed below, public universities overseen by state legislatures in at least 15 states

enacted weapons restrictions. Three of these, North Carolina, South Carolina, and Georgia, did

so during the Founding period, as did at least seven private institutions (see Exhibit E). In all, at

least 54 private universities enacted anti-weapons measures. Further, the rules discussed below

enacted by public and private institutions of higher learning applied regardless of the size of their

student bodies, were found throughout the country, and were based on the universally understood

*in loco parentis* powers exercised by colleges and universities over their students. The numerous

rules governing private campuses are not public law, to be sure, but they do provide a similar

source of information confirming the widespread societal understanding that those under 21 and

subject to the *in loco parentis* authority of universities were not entitled to anything resembling

adult gun rights. Indeed, college rules from this early period are a microcosm of societal attitudes

---

[57] The Percentage of Americans with College Degrees in 2023," *College Transitions,* August 12, 2023, https://www.collegetransitions.com/blog/percentage-of-americans-with-college-degrees/

[58] Thomas D. Snyder, ed., *120 Years of American Education: A Statistical Report* (Washington, D.C.: U.S. Department of Education, January 1993), 5, https://nces.ed.gov/pubs93/93442.pdf

[59] Claire Kluskens, "Census Fun Fact #6 - The Evolving Enumeration of College Students, 1850-1950," HistoryHUB, July 4, 2021, https://historyhub.history.gov/genealogy/census-records/b/census-blog/posts/census-fun-fact-6---the-evolving-enumeration-of-college-students-1850-1950. The U. S. population in 1870 was about 38 million. "POP Culture: 1870," U. S. Census, https://www.census.gov/history/www/through_the_decades/fast_facts/1870_fast_facts.html

concerning the rights (or lack of rights) pertaining to young people and for that reason alone are highly instructive.

37. Colleges' control over their students during this time was not based merely on the fact that people were living in close proximity to each other. First, these rules often applied to students whether they lived on campus or off campus.[60] That is, they were codes that applied uniformly to all the students enrolled in their institutions. For example, an 1810 regulation for Georgia public colleges and universities said, "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[61] In fact, these codes typically regulated or proscribed a wide range of student behaviors extending far beyond firearms restrictions both on campus and off, providing further evidence of colleges' plenary *in loco parentis* authority over students.

38. Second, college faculty and administrators functioned in the manner of, and with authority comparable to, parents. This is the very definition of *in loco parentis*: to act "[i]n the place of a parent; instead of a parent; charged . . .with a parent's rights, duties, and responsibilities."[62]

---

[60] E.g., Walter C. Bronson, The History of Brown University, 1714-1914 (Boston: D.B. Updike, The Merrymount Press, 1914), Student Laws of 1803; Laws and Regulations of the College of William and Mary, Volume 276 (1830), Regulations of the Society, 29; Oberlin College, Laws and Regulations of Oberlin College, 11th ed. (Oberlin, OH: Shankland and Harmon, 1859), 11. Students often sought or needed housing off campus, even in the 1700s and early 1800s. See David F. Allmendinger, Jr., *Paupers and Scholars: The Transformation of Student Life in Nineteenth-Century New England* (NY: St. Martin's Press, 1975), 82-90, 98-99.

[61] Georgia Public Colleges and Universities, The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810), https://firearmslaw.duke.edu/laws/the-minutes-of-the-senatus-academicus-of-the-state-of-georgia-1799-1842-at-86-1810/

[62] Black, *Black's Law Dictionary,* 542.

39. For example, a study of American college life in the 1700s and 1800s noted that "Teachers assumed the position of parents."[63] As early as the mid-1700s, "[c]olonial [college] faculties had assumed without question their authority over students. . . ."[64] This translated into a college campus system where faculty and administrators exercised "an intimate, 'parental' system of ordering the lives of students. 'Parental' government was more than a metaphor. . . . The 'parental' system extended over students an intimate supervision of residence, diet, company-keeping and manners" that was "[m]ore rigorous in its substitution of faculty for family than modern conceptions of in loco parentis. . . ."[65] Another analysis of college life makes the same point. "During the colonial period and the early years of the Republic, higher education was conducted . . . . in an environment that mirrored the families students left behind. . . . The dominant legal philosophy courts used to describe this familial relationship was the doctrine of *in loco parentis*. College authorities stood in the place of parents to the students entrusted to their care."[66]

40. The age range of college students in the late 1700s and 1800s generally coincided with the age range of college students today: roughly 18-22.[67] And while some college students were

---

[63] Allmendinger, *Paupers and Scholars*, 114.

[64] David F. Allmendinger, Jr., "The Dangers of Ante-Bellum Student Life," *Journal of Social History* 7(Autumn 1973): 75.

[65] Allmendinger, "The Dangers of Ante-Bellum Student Life," 79-80.

[66] Jackson, "The Lingering Legacy of 'In Loco Parentis,'" 1135-36. Moreover, as Jackson further notes, the fundamentals of this system persisted: "Even when college life changed in the late nineteenth and early twentieth centuries, the traditional legal interpretation of the student-university relationship remained relatively constant as courts continued to defer to almost every expression of institutional authority." (1136)

[67] Allmendinger studied twelve New England colleges from 1751 to 1860, and compiled data on the ages of those graduating from those institutions. While the age of graduation included a scattering of students who graduated younger than 18 and older than 28, the most common age of students at graduation was consistently from ages 20 to 22. *Paupers and Scholars,* 131-38. See also Joseph F. Kett, *Rites of Passage: Adolescence in America 1790 to the Present* (NY: Basic Books, 1977). Then and now, colleges included a

over the age of 21, the fact that these restrictions applied to them as well further validates the *in loco parentis* powers of colleges over those defined as students.

41. My excavation and examination of laws and campus rules pertaining to college students and dangerous weapons uncovered a considerable series of them (see Exhibit E, extending to both public and private colleges and universities.  This is despite the fact that relatively little attention has been given to this subject, that there is no central repository of such college policies to my knowledge, and many of these measures have been found in old reprints of campus policies which have been subject to far less modern examination and digitization as compared with old state laws. In all, at least 15 state university systems (some applying to multiple campuses within their states) and at least 54 private colleges imposed firearms restrictions (see Exhibit E. In no instance did I uncover a historic campus student discipline policy that did not include an anti-firearm restriction.

42. In 1655, Harvard College (Mass.) enacted a campus policy saying in part that "noe students shall be suffered to have [a g]un in his or theire chambers or studies, or keepeing for theire use any where else in the town. . . ."[68] Yale College (Ct.) enacted a similar measure in 1745 and 1795.[69]

---

few younger students and those older than 22 who for various reasons sought out a college education at a later age.

[68] A Copy of the Laws of Harvard College, 1655, at 10; Thirdly concerneing penall lawes. . . . 8. See also 1824, Laws of Harvard College, ch. 6, § 1, no. 2.

[69] Franklin Bowditch Dexter, Biographical Sketches of the Graduates of Yale College: May 1745-May 1763, Annals, at 8 (1745); 14; The Laws of Yale-College, in New-Haven, in Connecticut, Enacted by the President and Fellows, the Sixth Day of October, A.D. 1795 (New Haven: Thomas Green and Son, 1800), Chapter VIII. p. 26. From 1863 to the end of the 1800s, Yale was designated a land grant university under the federal Morrill Act of 1862, reflecting Yale's quasi-public status. Mark J. Roy, "Land Grant Status Acquired After 'Yale-Storrs Controversy,'" *UConn Today*, September 26, 2012, https://today.uconn.edu/2012/09/land-grant-status-acquired-after-yale-storrs-controversy/

43. Among public universities subject to state laws, the state University systems of North Carolina (1799, 1838),[70] University of South Carolina (1807, 1848),[71] Georgia (1810),[72] Ohio University (1814),[73] Virginia (1824),[74] University of Delaware (1828),[75] College of William and Mary (Va., 1830),[76] Miami University of Ohio (1843),[77] University of Iowa (1848),[78] the College of New Jersey/Rutgers College/Drew University (1853, 1854, 1871),[79] the University of Alabama (1861),[80] the University of Kentucky (1865, 1890-1891),[81] Purdue University (Indiana,

---

[70] University of North Carolina, Public Colleges and Universities, 1799, https://docsouth.unc.edu/unc/uncbk1018/uncbk1018.html; Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838), CHAPTER V, 13.

[71] Edwin L. Green, *A History of the University of South Carolina* (Columbia, SC: The State Company, 1916), p. 220.

[72] The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810).

[73] Thomas N. Hoover, *The History of Ohio University* (Athens, OH: Ohio University Press, 1954), 57. Also https://ohiomemory.org/digital/collection/p267401coll36/id/16772; Thomas N. Hoover, *The History of Ohio University* (Athens, OH: Ohio University Press, 1954), 57.

[74] University of Virginia Board of Visitors Minutes, 6-7 (October 4–5, 1824).

[75] Academy minutes, April 17, 1828; American Watchman, August 1, 1828; https://sites.udel.edu/uarm/the-university-of-delaware-chapter-2/

[76] Laws and Regulations of the College of William and Mary, Volume 276 (1830), Regulations of the Society, 29.

[77] The Laws of Miami University, for The Government of the Faculty and Students (Rossville, OH: J.M. Christy, 1843), p. 15; https://digital.lib.miamioh.edu/digital/collection/univdocs/id/3116/rec/3

[78] Merle Curti and Vernon Carstensen, *The University of Wisconsin: A History, 1848-1925* (Madison, WI: University of Wisconsin Press, 1949), 196.

[79] Mercer Beasley Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4 1871.Page 236-237, Image 282-283 (Trenton, 1877) available at The Making of Modern Law: Primary Sources. 1871.

[80] 1861, Regulations for the University of Alabama, art. 11, nos. 131-132 & art. 13, nos. 175-179 (Southern Methodist Publishing House).

[81] James F. Hopkins, *The University of Kentucky: Origins and Early Years* (Lexington, KY: University of Kentucky Press, 1951), p. 167; Kentucky University, Catalogue of Kentucky University, Lexington, Kentucky, 1890-1891, 23.

1874),[82] the University of Mississippi (1878, 1880, 1892),[83] the University of Vermont (1885),[84] and the Michigan State Agricultural College (1891)[85] all adopted strict measures against having, keeping, firing, and/or carrying weapons on campus, and sometimes extending to student housing, or student behavior, off campus. The University of Virginia's restriction, in particular, was enacted by a governing Board of Visitors which included Thomas Jefferson and James Madison, among others. Note that some of these encompass state university systems covering multiple campuses.

44. Similar measures existed on private campuses. In addition to Harvard and Yale, other private campuses with such codes included Union College (N.Y., 1802),[86] Brown University (R.I.; 1803, 1865),[87] Middlebury College (Vt., 1803, 1839),[88] Hampden-Sidney College (Va.,

---

[82] Robert W. Topping, *A Century and Beyond: The History of Purdue University* (West Lafayette, IN: Purdue University Press, 1988), p. 86.

[83] 1878 Miss. Laws 176, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, § 4; Josiah A. Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880); R.H. Thompson, The Annotated Code of the General Statute Laws of the State of Mississippi 327, § 1030 (1892).

[84] 1885 Laws of the University of Vermont, ch. 4, § 4234; ch. 6, §§ 4, 9. CHAPTER IV.

[85] 1891, Michigan State Agricultural College Rules and Laws, "Order," nos. 67 & 69 (sine nomine).

[86] Wayne Somers, *Encyclopedia of Union College History* (Schenectady, NY: Union College Press, 2003), p. 533.

[87] Walter C. Bronson, *The History of Brown University*, 1714-1914 (Boston: D.B. Updike, The Merrymount Press, 1914), 183, From the college rules for the conduct of students, Laws of 1803.

[88] *The Laws of Middlebury-College, 1803* (Middlebury, VT: Huntington & Fitch, 1804), p. 16. https://www.jstor.org/stable/community.28479483?seq=16; *The Laws Of Middlebury College* (Middlebury, VT: People's Press, 1839), 16-18. Chapter 7—Of Crimes and Misdemeanors, §§ 1, 11; 1839 Laws of Middlebury College, ch. 7, §§ 1, 11. CHAPTER VII.

1805),[89] Hamilton College (N.Y., 1813),[90] Bowdoin College (Me., 1817),[91] Princeton University

(N.J. 1819),[92] Columbian College (now George Washington University, D.C., 1824),[93]

University of Cambridge (Mass., 1825),[94] Cumberland College (Tenn., 1825),[95] Furman

University (S.C., 1826),[96] Trinity College (Ct., 1826),[97] McKendree College (Il., 1828),[98]

Dickinson College (Pa., 1830),[99] College of Louisiana (1830, 1839),[100] Mississippi Presbytery

and Oakland College (Miss., 1831),[101] Colby College (Me., 1832),[102] Wake Forest University

---

[89] John L. Brinkley, *On this Hill: A Narrative History of Hampden-Sydney College, 1774-1994* (Hampden-Sidney, VA: Hampden-Sidney, 1994), p. 65.

[90] Documentary History of Hamilton College (Clinton, NY: Hamilton College, 1922), The Laws of Hamilton College, 1813, Chapter VIII, Of Crimes and Misdemeanors. XII.

[91] Laws of Bowdoin College, 1817. Ernst Christian Helmreich, *Religion at Bowdoin College: A History* (Brunswick, ME: Bowdoin College, 1981), 39,

https://digitalcommons.bowdoin.edu/cgi/viewcontent.cgi?article=1005&context=bowdoin-histories

[92] At the time Princeton was known as the College of New Jersey, 1819, Laws of the College of New Jersey, ch. 17, § 9; ch. 19, § 10.

[93] 1824, Laws of the Columbian College, District of Columbia, ch. 5, § 2, no. 10.

[94] 1825, Statutes and Laws of the University in Cambridge, ch. 7, § 76, no. 3. CHAP. VII.

[95] 1825, Laws of Cumberland College, ch. 12, §§ 6 & 7 (Office of the Whig).

[96] W.J. McGlothlin, *Baptist Beginnings in Education: A History of Furman University* (Nashville, TN: Sunday School Board of the Southern Baptist Convention, 1926), p. 115.

[97] Laws of Washington College [renamed Trinity College in 1845],

https://digitalrepository.trincoll.edu/cgi/viewcontent.cgi?article=1414&context=bulletin

[98] *Centennial, McKendree College With St. Clair County History, 1828-1928* (Lebanon, IL: McKendree College, 1928), p. 238; https://archive.org/details/centennialmckend00mcke/page/238/mode/2up?q=gambling

[99] The statutes of Dickinson College, as revised and adopted by the Board of Trustees, April 16, 1830, 22-23, Chapter VI.

[100] Laws for the Government of the College of Louisiana, 1839, CHAPTER IX.

[101] Constitution & Laws of the Institution of Learning Under the Care of the Mississippi Presbytery, Oakland College (Miss.), at 10 (1831), Chapter XI.

[102] Waterville College, Laws of Waterville College, Maine (later renamed Colby College, located in Waterville), (Hallowell, ME: Glazier, Masters, & Co., 1832), 11.

(N.C., 1834),[103] Allegheny College (Pa., 1834),[104] Lafayette College (Pa., 1837),[105] LaGrange

College (Ala., 1837),[106] the University of Nashville (Tenn., 1837),[107] Georgetown University

(Washington, D.C., 1839),[108] Randolph-Macon College (Va., 1839),[109] Kemper College (Mo.,

1840),[110] Marietta College (Ohio, 1840),[111] Davidson College (N.C., 1845-46),[112] Denison

University (Ohio, 1847),[113] Emory University (Ga., 1847),[114] Dartmouth College (N.H.,

---

[103] George Washington Paschal, *History of Wake Forest College* (Wake Forest, NC: Wake Forest College, 1935), p. 136.

[104] Ernest Ashton Smith, *Allegheny—A Century of Education, 1815-1915* (Meadville, PA: The Allegheny College History Company, 1916), p. 401; https://books.googleusercontent.com/books/content?req=AKW5QadC9Mb3YgQwvgNd85fNiTqzRMDG kW3x5vKIB_nq46GrUPRMPxXftjaeLXwOnTyc-_6vho0bcCaH72dIaYTrbfImGjLWJgBADFHIx9gY183akY30Htm0gbgWT6xc_BcSzkySAH5K_62VpZ kkeWFrsO_aojPtnK9yoGcwFSgGNhwPzBoROwVcuFammCUD3ZkBX1aJQlnflioVWf6eMecUpfXD6E cvC2LYAS7pB76rUDsZAgEowZjXIf3TF2OKbaSIxUas8GdV2R3gN51Vcmw22hBw2MCYBg

[105] David B. Skillman, *The Biography of a College: Being the History of the First Century of the Life of Lafayette College* (Easton, PA: Lafayette College, 1932), p. 130.

[106] "Circular Letter of the Faculty of La Grange College" (Tuscumbia), North Alabamian, May 5, 1837; https://www.newspapers.com/image/308403735/?terms=%22the%20faculty%22&match=1

[107] Law of the University of Nashville for the moral conduct of the students, in American Annals of Education and Instruction for the Year 1837, at 185 (1837).

[108] Robert E. Curran, *A History of Georgetown University*, 3 vols. (Washington, D.C.: Georgetown University Press, 2010), I, p. 195.

[109] James Edward Scanlon, *Randolph-Macon College: A Southern History* (Charlottesville, VA: University Press of Virginia, 1983), p. 63-64.

[110] The Laws of Kemper College, Near St. Louis, Missouri 9 (1840), Chapter VIII. Miscellaneous. . . . 6.

[111] 1840, Laws of Marietta College, ch. 7, no. 15 (G. W. Tyler & Co.).

[112] Cornelia Rebekah Shaw, Davidson College (NY: Fleming H. Revell Press, 1923), APPENDIX IX, OLD RULES, from the second catalog issued, that for 1845-46. . . . 4.

[113] Francis W. Shepherdson, *Denison University: 1831-1931* (Granville, OH: Denison University, 1931), p. 55; https://babel.hathitrust.org/cgi/pt?id=mdp.39015058689640&seq=69&q1=fire

[114] Henry M. Bullock, *A History of Emory University* (Atlanta, GA: Cherokee Publishing Co., 1972), p. 134.

1849),[115] Beloit College (Wisc. 1850),[116] Illinois College (1850),[117] Gettysburg College (Pa., , 1839, 1852),[118] New York Conference Seminary (1851),[119] Tufts University (Mass., 1852),[120] Westminster College (Mo., 1852),[121] Franklin and Marshall College (Pa., 1853),[122] Jefferson County Institute (N.Y., 1853),[123] Amherst College (Mass., 1855),[124] North-Western Christian University (Ind., 1857),[125] Oberlin College (Ohio, 1859),[126] LaGrange Synodical College (Tenn., 1859),[127] Albion College and Wesleyan Seminary (Mich., 1860),[128] McKenzie College (Tex.,

---

[115] Laws of Dartmouth College (Hanover, NH: Dartmouth Press, 1849), p. 11; https://babel.hathitrust.org/cgi/pt?id=umn.31951002082852o&seq=7&q1=fire

[116] 1850 Laws of Beloit College, ch. 4, § 2.

[117] Laws of Illinois College, 1850, in Transactions of the Illinois State Historical Society for the Year 1906, at 245, 1850, Chapter XII.

[118] Charles H. Glatfelter, *A Salutary Influence: Gettysburg College, 1832-1985*, 2 vols. (Gettysburg, PA: Gettysburg College, 1987), I, p. 153; https://gettysburg.contentdm.oclc.org/digital/collection/GBNP01/id/64513/rec/1

[119] 1851, Catalogue of the Officers and Students in the New York Conference Seminary, "By-Laws," no. 11 (Gray & Sprague).

[120] Russell E. Miller, *Light on the Hill: A History of Tufts College 1852-1952* (Boston, MA: Beacon Press, 1966), p. 397.

[121] M.M. Fisher, *History of Westminster College, 1851-1903* (Columbia, MO: E.W. Stephens, 1903), p. 85; https://tile.loc.gov/storage-services/public/gdcmassbookdig/historyofwestmin00fish/historyofwestmin00fish.pdf

[122] Joseph Henry Dubbs, *History of Franklin and Marshall College* (Lancaster, PA: Franklin and Marshall College, 1903), p. 229.

[123] 1853, Catalogue of the Officers and Students of the Jefferson County Institute, "Abstract of By-Laws," no. 12 (Clark & Fayel).

[124] 1855, The Laws and Regulations of Amherst College, ch. 9, § 7. CHAPTER IX.

[125] 1857, Charter and By-Laws of the North-Western Christian University, "An Ordinance for the Government of the University," § 20, no. 5 (Indianapolis Journal Company).

[126] Oberlin College, Laws and Regulations of Oberlin College, 11th ed. (Oberlin, OH: Shankland and Harmon, 1859), 11.

[127] 1859, Code of Laws for the Government of La Grange Synodical College, ch. 10, §§ 2-9. CHAPTER X.

[128] Eighteenth Annual Catalogue of the Officers and Students of the Albion Female College, and Wesleyan Seminary (Michigan) 32 (1860-1861), 1860.

1860),[129] Centre College (Ky., 1861),[130] Grinnell College (Iowa, 1865),[131] Duke University

(N.C., 1869),[132] Howard College (Ala., 1870),[133] Vanderbilt University (Tenn., 1874),[134]

Williams College (Mass., 1878),[135] Agricultural & Mechanical College of Kentucky (1882),[136]

and the Agricultural and Mechanical College for the Colored Race (N.C., 1896).[137]

45. These many examples strongly indicate that such policies were common, if not

ubiquitous, on campuses during this time. I reach this conclusion both because of the length of

this list and because in every instance where I was able to obtain an actual code of student

conduct for campuses in the 1700s and 1800s, the codes included provisions banning or

otherwise restricting guns. I found no instance of a student code of conduct from this period

lacking a no-guns provision. Finally, in addition to the law and policy regulations pertaining to

the college campuses listed here, there is an entire additional category of statutes from the time

that barred the carrying or possession of firearms and other weapons from schools and

---

[129] "Laws of McKenzie College," in Education in Texas: Source Materials, comp. Fredrick Eby, University of Texas Bulletin, Education Series No. 2 (April 25, 1918): 392-93.

[130] Laws of the Centre College of Kentucky, Located at Danville (Frankfort, KY: A.G. Hodges & Co., 1861), p. 5; https://sc.centre.edu/sc/digital/pdf/laws1861.pdf

[131] John Scholte Nollen, *Grinnell College* (Cedar Rapids, IA: The State Historical Society of Iowa, 1953) [ca. 1865], p. 72.

[132] 1869, Catalogue of Trinity College, "Discipline," no. 4 (Episcopal Methodist Office) [Duke was formerly known as Trinity].

[133] Mitchell B. Garrett, "Sixty Years of Howard College," 1842-1902, *Howard College Bulletin*, LXXXV (October 1927): 81; https://archive.org/details/sixtyyearsofhowa00garr/page/n7/mode/2up

[134] Edwin Mims, *History of Vanderbilt University* (Nashville, TN: Vanderbilt University Press, 1946), p. 126.

[135] 1878, Laws of Williams College, ch. 3, § 3.

[136] 1882, Regulations of the Agricultural & Mechanical College of Kentucky, art. 7, no. 156 (Major, Johnston & Barrett).

[137] 1896, By-Laws Ordained by the Board of Trustees of the Agricultural and Mechanical College for the Colored Race, Admission and Deportment of Students, no. 14 (Reece & Elam).

educational institutions more generally.[138] This compilation of college student discipline codes restricting firearms lends strong additional support to the idea that weapons restrictions were commonly understood to apply to those under the age of 21, and that minors had nothing resembling a "right" to obtain or have firearms.

## IV.    MINORS AND MILITIA SERVICE

46. Militia laws around the time of the founding did not reflect a different understanding or tradition of arming minors or the power of an authority acting *in loco parentis*. There are several factors to consider when interpreting militia statutes, but two stand out in particular: first, a legal obligation, such as that pertaining to compulsory military service, is profoundly different from a right under law; second, even if one accepts the erroneous assertion that militia service obligation is somehow relevant to a civilian right under law, an examination of early militia laws demonstrates that militia members under 21 were treated as minors, unlike militiamen 21 and older. In fact, arming obligations for militia members under 21 usually belonged to their parents or guardians. Stated differently, the notion that 18-to-20-year-olds could be compelled to enter military or militia service does not equate to an adult civilian right to buy and own guns, as the many laws from the 1800s restricting minors' firearms rights examined above show.

47. Militia and military service were and are understood to be obligations or duties, not rights.[139] An obligation is, quite simply, something that one *must* do under law, as in to submit to

---

[138] For example: 1870 Tex. Laws 63; Laws of Missouri, Passed at the Session of the Thirtieth General Assembly, Begun and Held at the City of Jefferson, Wednesday, January 8, 1879: Regular Session (Jefferson City, MO: Carter & Regan, 1879), 90-91; An Act to Prohibit the Discharge of Firearms in the Immediate Vicinity of Any Courthouse, Church, or Building Used for School or College Purposes, §§ 1-3, Approved April 30, 1879, https://firearmslaw.duke.edu/assets/1879,-mo,-sess.-laws,-act-of-april-30,-1879,--1-3.pdf; 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1; 1889 Ariz. Sess. Laws 16-17.

[139] Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment."

military service under circumstances of a military draft, for example. An obligation is, in other words, "[t]hat which a person is bound to do or forebear; any duty imposed by law. . . ."[140] A right, on the other hand, is something that one *may* do by one's own judgment, or "powers of free action."[141] One does not implicate the other.

48. The age for militia service in the late 1700s and 1800s was typically defined as beginning at age 18. For example, the Uniform Militia Act of 1792 enacted by the U.S. Congress defined militia service as applicable to those between the ages of 18 and 45, and it required militia eligible men to obtain, at their own expense, the necessary military-grade weaponry and accoutrements.[142] Even the portion of the 1792 Militia Act that required militia-eligible men to keep and maintain "a good musket or firelock" at their own expense did so as one of the requirements attendant to military service but, as described below, for the most part did not apply to minors.

49. In addition, militia/military service is entirely different from civilian activities, rights, and actions. Military service occurs through a rigorous, closely supervised, controlled, and coordinated system of hierarchical rank, order, and discipline, especially with respect to every aspect of firearms in a military context, even when that involved the ill-trained, poorly disciplined, and haphazard American militias of the late eighteenth and nineteenth centuries.[143] For example, Baron von Steuben's celebrated manual of drill instruction, prepared at the request of General George Washington during the Revolutionary War, included detailed instructions on

---

[140] Black, *Black's Law Dictionary*, 740.

[141] Black, *Black's Law Dictionary,* 919.

[142] The Uniform Militia Act of 1792, 1 U.S. Stat. 271. In the colonial and Revolutionary period, some colonies put the minimum age for militia service at younger than 18.

[143] Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 39-41, 46-48.

the handling, use, and care of soldiers' weaponry.[144] Further, it is well understood that members of the military were not and are not necessarily entitled to the same rights (such as free speech) as civilians.[145]

50. Bearing this in mind, an examination of the militia implementation laws of the 13 states further supports the idea that militia service by 18- to 20- year-olds conferred no adult right to obtain or own firearms. After passage of the Uniform Militia Act of 1792 by Congress, each state enacted its own militia law in conformity with the federal law, with the states including in their laws more specific and detailed implementing provisions not addressed in the federal law. All of these state militia laws included wording that provided some kind of special consideration for militia members under the age of 21 that was consistent with their status as minors.[146]

---

[144] Frederick William Baron von Steuben, *Revolutionary War Drill Manual* (NY: Dover Publications 1985; first pub. in 1779 as *Regulations for the Order and Discipline of the Troops of the United States* and approved by Congress), 6, 63-64, 87, 115-16, 143, 145. Von Steuben was inspector general of the Continental Army.

[145] Elizabeth Beaumont, "Rights of Military Personnel," *The First Amendment Encyclopedia*, 2009, https://www.mtsu.edu/first-amendment/article/1131/rights-of-military-personnel. Members of the military are governed under the Uniform Code of Military Justice.

[146] *Acts and Laws of the State of Connecticut, in America* (Hartford: Hudson & Goodwin, 1796),

298-299, 308; *Laws of the State of Delaware* (Newcastle, DE: Samuel and John Adams, 1798), 1134, 1135; Robert and George Watkins, *A Digest of the Laws of the State of Georgia* (Philadelphia: R. Aitkin, 1800), section XVI, pp. 461-62; William Kilty, *The Laws of Maryland* (Annapolis: Frederick Green, 1800) 2: chapter LIII, Sec. XIX, https://babel.hathitrust.org/cgi/pt?id=njp.32101036883260&seq=460; *The Perpetual Laws of the Commonwealth of Massachusetts* (Worcester, MA, Isaiah Thomas, 1788), p 308; *The Laws of the State of New Hampshire* (Portsmouth: John Melcher, 1797), 422; William Patterson, *Laws of the State of New Jersey, Revised and Published Under the Authority of the Legislature* (New Brunswick, NJ, Abraham Blauvelt, 1800), Sec. VI, 438-440; New York's Militia Acts of 1793 and 1801. The relevant sections are at *The Laws of the State of New York,* Vol. III (New York, Thomas Greenleaf, 1798), Sec. VI, 63-64, 66 (from the New York Militia Act passed March 9, 1793); *Laws of the State of New York* (Albany: Charles R. & George Webster, 1802), p. 517,

section 32, 36 (for 1801 law); James Iredell and Francois Xavier Martin, *Public Acts of the*

*General Assembly of North Carolina,* Vol. II (New Bern: Martin & Ogden, 1804), 159, https://archive.org/details/publicactsofgene12nort/page/n669/mode/2up; James T. Mitchell and Henry Flanders, *The Statutes at Large of Pennsylvania from 1682 to 1801*, Vol. 14

(Harrisburg, PA: Harrisburg Publishing Co. 1909), Sec. II, 456 (penalties for failing to comply with the requirements in the militia law are described in Secs. XV and XXIV of the law), and also An Act for

51. To break this down in more detail, of the thirteen original states, ten—Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island—had laws (mostly enacted in the 1790s) that placed the legal burden for arming militiamen under the age of 21 onto parents, masters (employers), other guardians, or local governments. Vermont and Maine also enacted similar laws during this time.

52. For example, in a section of Connecticut's 1796 militia law describing the financial penalties to be levied against "delinquents" who committed any "breach"—i.e., soldiers who violated the terms of the militia law—the fines were to be

> levied on the Goods or Chattels of the respective Delinquents, if upwards of twenty-one years of Age—And for the want of such Goods or Chattels against the Body of such Delinquent, and against the Goods and Chattels of the Parents, Master or Guardians, of such Delinquents as have not arrived at the Age of twenty-one Years. . . .[147]

53. Delaware's militia implementation law of 1793 included this special, protected treatment for militiamen under 21:

> . . . all young men under the age of twenty-one years, and all servants purchased bona fide, and for a valuable consideration, though enrolled agreeable to the first section of this law, shall be exempted from furnishing the necessary arms, ammunition and accoutrements as are required by the fourth section thereof, and shall be exempted from

---

Arranging and Regulating the Militia Within this State, and for Repealing All Laws Heretofore Made for That Purpose, ch. 84, §§ 5, 6, 8, 10, 12, 14, 15, 19, 20, 26, 27, & 44, art. 15, 1820 N. H. Laws 831, 831-62 (Evans Printing Co. 1920); *Public Laws of the State of Rhode-Island and Providence Plantations* (Newport, RI: H & O Farnsworth, 1798), 437-39, https://babel.hathitrust.org/cgi/pt?id=mdp.35112203944048&seq=443; Benjamin Elliott and Martin Strobel, *The Militia System of South Carolina being a Digest of the Acts of Congress Concerning the Militia, Likewise of the Militia Laws of this State* (Charleston: A.E. Miller, 1835), 23, 81-82, https://books.googleusercontent.com/books/content?req=AKW5QacEnOgS5u_kUB3DpYkULtX3ZhjHjI vcTzVgHD5IkaeAM2qLpJAhtANRxsz07cUuIUvLBcpiZpQ6qIc-kVphez_m4D0vKC_54p2W3qOUWCemlT9KsGPErdTsWIpF6nuL4O_-pcnyQVvSo8ZvLzPX2_teqdQDeiWQxrOrihNrBzFIY7ZWmTK1nAAITYjGxbIKVU9kU4jluEuoJZD7O ckHVM7lZqXK9W86S4lh0AIzxj1lcPX6RysNmwLRSMZUW7ttr3FU6DqoxhJB9FDhiZSxwiMzLyaCg w; William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia* (Richmond: George Cochran, 1823), 483.

[147] *Acts and Laws of the State of Connecticut, in America*, 308.

militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion of this or any of the neighbouring states.[148]

54. In instances where those under 21 came from families or circumstances without the means to purchase or obtain the necessary weapons, some of the states enacted laws saying that government monies could be used to purchase muskets, though the firearms remained the property of the government that purchased them. For example, in the Rhode Island militia law of 1798, after describing how penalty fees from militia law violations were to be assessed and spent on sundry militia expenses, the law added that, for any money left over:

> . . .the residue thereof, if any, shall be paid to the Town-Councils of the several towns, to be by them appropriated to the arming and equipping of those who are not able to arm and equip themselves.[149]

55. The militia laws of three states—Georgia, South Carolina, and Virginia—are ambiguous cases with statutory militia wording that might have placed a legal burden on parents or others legally responsible for militiamen under 21. Yet all three states did have provisions that provided for more careful, preferential treatment of militiamen under 21.[150]

---

[148] *Laws of the State of Delaware*, 1793, Chap. 36, Sect. 2, 1135, https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssde0090&id=81&collection=ssl&index= The Delaware militia law of 1785 said that ". . .every apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock. . . ." Any penalty for failing to abide by the terms of the law would result in a fine to be paid by the militiaman, "or by the parent or guardian of such as are under twenty-one years. . . ." *In the Ninth Year of the Independence of the Delaware State,* May Adjourned Session 1785, 13, https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssde0075&id=11&men_tab=srchresults

[149] *Public Laws of the State of Rhode-Island and Providence Plantations*, 438-39.

[150] The Georgia law said: ". . .every master or other person who hath the command, government or power over any indented man servant, liable to do militia duty by this act, shall, at his or her own proper costs and charge furnish and provide every such indented man servant during his servitude, with the arms, ammunition and accoutrements directed by this act. . . ." Watkins, *A Digest of the Laws of the State of Georgia*, 462. The reference not just to "master" but also "other person who hath command, government or power" over these persons (noting both males and females could be the responsible "masters" referencing "at his or her own proper costs") could feasibly incorporate the authority of parents over children. The South Carolina militia laws said: "every master or other person who hath the power over, government or command of any white apprentice or man servant shall. . .furnish and provide every such

56. In addition, in 1797 Vermont adopted a measure requiring that, for militiamen under 21, "all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipments above mentioned, under the like penalties for any neglect."[151] In 1821, Maine similarly required that "all parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms, and equipments, required by this Act" and that "if said minor shall absent himself from any meeting of the company . . . without sufficient excuse, the said parent, master or guardian is hereby subjected and made liable to the same forfeitures as such minor would be liable to for a like deficiency, neglect or non-appearance, if such minor were of age. . . ."[152]

---

apprentice or man servant liable to do military duty. . .with the arms and accoutrements directed by the aforesaid act of Congress. . . ." Elliott and Strobel, *The Militia System of South Carolina being a Digest of the Acts of Congress Concerning the Militia,* 23. Terms like "minor" and "apprentice" are analogous categories of dependent persons, as is the case in the Georgia law. This section also notes that if the recruit fails to appear or "his arms or accoutrements shall be found to be deficient" then "the master or other person aforesaid" shall "be subject to the same forfeitures and penalties as are inflicted" as on other recruits who commit the same offense. The Virginia militia law included a provision that segregated militiamen between the ages of 18 and 25 to be formed into "light companies," described thusly: "And whereas, it will be of great utility and advantage in establishing a well disciplined militia, to annex to each regiment a light company, to be formed of young men, from eighteen to twenty-five years old, whose activity and domestic circumstances will admit of a frequency of training, and strictness of discipline, not practicable for the militia in general. . . ." Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia,* 483.

[151] An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131- 32 (1808; enacted March 20, 1797), https://books.googleusercontent.com/books/content?req=AKW5Qad0g3k0ZWc7kMs-Nbgcchrb11e61iuMzo9Hc8cuOhldv4UyStdznTaPMMILPcZ3ruAxHtFGc1ueVGJk8qabLiqjlIBvuavij9n9 b9vqdXojoCt22_EY6o2SiUCL9hgNqR849PJnaI9zm0MMHRfpjIDgbxxbHID4Fc-oWqosvO9eHL8Q7zcJnKrQCOQHeymMR65SIFNmbzPkTihxHX0OORlPzo-SiQ7NNFdpHxQqhX3515LsFzaUnIWyquMs_aVCmKt9DEo6fAq9hqyDTFu1CjlXbl-LG_mkxohbE9aEe9HNksmkW50. See also *Vermont Annual Session 1811,* Chap. 112, 139, https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssvt0108&id=139&men_tab=srchresult s; *Vermont Annual Session 1814*, Chap. 130, 113-14, https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssvt0114&id=113&men_tab=srchresult s

[152] An Act to organize, govern, and discipline the Militia of this State, ch. CLXIV, § 34, 1821, Me. Laws 548, 570-71,

57. In short, virtually all state militia laws expressly treated militiamen below the age of 21 as minors, not as militia adults 21 and over, as these laws shifted legal burdens to parents or others exercising similar authority over militiamen under 21. None of this supported an adult civilian "right" of 18- to 20- year-olds to obtain firearms. There is no evidence that the duties described in the militia statutes corresponded with a broad societal practice of arming minors.

## V. CONCLUSION

58. State and local restrictions that were designed to restrict or regulate guns and other dangerous weapons in the hands of minors emerged in the eighteenth century, and became ubiquitous in the nineteenth century, enacted in response to public safety problems that emerged in growing cities and towns. Consistent with the common law, the universally understood age of adulthood during this time was 21, which was also the most common age set in legislation pertaining to firearms restrictions (noting that lower ages were set in many laws for various firearms-related activities, such as hunting, or with permission of parents).

59. The relative paucity of such regulations pertaining to minors before the time examined here was not based on any belief that those below the age of 21 were somehow adults with full rights. Far from it. Historians and legal sources make clear that minors in the eighteenth and nineteenth centuries (defined as those younger than 21) decidedly did not have such full rights.[153] The proliferation of age-based restrictions on gun purchase and ownership that occurred in the mid-to-late nineteenth century was a general consequence of profound societal shifts from overwhelmingly agrarian life, where children generally lived and worked at home in

---

https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssme0156&id=572&men_tab=srchresults

[153] Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment"; Hamilton, "Adulthood in Law and Culture."

a rural setting and therefore under direct parental control, to urban, industrialized life where children increasingly worked, were schooled, and often spent significant time outside of the home (and therefore often beyond direct parental supervision) in population centers. Beyond all this, as Jacob Charles has persuasively noted, "the absence of positive law. . . . tells us nothing about what our ancestors thought their elected representatives *could* do."[154]

60. Many historical questions are ambiguous. But this one is not: historically speaking, adult gun rights did not accrue to those under 21. Connecticut's challenged laws are consistent with that historic tradition.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 18, 2025, at Williamsburg, VA.

*Robert J. Spitzer*

Dr. Robert Spitzer

---

[154] Jacob D. Charles, "The Dead Hand of a Silent Past: *Bruen*, Gun Rights, and the Shackles of History," 73 *Duke Law Journal* 67, 111 (2023).

**EXHIBIT A**

May 2025

## Curriculum Vitae

### Robert J. Spitzer

### Adjunct Professor, College of William & Mary School of Law

### Distinguished Service Professor, Emeritus
### State University New York at Cortland

Address:      5333 Center St.
              Williamsburg, VA  23188
              (607) 423-1781
              Robert.spitzer@cortland.edu
              https://sites.google.com/site/robertspitzercortland/

Education:    A.B. (Political Science), summa cum laude, State University of New York at
              Fredonia, 1975.
              M.A. Cornell University, 1978.
              Ph.D. Cornell University, 1980.

Positions Held:

    Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
    Affiliated Scholar, Research Scholar of Public Policy, College of William & Mary, 2023-
        present.
    Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
    Department Chair, SUNY Cortland, 2008-2020.
    Interim Department Chair, SUNY Cortland, 2004-2005.
    Distinguished Service Professor, SUNY Cortland, 1997-present.
    Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-
        1990, 1992-2017.
    Professor, SUNY Cortland, 1989 to 1997.
    Continuing Appointment, SUNY Cortland, 1986.
    Associate Professor, SUNY Cortland, 1984 to 1989.
    Department Chair, SUNY Cortland, 1983 to 1989.
    Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985,
        1986, 1988.
    Copy Editor, Administrative Science Quarterly, 1982 to 1983.
    Adjunct Professor, Tompkins-Cortland Community College, 1982-83.

1

Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.


Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.
Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.
Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.
Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.
Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.
SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.
Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."
Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.
Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.
Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.
Who's Who in the World, 1996.
Dictionary of International Biography, 1995.
Who's Who in the East, 1995-96; 1997-98
Ex officio member, Cortland County Bicentennial Committee, 1987-89.
Chair, SUNY Cortland Bicentennial Committee, 1987-89.
Phi Eta Sigma, SUNY Cortland, 1994.
Phi Kappa Phi, SUNY Cortland, 1990.

Men of Achievement (1986)
Contemporary Authors, vol. 112 (1985) and subsequent updates.
International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.


Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.


Publications and Papers:

BOOKS:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents

and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, <u>The Bicentennial of the U.S. Constitution: Commemoration and Renewal</u> (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial. Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

<u>President and Congress: Executive Hegemony at the Crossroads of American Government</u> (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, <u>Media and Public Policy</u> (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

<u>The Politics of Gun Control</u> (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, <u>Politics and Constitutionalism: The Louis Fisher Connection</u>, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

<u>The Right to Bear Arms: Rights and Liberties Under the Law</u> (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

<u>Essentials of American Politics</u>, co-authored with Benjamin Ginsberg, Johns Hopkins;

Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023; revised paperback ed. 2025). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:
> Daniel Hoffman, Our Elusive Constitution, (1997)
> Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)

Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)

Robert Spitzer, ed., Politics and Constitutionalism, (2000)

Laura Langer, Judicial Review in State Supreme Courts (2002)

Ian Brodie, Friends of the Court (2002)

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)

Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, Universal Rights and the Constitution (2014).

Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).

Anthony Maniscalco, <u>Public Spaces, Marketplaces, and the Constitution</u> (2015).
Goirgi Areshidze et al., eds., <u>Constitutionalism, Executive Power, and the Spirit of Moderation</u> (2016).
Peter J. Galie, et al., eds., <u>New York's Broken Constitution</u> (2016).
Robert J. Hume, <u>Ethics and Accountability on the U.S. Supreme Court</u> (2017).
Michael A. Dichio, <u>The U.S. Supreme Court and the Centralization of Federal Authority</u> (2018).
Clyde H. Ray, <u>John Marshall's Constitutionalism</u> (2019).
Daniel P. Franklin, et al., <u>The Politics of Presidential Impeachment</u> (2020).
Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).
Richard W. Waterman, <u>Constitutional Ambiguity and the Interpretation of Presidential Power</u> (2025).
Eric T. Kasper and JoAnne Sweeny, eds., <u>Free Speech and Incitement in the Twenty-First Century</u> (2025).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)


Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.


<u>BOOK CHAPTERS</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent</u>

Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in Inventing the American Presidency: Early Decisions and Critical Precedents, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in The CQ Guide to the Presidency, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in Encyclopedia of American Political Parties and Elections, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in <u>The Executive Office of the President</u>, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the <u>Oxford Historical Guide to American Government</u> (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in

Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for Issues: Understanding Controversy and Society, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," Encyclopedia of Applied Ethics, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" Winning the Presidency 2012, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." American Government. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," American Governance, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," American Presidents and the Constitution, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," The George W. Bush Presidency, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Guns Return to American Elections," <u>US Election Analysis 2016: Media, Voters and the Campaign,</u> Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2016.

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Guns and the 2020 Elections," <u>US Election Analysis 2020</u>, Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2020.

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," <u>The Conversation on Guns</u>, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023).

"To Brandish or Not to Brandish: The Consequences of Gun Display," <u>New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society</u>, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2023).

"Guns and the 2024 Elections," <u>U.S. Election Analysis 2024</u>, Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2024.


<u>ARTICLES</u>:

13

"Jamestown:  Anatomy of an All-American City," <u>Sunday Buffalo Courier Express Magazine</u>, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, <u>The Journal of Politics</u>, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," <u>Presidential Studies Quarterly</u>, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," <u>Presidential Studies Quarterly</u>, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," <u>National Civic Review</u>, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," <u>Party Line</u>, 17 (September 1984).

"Shooting Down Gun Myths," <u>America</u>, June 8, 1985, pp. 468-69.  Reprinted in: the <u>Des Moines Register</u>, October 24, 1985; <u>Criminal Justice</u>, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); <u>U.S. News and World Report</u> educational study unit on Gun Control, April/May, 1987; <u>Gun Control</u>, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985): 611-17.

"Promoting Policy Theory: Revising the Arenas of Power," <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in Daniel C. McCool, ed. <u>Public Policy Theories, Models, and Concepts</u> (Englewood Cliffs, NJ: Prentice-Hall, 1995); and L.F. Goodchild, et al, <u>Public Policy and Higher Education</u> (Needham Heights, MA: Simon & Schuster, 1997).

"A Course Module: The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

14

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," Policy Studies Journal, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," Policy Studies Journal, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," PS: Political Science and Politics, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," PS: Political Science and Politics, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," Oklahoma City University Law Review, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," Congress and the Presidency, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," Pace Law Review, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" The Spectator, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15.  Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, <u>American Literary History</u> 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, <u>Injury Prevention</u> 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

16

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," <u>Law and Contemporary Problems</u> 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" <u>Items: Insights from the Social Sciences,</u> Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," <u>The Regulatory Review</u>, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," <u>Law and Contemporary Problems</u> 83, 3(2020): 231-55.

"Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," <u>Fordham Urban Law Journal</u> 51 (October 2023): 57-115.

"Historical Weapons Restrictions on Minors," <u>Rutgers University Law Review Commentaries</u> 76(Spring 2024): 101-24.

"America's Untold Gun Law History," <u>The Torch: The Magazine of the International Association of Torch Clubs</u> (98) Fall 2024: 20-24.

"Historical Firearms Licensing and Permitting Laws," <u>Dickinson Law Review</u> 129 (Spring 2025): 1041-74.


<u>OP-ED ARTICLES:</u>

"Court Rulings on 2nd Amendment: No Individual Right to Keep Arms," <u>Des Moines Register</u>, October 24, 1985.

"Gun Control and Pressure Politics," <u>Syracuse Post-Standard</u>, November 30, 1985.

"Pocket Vetoes and Abuse of Power," <u>Rochester Times Union</u>, January 7, 1987.

"But for One Vote, a Different Nation," <u>Rochester Times Union</u>, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," <u>Rochester Times Union</u>, September 14, 1987.

"The Great Gun Fallacy," <u>Syracuse Post-Standard</u>, March 30, 1989.

"Four Cases on Right to Bear Arms," <u>Syracuse Post-Standard</u>, April 22, 1989.

"Don't Start Line-Item Veto," <u>Syracuse Post-Standard</u>, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," <u>Columbus Dispatch</u>, April 24, 2003.

"Hazing Scandals," <u>Syracuse Post-Standard</u>, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 18, 2004.

"NRA Loses Its Political Firepower," <u>Los Angeles Times</u>, April 12, 2004. Also in the <u>Deseret News</u>.

"A 'Tortured' Interpretation of the President's Vast Powers," <u>Syracuse Post-Standard</u>, June 18, 2004.

"Clearing the Air," <u>Syracuse Post-Standard</u>, August 4, 2004.

"Why Gun Ban Died Quietly," <u>San Jose Mercury News</u>, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," <u>Christian Science Monitor</u>, August 18, 2005. Also published in the <u>Deseret News</u>, <u>Sacramento Bee</u>, the <u>Fresno Bee</u>, the <u>Modesto Bee</u>, the <u>Ithaca Journal</u>, the <u>Johnstown Breeze</u>, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But

Static," <u>Syracuse Post-Standard</u>, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" <u>Syracuse Post-Standard</u>, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," <u>Los Angeles Times</u>, January 8, 2008. Reprinted in the <u>St. Louis Post-Dispatch</u>, <u>St. Paul Pioneer Press</u>, <u>Wilmington Star News</u> (NC), <u>News and Observer</u> (NC), <u>The Morning Call</u> (Pa.), <u>Contra Costa Times</u> (CA), the <u>Sun News</u> (FL), <u>The Vindicator</u>, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, <u>Cleveland Plain Dealer</u>, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," <u>Cortland Standard</u>, May 27, 2009.

"A Better Way to Run Our Elections," <u>Syracuse Post Standard</u>, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post

(www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

22

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

23

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com,* June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill,* July 14, 2023.

"America's Original Gun Control," *The Atlantic Monthly,* August 12, 2023.

"The Unusual Thing About Hunter Biden's Indictment," *CNN.com*, September 15, 2023.

"Minors, Gun, History, and the Second Amendment," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, April 24, 2024.

"The Supreme Court's Gun Rights Decision Deepens the Cracks in Originalism," *The Hill,* June 24, 2024.

"Court's Immunity Ruling Undermines Founders' Intent," *Virginia Daily Press/Virginian-Pilot,* July 17, 2024.

"Historical Context, Weapons Laws, and Early American Governance," *Second Thoughts Blog*, Duke Center for Firearms Law, October 18, 2024.

"The Trump Threat to America's Legal Order," *ArtsForum*, November 12, 2024.

"Newport News Council's Revised Gun Rule has Long Legal Precedent," *Virginia Daily Press/Virginian-Pilot,* December 8, 2024.   170

"A Court Ruling on Minors and Handguns Got the History Wrong," *The Hill*, February 7, 2025.

"Historic Weapons Licensing Laws," *Second Thoughts Blog*, Duke Center for Firearms Law at Duke University, June 4, 2025.


TESTIMONY, BRIEFS, AND REPORTS:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the

New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and <u>Sine Die</u> Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u>, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Healey,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26, 2019).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.


<u>PAPERS AND PRESENTATIONS</u> (not including those given on the Cortland Campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

31

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential

Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science

35

Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America,"

Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of

40

William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023. Archived with selected conference papers at: https://www.hofstra.edu/cultural-center/obama/; https://www.hofstra.edu/sites/default/files/2024-02/spitzer-paper.pdf

"Gun Law History and Virginia," League of Women Voters, Williamsburg, Va., June 22, 2023.

"Gun Policy in the U.S.: Past, Present, Future," College of William & Mary, Williamsburg, Va., September 21, 2023.

"Historical Gun Laws Pertaining to Minors," 2023 Cooper-Walsh Colloquium, Conference on *Public Health, History, and the Future of Gun Regulation After Bruen,* Fordham University School of Law, New York City, NY, October 12-13, 2023.

"Presidential Impeachment: What It Is, How It Works, Why It Matters," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., October 19, 2023.

"The Politics of Gun Control," TORCH Club of Williamsburg, Va., January 16, 2024.

"Gun Law History in America and Virginia," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., February 21, 2024.

"Law and History Roundtable: The *Rahimi* Supreme Court Case," Center for the Study of Guns and Society, Duke University School of Law, Durham, NC, August 2, 2024.

"The 2024 Presidential Elections," TORCH Club of Williamsburg, Va., October 15, 2024.

"The 2024 Presidential Elections," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., October 18, 2024.

"Gun Law History: Separating Fact from Fiction," SUNY Geneseo, NY, October 22, 2024.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., February 28, 2025.

"Historical Gun and Weapons Licensing and Permitting Laws," Conference on the Second Amendment After *Bruen,*" Penn State Dickinson Law School, Carlisle, PA, April

4, 2025.

PANEL PARTICIPATION:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San

Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022 (virtual).

Discussant, "Revisiting Watergate: Crisis, Renewal, and the Presidency," APSA, Philadelphia, Sept. 5-8, 2024.


BOOK REVIEWS:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142: An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative

Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective,

Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The

Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).

Gun Country: Gun Capitalism, Culture and Control in Cold War America by Andrew McKevitt, Perspectives on Politics 22(December 2024).


SELECTED MEDIA APPEARANCES/QUOTATIONS:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Full Frontal With Samantha Bee," "Ali Velshi"; "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ

Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area universities.

PROFESSIONAL ASSOCIATIONS:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

TEACHING AREAS:

American Government:  courses taught include Law and Politics, Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy.  Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

TEACHING-RELATED AWARDS:

Three-time recipient of the SUNY Cortland Student Government Association

51

Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

## OTHER PROFESSIONAL ACTIVITIES

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

SELECTED COMMUNITY SERVICE

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).
Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

**EXHIBIT B**

1. Co-authored amicus briefs: *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012).

2. I have been invited to submit written testimony and serve as an expert witness in the following cases, in addition to this one:  *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum* No. 22-cv-01859

(D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al.*, 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.); *RMGO/Mosgrove v. Polis*; *Koppel v. Bonta*, 8:23-cv-00813 (C.D. Cal.); *Calce v. City of New York*, Case 1:21-cv-08208-ER; *D.B. v. Sullivan*, No. 22-CV-282 (MAD)(CFH) (N.D.N.Y.); *Richey v. Sullivan*, Case No. 1:23CV344 (AMN-DJS) (N.D.N.Y.); *D.B. v. Sullivan*; *Commonwealth of Pennsylvania v. Tomlinson*; *National Association for Gun Rights et al v. Polis* U.S.D.C. Colo. Case No. 1:2024cv00001; *O'Neil et al. v. Neronha et al.*, C.A. No. 1:23-cv-00070-WES-PAS; *State of Washington v. Gator's Custom Guns* (Cowlitz County Superior Court Case No. 23-2-00897-08); *Guardian Arms, LLC, et al. v. State of WA, et al.*, No.: 23-2-01761-34; *Virginia Citizens Defense League et al. v. City of Roanoke et al.*, CL-2474; *RMGO v. Polis* (U.S. District Court for the District of Colorado); *Yzaguirre v. District of Columbia*, 24-cv-01828 (D.D.C.); *Clemendor v. District of Columbia*, 24-cv-01955 (D.D.C); *State of New Jersey v. Fox*, Docket No. FO-14-123-20, FO-14-141-21; *State of New Jersey v. Ricciardi*, Docket No. FO-14-54-21, FO-14-149-22, DOL Nos. 24-01899, 24-01900; *Birney et al., v. Delaware Department of Safety and Homeland Security, et al.* (C.A. No. K23C-07-019 RLG); *Beckwith et al. v. Frey*, Dkt. No. 1:24-cv-00384-LEW (D. Me.).

3. I have presented written testimony several times to the U.S. Congress: "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

**EXHIBIT C**

# GUN/WEAPONS RESTRICTIONS FOR MINORS

## ALABAMA

1856 Ala. Acts 17, To Amend the Criminal Law, §1. (855 Ala. Laws 17)
That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars.

George Washington Stone, The Penal Code of Alabama, Montgomery, 1866 Page 63, Image 63 (1866) available at The Making of Modern Law: Primary Sources. 1866
Miscellaneous Offenses § 204. Selling or giving fire-arms to minor. – Any person who sells, gives, or lends to any boy under eighteen years of age, any pistol, or bowie-knife, or other knife of like kind or description, must, on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876: with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources. 1877
Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

## ARIZONA

Laws regulating the sale of firearms to minors and Native Americans, Title 10, §§ 342 & 362 of AZ Penal Code in The Revised Statutes of Arizona Territory (1901).
Sec. 342. Any person who shall sell or give to any minor under the age of fourteen years, or to any person for the use of such minor, any firearms, or toy pistols from which dangerous and explosive substances may be discharged, shall be deemed guilt...

## CALIFORNIA

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. 1896
Misdemeanors. Section 53. No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

## CONNECTICUT

The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources.  1835

Chapter 26. A ByLaw in relation to the Firing of Guns and Pistols, within the limits of the city of New-London, and making parents and guardians, and masters, liable for breaches of by-laws by minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city.

Henry Dutton, A Revision of Swift's Digest of the Laws of Connecticut. Also, Practice, Forms and Precedents, in Connecticut Page 564, Image 565 (Vol 1, 1871) available at The Making of Modern Law: Primary Sources. 1871

Of Trespass on the Case. A person, before he trusts a gun with an incautious person, is bound to render it perfectly innoxious. Where the defendant negligently and imprudently entrusted a loaded gun to a young mulatto girl, who discharged it against the son of the plaintiff, and severely wounded him by which the plaintiff lost his service and was put to great expense for his cure, the defendant was subjected to 100 pounds damages.

Charter of the City of New Haven Page 142-143, Image 241-242 (1881) available at The Making of Modern Law: Primary Sources. 1881

Charter of the City of New Haven. Trade. § 18. No person shall sell to any child under the age of sixteen years, without the written consent of the parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of cartridge, or of any fulminate.

## **DELAWARE**

Act of Feb. 4, 1812, 195 Del. Laws 522 (1812)

An Act to prevent the discharging of fire-arms within the towns and villages, and other public places within this State, and for other purposes.

SEC. 1. Be it enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly met, That from and after the first day of June next, if any person or persons shall presume to fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol,

within any of the towns or villages of this State, or within the limits thereof; of where the limits cannot be ascertained, within one quarter of a mile of the center of such town or village, shall fire or discharge any gun, ordnance, musket, fowling piece, fusee or pistol, within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State, whereon any buildings are or shall be erected, or within one hundred yards of any mill-dam, over or across where any of the main public or State roads may go or pass; every person or persons so offending, shall be fined or punished as hereinafter directed.

SEC. 2. And be it enacted by the authority aforesaid, That if any free white person or persons, or the child or children of any such person or persons, shall fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any, or at any of the places or limits aforesaid, every such person or persons, or the child or children of every such person or persons, shall forfeit and pay for every such offence, any sum, not exceeding five dollars, to be recovered from the person or persons, or from the parent of such child or children, before any justice of the peace of this State, on his own view, or on the oath or affirmation of any one or more credible witnesses, to be recovered as debts under forty shillings are recoverable by the laws of the State.

SEC. 3. And be it enacted by the authority aforesaid, That if any free negro or mulatto, or the child or children of any such free negro or mulatto, or any manumitted negro or mulatto, or any servant or servants, slave or slaves, apprentice or apprentices, of any person or persons whatsoever, shall fire or discharge any gun, ordnance, musket, fusee, fowling-piece or pistol, within the limits herein before described, and be thereof convicted by the view of any one justice of the peace, or on the oath or affirmation of one or more credible witnesses, every person so offending, shall forfeit and pay any sum, not exceeding five dollars: Provided nevertheless, That in all and every case where the money is not immediately paid on such conviction, into the hands of the justice before whom such conviction is had, it shall and may be lawful, and the said justice is hereby directed and commanded to commit such person or persons to the fail of his county, there to remain, until the forfeitures and costs are paid.

SEC. 4. And be it enacted by the authority aforesaid, That all fines and forfeitures incurred under this law, shall be paid over for the use of the poor of the county where the offence shall have been committed.

SEC. 5. Provided nevertheless, and be it enacted by the authority aforesaid, That nothing in this act shall extend, or be construed to prevent any such firing, on any day or days of public rejoicing, or where it is authorized by any law of this State, or where it shall be deemed by the justice before whom the information is lodged, that the necessity of the case required the same.


A Supplement to the Act Entitled "An Act for Establishing the Boundaries of the Town of Dover, and for Other Purposes Therein Mentioned," ch. 169, § 2, 1832 Del. Laws 197, 198 (S. Kimmey 1841).

"CHAPTER CXLXXIX.

A SUPPLEMENT to the act entitled 'An act for establishing the boundaries for the town of Dover, and for other purposes therein mentioned...'

   ...Sec. 2. And be it enacted, That it shall be the duty of the said commissioners, justices and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up on the public square of the said town: and to suppress and prevent the firing of guns, crackers or squibs, by boys or others, within the limits of the said town."

Laws of the State of Delaware from the Sixteenth Day of January, One Thousand Eight Hundred and Thirty, to the Thirteenth Day of February, One Thousand Eight Hundred and Thirty-Five, to

which Is Prefixed the Amended Constitution of Said State, vol. 8 (Dover, DE: S. Kimmey, 1841), 198. Chapter 169—A Supplement to the Act Entitled "An Act for Establishing the Boundaries of the Town of Dover, and for Other Purposes Therein Mentioned, § 2. Passed February 8, 1832.

Act of January 29, 1845, ch. 12, § 2, 1845 Del. Laws 9, 10 (S. Kimmey).
"CHAPTER XII.
A SUPPLEMENT to the act entitled 'An act to survey, lay out and regulate the streets of Smyrna and for other purposes...'
   ...Sec. 2. And be it enacted, That it shall be the duty of the said commissioners, justice of the peace and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up in any of the streets, lanes or alleys of the said town, and to suppress and prevent the firing of guns, pistols crackers or squibs, or the making or throwing of fire-balls by boys or others within the limits of said town."
Laws of the State of Delaware, Passed at a Session of the General Assembly, Commenced and Held at Dover, on Tuesday the Seventh Day of January, in the Year of Our Lord, One Thousand Eight Hundred and Forty-Five, and of the Independence of the United States the Sixty Ninth (Dover, DE: S. Kimmey, 1845), 10. Chapter 12—A Supplement to the Act Entitled 'An Act to Survey, Lay out and Regulate the Streets of Smyrna and for other Purposes,' § 2. Passed January 29, 1845.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.  1881
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers. § 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court. 16 Del. Laws 716 (1881).

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more

5

than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.

1918–1919 Del. Laws 484, Minors Under Fifteen Not to Use Gun Unless Accompanied by an Adult, § 2382 A. Sec. 25 A. 1918
It shall be unlawful for any minor under fifteen years of age to hunt game birds or game animals anywhere in this state with a rifle or shotgun of any kind unless accompanied by an adult lawfully hunting.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk, employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## DISTRICT OF COLUMBIA

WASHINGTON, D.C., LAWS OF THE CORPORATION OF THE CITY, ch. 98, §§ 1-3 (Way & Gideon 1829).
"CHAP. 98.
AN ACT concerning the use of fire arms, and the use and sale of fire crackers, squibs and other artificial fireworks.
    Be it enacted by the board of aldermen and board of common council of the city of Washington[,] That if any person shall fire or shoot a gun, pistol, or other fire arm, idly or for sport or amusement, within two hundred and fifty yards of any dwelling house within this city, or in any part of the city on the Sabbath, the person so firing or shooting shall forfeit and pay a fine not exceeding ten dollars, nor less than five dollars. Provided, That nothing herein contained shall be construed to affect any officer of this Corporation for firing and shooting as aforesaid in the execution of his duty, or the militia or troops of the United States, for discharging their fire

arms, on days of mustering, training or rejoicing, when ordered so to shoot or fire by their commanding officer: or any person shooting as aforesaid, in the performance of any philosophical experiment or theatrical amusement, for the exhibition of which a license shall have been previously obtained: And provided, that nothing in this or any other act contained, shall be construed to prohibit any person from shooting at water fowl in the Eastern branch, or Potomac river, although such person may be within the limits herein prescribed.   .

Sec. 2. And be it enacted, That if any person shall set off any fire crackers, squibs, or other artificial fireworks, in any street or avenue within one hundred yards of any dwelling house, such person shall forfeit and pay a fine not exceeding five dollars, nor less than one dollar; and if the offence be committed by a slave, it shall be punished by whipping, not exceeding thirty-nine stripes, at the discretion of the magistrate; which punishment may be commuted by the payment of the fine aforesaid; and if by an apprentice or minor, the parent or guardian shall pay the fine.

Sec. 3. And be it enacted, That it shall not be lawful for any person to sell or offer, or expose for sale, fire crackers, squibs, or other artificial fireworks, without having previously obtained a license from the Mayor for that purpose, for which license the sum of fifty dollars per annum shall be paid to the Corporation; and if any person shall violate the provisions of this section, such person shall forfeit and pay a fine not exceeding ten dollars, nor less than five dollars, for each and every offence.

Approved, June 4th, 1829,

Laws of the Corporation of the City of Washington, Passed by the Twenty-Sixth Council (Washington, DC: Way & Gideon, 1829), 54-55. Chapter 98—An Act Concerning the Use of Fire Arms, and the Use and Sale of Fire Crackers, Squibs and Other Artificial Fireworks, §§ 1-3. Passed June 4, 1829.

Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his

place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction

of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

Washington D.C. 47 Stat. 650, 651-652 (1932)
CARRYING CONCEALED WEAPONS
SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS
SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY
SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SELLING TO MINORS AND OTHERS
SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

9

## FLORIDA

1881 Fla. Laws 87, An Act to Prevent the Selling, Hiring, Bartering, Lending or Giving to
§ 1. it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any minor under sixteen years of age any pistol, dirk or other arm or weapon, other than an ordinary pocket-knife, or a gun or rifle used for hunting, without the permission of the parent of such minor, or the person having charge to such minor, and it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife. § 2. Any person or persons so offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty nor more than fifty dollars, or imprisoned in the county jail not more than three months.

## GEORGIA

1876 Ga. Laws 112.
Section I. That from an after the passage of this Act it shall not be lawful for any person or persons knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane. Any person found guilty of a violation of this Act shall be guilty of a misdemeanor, and punished as prescribed in section 4310 of the Code of 1873: Provided, that nothing herein contained shall be construed as forbidding the furnishing of such weapons under circumstances justifying their use in defending life, limb or property. Sec. II. Repeals conflicting laws.

1920 Ga. Laws 134, § 2. 1910
(forbids the sale of pistols to minors and makes the violations of the statute a misdemeanor). See Spires v. Goldberg, 26 Ga. App. 530 (1921).

## HAWAII

1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), § 8.
Section 8. Selling to minors. No person shall sell, barter, hire, lend, or give any pistol or revolver to any person under the age of eighteen years.

1933 Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 4.
§ 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be

10

neither place of business nor residence, his place of sojourn, a permit to acquire as prescribed herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship. Applications for such permits shall be signed by the applicant upon forms to be specified by the bureau of crime statistics, and shall be signed by the issuing authority. One copy of such permit shall be retained by the issuing authority, as a permanent official record. Such permit shall be void unless used within ten days after the date of issue. In all cases where possession is acquired from another person in the Territory the permit shall be signed in ink by the holder thereof and shall thereupon he delivered to and taken up by the person selling, loaning, giving or delivering the firearm or ammunition, who shall make entry thereon setting forth in the space provided therefor the name of the person to whom the firearm or ammunition was delivered, and the make, style, caliber, and number, as applicable. He shall then sign it in ink and cause it to he delivered or sent by registered mail to the issuing authority within forty-eight hours. In case receipt of such firearms or ammunition is had by mail, express, freight, or otherwise, from sources outside the Territory, the person to whom such permit has been issued, shall make the prescribed entries thereon, sign in ink, and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearms or ammunition. No person shall sell, give, loan, or deliver into the possession of another any firearm or ammunition except in accordance with the Provisions of this section. Any person acquiring a firearm or ammunition under the provisions of this section shall, within five days of acquisition, register same in the manner prescribed by Section 3 of this Act. No fee shall be charged for permits under this section. Any person who violates any provision of this section shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year, or by both.

## __IDAHO__

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.

If any person . . . or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor under the age of sixteen (16) years any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction, be punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred dollars ($200.00), or by imprisonment in the county jail for a period of not less than twenty (20) nor more than sixty (60) days, or by both such fine and imprisonment: Provided, however, that it shall be a good defense to the charge of carrying such concealed weapons if the defendant shall show that he has

been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, family home or property.

## ILLINOIS

Proceedings of the Common Council of the City of Chicago Page 140, Image 185 (Vol. 5, 1874) available at The Making of Modern Law: Primary Sources.  1873
Ordinances of Chicago: An Ordinance Prohibiting the Sale to or Furnishing Minors with Firearms. § 1. That no person within said city shall sell to or in any manner furnish any minor with any gun, pistol, revolver, or other firearms; and any person offending against this ordinance shall on conviction be fined in a sum not less than twenty-five dollars nor more than one hundred dollars for each offense.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. 1881
Deadly Weapons: Selling or Giving to Minor. § 54b. Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, IMage 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources.  1914
Ordinance of May 25, 1914, § 4a. It shall be unlawful for any person, firm or corporation to sell, barter or give away to any person within the City of Chicago, any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character which can be concealed on the person, except to licensed dealers and to persons who have secured a permit for the purchase of such articles from the general superintendent of police as hereinafter required; provided, this section shall not apply to sales made of such articles which are delivered or furnished outside the City of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character, which can be concealed on the person, without first securing from the General Superintendent of Police a permit so to do. Before any such permit is granted, an application in writing shall be made therefor, setting forth in such application the name, address, age, height, weight, complexion, nationality and other elements of identification, of the person desiring such permit, and the applicant shall present such evidence of good character as the General Superintendent of Police in his discretion may require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to (a) All persons having been convicted of any crime. (b) all minors. "Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar. § 8. Any person, firm or corporation violating any of the provisions of this ordinance, shall be fined not less than Fifty

Dollars ($50.00) nor more than Two hundred Dollars ($200.00) for each offense, and every purchase, sale or gift of any weapon mentioned in this ordinance shall be deemed a separate offense.

Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278, Chicago, Ill, 1917). 1917
It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.

## **INDIANA**

Edwin Augustine Davis, LL.B., The Statutes of the State of Indiana: Containing the Revised Statutes of 1852, with the Amendments Thereto, and the Subsequent Legislation, 246with Notes and References to Judicial Decisions. Second Edition Vol. 2 Page 482, Image 493 (1877) available at The Making of Modern Law: Primary Sources.  1875
An Act to prohibit the sale, gift or bartering of deadly weapons or ammunition therefor, to minors. § 1. Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. § 2. Be it further enacted, That any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars.

The Revised Statutes of the State of Indiana, the Revision of 1881 and All General Laws Enacted to that Revision (1888) Section 1986-87, Furnishing Deadly Weapon to Minor. 1881
Sec. 1986. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell¸ barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol. 1987. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars.

1905 Ind. Acts 688, Weapon— Furnishing to Minor, § 450.
It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell¸ barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars.

13

1925 Ind. Acts 496, ch. 207, An Act to Regulate and Control the Possession, Sale, and Use of Pistols and Revolvers in the State of Indiana
Sec 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars, or be imprisoned for not more than three months, or both, except for uses as hereinbefore provided.

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.
Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

## IOWA

1884 Iowa Acts 86.
Section 1. That it shall be unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor. Sec. 2. Any violation of this act shall be punishable by a fine of not less than twenty-five nor more than one hundred dollars or by imprisonment in the county jail of not less than ten nor more than thirty days. Sec. 3. This act being deemed of immediate importance shall be in full force and take effect from and after its publication in the Iowa State Leader and Iowa State Register, newspapers published at Des Moines, Iowa.


Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887) available at The Making of Modern Law: Primary Sources. 1887. Ordinances, City of Council Bluffs, Shooting Gallery, § 5. No person shall carry on or take part in carrying on any pistol gallery or shooting gallery without license therefor from said city, and the charge for such license shall be ten dollars per month, or fifty dollars per annum. §6. No licensee or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or remain in or about the same to play thereat, under penalty of the same fine and forfeiture as set forth in section 2 of this chapter.

Annotated Code of the State of Iowa Containing All the Laws of a General Nature Enacted by The Twenty-Sixth General Assembly at the Extra Session, Which Adjourned July 2, 1897 Page 1955, Image 787 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources. 1897 § 5004. Selling Firearms to Minors. No person shall knowingly sell, present or give any pistol, revolver or toy pistol to any minor. Any violation of this section shall be punished by a fine of

14

not less than twenty-five nor more than one hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days.

## KANSAS

1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, ch. 106, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars. § 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

Sam Kimble Revised Ordinances of the City of Manhattan and Rules of the Council Page 49-50, Image 51-52 (1887) available at The Making of Modern Law: Primary Sources. 1887 Ordinances of Manhattan, KS; Offenses Against the Public Peace, Health and Safety, Toy Pistols, §13. Any person who shall give, trade, loan or otherwise furnish any pistol, revolver, or toy pistol by which cartridges or caps may be exploded, or any dirk, bowie-knife sling shot or toy known as "rubber sling shot" or other dangerous weapon, to any minor or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before the Police Judge be fined not less than five nor more than one hundred dollars. § 14. Having Possession of the Same. Any minor who shall have in his possession any pistol, revolver, or toy pistol by which cartridges may be exploded or any dirk, bowie knife, brass knuckles, slung shot or toy known as "rubber sling shot" or other dangerous weapons shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than one nor more than ten dollars.

## KENTUCKY

An Ordinance as to Retailing Gun Powder, LOUISVILLE, STATE AND MUNICIPAL LAWS IN FORCE AND APPLICABLE TO (Passed 1853) (C. Settle 1857).
"No. 68. An Ordinance as to Retailing Gun Powder.
   No person shall retail gunpowder to minors under fifteen years of age, or free colored persons, without authority from his parent or guardian, or to slaves without authority from his master. Any person doing so in either case, shall be fined twenty dollars.
   Approved October 17, 1853."
Oliver H Strattan & John M. Vaughan, eds., A Collection of the State and Municipal Laws in Force and Applicable to the City of Louisville, KY (Louisville, KY: C. Settle, 1857), 175. Number 68—An Ordinance as to Retailing Gun Powder. Approved October 17, 1853.

1859/1860 Ky. Acts 245, AN ACT to amend an act, entitled "An act to reduce into one the several acts in relation to the town of Harrodsburg, Ch. 33, § 23.

15

If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

Acts of the General Assembly of the Commonwealth of Kentucky, Passed at the Session Which Was Begun and Held in the City of Frankfort, on Monday, the Fifth Day of December, 1859, and Ended on Monday, the Fifth Day of March, 1860, vol. 1 (Frankfort, KY: J. B. Majors, 1860), 245. Chapter 33—An Act to Amend an Act, Entitled "an Act to Reduce into One the Several Acts in Relation to the Town of Harrodsburg,["] § 23. Approved January 12, 1860.

1873 Ky. Acts 359

Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873). Passed 1873.

ARTICLE XXIX.

Deadly Weapons.

§ I. If any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon indictment and conviction, be fined not less than twenty-five nor more than one hundred dollars, and imprisoned in the county jail for not less than ten nor more than thirty days, in the discretion of the court or jury trying the case.

§ 2. That it shall be the duty of all ministerial officers in this State to apprehend such violator within their knowledge of this act, and to take such persons before a magistrate of the county in which said offense was committed; and if said magistrate shall, upon hearing the evidence, believe such accused person guilty of the offense charged, he shall require such accused person to give such bail as will insure his or her appearance at the next term of the circuit court for said county, to answer any indictment found against him or her in said court for said offense

§ 3. If any such officer shall knowingly and willfully fail or refuse to discharge the duties imposed and required of him under this act, he shall, upon indictment found by the grand jury of his county, and on conviction, be fined in a sum of not less than one hundred nor more than five hundred dollars.

s 4. That if judgment shall be confessed under this article, the penalty shall be the highest punishment imposed herein.

§ 5. Carrying concealed deadly weapons shall be lawful in the following cases: 1st. When the person has reasonable grounds to believe his person or the person of some of his family, or his property is in immediate danger from violence or crime; 2d. By sheriffs, constables, marshals, policemen, and other ministerial officers, when necessary for their protection in the discharge of their official duties.

Carrying Weapons or Sale to Minors Prohibited, Amendment to Ordinance No. 11—Crimes and Punishment, §§ 7-9 in Ordinances, Charter and Laws for the Government of the City of Frankfort, Kentucky (1876)

"Sec. 7. Any person who shall discharge any gun or pistol within the city, unless in the lawful defense of his person, family, or property, shall be fined ten dollars for each offense; but this provision shall not apply to gunsmiths who discharge firearms on their own premises in the pursuit of their regular business.

Sec. 8. Any person who shall, within the city, carry concealed a deadly weapon, other than an ordinary pocket-knife, shall be fined, for each offense, not less than twenty-five nor more than

16

one hundred dollars: Provided, That it shall be a sufficient defense to a prosecution for a violation of this provision to establish—

That the person charged had reasonable grounds to believe his person, or the person of some member of his family, or his property, was in danger from violence or crime.

That he was a Sheriff, Constable, Marshal, Policeman, Officer or Guard of the Penitentiary, or carrier of the United States mail, and that such weapon was a necessary precaution to his protection in the efficient discharge of such public or official duty; or,
III. That he was required, by his business or occupation, to travel during the night-time. (Sec. 8 repealed by sec. 9.)
9. That section 8 of the published Ordinances of the said city, and an Ordinance approved March 24, 1869, pertaining to carrying concealed deadly weapons, be, and the same are hereby, repealed, and the following be substituted in lieu thereof: If any person shall carry concealed a deadly weapon upon or about his person, other than an ordinary pocket-knife, or shall sell a deadly weapon to a minor, other than an ordinary pocket-knife, such person shall, upon conviction, be fined not less than twenty-five nor more than one hundred dollars, in the discretion of the court or jury trying the case. Carrying concealed deadly weapons shall be lawful in the following cases: 1st. When the person has reasonable grounds to believe his person or the person of some of his family, or his property, is in immediate danger from violence or crime. 2d. By Sheriffs, Constables, Marshals, Policemen, and other ministerial officers, when necessary for their protection in the discharge of their official duties[.]—Approved April 8, 1876."
Ordinances, Charter and Laws for the Government of the City of Frankfort, Kentucky: Ordinances Approved December 1st, 1890, and in Force from and after That Date (Frankfort, KY: G. A. Lewis, Printer, 1891), 22-24. Ordinance No. 11: Crimes and Punishment, §§ 7-9. Amended April 8, 1876.

## LOUISIANA

1890 La. Acts 39, An Act Making it a Misdemeanor for Any Person to Sell, Give or Lease, to Any Minor, Any Pistol, Bowie-Knife, Dirk or Any Weapons, Intended to be Carried or Used as a Concealed Weapon, § 1.
. . . [I]t shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon which may be carried concealed to any person under the age of twenty-one years.

John Q. Flynn Flynn's Digest of the City Ordinances, Together with the Constitutional Provisions, Acts of the General Assembly, and Decisions of the Courts Relative to the Government of the City of New Orleans Page 545, Image 617 (1896) available at The Making of Modern Law: Primary Sources. 1893
Ordinances of the City of New Orleans. Offences, Misdemeanors and Nuisances. § 1342. It shall be unlawful for any one to sell, or lease, or give through himself or any other person, any pistol, dirk, bowieknife, toy pistol for which cartridges are used, or any other dangerous weapon which may be carried concealed, to any person under the age of eighteen years. § 1343. That any person violating the provisions of this ordinance shall be deemed guilty of a misdemeanor and shall be liable to a fine not exceeding twenty-five dollars or imprisonment for a period not exceeding thirty days, or both, at the discretion of the Recorder having jurisdiction.

**MAINE**

Seth L. Haarrabee, The Charter and Ordinances of the City of Portland , Me.Page 136, Image 150 (1892) available at The Making of Modern Law: Primary Sources. 1892
Nuisances. Sale of blank cartridges and pistols prohibited. § 4. No person shall sell to any child under the age of sixteen years, without the written consent of a parent or guardian of such child, any blank cartridge, or any pistol, or mechanical contrivance specially arranged or designed for the explosion of the same and any person violating the provisions of this ordinance shall be liable to a penalty of not less than fifty, and not exceeding one hundred dollars, to be recovered on complaint to the use of the City of Portland.

**MARYLAND**

1882 Md. Laws 656
Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or sell, barter or give away the cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur.

1904 Md. Laws 295, An Act to Prohibit all Persons Under Fifteen Years of Age from Carrying or Having in Their Possession Firearms of any Description Within the Limits of Garrett County, ch. 177, §§ 1-2
§ 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for all persons under the age of fifteen years to carry or have in his or her possession any shot gun, rifle, revolver or other firearm of any description within the limits of Garrett County. § 2. And be it enacted, That any person convicted of violating this Act before any court of competent jurisdiction shall be fined not less than five dollars nor more than twenty dollars, or be imprisoned in the county jail for not less than ten nor more than thirty days for each and every offense.

1908 Md. Laws 397, § 31.
It shall be unlawful for any person under the age of twenty-one years to fire a gun, cat rifle, pistol, or any explosive instrument of metal, within one mile in any direction of the Library Hall in Catonsville, Baltimore county; and any person under said age of twenty-one years, violating this section, shall upon conviction before the Circuit Court, or any justice of the peace for said county, be fined a sum not less than one dollar nor more than ten dollars, or be imprisoned in the county jail for not less than five days nor more than thirty days, or be both fined and imprisoned, in the discretion of the court or the justice of the peace.

## MASSACHUSETTS

Report of Commissioners on Revision of Ordinances Page 141, Image 146 (1882) available at
The Making of Modern Law: Primary Sources. 1882
Of Explosive Compounds. Penalty for selling guns, pistols, cartridges, etc., to children. § 1.
Whoever sells to a child under the age of sixteen years, without the written consent of its parent
or guardian, any cartridge or fixed ammunition of which any fulminate is a component part, or a
gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge or of
any fulminate, shall be liable to a penalty of not less than five nor more than fifty dollars.

The Revised Ordinances of 1885, of the City of Boston, as Passed and Approved December 14,
1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth
Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th
Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources.
1884
Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall
sell to any child under the age of sixteen years without the written consent of a parent or
guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component
part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such
cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of
which the only component parts are chlorate of potash and sulphide of antimony, nor to any
appliance for exploding the same. The provisions of this section shall be inserted in every license
granted for the sale of gunpowder.

1909 Mass. Acts 148, An Act to Prohibit the Sale of Air Guns to Certain Minors
Section ninety-two of chapter one hundred and two of the Revised Laws is hereby amended by
inserting after the word "firearms", in the second line, the words — air guns, — so as to read as
follows: Section 92. Whoever sells or furnishes to a minor under the age of fifteen years any
firearms, air guns or other dangerous weapon shall be punished by a fine of not less than ten nor
more than fifty dollars for each offence; but instructors and teachers may furnish military
weapons to pupils for instruction and drill.

1922 Mass. Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 8
(amending § 130)
§ 8 (amending § 130). Whoever sells or furnishes to a minor under the age of fifteen, or to an
unnaturalized foreign born person who has who has not a permit to carry firearms under section
one hundred and thirty-one, any firearm, air gun or other dangerous weapon or ammunition
therefor shall be punished by a fine of not less than ten nor more than fifty dollars, but instructors
and teachers may furnish military weapons to pupils for instruction and drill.

## MICHIGAN

1883 Mich. Pub. Acts 144, An Act To Prevent The Sale And Use Of Toy Pistols, § 1.
That no person shall sell, give, or furnish to any child under the age of thirteen years, any
cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially
arranged or designated for the explosion of the same. . . . § 3. It shall be unlawful for any person

under the age of thirteen years, to have in possession, or use any of the articles named in section one of this Act.

## MINNESOTA

Making, selling, etc., dangerous weapons; Carrying, using, etc., certain weapons, §§ 333-334, The Penal Code of the State of Minnesota (1885). 1885, MN, The Penal Code of the State of Minnesota, Title 12, Of Crimes Against the Public Health and Safety §§ 333-334. The Penal Code of the State of Minnesota, To Take Effect January 1, A.D. 1886 (St. Paul, MN: The Pioneer Press Company, 1885), 127. Title 12, Of Crimes Against the Public Health and Safety, § 333 Making, selling, etc., dangerous weapons; § 334 Carrying, using, etc., certain weapons. Undated.

Sec. 333. Making, selling, etc., dangerous weapons.—A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or firearm to any person under the age of eighteen (18) years, is guilty of a misdemeanor.

Sec. 334. Carrying, using, etc., certain weapons.—A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as slung-shot, sand-club or metal knuckles, or a dagger, dirk, knife, pistol or other firearm, or any dangerous weapon, is guilty of a misdemeanor.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources. 1888.

Making, Selling, etc., Dangerous Weapons, § 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons, § 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3.

§ 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months. § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of

the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court.

Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources. 1880

Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any person of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided.

## MISSOURI

MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more

than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Chester H. Krum, Reviser, The Revised Ordinance City of St. Louis. No. 17188. Approved April 7, 1893 Page 885, Image 894 (1895) available at The Making of Modern Law: Primary Sources. 1887
Ordinances of the City of St. Louis. Minors – Conditions of Sale to, of Ammunition. – No person shall sell to any child under the age of sixteen years, without the written consent of the parents or guardian of such child, any cartridge of fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate.

Joplin Code of 1917, Art. 67, § 1201. Weapons; Deadly. 1917
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

## NEBRASKA

1895 Neb. Laws 237-38, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XXVI, §§ 2, 5.
§ 2. No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm, within the limits of the city, under penalty of a fine of fifty dollars for each offense. § 5. It shall be unlawful for any parent, guardian, or other person having the care and custody of any minor, to purchase for or give to any such minor or knowingly to permit any minor to have any toy pistol, toy gun, or other toy arm or arms, or sling shot, out of which any leaden or other dangerous missiles may be discharged. Any such person so offending shall, upon conviction thereof, be fined in any amount not exceeding twenty dollars, and stand committed until such fine and costs are paid and secured.

## NEVADA

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources. 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1. Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment. See also NEV. REV. STAT. § 4864 (1885).

Ordinance no. 67: An Ordinance to Prohibit the Selling of Dangerous Weapons to Minors, MORNING APPEAL, Apr. 18, 1885, at 1 (Carson City, Nevada).
"ORDINANCE NO. 67
AN ORDINANCE TO PROHIBIT the Selling of Dangerous Weapons to Minors:
The Board of Trustees of Carson City do ordain:
   SECTION 1—It shall be unlawful for any person, firm or association to sell or dispose of any dirk, dirk knife, sword, sword cane, billy, slung shot, revolver pistol, gun or other dangerous or deadly weapon, to any person under the age of 21 years.
   SECTION 2—Any person violating any of the provisions of this ordinance shal be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding twenty dollars, or imprisonment in the city Jail not exceeding ten days, or by both such fine and imprisonment.
Full Text: 1885, Carson City, NV, Morning Appeal, An Ordinance to Prohibit the Selling of Dangerous Weapons to Minors

## NEW HAMPSHIRE

William Martin Chase, The Public Statutes of the State of New Hampshire, To which are Prefixed the Constitutions of the United States and State of New Hampshire with a Glossary and Digested Index Page 713, Image 732 (1891) available at The Making of Modern Law: Primary Sources. 1883
Offenses Against Minors. § 4. If any person shall have in his possession a toy pistol, toy revolver, or other toy firearms, for the explosion of percussion caps or blank cartridges, with intent to sell the same, or shall sell, or offer to sell or to give away the same, he shall be fined not more than fifty dollars; and he shall be liable for all damages resulting from the use of the toy pistol, revolver, or other firearms by him sold or given away, to be recovered in an action on the case.

## NEW JERSEY

An Ordinance to Prevent the Firing of Guns and Pistols within the Island of Burlington, §§ 1-4, BURLINGTON, NEW JERSEY, CHARTER AND BY-LAWS OF THE CITY (D. Allinson 1824) (Law Passed 1822).
"An Ordinance to prevent the firing of Guns and Pistols within the Island of Burlington.

WHEREAS the peace of the city of Burlington has been frequently disturbed, by the firing of guns and pistols in the night preceding Christmas and New-Year, to the great annoyance of the inhabitants: And whereas much mischief may happen by the firing of guns or pistols at any time in the said city, whereby the lives, persons, and property of the citizens may be in danger, for remedy whereof in future,

Sect. 1. Be it ordained by the Mayor, Recorder, Aldermen, and Commonalty of the city of Burlington in common council assembled, and it is hereby ordained by the authority of the same, that it shall not be lawful for any person to fire any gun or pistol within the Island of Burlington, and that every such offence be and is hereby adjudged to be a common nuisance; and any and every person who shall fire or cause to be fired, any gun or pistol any where within the said Island, shall forfeit and pay the sum of three dollars for every such offence, to be sued for and recovered before any Justice of the peace or Magistrate of this city, by action of debt with costs of suit, by any person who will sue for the same. Provided always nevertheless, that this ordinance shall not extend to any person or persons who shall fire at birds or game from the shores of the river Delaware, into or over the said river, west of Reed street or east of York street, or to any person or persons who shall fire or cause to be fired any gun or pistol in defense[1] of his or her person, property or family, or to prevent the commission of any felony whatever, or who shall have leave on public[2] or particular occasions from three Magistrates of this city.

Sect. 2. And be it further ordained by the authority aforesaid, that if any person or persons shall knowingly and willfully[3] permit another to fire any gun or pistol in his or her house, or on his or her premises, within the said Island, except as provided for in the first section of this ordinance, or shall knowingly or willfully[4] harbor[5] or conceal any person who shall have fired any gun or pistol contrary to this ordinance, with the intent of preventing him or her from being detected; every person so offending, shall forfeit and pay the sum of five dollars for every such offence, to be sued for and recovered before any magistrate of this city, by action of debt with costs of suit, by any person who will sue for the same.

Sect. 3. And be it further ordained by the authority aforesaid, that in case any minor, apprentice, servant or slave, shall be convicted of any offence against this ordinance, then and in that case the penalty for such offence, with the costs of suit, shall be made and levied of the proper goods and chattels of his or her parent or guardian, master or mistress, and for want thereof, then of the proper goods and chattels of such minor, apprentice, servant or slave.

Sect. 4. And be it further ordained by the authority aforesaid, that the ordinance passed the twenty sixth day of September, in the year of our Lord one thousand seven hundred and eighty-five, entitled 'An act to prevent the firing of guns and pistols within the Island of Burlington,' be and the same is hereby repealed.

This bill having been three times read in council, Resolved that the same do pass, December 26th, A.D. 1822."

Charles Kinsey, ed., Charter and By-laws of the City of Burlington, Compiled and Published Under the Authority of the Common Council (Burlington, NJ: D. Allinson, 1824), 80-81. An Ordinance to Prevent the Firing of Guns and Pistols within the Island of Burlington, §§ 1-4. Passed December 26, 1822.

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14.
CHAPTER IV.

An Act to prevent vending, using or exploding, of guns, pistols, toy pistols, or other firearms, to or by persons under the age of fifteen years in this state.

1. BE IT ENACTED. . .That it shall not be lawful for any person or persons, to sell, barter, or exchange, or to offer or exhibit for sale, barter or exchange, any gun, pistol, toy pistol, or other firearms in this state, to any person under the age of fifteen years.

2. And be it enacted, That it shall not be lawful for any person to sell, hire or loan to any person under the age of fifteen years, any gun, pistol, toy pistol or other firearms, or for any person under the age of fifteen years to purchase, barter or exchange, or carry, fire or use any gun, pistol, toy pistol or other firearms in this state.

3. And be it enacted, That any person offending against the provisions of this act shall be deemed guilty of a, misdemeanor, and on being thereof convicted shall be punished by a fine not exceeding one hundred dollars, or imprisonment at hard labor for any term not exceeding three months, or both, at the discretion of the court.

Approved February 10, 1882.

1885 N.J. Laws 52, An Amendment to an Act to Prevent Vending, Using, or Exploding of Guns, Pistols, Toy Pistols, or Other Fire-Arms to or by Persons under the Age of Fifteen Years in this State, ch. 44, § 2.

That it shall not be lawful to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol, or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school.

1903 N.J. Laws 337-38, An Act to Amend an Act Entitled "An Act for the Punishment of Crimes," ch. 169, § 1.

It shall not be lawful to sell, barter, exchange, hire or loan to any person under the age of fifteen years, any gun, pistol, toy pistol, or other firearms, or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other firearms, nor for any person under the age of fifteen years to carry, fire or use a gun, pistol¸ toy pistol or other firearms, except in the presence of his father or guardian, or for purpose of military drill in accordance with the rules of a school; it shall be the duty of all persons selling, hiring, bartering or exchanging pistols, revolvers, guns or other firearms, to keep and maintain a book of registry of the same, in which said book of registry shall be entered the number of the article sold, if any, the name of the maker, together with such other means of identification as may be obtainable concerning the same, and also the name and address of the person to whom such pistol, revolver, gun or other firearm is sold, bartered, exchanged or hired[.]

1914 N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt and Pursue Wild Animals and Fowl," ch. 43, § 1.

No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds¸ wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws.

## NEW YORK

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 11, Image 12 (1763) available at The Making of Modern Law: Primary Sources. 1763.
Ordinances of the City of New York, § VI. And be it further ordained by the authority aforesaid, That if any Children, Youth, apprentices, Servants, or other persons, do fire and discharge any gun, pistol, leaden-gun, rockets, crackers, squibs, or other fire works, at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk, such person so offending shall forfeit for every such offense, the sum of forty shillings, current money of New York; and on refusal to pay the same, shall be committed to the House of Correction, at the discretion of the Mayor, recorder or aldermen, or any one of them before whom such offender shall be convicted, there to remain committed, not exceeding Twenty days; unless such forfeiture as aforesaid, be sooner paid with the lawful fees of commitment; one half thereof to the informer with costs, and the other half to the church wardens of this City, for the use of the poor thereof.

Edward Livingston, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty of the City of New-York, in Common-Council Convened, for the Good Rule and Government of the Inhabitants and Residents of Said City Page 83-84, Image 84-85 (1803) available at The Making of Modern Law: Primary Sources. 1803.
Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1. Whereas the firing of guns and the practice of fowling in the public streets and in the roads or highways in the vicinity of this city, are frequently productive of accidents and dangerous consequences are always to be apprehended therefrom: Be it therefore ordained by the Mayor, Aldermen, and Commonalty of the City of New York, in the Common Council convened, That no person shall hereafter be permitted to fire or discharge any gun, pistol, fowling piece or fire-arm, at any place on the island of New York, within the distance of four miles from the City Hall, under the penalty of five dollars upon each offender, to be recovered with costs. And if the person so offending shall be a minor, apprentice, servant or slave, the said fine shall be recoverable from his father, mother, master or mistress, together with costs. Provided always, that nothing contained in this ordinance shall be constructed to extend to the reviews or exercises of any military company, or of the State Prison Guards.

D. T. Valentine, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York: Revised A. D. 1859 Adopted by the Common Council Page 235, Image 243 (1859) available at The Making of Modern Law: Primary Sources. 1859.
Ordinances of the City of New York. Firing of Fire-Arms, Cannons and Fireworks. § 6. No tavern-keeper, keeper of a public house, garden or place of resort, nor any other person, shall suffer or permit any person to practice with or fire off any pistol, gun, fowling-piece or other fire-arms, in or upon his or her premises, nor shall suffer or permit any pistol gallery, erected in his or her house, or upon his or her premises, to be used for the purpose of practicing with any pistol gun, fowling-piece or other fire-arms, upon the first day of the week, called Sunday, under the penalty of fifty dollars for each offense, to be sued for and recovered from the person keeping such public house, tavern, public garden, pistol gallery, place of resort or premises; and also the

26

further penalty of fifty dollars for each offense, to be sued for and recovered from the person firing off or practicing with a pistol, gun, fowling-piece, or other fire-arms; and in case of such person so offending shall be an apprentice, such penalty shall be sued for and recovered from the master of such apprentice, or in case such person so offending shall be a minor and not an apprentice, the same shall be sued for and recovered from the father of, or in case of the death of the father, then from the mother or guardian of such minor.

  § 8. No person shall sell, or expose for sale, nor fire, discharge or set off, in the city of New York, any fire-works called or known by the name of 'snakes,' or 'chasers,' or any fireworks called or known by the name of 'double-headers,' nor any fireworks under any other name, composed of the same material and of the same character of those fireworks specified in this section, under the penalty of fifty dollars for each offense, to be sued for and recovered of the person selling or exposing the same for sale, firing off or discharging the same. And in case such person shall be an apprentice, such penalty shall be sued for, and recovered of and from the master of such apprentice. In case such person shall be a minor, and not an apprentice, the same shall be sued for, and recovered of, and from the father, or in case of the death of the father, then of and from the mother or guardian of such minor.

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556.
CHAP. 375. AN ACT to limit the carrying and sale of pistols and other fire-arms in the cities of this state. PASSED May 10, 1883.
SECTION 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other fire-arms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age.
§ 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person.
§ 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside of said city; nor to any person under the age carrying any pistol or other firearms under a license given by the mayor of said cities; but no licenses so given shall be in force more than one year from its date, and all such licenses may be revoked at the pleasure of the mayor, and a full, complete and public record shall be kept by the mayor of said cities of all such licenses, and the terms and date thereof.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884
Carrying, Using, Etc., Certain Weapons, § 410. A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and

ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 172, image 699 (1885) available at The Making of Modern Law: Primary Sources. 1885
Making Selling, Etc., Dangerous Weapons, § 409. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of, any instrument or weapon of the kind usually known as slung-shot, billy, sand club or metal knuckles, or who, in any city in this state, without the written consent of a police magistrate, sells or gives any pistol or other fire-arm to any person under the age of eighteen years is guilty of a misdemeanor.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. 1885
An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such licenses may be revoked at the pleasure of the mayor, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1913 N.Y. Laws 1627-30, Vol. III, Ch. 608

AN ACT to amend the penal law generally, in relation to the carrying, use and sale of dangerous weapons.

Became a law May 21, 1913

§ 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony.

Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor.

Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon

the person, without a written license therefor, issued to him as hereinafter prescribed, shall be guilty of a misdemeanor.

Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, issued as hereinafter prescribed and licensing such possession and concealment, shall be guilty of a felony.

Any person not a citizen of the United States, who shall have or carry firearms, or any dangerous or deadly weapons in any place, at any time, shall be guilty of a felony, unless authorized by license issued as hereinafter prescribed.

## NORTH CAROLINA

1893 N.C. Sess. Laws 468–69
Section 1: That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling shot. Sec. 2. That any person, corporation or firm violating this act shall be guilty of a misdemeanor, and upon conviction for each and every offense shall be fined or imprisoned, one or both, in the discretion of the court.

1913 N.C. Sess. Laws 57, Pub. Laws, An Act to Prevent the Use of Firearms by Children, ch. 32 § 1.
That any person being the parent or guardian of, or standing in loco parentis to, any child under the age of twelve years who shall knowlingly permit such child to have the possession or custody of, or use in any manner whatever, any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any other person, who shall knowingly furnish such child any such firearm, shall be guilty of a misdemeanor, and upon conviction shall be fined not exceeding fifty dollars, or imprisoned not exceeding thirty days.

## NORTH DAKOTA

GRAND FORKS, THE MUNICIPAL CHARTER ACT AND THE ORDINANCES OF THE CITY, tit. 2, ch. 12, § 181 (sine nomine 1908).
"CHAPTER XII
PUBLIC SAFETY REGULATIONS
§ 181. Firearms Not to Be Furnished to Minors. It shall be unlawful for any person, firm or corporation to sell or rent firearms to minors within the limits of the city of Grand Forks. Any person, firm or corporation violating the provisions hereof shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be liable to a fine of not less than ten dollars nor more than fifty dollars for each offense. (Ord. 158.)"
Scott Rex, ed., The Municipal Charter Act and the Ordinances of the City of Grand Forks, N. Dak.: Comprising All Ordinances in Force on March 4, 1908: Compiled by Order of the City Council (Grand Forks, ND: s.n., 1908), 127. Title 2—Ordinances, Chapter 12—Public Safety Regulations, § 181. Undated.

Ordinance no. 86, §§ 1-6, NORTH DAKOTA RECORD, Jun. 16, 1910, at 6 (Ellendale, North Dakota).

"Ordinance No. 86.

An ordinance relating to the use of firearms in the city of Ellendale, N.D., and prohibiting the use[,] firing, burning or exploding of fire-works in said city and providing penalties for the violation thereof.

BE IT ORDAINED, by the City Council of the city of Ellendale, N.D.

Section 1[.] It shall be unlawful for any person to fire or discharge within the limits of Ellendale, N.D., any gun, pistol or firearms of any description or to use, burn, fire or explode any giant fire crackers, skyrockets, roman candles or anything that contains powder or other dangerous explosives.

Provided that it shall be lawful to burn or explode bunch firecrackers, torpedoes or other infant fireworks within the city limits[.]

And provided further that nothing in this section must be construed as meaning that the customary salute of guns on the fourth of July in any year is prohibited or the firing of any gun when done in the case of actual necessity, or in the performance of lawful duty, or by military companies when on parade, is unlawful or prohibited by this Ordinance.

Section 2[.] It shall be unlawful for any person, firm or corporation to sell, trade, lend or give to any minor residing within the limits of the city of Ellendale, any gun, pistol, revolver or other kinds of firearms.

Section 3. It shall be the duty of the Mayor and Chief of Police to see that the provisions of this Ordinance are rigidly enforced, but the Mayor may modify any of its provisions or conditions on the Fourth of July or any day of general rejoicing.

Section 4. PENALTIES. Any person violating any of the provisions of Section 1 of this Ordinance shall be fined a sum of not less than $5.00 nor more than $10.00 for each offence. Any one violating Section 2 of this Ordinance shall be fined a sum of not less than $10.00 nor more than $10.00[1] at the discretion of the Court.

Section 5. All Ordinances or parts of Ordinances in conflict herewith are hereby repealed.

Section 6. This Ordinance shall take effect from and after its passage, approval and publication.

"Ordinance no. 86." North Dakota Record, June 16, 1910, p. 6. Volume 16; Number 44.[1] Ordinance no. 86—An Ordinance Relating to the Use of Firearms in the City of Ellendale, N.D., and Prohibiting the Use[,] Firing, Burning or Exploding of Fire-Works in Said City and Providing Penalties for the Violation Thereof, §§ 1-6. 1st Reading, June 7, 1910; 2nd Reading, June 14, 1910; Passed, June 14, 1910; Approved, June 14, 1910.


1923 N.D. Laws 381, Pistols and Revolvers, ch. 266, § 9.
Sec. 9. Selling to Minors. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of eighteen years any pistol or revolver shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be fined not less than $100, nor more than $1,000, or be imprisoned not less than three months, nor more than one year, or both.


## OHIO

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80.
Section 6986a. That whoever sells, barters, or gives away to any minor under the age of fourteen years, any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other fire-arm, of any kind or description whatever, or ammunition for the same, or whoever being the owner, or having charge

or control of any such air-gun, musket, rifle-gun, shot-gun, revolver, pistol or other fire-arm knowingly permits the same to be used by such minor, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not exceeding one hundred dollars, or be imprisoned in jail not exceeding thirty days or both.
Passed March 25, 1880.

1883 Ohio Laws 222, An Act to Prohibit the Sale of Toy Pistols in the State of Ohio, § 1.
That it shall be unlawful for any firm, company or person in the state of Ohio, to sell or exhibit for sale any pistol manufactured out of any metallic or hard substance, commonly known as the "toy pistol"; to a minor under the age of fourteen years; any firm company or person violating the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than ten nor more than fifty dollars, or be imprisoned not less than ten days nor more than twenty days, or both, and shall be liable to a civil action in damages ot any person injured by such sale.

1913 Ohio Laws 906, An Act: A Bill to Amend and Supplement [Certain] Sections . . . and to Repeal [Certain] Sections of the General Code; Relating to Children and to Females under Twenty-One Years of Age and to Organizations which Include within Their Objects Matters Relating to Children, ch. 11, §§ 12966-67.
§ 12966. Whoever sells or exhibits for sale, to a minor under sixteen years of age, a pistol manufactured of a metallic or hard substance, commonly known as a "toy pistol" or air gun, or any form of explosive gun ,shall be fined not less than ten dollars nor more than fifty dollars or imprisoned not less than ten days nor more than twenty days, or both, and be liable in damages to any person injured by such sale. § 12967. Whoever sells, barters, furnishes or gives to a minor under the age of seventeen years, an air-gun, musket, rifle, shotgun, revolver, pistol, or other fire-arm, or ammunition therefor, or, being the owner or having charge or control thereof, knowingly permits it to be used by a minor under such age, shall be fined not more than one hundred dollars or imprisoned in jail not more than thirty days, or both.

## **OKLAHOMA**

1890 Okla. Laws 495, art. 47
Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.
Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise. . . .

Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Sec. 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

Sec. 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

## <u>OREGON</u>

1868 Or. Laws 18-19, An Act to Protect the Owners of Firearms, §§ 1-2.
Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore . . . § 1. Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms, to wit: either or any one of the following-named guns, and one revolving pistol: a rifle, shot-gun (double or single barrel), yager, or musket; the same to be exempt from execution, in all cases, under the laws of Oregon. § 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state.

1903 Or. Laws 309-10, An Act to Regulate and Prohibit the Sale, Barter, Exchange, or Gift of Explosives, Firearms or Other Articles of a Like Kind, to Children Under the Age of Fourteen Years, and to Punish the Violation of the Provisions of this Act. §§ 1-2.
§ 1. It shall be unlawful to sell, exchange, barter, or give to any child, under the age of fourteen years, any explosive article or substance, other than an ordinary firecracker, containing ten grains of gunpowder; or to sell, exchange, barter, or give to any such child any firearms, or other device of a like kind, ordinarily used or ordinarily capable of being used in discharging gunpowder in a greater quantity than ten grains; and it is herby made unlawful in any event to sell, exchange, barter, or give to any child, under the age of fourteen years, any instrument or apparatus, the chief utility of which consists in the fact that it is used, or is ordinarily capable of being used, as an article or device to increase the force or intensity of such explosive, or to direct or control the discharge of any such explosive. § 2. Any person violating the provisions of this act shall be guilty of a misdemeanor.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 10. Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment.

## PENNSYLVANIA

Act of June 10, 1881, § 1
makes any person, "who shall knowingly and willfully sell or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, … shall, in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars."

John Purdon, A Digest of the Laws of Pennsylvania: From the Year One Thousand Seven Hundred to the Sixth Day of July, One Thousand Eight Hundred and Eighty-Three.11th Edition Page 423-424, Image 472-473 (Vol. 1, 1885) available at The Making of Modern Law: Primary Sources. 1883
Crimes, Carrying and Sale of Explosives, § 113. Any person who shall knowingly and willfully sell or cause to be sold to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell, or cause to be sold, to any such minor, any imitation or toy cannon, revolver or pistol so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell, or cause to be sold to any such minor, any cartridge, gunpowder or other dangerous and explosive substance, shall in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars.

## RHODE ISLAND

1883 R.I. Pub. Laws 157, An Act In Amendment Of And in Addition To Chapter 92 Of The Public Statutes "Of Fire-arms and Fire-works", § 1
§ 1. No person shall sell to any child under the age of fifteen years, without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate. . . .
Firearms and Fire-works. § 7. No person shall sell to any child under the age of fifteen years, without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate. § 8. Every person

violating the provisions of the foregoing section shall be fined not less than ten dollars nor more than twenty dollars for each offence.

## **SOUTH CAROLINA**

Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto Page 61-61, Image 61-62 (1823) available at The Making of Modern Law: Primary Sources. 1817.

[Ordinances of the Town of Columbia, An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817). Whereas the practice of firing small arms within the town of Columbia is extremely dangerous to the lives; as well as the property of the inhabitants thereof, and ought to be strictly prohibited: Be it ordained by the Intendent and Municipal Wardens of the towns aforesaid, in council assembled, and it is hereby ordained by the authority of the same, That hereafter it shall not be lawful for any person to fire or discharge any gun, pistol or other small arms within the limits bounded by Henderson, Blossom, Lincoln and Upper streets; and if any person shall wantonly, knowingly, and willfully fire or discharge any gun, pistol, or other small arms within the said limits, such person shall forfeit and pay to the use of the town aforesaid, a sum not exceeding five dollars, for each and every such offence, to be sued for and recovered according to law. And whereas, offences of this kind may be committed by minors or other disorderly persons, who have no ostensible property whereof the said penalty can be levied. Be it therefore ordained by the authority aforesaid, That any gun, pistol or other small arms, fired or discharged by any such person in breach of this ordinance, shall be liable for the payment of the penalty or penalties aforesaid; and it shall be lawful for the intendant, either of the Wardens or constables, who shall see such person offending against this ordinance, to seize and take into possession the gun or pistol, or other small arms so fired or discharged, and despite the same with the Intendant or either of the Wardens; and if the person charged with the said offense, and convicted thereof, shall not within ten days after conviction pay the penalty incurred and the costs of prosecution, the same shall be sold to discharge the said penalty and costs: Provided nevertheless, That nothing in this ordinance contained shall extend to prohibit or restrain the usual exercises or duties of the military on muster or parade days, or in performance of patrol or other duties enjoined by law, or to prohibit or restrain any of the inhabitants of said town from shooting any mad dog, or any other dangerous animal found within the same, or from firing guns on the fourth of July, Christmas and New-Years days, or on any other day of general rejoicing of said town.]

1923 S.C. Acts 221

If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

1903 S.D. Sess. Laws 168-69, Prohibiting the Use of Fire Arms by Persons under Fifteen Years of Age, ch. 144, §§ 1-3.

§1. It shall be unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other fire arms except with the consent and knowledge of their parents or guardians. § 2. It shall be unlawful for any parent or guardian, having the legal charge or control of any minor under the age of fifteen years, to allow or permit such minor to use or carry while loaded any of the arms mentioned in section one of this act within the platted portion or within the distance of one mile of the platted portion of any city, town or village. § 3. Any person or persons violating the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not exceeding Fifty Dollars.

## TENNESSEE

John M. Lea, The Revised Laws of the City of Nashville, with the Various Acts of Incorporation and Laws Applicable to the Town and City of Nashville, and a List of the Different Boards of Mayor and Aldermen, and Other Officers of Said City from the Year 1806 to 1850, Inclusive Page 68, Image 69 (1850) available at The Making of Modern Law: Primary Sources. 1850. [An Act to Provide for the Prevention and Extinguishment of Fires within the City of Nashville,]§ 11. Be it enacted, That if any person or persons shall fire any gun or pistol, cast, throw, or fire any squib, rocket, cracker, or other combustible fire-works within the limits of the corporation, every such person, for every such offence, shall forfeit and pay the sum of five dollars; and if a slave, he, she or they shall receive not less than five, nor more than twenty lashes, any person or persons shall vend, manufacture, give away, deal in or have in his possession any squib, rocket, cracker, powder, or other combustible fire-works within the limits of the corporation of Nashville for the purpose of disposing of the same to minors or slaves, every such person, for every such offence, shall forfeit and pay the sum of twenty dollars.

An Act to Amend the Criminal Laws of this State, ch. 81, §§ 2-3, 1856 Tenn. Acts 92, 92. "CHAPTER 81.

AN ACT to Amend the Criminal Laws of this State...

SEC. 2. Be it enacted, That, hereafter, it shall be unlawful for any person to sell, loan, or give, to any minor a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife; and whoever shall so sell, loan, or give, to any minor any such weapon, on conviction thereof, upon indictment or presentment, shall be fined not less than twenty-five dollars, and be liable to imprisonment, at the discretion of the Court: Provided, that this act shall not be construed so as to prevent the sale, loan, or gift, to any minor of a gun for hunting.

SEC. 3. Be it enacted, That it shall be the duty of the Circuit Judges and the Judges of the Criminal Courts to give this act in charge to the Grand Juries: Provided, said minor be travelling on a journey, he shall be exempted.

SEC. 3. Be it enacted, That this act shall be in force from and after its passage." Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-'71 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.  1856

Offences Against Public Policy and Economy. § 4864. Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

The Code of Tennessee Enacted by the General Assembly of 1857-8, 871 (Return J. Meigs & William F. Cooper eds. 1858). Chapter 9, Article II, Selling Liquors or Weapons to Minors or Slaves. Page 871. 1858.
4864. Any person who sells, loans, or gives to any minor [under 21*] a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in travelling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.
https://heinonline-
org.proxy.wm.edu/HOL/Page?collection=sstatutes&handle=hein.sstatutes/ctengas0001&id=903
&men_tab=srchresults
*_Warwick v. Cooper_, 37 Tenn. 659, 660–61 (1858) (describing "an infant under the age of twenty-one")


MEMPHIS, DIGEST OF THE CHARTERS AND ORDINANCES OF THE CITY, art. 9, §§ 1-6 (Saunders, Oberly, & Jones 1860) (Law Passed 1859).
"ARTICLE IX. [Adopted September 15th, 1859.]
SHOOTING GALLERIES.
Be it ordained by the Board of Mayor and Aldermen of the city of Memphis:

   Section 1. That the ordinances heretofore passed or now in force in this city, prohibiting the shooting or discharging of guns, pistols, or other fire-arms, be, and the same are hereby so amended, as to permit the establishment of shooting galleries in the second, third or fourth story of any building in the city, subject to the provisions of this ordinance, and of all such other ordinances as may hereafter be passed for the control and government of such galleries.

   Sec. 2. That no person or persons shall set up or use any such pistol gallery or place for the discharging of pistols, guns or other fire-arms, in the first story of any building in this city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinances and penalties now in force, for discharging or shooting any pistol, gun or other fire-arm within the city limits until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance.

   Sec. 3. That the person or persons applying for license to keep such pistol gallery shall, at the time of obtaining such license, enter into bond with good security, to be approved of by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind shall be permitted in such pistol gallery, or in the room used for such pistol gallery, or in any room adjacent thereto under the control and connected with said pistol gallery or its proprietors or keepers; and that all shooting or discharging of fire-arms shall be done only with perfect security against any harm to persons or property in the vicinity of such pistol gallery, such penalty to be recoverable for every violation of this section of this ordinance and of the conditions of said bond.

Sec. 4. That the proprietors or persons keeping such pistol gallery shall not permit any minors to shoot at such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday; nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction, shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines are.

Sec. 5. Every person or persons shall, before putting up or using such pistol or shooting gallery, first apply for and obtain license as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery established under the provisions of this ordinance.

Sec. 6. That the Board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding."
Smith P. Bankhead, ed., Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1860 Inclusive, Together with the Acts of the Legislature Relating to the City, and Municipal Corporations Generally, with an Appendix (Memphis, TN: Saunders, Oberly, & Jones, 1860), 264–65. Article 9—Shooting Galleries, §§ 1-6. Adopted September 15, 1859.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149, Image 149-150 (1863) available at The Making of Modern Law: Primary Sources. 1863.
[Ordinances of the City of Memphis, Shooting Galleries, § 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not permit any minors to shoot in such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines. § 4.

Any person or persons shall before putting up or using such pistol or shooting gallery, first apply for, and obtain license, as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery establishment under the provision of this ordinance. § 5. That the board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding.]

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. 1867
Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864. Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

## TEXAS

1897 Tex. Gen. Laws 221-22, An Act to Prevent the Barter, Sale and Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal or Hard Substance to Any Minor Without the Written Consent of the Parent or Guardian of Such Minor. . . , ch. 155, § 1.
That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment. And during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is committed.

## UTAH

1905 Utah Laws 60, An Act to Prohibit the Sale of Firearms to Minors and the Carrying of Firearms by Minors, and Prescribing Penalties for Violation Thereof, ch. 52, §§ 1-2.
§ 1. Selling or giving firearms to minors under fourteen. Any person who sells, gives or disposes of, or offers to sell, give or dispose of any pistol, gun, target gun, or other firearm, to any person under the age of fourteen years, is guilty of a misdemeanor. § 2. Minor under fourteen must not carry firearms. Any person under the ager of fourteen years who shall carry, or have in his possession, any pistol, gun, target gun or other firearm, unless accompanied by a parent or guardian, shall be guilty of a misdemeanor.

## VERMONT

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83.

No. III.-AN ACT RELATING TO THE SALE, DISTRIBUTION AND USE OF FIRE-ARMS.

It is hereby enacted by the General Assembly of the State of Vermont:

SECTION I. No person shall sell, loan, furnish or give any pistol, revolver or other firearm, constructed or designed for the use of gunpowder or other explosive substance, with leaden bullets or shot, to a child under the age of twelve years, and any person so offending, on conviction thereof, shall be punished by fine not exceeding fifty dollars, together with the costs of prosecution.

SEC. 2. No child under the age of twelve years shall have in his control or possession any pistol or revolver, constructed or designed for the use of gunpowder or other explosive substance with leaden bullets or shot, and any person so offending shall, on conviction thereof, be fined not exceeding twenty dollars and pay costs of prosecution.

Approved November 6, 1896.

1912 Vt. Acts and Resolves 306, An Act . . . Relating to Firearms, §§ 1-2.

§ 1. A person, other than a parent or guardian, who sells or furnishes to a minor under the age of sixteen years a firearm or other dangerous weapon, shall be fined not more than fifty dollars nor less than ten dollars. This section shall not apply to an instructor or teacher who furnishes military weapons to pupils for instruction and drill. § 2. A child under the age of sixteen years who, without the consent of his parent or guardian, has in his possession or control a pistol or revolver constructed or designed for the use of gunpowder or other explosive substance with leaden ball or shot shall be fined not more than twenty dollars.

## VIRGINIA

An Act to Restrain the Unnecessary Use of Fire Arms, §§ 1–3, Mayor, Recorder, and Common Council of Leesburg, Virginia (Leesburg, Virginia) (1813).

"An Act to restrain the unnecessary use of Fire Arms.

May 7th, 1813.

Sec 1st. Be it enacted by the Mayor, Recorder and Common Council of the Town of Leesburg in Common Hall assembled, - that from and after the passage of this Act if any shall fire or shoot a Gun, Pistol, or other fire arms, or cause an explosion of gun-powder idly or for sport or amusement within the limits of the Corporation, the person so offending shall forfeit and pay for every such offense, – a fine of not exceeding two Dollars, nor less than one, at the discretion of any Justice of the Peace resident within said Town. Provided, that nothing herein contained shall be construed to effect any person, or persons discharging their fire-arms on the usual and customary days of rejoicing or parade.

Sec 2nd. And be it further enacted, that if any minor or apprentice or slave, shall be convicted of violating the provisions of this act, the Parent or guardian of such minor, the master or mistress of such apprentice or the owner or holder of such slave as the case may be, shall forfeit and pay the fine or fines incurred by such minor, apprentice or slave and if the owner or holder of such slave, shall refuse or fail to pay the fine or fines aforesaid incurred by him, the slave so offending shall receive on his or her bare back not less than ten nor more than fifteen lashes well laid on, at the public whipping post.

40

Sec 3d. This act to commence and be in force from and after the passing thereof.[1] " Leesburg, Virginia, Thomas Balch Library, Town of Leesburg Ordinances and Laws: 1813-1822. Mayor, Recorder, and Common Council of Leesburg, An Act to Restrain the Unnecessary Use of Fire Arms, §§ 1–3 [Microfilm]. Passed May 7, 1813.

The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources.  1869
Ordinances of the town of Lexington. Of Concealed Weapons and Cigarettes. § 2. If any person sell, barter, give or furnish, or cause to be sold, bartered, given or furnished to any minor under sixteen years of age, cigarettes, or pistols, or dirks, or bowie knives, having good cause to believe him or her to be a minor under sixteen years of age, shall be fined not less than ten dollars nor more than one hundred dollars.

1902-1904 Va. Acts 261, An Act to Prevent the Sale or Gift of Toy Firearms to Persons Under Twelve Years of Age, and to Provide a Penalty Therefor, ch. 186, §§ 1-2. 1903
1. Be it enacted by the general assembly of Virginia, That it shall be unlawful for any person, firm, corporation, or association, to sell, barter, exchange, furnish, or dispose of by purchase, gift, or in any other manner, any toy gun, pistol, rifle, or other toy firearm, if the same shall, by means of powder or other explosive discharge blank or ball charges, to any person under the age of twelve years. Any firm, corporation, or association violating the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than fifty dollars nor more than one hundred dollars, or confined in jail for a period not less than thirty, nor more than ninety days, either or both. 2. Each sale of any of the articles hereinbefore specified to any person under the age mentioned shall constitute a separate offense, and any person over the age of twelve years who shall purchase, accept, or in any manner acquire any of the toy articles of the kind hereinbefore enumerated for any person under the age of twelve years, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred dollars nor more than two hundred dollars, or confined in jail for a period not less than thirty days nor more than six months, either or both.

## **WASHINGTON**

Edward D. McLaughlin, The Revised Statutes and Codes of the State of Washington Page 1042, Image 1094 (1896) available at The Making of Modern Law: Primary Sources. 1883
Sale of Toy Pistols to Children, It shall be unlawful for any person or persons to sell or offer for sale, any toy pistols within this state, and every person who shall sell, give, furnish, or cause to be furnished to any person under the age of sixteen years, any pistol, toy pistol or other pocket weapon, in which explosives may be used, shall be deemed guilty of a misdemeanor, and upon conviction, shall be fined in any sum not less than five, nor more than twenty-five dollars.

1909 Wash. Sess. Laws 984, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 8, § 308.
Use of Firearms by Minor. No minor under the age of fourteen years shall handle or have in his possession or under his control, except while accompanied by or under his control, except while accompanied by or under the immediate charge of his parent or guardian, any firearm of any

41

kind for hunting or target practice or for other purposes. Every person violating any of the foregoing provisions, or aiding or knowingly permitting any such minor to violate the same, shall be guilty of a misdemeanor.

## <u>WEST VIRGINIA</u>

1882 W. Va. Acts 421–22
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

See State v. Workman, 14 L.R.A. 600 (1891): John Augustus Warth, The Code of West Virginia. Containing the Constitution and Naturalization of the United States – the Constitution of the State – the Code, as Amended by Legislation to and Including the Year 1891 and Marginal Notes to all Prior Laws and Applicable Decisions, with an Appendix, Containing all the Statutes of the State in Force, of a General and Prospective Nature, not Enacted or Inserted in the Several Chapters of the Code Page 915-916, Image 920-921 (1891) available at The Making of Modern Law: Primary Sources. 1891
Offenses Against the Peace, § 7. If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it

42

repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.

Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. Fourth: The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor and the county or counties in which said license is desired to be effective. Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good

reason and cause for such person to carry such weapon, and all of the other conditions of this act be complied with, said circuit court or the judge thereof in vacation, may grant said license for such purposes, and no other, as said a circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act. The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county. Provided, that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, provided, further, that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; provided, such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, and with security to be approved by the secretary of state of the state of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in

doing anything that is reasonably incident to such duties; but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, provided further, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; provided, such railroad company shall execute a continuing bond in the penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually employed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and provided, further, that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons for the purpose of executing a process, and a sheriff in such cases may authorize a deputy or posse to carry weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person willfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such willful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof

shall be fined not exceeding one hundred dollars; provided, further, that nothing herein contained shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually collect taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not. It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court. Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; provided, that the authority so revoking such license may, after a hearing, sooner reinstate such licensee.

## WISCONSIN

Supplement to the Revised Statutes of the State of Wisconsin, 1878, Containing the General Laws from 1879 to 1883, with the Revisers' Notes to the Statutes of 1878 and Notes to Cases Construing and Applying These and Similar Statutes by the Supreme Court of Wisconsin and the Courts of Other States Page 847, Image 889 (1883) available at The Making of Modern Law: Primary Sources. 1882
Offenses Against Lives and Persons of Individuals. §4397a. (1) It shall be unlawful for any person to sell or use, or have in his possession, for the purpose of exposing for sale or use, any toy pistol, toy revolver, or other toy fire-arm. (2) Any person violating any of the provisions of this act, on conviction thereof, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars, or by both fine and imprisonment, in the discretion of the court. § 4397b. (1) It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor any pistol or revolver, found in his possession. (2) It shall be unlawful for any dealer in pistols or revolvers, or any other person to sell, loan or give any pistol or revolver to any minor in this state.

1883 Wis. Sess. Laws 290

Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession. Section 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state. Section 3. It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100).

## **WYOMING**

1890 Wyo. Terr. Sess. Laws 140. Josiah A. Van Orsdel, Attorney General, Revised Statutes of Wyoming, in Force December 1, 1899 Including the Magna Charta, Declaration of Independence, Articles of Confederation, Organic Act of Territory of Wyoming, Act of Admission of the State of Wyoming, Constitution of the United States and of Wyoming, and the Rules of the Supreme Court Page 1253, Image 1253 (1899) available at The Making of Modern Law: Primary Sources. 1890.
Furnishing Deadly Weapons to Minor. § 5052. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars.

Source unless otherwise noted: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/ Note that the unit of analysis is the law, not the state, though the laws are organized by state for the sake of clarity.

*Cites from: Brief for the United States, *U.S. v. Rahimi*, August 2023, 24-25, fn. 16.

**EXHIBIT D**

**TABLE OF STATE LAWS RESTRICTING WEAPONS TO MINORS**

| STATE | YEAR* | OTHERS BARRED IN SAME LAW |
|---|---|---|
| Alabama | 1855/1856 (minors 21#); 1866 (under 18); 1876 (under 18) | |
| Alaska | | |
| Arizona | 1901 (under 14) | Indians (1901) |
| Arkansas | | |
| California | 1896 (18) | |
| Colorado | | |
| Connecticut | 1835 (minors); 1871 (minors); 1881 (16) | |
| Delaware | 1812 (child); 1845 (minors); 1881 (minors 21); 1881 (21); 1911 (21); 1918 (no hunt under 15); 1919 (21) | Intoxicated (1911, 1919) |
| District of Columbia | 1829 (minors) 1892 (under 21); 1932 (under 18) | Enslaved (1829); no drug addicts, unsound mind, convicts (1932) |
| Florida | 1881 (under 16) | Unsound mind (1881) |
| Georgia | 1876 (minors 21); 1920 (21) | |
| Hawaii | 1927 (minors); 1933 (under 20; no shotguns under 16) | |
| Idaho | 1909 (under 16) | Intoxicated (1909) |
| Illinois | 1873 (minors); 1881 (minors 21); | |

|  |  |  |
|---|---|---|
|  | 1914 (21); 1917 (21) |  |
| Indiana | 1875 (under 21); 1881 (under 21); 1905 (under 21); 1925 (under 21) 1929 (sentence enhanced if commit weapon crime over 16) |  |
| Iowa | 1884 (minors 21); 1887 (21); 1897 (21) |  |
| Kansas | 1883 (minors 21); 1887 (21) | Unsound mind (1887) |
| Kentucky | 1853 (under 15); 1859/60 (minors 21); 1873 (minors 21) | Free colored, enslaved persons (1853, 1859) |
| Louisiana | 1890 (under 21); 1893 under 18) |  |
| Maine | 1892 (under 16) |  |
| Maryland | 1882 (under 21); 1904 (under 15); 1908 (under 21) |  |
| Massachusetts | 1882 (under 16); 1884 (under 16); 1909 (under 15); 1922 (under 15) | Unnaturalized or foreign born (1922) |
| Michigan | 1883 (under 13) |  |
| Minnesota | 1885 (under 18), 1888 (under 18) |  |
| Mississippi | 1878 (minors 21, parents under 16); 1880 (minors 21, parents under 16) | Intoxicated (1878, 1880) |
| Missouri | 1883 (minors 21); 1887 (no ammo under 16); 1917 (21) | Intoxicated (1883, 1917) |
| Montana |  |  |
| Nebraska | 1895 (minors) |  |
| Nevada | 1881 (under 21). 1885 (under 21) |  |
| New Hampshire | 1883 (minors) |  |

| | | |
|---|---|---|
| New Jersey | 1822 (minors); 1882 (under 15); 1885 (under 15); 1903 (under 15); 1914 (no hunt under 14); | Enslaved, servants (1822) |
| New Mexico | | |
| New York | 1763 (no children, youth); 1803 (minors); 1859 (minors); 1884 (under 18); 1885 (under 18); 1885 (under 18); 1900 (under 18; no spring/air gun under 16; no toy pistol under 16); 1911 (under 16); 1911 (under 16) | Apprentices, Servants (1763); apprentices, servants, enslaved (1803) |
| North Carolina | 1893 (minors 21); 1913 (under 12) | |
| North Dakota | 1908 (minors) 1910 (minors) 1923 (under 18) | |
| Ohio | 1883 (under 14); 1913 (no toy gun under 16; no gun under 17) | |
| Oklahoma | 1890 (minors) | Intoxicated (1890) |
| Oregon | 1868 (rt. to have guns over 16); 1903 (under 14); 1917 (under 21) | |
| Pennsylvania | 1881 (under 16); 1883 (under 16) | |
| Rhode Island | 1883 (under 15) | |
| South Carolina | 1817 (minors); 1923 (minors; no parents to child under 12) | Disorderly persons, those w/o property |
| South Dakota | 1903 (under 15) | |
| Tennessee | 1850 (explosives); 1856 (no minors except hunting, | Enslaved (1850) |

|  |  |  |
|---|---|---|
|  | defense); 1858 (under 21); 1859 (minors); 1863 (21); 1867 (no minors 21 exc. hunting) |  |
| Texas | 1897 (minors 21) |  |
| Utah | 1905 (under 14) |  |
| Vermont | 1896 (under 12); 1912 (under 16) |  |
| Virginia | 1813 (minors); 1869 (under 16); 1903 (under 12) | Enslaved (1813) |
| Washington State | 1883 (under 16); 1909 (under 14) |  |
| West Virginia | 1882 (under 21); 1891 (21); 1925 (under 18 lesser penalty; "over 21" to get license) | Intoxicated (1925) |
| Wisconsin | 1882 (minors 21); 1883 (21) | Intoxicated (1883) |
| Wyoming | 1890 (no concealed weapon under 21; no cartridges under 16) |  |
| TOTAL STATES | 46 | 18 |
| TOTAL LAWS | 115 |  |

*Source: https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search
Designation "minors" after years of law means the laws restrict weapons from this category without specifying an age. Years with numbers following them are ages defined in the laws as age of majority. Note that the unit of analysis is the law, not the state, though the laws are organized by state for the sake of clarity.
#The designations "minors 21" refer to laws that say only "minors" without listing an age, but where state court rulings define minors as those under 21. See *NRA v. Bondi*, No. 21-12314, United States District Court for the Northern District of Florida, D.C. Docket No. 4:18-cv-00137-MW-MAF, March 9, 2023, Appendix.

**EXHIBIT E**

# COLLEGE CAMPUS WEAPONS RESTRICTIONS

**PUBLIC INSTITUTIONS**

UNIVERSITY OF NORTH CAROLINA, PUBLIC COLLEGES AND UNIVERSITIES, 1799, 1829
"8. No student shall keep a dog or fire-arms; nor shall he use fire-arms without permission from some one of the Faculty." (1799, p. 12)
https://docsouth.unc.edu/unc/uncbk1018/uncbk1018.html

1829 Laws of the University of North Carolina, ch. 3, § 13.
"13. No student shall keep a dog, or fire arms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane, or any dead-ly weapon; nor shall he use fire arms without permission from some member of the Faculty."
https://firearmslaw.duke.edu/wp-content/uploads/2023/08/1829-UNC.pdf
Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838)

UNIVERSITY OF SOUTH CAROLINA, 1807
"Of Misdemeanors and Criminal Offences:
1. If any student shall be guilty of any blasphemy, robbery, duelling, fornication, forgery, or any such atrocious crime, he shall be expelled.
2. All the students are strictly forbidden to play at cards, or any unlawful game; to use profane or obscene language; to strike or insult any person; to associate with persons of known bad character; to visit taverns without liberty; to appear in indecent dress, or in woman's apparel; to lie, steal, get drunk, or be guilty of other gross immoralities. If any student shall transgress in any of these respects, he shall be admonished, suspended, degraded or expelled, as the case may require.
3. No student may keep in his room any kind of firearms or gun powder; nor fire any in or near the College, in any manner whatever; and any student who shall violate this law, shall be liable to admonition, suspension, or expulsion."
Edwin L. Green, *A History of the University of South Carolina* (Columbia, SC: The State Company, 1916), p. 220.

South Carolina College, 1848
"CHAPTER XVI.
Of Offences, Rewards and Punishments…
  …202. Any student who shall be guilty of any infamous or atrocious offence, or shall fight a duel, or give or accept a challenge to fight a duel, or shall carry any challenge to fight a duel, or act as a second to those who shall give or accept a challenge, shall be forthwith suspended from the College and reported for expulsion…

…205. If any student shall keep in his room, or within the College, or in the town of Columbia, or its vicinity, any pistol, dirk, sword-cane, bowie knife, or other deadly weapon, he shall be forthwith suspended and reported for expulsion."

Laws of the South Carolina College, Adopted by the Board of Trustees, at Their Annual Meeting in December, 1847: To Which Are Prefixed the Act of Incorporation, and the Subsequent Acts Passed in Amendment Thereof; Various Resolutions of the Legislature, Extracts from Governors' Messages, and Other Important Matters Relating to the College (Columbia, SC: A. S. Johnston, 1848), 40-41. Chapter 16—Of Offences, Rewards and Punishments, §§ 202 & 205.

https://firearmslaw.duke.edu/assets/1848,-sc,-laws-of-the-south-carolina-college,-ch.-16,--202-&-205..pdf

https://firearmslaw.duke.edu/assets/1853,-sc,-by-laws-of-the-south-carolina-college,-ch.-17,--3,-nos.-3-4,-&--4,-no.-1.pdf

GEORGIA PUBLIC COLLEGES AND UNIVERSITIES, 1810
The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810)
And be it further ordained that no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever.
https://dlg.galileo.usg.edu/guan/ua0148/pdfs/ua0148-002-004-001.pdf

OHIO UNIVERSITY, 1814
"What is Required of Students in the Ohio University"
"It will be deemed a Transgression. . .
2. To carry a dirk, or a knife to be used as such.
3. To keep fire-arms, gun-powder, or any preparation thereof in the College, or to discharge any fire-arms in or near it."
Thomas N. Hoover, *The History of Ohio University* (Athens, OH: Ohio University Press, 1954), 57. https://ohiomemory.org/digital/collection/p267401coll36/id/16772

VIRGINIA PUBLIC COLLEGES AND UNIVERSITIES, 1824
University of Virginia Board of Visitors Minutes, 6-7 (October 4–5, 1824)
No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school, be covered without permission of the Professor, nor use tobacco by smoking or chewing, on pain of any of the minor punishments, at the discretion of the Faculty, or of the board of Censors, approved by the Faculty.

UNIVERSITY OF DELAWARE, 1828
John A. Munroe, *The University of Delaware: A History* (Newark, DE: University of Delaware, 1983).
Chap. 2
"The rules for deportment sound very strict. The students were to act like 'young gentlemen,' treating their teachers with 'profound respect.' They were forbidden to swear, riot, strike anyone, or associate with immoral persons, as well as to play cards, dice, or other games of chance. Drinking alcoholic beverages was not forbidden, but becoming intoxicated was, and students

3

could be suspended or dismissed for possessing liquor, except for medicinal purposes, or for frequenting a tavern. Students were not permitted to keep a horse or a dog or to have a gun or ammunition (except with the rector's approval), or a sword, dirk, sword cane, or any deadly weapon. Only the trustees could expel a student, and he could not then be readmitted."
Cite: Academy minutes, April 17, 1828; American Watchman, August 1, 1828.
https://sites.udel.edu/uarm/the-university-of-delaware-chapter-2/

COLLEGE OF WILLIAM AND MARY, VIRGINIA
Laws and Regulations of the College of William and Mary, Volume 276 (1830)
Regulations of the Society.
29. Students are strictly forbidden to keep, or to have about their person, any dirk, sword or pistol. Firing squibs or crackers in and about College or elsewhere is also strictly forbidden.

MIAMI UNIVERSITY OF OHIO, 1843
Chapter XI, Misdemeanors
"12. No student shall bring into any of the buildings or on the College premises any cannon, musket, pistol, or other species of fire-arms, or powder in any mode of preparation, without the consent of the Faculty."
The Laws of Miami University, for The Government of the Faculty and Students (Rossville, OH: J.M. Christy, 1843), p. 15.
https://digital.lib.miamioh.edu/digital/collection/univdocs/id/3116/rec/3

UNIVERSITY OF IOWA, 1848
". . .University of Iowa . . . prohibit[ed] students from carrying pistols and knives." [pre-Civil War period]
Merle Curti and Vernon Carstensen, *The University of Wisconsin: A History, 1848-1925* (Madison, WI: University of Wisconsin Press, 1949), 196.
file:///C:/Users/Bob/Downloads/AXUYZPH27KIWLQ8R-E-file-83c7a-1.pdf

COLLEGE OF NEW JERSEY/RUTGERS COLLEGE/DREW UNIVERSITY, NEW JERSEY, 1853, 1854, 1871
1853 Laws of New Jersey, Ch. CXXVIII, 326; 1854 Laws of New Jersey, Ch. XLIV, 109; Mercer Beasley Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4 1871. Page 236-237, Image 282-283 (Trenton, 1877) available at The Making of Modern Law: Primary Sources.  1871 Crimes Against Public Morals and the Institution of Marriage, § 54. The opening or keeping of any room or place for playing billiards, or A. B. C. or E. O. Table or tables or at tennis, bowls, or shuffle-board, or at faro banks, or other bank or l, or of like kind, under any denomination whatever, or for playing at nine-pins, or any other number of pins, or for cock-fighting, or for pistol shooting, either for money or without money, within three miles of the main building of the College of New Jersey, or of "Rutgers College" or of Drew Seminary or University, in New Jersey, shall be and hereby are declared to be offences against this state; and the owner, tenant, keeper, or attendant, of such room or place shall be prosecuted and proceeded against by indictment, and upon conviction shall be fined in a sum not exceeding two hundred dollars, or by imprisonment for a period not exceeding six months, or both at the discretion of the court.

4

UNIVERSITY OF ALABAMA, 1861
1861, Regulations for the University of Alabama, art. 11, nos. 131-132 & art. 13, nos. 175-179 (Southern Methodist Publishing House).
"ARTICLE XI.
DISCIPLINE…
    …131. No Cadet shall send or accept a challenge to fight, nor be the bearer of such challenge, written or verbal; nor in any way, directly or indirectly, countenance or promote a duel, nor upbraid another for declining to fight, on pain of being dismissed.
    132. Every Cadet who knows that a challenge to fight has been or is about to be sent or accepted by any other Cadet, shall, without delay, give information thereof to the Superintendent….
…ARTICLE XIII.
REGULATIONS FOR THE INTERIOR POLICE AND DISCIPLINE OF THE UNIVERSITY OF ALABAMA…
…ARMS, ETC.
    175. No Cadet shall lend or exchange his arms or accoutrements, or use those of any other Cadet.
    176. The arms and accoutrements issued to Cadets will not be taken from their quarters except for duty.
    177. No Cadet shall alter his musket by scraping, filing, or varnishing the stock, barrel, or any other portion of it; nor shall the lock be removed or taken apart.
    178. If a Cadet allows his musket to get out of order, he shall get permission from the Commandant for it to be put in order by the Ordnance Sergeant, and the price of the repairs charged to him.
    179. Cadets are prohibited from having in their possession any description of firearms, or other weapon, not issued to them by proper authority."
Regulations for the University of Alabama, at Tuscaloosa: With an Appendix, Containing Extracts from the Army Regulations, and from the Rules and Articles of War (Nashville, TN: Southern Methodist Publishing House, 1861), 56 & 65. Article 11—Discipline, nos. 131-132 & Article 13—Regulations for the Interior Police and Discipline of the University of Alabama, nos. 175-179. Undated.
https://firearmslaw.duke.edu/assets/1861,-al,-regulations-for-the-university-of-alabama,-art.-11,-nos.-131-132-&-art.-13,-nos.-175-179.pdf


UNIVERSITY OF KENTUCKY, 1865, 1890-1891
Rules, Board of Trustees:
"156. Students are forbidden to have in their possession any description of firearms or other deadly weapons not issued to them by proper authority."
James F. Hopkins, *The University of Kentucky: Origins and Early Years* (Lexington, KY: University of Kentucky Press, 1951), p. 167.


University of Kentucky, 1890-1891
Kentucky University, Catalogue of Kentucky University, Lexington, Kentucky, 1890-1891, 23.
Prohibited students from keeping or using "fire-arms, a dirk, a bowie-knife, or any other deadly weapon."

https://go-gale-
com.libproxy.cortland.edu/ps/i.do?id=GALE%7CA393875922&sid=googleScholar&v=2.1&it=r
&linkaccess=abs&issn=08954852&p=AONE&sw=w&enforceAuth=true&linkSource=delayedA
uthFullText&userGroupName=sunycort_main&u=sunycort_main

PURDUE UNIVERSITY, INDIANA, 1874
"The carrying of firearms, especially to class, was banned. But, though it was discouraged,
students then could spit on the floor without fear of faculty retribution."
Robert W. Topping, *A Century and Beyond: The History of Purdue University* (West Lafayette,
IN: Purdue University Press, 1988), p. 86.

UNIVERSITY OF MISSISSIPPI, 1878, 1892 (1880: ALL COLLEGES & UNIVERSITIES IN
MISSISSIPPI)
1878 Miss. Laws 176, An Act To Prevent The Carrying Of Concealed Weapons And For Other
Purposes, ch. 46, § 4.
[A]ny student of any university, college or school, who shall carry concealed, in whole or in part,
any weapon of the kind or description in the first section of this Act described, or any teacher,
instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by
any student or pupil, shall be deemed guilty of a misdemeanor, and, on conviction, be fined not
exceeding three hundred dollars, and if the fine and costs are not paid, condemned to hard labor
under the direction of the board of supervisors or of the court.

Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi:
With References to Decisions of the High Court of Errors and Appeals, and of the Supreme
Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making
of Modern Law: Primary Sources. 1880
Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor
or person intoxicated knowing him to a minor or in a state of intoxication, any weapons of the
kind or description in the foregoing section described, or any pistol cartridge and on conviction
he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not
paid, be condemned to hard labor under the direction of the board of supervisors or of the court
not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor
son under the age of sixteen years to carry concealed, in whole or in part, any person of the kind
or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and
on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and
if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding
section. § 2988. Any student of any university, college, or school, who shall carry concealed, in
whole or in part, any weapon of the kind or description in the foregoing section described, or any
teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be
carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be
fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to
hard labor as above provided.

R.H. Thompson, The Annotated Code of the General Statute Laws of the State of Mississippi
327, § 1030 (1892)

6

1030 (2988). The same; college students not to have, etc.-A student of any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher, instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both.

UNIVERSITY OF VERMONT, 1885
1885 Laws of the University of Vermont, ch. 4, § 4234; ch. 6, §§ 4, 9.
"CHAPTER IV.
OF STUDENTS AS UNDER CIVIL LAW.
    In all matters relating to good order and quietness: to the treatment of property public or private: and in general to the rights and obligations of citizens in a community, the students will be regarded and treated as amenable to the laws of the land and to the police regulations of the city in all respects like other citizens: and in case of any violations of such laws or regulations the Faculty will not shield students from the ordinary processes of justice, but will seek rather to put the Institution under the protection, and to secure for students the wholesome educating influence, of public law.
Extracts from the Revised Statutes of Vermont…
    …SECT. 4234. A person who between sunset and sunrise disturbs and breaks the public peace by firing guns, blowing horns, or by other unnecessary and offensive noise, shall be fined not more than fifty dollars…
CHAPTER VI.
OF ROOMS, BUILDINGS AND GROUNDS…
    …SECT. 4. Rooms shall be held by students subject to the condition that all rules, for securing quiet, order, and cleanliness in the rooms, halls, and premises, are strictly observed… the keeping of fire-arms or gunpowder except under direction of the Military Instructor: bringing into the rooms any fermented or distilled liquors: are prohibited…
    …SECT. 9. No student shall use gun powder or fire-arms in the buildings, or on the adjacent grounds of the University, except under direction of the Military Instructor."

MICHIGAN STATE AGRICULTURAL COLLEGE, 1891
1891, Michigan State Agricultural College Rules and Laws, "Order," nos. 67 & 69 (sine nomine).
"COLLEGE RULES.
[Adopted by the Faculty, March 3, 1891.]…
…RULES ON GENERAL CONDUCT…
…ORDER…
    …67. No student shall keep a pistol in his room, or carry concealed weapons on his person.
    68. No student shall sell or keep for sale in rooms on the College premises anything except books, stationery and supplies for athletic sports.
    69. Shooting with guns or pistols on any part of the College grounds, farm or fields is prohibited, except under military orders…"
Michigan State Agricultural College Rules and Laws, 1891 (s.l.: s.n., 1891), 6. "Order," nos. 67 & 69. Adopted March 3, 1891.

7

https://firearmslaw.duke.edu/assets/1891,-mi,-michigan-state-agricultural-college-rules-and-laws,-order,-nos.-67-&-69.pdf

**PRIVATE INSTITUTIONS**

HARVARD COLLEGE, MASSACHUSETTS, 1655, 1790, 1824
A Copy of the Laws of Harvard College, 1655, at 10
Thirdly concerneing penall lawes. . . .
8. No undergraduate shall buy, sell, barter, or exchange books, apparrell or any thing of considerable value ; but by the leave of the President or his Tutor, Guardian or Parent, or If he shall sell or pawne any thing to any scholler, the President shall make the bargaine and admoni[sh] [the] student noe students shall be suffered to have [a g]un in his or theire chambers or studies, or keepeing for theire use any where else in the town, or If they be found to have such by the President or Theire Tutors, then they shall be admonished by the President or theire Tutors to put it away : which If they shall refuse to doe, the President shall have power to take it quite away from them, and If they resist the President herein, they shall upon due proofe be expelled out of the Colledge by the advise of the Colledge overseers : the same penalty is appointed to any student that shall make resistance against or offer violence unto the President or fellows.

The Laws of Harvard College, 1790 (Boston: Samuel Hall, 1790), 25:
XIV. No Undergraduate shall keep a gun or pistol, or any gun-powder, in the College, without leave of the President; nor shall he go gunning, fishing, or seating over deep waters, without leave of the President. . . .And if any Scholar shall fire a gun or pistol within the College walls, yard, or near the College, he shall be fined not exceeding two shillings and six pence, or be admonished, degraded, suspended, or rusticated, according to the aggravation of the offense.
https://archive.org/details/bim_eighteenth-century_the-laws-of-harvard-coll_harvard-university_1790/page/24/mode/2up?q=gun

1824, Laws of Harvard College, ch. 6, § 1, no. 2.
"CHAPTER VI.
MISDEMEANORS AND CRIMINAL OFFENCES.
   1. For either of the following offences, Students may be punished by any of the college censures, at the discretion of the Immediate Government, viz.
   (1.) Profane language; intoxication; falsehood; gaming; extravagance; dissipation; indecency in language, dress, or behaviour; the offering of violence to the person or the chamber of a student; also violations of the respect due to the instructers and officers of the College.
   (2.) Making or being present at any festive entertainment, except at Commencement season, or on Exhibition days with the permission of the President; or going into any tavern or victualling house in Cambridge for the purpose of eating or drinking.
   Making noises to the disturbance of the College, or of any of the inhabitants of the town.
   Having any concern in bonfires, fire-works, or illuminations.
   Being an actor or spectator in any theatrical entertainment, or being present at any ball, assembly, or party of pleasure, in term time, without leave from the President, at the request of a parent, guardian, or patron.
   Playing at cards or dice.

    Buying, selling, or bartering books, apparel, furniture, or any other property, without leave from the President, or a written permission from a parent or guardian.
    Keeping a gun or pistol, or gunpowder, or firing a gun or pistol."

YALE COLLEGE, CONNECTICUT 1745, 1795
Franklin Bowditch Dexter, Biographical Sketches of the Graduates of Yale College: May 1745-May 1763, Annals, at 8 (1745)
14. If any Scholar Shall keep a Gun or Pistol, or Fire one in the College-Yard or College, or Shall Go a Gunning, Fishing, or Sailing, or Shall Go more than Two Miles from College upon any Occasion whatsoever : or Shall be Present at any Court, Election, Town-Meeting, Wedding or Meeting of young People for Diversion or any Such-like Meeting which may Occasion Mispence of precious Time without Liberty first obtain'd from the President or his Tutor, in any of the cases abovesaid he Shall be fined not exceeding Two Shillings.

The Laws of Yale-College, in New-Haven, in Connecticut, Enacted by the President and Fellows, the Sixth Day of October, A.D. 1795 (New Haven: Thomas Green and Son, 1800), Chapter VIII. p. 26
XIV. No Scholar is allowed to keep any kind of fire-arms, or gun-powder, upon penalty of seventeen cents and if any Scholar shall fire any gun-powder in or near the College-yard, he shall be fined fifty cents and if it be done near the dwelling- house or the person of the President, a Professor or a Tutor, he shall also be punished as for contempt.
https://books.googleusercontent.com/books/content?req=AKW5QacZ072t6HI4cXTbvEQOGUx wiBNVM6QFESvPa9aGFq2zCyG2wo45ENwKxrD6qr_0G-A89YxadU21Z1wu8Udiftxdhjiljbg8QYism7QJn_5tWpqK4eQgDV69irc4W3ERAFBNbTlnjAN mhdOYgoEfPSyRNmLEIUt1fjlIWbQTy2SaICy9vtrzYf54H1GZEjHur-Ma4q33F_8E7BrvwCx38aa-wUyb4ls7xk7v2H57k2kHb3aleg3LYnNd4908RFWBr8CLjWtWvJQHXfxRWmuq66jkV4_atpL Cm9MLrsM4NGMGzCDbqwY

UNION COLLEGE, NEW YORK, 1802
"Keeping guns or gunpowder has likewise been forbidden since 1802; other 'deadly weapons' have been proscribed since `1832."
Wayne Somers, *Encyclopedia of Union College History* (Schenectady, NY: Union College Press, 2003), p. 533.

BROWN UNIVERSITY, RHODE ISLAND [Rhode-Island College], 1803
From the college rules for the conduct of students, Laws of 1803, "Of Criminal Offenses":
"3. No student shall keep any kind of fire-arms or gunpowder in his room, nor fire gunpowder in or near the College, in any manner whatever." (p. 183)
Walter C. Bronson, *The History of Brown University, 1714-1914* (Boston: D.B. Updike, The Merrymount Press, 1914)
https://books.googleusercontent.com/books/content?req=AKW5Qad1qkztopftoq5ctcQoijLFt4Vn ZLvsCK8EPwy8IqNErJWPne_qJmP4JAsFly3xpMQlH5JN1EB5xRlnvY1p7BK62ylggMoctbzE dO1CxZnvIB7AVTfHLT7jVD2Wa5R5cUppkzwiIb2FC2LqrbvWy6qZydbtVU2HmidbRbk2Dgn VCU4pKzPID0OCY6rTdDvXCcrsa-

[4wDYIMb9ku2QSm7ncjZHWcYMP2KlCnpA59umtk8sJXF8HScqvDUE8Buz_nS9LQtLyrVAo](#)
[6aCELgkuDL-71k50RZ8CWa4PvzIXP4kuQGgzCyiZg](#)

1865 Laws of Brown University, § 5, no. 4.
 "No student is permitted to use camphene or any burning fluid, to keep in his room gunpowder, fire arms, or any dangerous weapon, or any intoxicating liquor, or allow noise or any disturbance in his apartment."
The Laws of Brown University (Providence, RI: Knowles, Anthony & Co., 1865), 16-17. § 5—Of Discipline, no. 4.
[https://firearmslaw.duke.edu/wp-content/uploads/2023/08/1865-Brown-University.pdf](https://firearmslaw.duke.edu/wp-content/uploads/2023/08/1865-Brown-University.pdf)

MIDDLEBURY COLLEGE, VERMONT, 1803, 1839
"10. No scholar is allowed to keep any kind of firearms or gunpowder in College, nor to fire a gun or pistol within the College-walls on penalty of twelve cents for every such offense."
*The Laws of Middlebury-College, 1803* (Middlebury, VT: Huntington & Fitch, 1804), p. 16.
[https://www.jstor.org/stable/community.28479483?seq=16](https://www.jstor.org/stable/community.28479483?seq=16)

1839 Laws Of Middlebury College, ch. 7, §§ 1, 11.
"CHAPTER VII.
OF CRIMES AND MISDEMEANORS.
   1. If any student shall be guilty of blasphemy, or robbery, fornication, theft, forgery, duelling, or any other crime for which an infamous punishment may be inflicted by the laws of the State, he shall be expelled…
   11. No student is allowed to keep any kind of fire-arms or gunpowder in his room or in any part of the College buildings, nor to fire a gun or pistol within or near said buildings."
*The Laws Of Middlebury College* (Middlebury, VT: People's Press, 1839), 16-18. Chapter 7—Of Crimes and Misdemeanors, §§ 1, 11.

HAMPDEN-SIDNEY COLLEGE, VIRGINIA, 1805
"The equally ineffectual outlawing of dogs and guns, both being the cause of 'great inconvenience,' would be repeated and expanded: in 1805 the reaffirmed rule on guns was supplemented with a prohibition on dueling or promoting a duel."
John L. Brinkley, *On this Hill: A Narrative History of Hampden-Sydney College, 1774-1994* (Hampden-Sidney, VA: Hampden-Sidney, 1994), p. 65.

HAMILTON COLLEGE, NEW YORK, 1813, 1867
The Laws of Hamilton College, 1813
Chapter VIII, Of Crimes and Misdemeanors.
XII. If any student shall keep any kind of firearms or gunpowder, or shall fire any gun-powder in or near the college-yard, or near the dwellinghouse or the person of the president, a professor or tutor, he shall be admonished, rusticated, or otherwise punished as the case may require.
*Documentary History of Hamilton College* (Clinton, NY: Hamilton College, 1922), p. 151.
[https://babel.hathitrust.org/cgi/pt?id=mdp.39015035550865&view=1up&seq=163&q1=gun](https://babel.hathitrust.org/cgi/pt?id=mdp.39015035550865&view=1up&seq=163&q1=gun)

1867, The Laws of Hamilton College, ch. 12, pt. 2, § 1, no. 1 (D. P. White).
"CHAPTER XII.

10

OF DELINQUENCIES AND EXCUSES—OF OFFENCES AND THEIR PUNISHMENTS…

…2d. Of Offences.—The Students in this Institution,  are expected to manifest in speech and action, all proper respect and obedience to the Government of the College; a gentlemanly deportment toward each other; and in all their conduct, a practical compliance with the dictates of morality and the laws of the land.

§ 1. In addition to these general rules the following things are particularly[1] prohibited.

1. The keeping or using fire arms or gunpowder; kindling fires in the College yard or near the College buildings, and use of fire-works of every kind."

[1] Spelled "particularlarly" in original source document.

The Laws of Hamilton College: Published January, 1861 (Utica, NY: D. P. White, 1867), 17. Chapter 12—Of Delinquencies and Excuses—Of Offences and Their Punishments, pt. 2, § 1, no. 1. Undated.

https://firearmslaw.duke.edu/assets/1867,-ny,-the-laws-of-hamilton-college,-ch.-12,-pt.-2,--1,-no.-1.pdf

BOWDOIN COLLEGE, MAINE, 1817

Laws of Bowdoin College, 1817

"He [the student] was not permitted to keep a gun or pistol in his room without permission of the president, nor could he go 'a gunning or fishing' without permission of some member of the faculty. He was not to fire a gun or pistol within or near a college building, make any bonfire or illumination, or set off fireworks."

Ernst Christian Helmreich, *Religion at Bowdoin College: A History* (Brunswick, ME: Bowdoin College, 1981), 39.

https://digitalcommons.bowdoin.edu/cgi/viewcontent.cgi?article=1005&context=bowdoin-histories

PRINCETON UNIVERSITY (then known as the College of New Jersey), NEW JERSEY, 1819

1819, Laws of the College of New Jersey, ch. 17, § 9; ch. 19, § 10.

"CHAPTER XVII.

OF RELIGIOUS WORSHIP, AND MORAL CONDUCT…

…9. Any student convicted of sending or receiving a challenge to fight a duel, or who shall carry such challenge, or be a second in a duel, or in any wise aid or abet it, shall immediately be dismissed by the faculty, and as soon as practicable expelled by the trustees."

"CHAPTER XIX.

MISCELLANEOUS REGULATIONS…

…10. No student shall keep for his use or pleasure any horse or riding beast; nor shall any student keep a dog, or gun, or fire-arms and ammunition of any kind, nor any sword, dirk, sword-cane, or any deadly weapon whatever."

Laws of the College of New Jersey; Revised, Amended, and Adopted by the Board of Trustees, April 14th, 1819 (Trenton, NJ: George Sherman, 1819), 21-26. Chapter 17—Of Religious Worship and Moral Conduct, § 9; Chapter 19—Miscellaneous Regulations, § 10. Adopted April 14th, 1819.

https://firearmslaw.duke.edu/wp-content/uploads/2023/08/1819-College-of-NJ.pdf

COLUMBIAN COLLEGE (now GEORGE WASHINGTON UNIVERSITY), DISTRICT OF COLUMBIA, 1824

1824, Laws of the Columbian College, ch. 5, § 2, no. 10.

"10th. No student shall keep a servant, nor shall he keep fire arms, or any deadly weapon whatever. He shall bring no gun-powder upon the College premises; nor shall horses or dogs be kept by students for their private use or pleasure."

UNIVERSITY IN CAMBRIDGE, MASSACHUSETTS, 1825

1825, Statutes and Laws of the University in Cambridge, ch. 7, § 76, no. 3.

"CHAP. VII.

HIGH OFFENCES AND MISDEMEANORS.

76. High offences may be punished at the discretion of the Faculty with any of the College punishments…

The following are deemed high offences: . . . .

3. Keeping any gun, pistol, or gun-powder, or firing or using the same in the town of Cambridge.—Being concerned in any bonfire, fireworks, or unauthorized illuminations.—Being an actor or spectator at any theatrical entertainment in term time…"

CUMBERLAND COLLEGE, TENNESSEE, 1825

1825, Laws of Cumberland College, ch. 12, §§ 6 & 7 (Office of the Whig).

"CHAPTER XII.

Of moral conduct and criminal offences.

   6. If any student shall fight a duel, or send or accept a challenge to fight a duel, or carry such challenge, or be a second in a duel or in any wise aid or abet it, or abuse or ridicule a fellow-student for refusing to fight or be concerned in a duel, he shall be immediately expelled.

   7. No student shall bring, or cause to be brought into College, or, on any occasion, keep in his room, any spirituous or fermented liquors; nor any fire-arms or ammunition of any kind; nor a sword, dirk, sword-cane or any deadly weapon whatever, upon penalty of such censure or punishment as the Faculty may judge the offence to deserve."

Laws of Cumberland College, in Nashville, Tennessee: Enacted by the Board of Trustees, November 5, 1825 (Nashville, TN: Office of the Whig, 1825), 16-17. Chapter 12—Of Moral Conduct and Criminal Offences, §§ 6 & 7. Undated.

https://firearmslaw.duke.edu/assets/1825,-tn,-laws-of-cumberland-college,-ch.-12,--6-&-7..pdf

FURMAN UNIVERSITY, SOUTH CAROLINA, 1826

". . .they were forbidden to use or possess intoxicating liquor or frequent bar rooms, to accept a challenge or in any way aid, abet or promote a duel, to carry or have in their rooms firearms, W.J. McGlothlin, *Baptist Beginnings in Education: A History of Furman University* (Nashville, TN: Sunday School Board of the Southern Baptist Convention, 1926), p. 115.

TRINITY COLLEGE, CONNECTICUT, 1826

Chap. IV, p. 10

"Sec. 3. . . Keeping any gun, pistol, or gunpowder, or firing, or using the same in the City of Hartford; or having in possession any dirk, sword-cane, or ·other offensive weapon, unless in case of military exercises being allowed by the Faculty."

Laws of Washington College [renamed Trinity College in 1845]

https://digitalrepository.trincoll.edu/cgi/viewcontent.cgi?article=1414&context=bulletin

McKENDREE COLLEGE, ILLINOIS, 1828
"The Faculty are determined that the college shall not be infested, and the whole community embarrassed and perhaps corrupted by idle and dissolute members." There is an interesting list of requirements: . . . "using profane or obscene language; visiting circuses or shows; keeping pistols, dirk knives or any unlawful weapons. . . ."
*Centennial, McKendree College With St. Clair County History, 1828-1928* (Lebanon, IL: McKendree College, 1928), p. 238.
https://archive.org/details/centennialmckend00mcke/page/238/mode/2up?q=gambling

CENTENARY COLLEGE OF LOUISIANA, 1830, 1839
"Soon after a student tried to stab a professor the trustees, the date was March 12, 1830, passed another Article for the By-Laws which would take care of the situation in the future. They also passed a rule that no student could keep a riding animal, or dog, or gun, or other firearms."
William Hamilton Nelson, *A Burning Torch and a Flaming Fire: The Story of Centenary College of Louisiana* (Nashville, TN: Methodist Publishing House, 1931), p. 81.
https://archive.org/details/burningtorchandf00nels/page/n7/mode/2up?q=gun

Laws for the Government of the College of Louisiana, 1839
"CHAPTER IX.
OF PUNISHMENTS, AND OF MISDEMEANORS AND OTHER OFFENCES…
   …Art. 7. Dueling,[1] or any concern in promoting or abetting it, shall in all cases be punished by expulsion.
   Art. 8. No student shall be permitted to carry a dirk, sword cane, or any deadly concealed weapon whatsoever.
   Art. 9. No student shall keep, for his use or pleasure, any horse or other riding animal, or dog, or gun or other fire arms; nor shall any student ride, or go beyond such limits as the Faculty shall designate, for any purpose, except by permission of some member of the Faculty…"
https://firearmslaw.duke.edu/assets/1839,-la,-laws-for-the-government-of-the-college-of-louisiana,-ch.-9,-arts.-7-9.pdf

DICKINSON COLLEGE, PENNSYLVANIA, 1830
The statutes of Dickinson College, as revised and adopted by the Board of Trustees, April 16, 1830, 22-23.
Chapter VI. Of the deportment of the students, of misdemeanors and their punishment
Section 1. . . . 12.–If any student shall keep for his use or pleasure any riding beast, dog, gun, fire arms or ammunition, sword-dirk, sword-cane, or any deadly weapon whatever, or shall ride out unless the Principal may think his health or any special circumstance may require it, and grant him permission to do so, he shall be publicly admonished, suspended, or dismissed.

MISSISSIPPI PRESBYTERY, OAKLAND COLLEGE, MISSISSIPPI, 1831
Constitution & Laws of the Institution of Learning Under the Care of the Mississippi Presbytery, Oakland College (Miss.), at 10 (1831)
Chapter XI. Of Misdemeanors, Offences and Punishments.
Sec. 1. Neglect of study-interrupting the studies of others-profaneness-playing at games of cards or chance-duelling, or aiding or abetting it-wearing or carrying a dirk or other deadly weapon-intemperance in any degree-keeping company with persons of known immoral character-

resorting to places of expensive amusement, & every other species of immoral conduct, of which the Faculty are the sole judges, are offences; and shall be punished as hereinafter directed.

COLBY COLLEGE, MAINE (founded as Waterville College), 1832
6. No student shall keep firearms, or any deadly weapon whatever. He shall bring no gunpowder upon the College premises. . . .
Waterville College, Laws of Waterville College, Maine (Hallowell, ME: Glazier, Masters, & Co., 1832), 11.
https://www.google.com/books/edition/Laws_of_Waterville_College_Maine/n0wMAQAAMAA J?hl=en&gbpv=1&dq=Waterville+College,+Laws+of+Waterville+College,+Maine+(Hallowell, +ME:+Glazier,+Masters,+%26+Co.,+1832),&pg=PA1&printsec=frontcover

ALLEGHENY COLLEGE, PENNSYLVANIA, 1834
Ernest Ashton Smith, *Allegheny—A Century of Education, 1815-1915* (Meadville, PA: The Allegheny College History Company, 1916), p. 401.
Adopted 1834 (printed in the Annual Catalog starting in 1840):
"Art. III, Sect. 12. No student shall bring or cause to be brought gunpowder, firearms, or any deadly weapon within the College premises; nor shall any one engage in any species of hunting during the college term without permission from the Faculty. No student shall be allowed to smoke tobacco in any form within the college enclosures."
https://books.googleusercontent.com/books/content?req=AKW5QadC9Mb3YgQwvgNd85fNiTq zRMDGkW3x5vKIB_nq46GrUPRMPxXftjaeLXwOnTyc- _6vho0bcCaH72dIaYTrbfImGjLWJgBADFHIx9gY183akY30Htm0gbgWT6xc_BcSzkySAH5K _62VpZkkeWFrsO_aojPtnK9yoGcwFSgGNhwPzBoROwVcuFammCUD3ZkBX1aJQlnflioVWf 6eMecUpfXD6EcvC2LYAS7pB76rUDsZAgEowZjXIf3TF2OKbaSIxUas8GdV2R3gN51Vcmw 22hBw2MCYBg
Bylaws of 1841 barred "possession of guns or tobacco on College premises."
Jonathan E. Helmreich, *All Through the Years: A History of Allegheny College* (Meadville, PA: Allegheny College, 2005), 64.

WAKE FOREST UNIVERSITY, NORTH CAROLINA, 1834
Students "not to keep any dirk, sword-cane, fire arms or any other weapon of defense."
George Washington Paschal, *History of Wake Forest College* (Wake Forest, NC: Wake Forest College, 1935), p. 136.
https://wakespace.lib.wfu.edu/bitstream/handle/10339/33244/wf_history_v1.pdf

LAFAYETTE COLLEGE, PENNSYLVANIA, 1837
"Section 14. No student shall wear about his person any pistol, dirk, stiletto, or other dangerous weapon."
David B. Skillman, *The Biography of a College: Being the History of the First Century of the Life of Lafayette College* (Easton, PA: Lafayette College, 1932), p. 130.

LaGRANGE COLLEGE, ALABAMA, 1837
Laws of the College, Chap. X, Sec. 7.
"No student shall bring or cause to be brought into College, or on any occasion, keep in his room, any spiritous or fermented liquors, nor any fire-arms, or ammunition of any kind; nor a

14

sword, dirk, sword-cane, or any deadly weapon whatever; upon penalty of such censure or punishment as the Faculty may judge offence to deserve."

"Circular Letter of the Faculty of La Grange College" (Tuscumbia), North Alabamian, May 5, 1837. Stated purpose of this provision, "afford all the protection against intemperance and bloodshed which can be had."

https://www.newspapers.com/image/308403735/?terms=%22the%20faculty%22&match=1

UNIVERSITY OF NASHVILLE, TENNESSEE, 1837
Law of the University of Nashville for the moral conduct of the students, in American Annals of Education and Instruction for the Year 1837, at 185 (1837)
No student shall bring, or cause to be brought into College, or, on any occasion, keep in his room, any spirituous or fermented liquors; nor any fire-arms or ammunition of any kind; nor a sword, dirk, sword-cane or any deadly weapon whatever, upon penalty of such censure or punishment as the Faculty may judge the offence to deserve.

GEORGETOWN UNIVERSITY, WASHINGTON, D.C., 1839
"A school rule forbade students from possessing any sort of weapon, including 'pistols, Guns, swords, daggers, &c.'"
Robert E. Curran, *A History of Georgetown University*, 3 vols. (Washington, D.C.: Georgetown University Press, 2010), I, p. 195.

RANDOLPH-MACON COLLEGE, VIRGINIA (1839)
"no prep. schollar [sic] be permitted to possess or use any fire arms, dirks or other dangerous weapons, but that the Principal be allowed on Saturday afternoon at his discretion to give permission to them to use guns in hunting."
James Edward Scanlon, *Randolph-Macon College: A Southern History* (Charlottesville, VA: University Press of Virginia, 1983), p. 63-64.

KEMPER COLLEGE, MISSOURI, 1840
The Laws of Kemper College, Near St. Louis, Missouri 9 (1840)
Chapter VIII. Miscellaneous. . . .
6. No Student shall keep arms of any sort, or keep or fire powder on the College premises.

MARIETTA COLLEGE, OHIO, 1840
1840, Laws of Marietta College, ch. 7, no. 15 (G. W. Tyler & Co.).
"CHAPTER VII
CRIMES AND MISDEMEANORS…
    …15. No student shall keep any kind of fire arms, or gunpowder, nor shall he fire or cause to be fired any gunpowder in or near the College buildings or College yards…"
Laws of Marietta College, and a Catalogue of the Library (Marietta, OH: G. W. Tyler & Co., 1840), 10. Chapter 7—Crimes and Misdemeanors, no. 15. Undated.
https://firearmslaw.duke.edu/assets/1840,-oh,-laws-of-marietta-college,-ch.-7,-no.-15.pdf

DAVIDSON COLLEGE, NORTH CAROLINA, 1845-46
APPENDIX IX, OLD RULES, from the second catalog issued, that for 1845-46. . . .

4. No Student shall play at cards, dice, or any other immoral game; or buy, keep, or use in his room or elsewhere any intoxicating liquors; or keep a dirk, pistol, or any deadly weapon; or visit the tippling houses, or other places of ill-fame; or use profane language; or be guilty of any grossly immoral conduct whatever, under severe penalties.

Cornelia Rebekah Shaw, *Davidson College* (NY: Fleming H. Revell Press, 1923), p. 300. https://babel.hathitrust.org/cgi/pt?id=njp.32101068568573&view=1up&seq=360&q1=pistol

DENISON UNIVERSITY, OHIO, 1847
Laws of Granville College [renamed Denison University in 1850s], 1847
"6—No student shall play at cards or other games of hazard; keep in his room or use intoxicating liquors of any kind, except when prescribed by a physician; associate with persons of known immoral character; loiter around taverns or other places of public resort in the village; use profane or obscene language; keep in his room fire-arms or other deadly weapons; or be absent from his room without permission after the evening bell for study hours."

Francis W. Shepherdson, *Denison University: 1831-1931* (Granville, OH: Denison University, 1931), p. 55; https://babel.hathitrust.org/cgi/pt?id=mdp.39015058689640&seq=69&q1=fire

EMORY UNIVERSITY, GEORGIA, 1847
"The possession of firearms was strictly forbidden. . . ."
Henry M. Bullock, *A History of Emory University* (Atlanta, GA: Cherokee Publishing Co., 1972), p. 134.

DARTMOUTH COLLEGE, NEW HAMPSHIRE, 1849
Laws of Dartmouth College
Chapter Six: Crimes and Misdemeanors
IV. No student shall purchase, or have in his room, any spirituous or vinous liquor, or play at cards, dice, or any cards, dice, or any unlawful game, or keep fire-arms or gun-powder in his room arms, unlawful combinations without permission, or fire; gun-powder in or near the College premises, or meet with any forbidden club or society, or join in any combination or agreement for unlawful purposes, or commit any vexatious or injurious act upon the person or property of a fellow student. Violations of this law shall be punished at the discretion of the Faculty. [A version of these Laws first appeared in 1819.]

Laws of Dartmouth College (Hanover, NH: Dartmouth Press, 1849), p. 11; https://babel.hathitrust.org/cgi/pt?id=umn.31951002082852o&seq=7&q1=fire

BELOIT COLLEGE, WISCONSIN, 1850
1850* Laws of Beloit College, ch. 4, § 2.
"…Therefore, no student shall be allowed to have in his room, spirituous, vinous or malt liquor; to play at cards, dice, or any similar game; to use or keep upon the College premises, fire-arms, or gunpowder; to attend assemblies for dancing or theatrical amusements; or to give or attend convivial entertainments, either in students' rooms or in public houses…."

The Laws of Beloit College (s.l.: s.n., 1850*), 4. Chapter 4—Of the Deportment of the Students, § 2.
*The publication date is not on the monograph itself, and sources differ. Some give the vague date of 185? (i.e., eighteen-fifty-"something"); others plainly state 1850.

16

ILLINOIS COLLEGE, ILLINOIS, 1850
Laws of Illinois College, 1850, in Transactions of the Illinois State Historical Society for the
Year 1906, at 245.  1850
Chapter XII. Of Crimes and Immoralities.
Sec. 5. No student shall carry deadly weapons upon his person, on penalty of admonition,
dismission or expulsion, according to the aggravation of the offense.

GETTYSBURG COLLEGE, PENNSYLVANIA [formerly Pennsylvania College], 1839, 1852
Regulations of Pennsylvania College, 1839
"No Student shall keep or fire any gunpowder in or near the College premises; nor play at any
unlawful game, or at any time game for a wager."
https://firearmslaw.duke.edu/assets/1839,-pa,-regulations-of-pennsylvania-college,-p.-6,-para.-
5.pdf

"Any student was courting trouble by. . .keeping a pistol in his room (1852). . . ."
Charles H. Glatfelter, *A Salutary Influence: Gettysburg College, 1832-1985*, 2 vols. (Gettysburg,
PA: Gettysburg College, 1987), I, p. 153.
https://gettysburg.contentdm.oclc.org/digital/collection/GBNP01/id/64513/rec/1

NEW YORK CONFERENCE SEMINARY, CHARLOTTEVILLE, N.Y. 1851
1851, Catalogue of the Officers and Students in the New York Conference Seminary, "By-Laws,"
no. 11 (Gray & Sprague).
"By-Laws...
   ...11. No student shall be permitted to carry around him fire arms or other deadly weapons, nor
to have or use gunpowder in or about the Seminary…"
Catalogue of the Officers and Students in the New York Conference Seminary, Charlotteville,
Schoharie Co., N.Y., During the First Year 1850-1 (Albany, NY: Gray & Sprague, 1851), 22.
"By-Laws," Number 11.
https://firearmslaw.duke.edu/assets/1851,-ny,-catalogue-of-the-officers-and-students-in-the-new-
york-conference-seminary,-by-laws,-no.-11.pdf

TUFTS UNIVERSITY, MASSACHUSETTS, 1852
"The first incident requiring faculty disciplinary action occurred shortly after the College
opened, when a freshman allegedly attempted 'to use a pistol upon a room-mate.'. . .The culprit
was suspended for a year for 'intemperance, falsehood, disobedience, and for having dangerous
weapons in the college and for using them.'"
Russell E. Miller, *Light on the Hill: A History of Tufts College 1852-1952* (Boston, MA: Beacon
Press, 1966), p. 397.

WESTMINSTER COLLEGE, MISSOURI, 1852
"q. No student is allowed to have or carry weapons, sword canes, pistols, and other than pen
knives; and the sending or accepting of a challenge subjects to the highest penalty."
M.M. Fisher, *History of Westminster College, 1851-1903* (Columbia, MO: E.W. Stephens, 1903),
p. 85; https://tile.loc.gov/storage-
services/public/gdcmassbookdig/historyofwestmin00fish/historyofwestmin00fish.pdf

FRANKLIN AND MARSHALL COLLEGE, PENNSYLVANIA, 1853
From earliest printed copy of the College Laws:
"No student shall keep for his use or pleasure any horse, dog, gun, or fire-arms and ammunition of any description, or any dirk, sword, or any other deadly weapon."
Joseph Henry Dubbs, *History of Franklin and Marshall College* (Lancaster, PA: Franklin and Marshall College, 1903), p. 229.

JEFFERSON COUNTY INSTITUTE, WATERTOWN, N.Y. 1853
1853, Catalogue of the Officers and Students of the Jefferson County Institute, "Abstract of By-Laws," no. 12 (Clark & Fayel).
"ABSTRACT OF BY-LAWS…
    …12. All abusive and insulting conduct towards a fellow student or other person—visiting groceries, taverns or other places for the purpose of entertainment—using immodest or profane language—playing cards or other games of chance—the use of intoxicating liquors— keeping or using fire-arms or gun-powder in the Institute buildings, and all other practices calculated to injure the morals or disturb the good order of the School, are forbidden…"
Catalogue of the Officers and Students of the Jefferson County Institute for the Year Ending December, 1853 (Watertown, NY: Clark & Fayel, 1853), 27. "Abstract of By-Laws," no. 12. Undated.
https://firearmslaw.duke.edu/assets/1853,-ny,-watertown,-catalogue-of-the-officers-and-students-of-the-jefferson-county-institute,-abstract-of-by-laws,-no.-12.pdf

AMHERST COLLEGE, MASSACHUSETTS, 1855
1855, The Laws and Regulations of Amherst College, ch. 9, § 7.
"CHAPTER IX.
DAMAGES AND REPAIRS.
VII. In no case shall a student bring into the College premises, any cannon, musket, pistol, or other species of fire-arms, or any gunpowder in any mode of preparation; and in no case, in term time, shall any student be concerned in the discharge of any fire-arms or fire-works in the town of Amherst."
https://firearmslaw.duke.edu/wp-content/uploads/2023/08/1855-Amherst.pdf

NORTH-WESTERN CHRISTIAN UNIVERSITY, INDIANAPOLIS, IN, 1857
1857, Charter and By-Laws of the North-Western Christian University, "An Ordinance for the Government of the University," § 20, no. 5 (Indianapolis Journal Company).
"AN ORDINANCE FOR THE GOVERNMENT OF THE UNIVERSITY…
    …Sec. 20. To remain a Student, in connection with the University, every Student is required to observe the following regulations…
    …5th. That the Student do not bring, or use, upon said premises any fire arms, dirk, bowie knife, or any other kind of deadly weapon."
Charter and By-Laws of the North-Western Christian University, and an Ordinance for the Government of the Institution (Indianapolis, IN: Indianapolis Journal Company, 1857), 33. An Ordinance for the Government of the University, § 20, no. 5. Undated.
https://firearmslaw.duke.edu/assets/1857,-in,-charter-and-by-laws-of-the-north-western-christian-university,-an-ordinance-for-the-government-of-the-university,--20,-no.-5.pdf

LaGRANGE SYNODICAL COLLEGE, TENNESSEE, 1859
1859, Code of Laws for the Government of La Grange Synodical College, ch. 10, §§ 2-9.
"CHAPTER X.
DISCIPLINE.
SEC. 1. The penalties which may be imposed are, admonition, reprimand, private dismission, suspension, and expulsion.
SEC. 2. No student shall be condemned without an opportunity for explanation of his conduct.
SEC. 3. Any student charged and proved guilty of carrying about his person, or keeping in his possession, fire-arms, or any deadly weapon, shall be suspended.
SEC. 4. A student using, or threatening to use, a weapon in a quarrel, shall be expelled.
SEC.  5. A student sending, or accepting, or bearing a challenge in a duel, shall be expelled.
SEC.  6. A student guilty of a flagrant offence against morality shall be expelled.
SEC.  7. No student shall be permitted to keep a pistol or gun, or other deadly weapon, at his room, under any circumstances.
SEC.  8. Students may not use a gun in hours of recreation, for hunting, without permission from the President.
SEC.  9. All guns owned by students (save those who reside with their parents) must be deposited with the President, and kept under his control…"
https://firearmslaw.duke.edu/wp-content/uploads/2023/08/1859-La-Grange-Synodical-College.pdf

OBERLIN COLLEGE, OHIO, 1859
Oberlin College, Laws and Regulations of Oberlin College, 11th ed. (Oberlin, OH: Shankland and Harmon, 1859), 11.
"22. No student when in Town, shall use firearms, or burn gun-powder in any way, without permission from a member of the Faculty."
https://books.googleusercontent.com/books/content?req=AKW5QadX44K_x7mxEEi-hFccZ5kz0v4vq8C6a5ZIzWZ-r9gkALZCLRu9rB7Pc5I4YrgE4yIty6O2ip3Kh-vHrpJokW30GQ_fsxTdiCzB1T_82mumGZ3Vs-H7BaULGWUaXEhj2JSiQlMpKnLPGbw0a5wD5F3t3BZDPFURlMhXefoeUddg0EFoROy8Y6BNimrEHd5NnR4hGFzsXInGCnZ5OMl_Ak3io4YoUdP1TSKkvL8crdkMV6dRduIERpTRvXuM3LPnq-DqGO17Bxk7Okln1Ihr3jAfaTdt3agB3IZ-bnpJT2AJu8Mayjg

ALBION COLLEGE AND WESLEYAN SEMINARY, MICHIGAN, 1860
Eighteenth Annual Catalogue of the Officers and Students of the Albion Female College, and Wesleyan Seminary (Michigan) 32 (1860-1861). 1860
PROHIBITIONS. . . . Gunpowder, firearms, or deadly weapons of any kind on the premises.

McKENZIE COLLEGE, TEXAS, 1860
"Laws of McKenzie College," in Education in Texas: Source Materials, comp. Fredrick Eby, University of Texas Bulletin, Education Series No. 2 (April 25, 1918): 391-93.
"VIII. The following are among the things forbidden by the laws of the College:. . . .
7. Keeping gunpowder, firearms, or deadly weapons of any kind, about the person, or in the room. . . .
5. A student, on entrance. . .will be required to deliver up to the President all fire-arms, or weapons of any kind, in his possession, to be returned at the close of the College year."

Annual Catalogue of the Students and Faculty of McKenzie College, 1860-61.

CENTRE COLLEGE, KENTUCKY, 1861
Ch. VI, Misdemeanors
"4. No student shall be guilty of insulting or striking a fellow student, nor of keeping in his possession any pistol, sword-cane, or other deadly weapon, And if he shall draw, or attempt to use, such deadly weapon upon a fellow student, or wear it for this purpose, he shall be forthwith dismissed, and not restored without a vote of the Board of Trustees."
Laws of the Centre College of Kentucky, Located at Danville (Frankfort, KY: A.G. Hodges & Co., 1861), p. 5.
https://sc.centre.edu/sc/digital/pdf/laws1861.pdf

GRINNELL COLLEGE (FOUNDED AS IOWA COLLEGE), IOWA, 1865
"Of course dancing, cards, billiards, intoxicants, gambling, and tobacco were equally taboo at Grinnell, and these indulgences were linked with 'profanity, obscenity and lewdness' in the college rules, and with 'keeping gunpowder, fire-arms and other dangerous weapons.'"
John Scholte Nollen, *Grinnell College* (Cedar Rapids, IA: The State Historical Society of Iowa, 1953) [ca. 1865], p. 72.

DUKE UNIVERSITY [formerly Trinity College], N.C., 1869
1869, Catalogue of Trinity College, "Discipline," no. 4 (Episcopal Methodist Office).
"Discipline.
   We have laws and regulations to which all are required to yield obedience; but we do not think that students should be left to themselves and the letter of the law. We endeavor by all proper means, personal and public, religious and social, to make every one a successful and useful man. No parent need suppose that his son is deprived of warnings, admonitions and affectionate advice; we endeavor to cultivate as well as educate, and strive by all proper means to avoid the evils so common to college life. So soon as we are convinced that any student will not do well, or that he will deteriorate by remaining, we cause him to be taken home.
   The following general laws must be observed:
1. Every applicant must enter College as soon as possible after he arrives, and must consult the President before making any engagements for board.
2. All moneys must be deposited with the President, and all expenses should be paid through him.
3. All students under age should bring a letter from parent or guardian, and all others should bring a letter of introduction or a certificate of character.
4. No student is permitted to have in his possession at College, any pistol, gun, or other weapon, or to play at any game of chance, to drink any intoxicating liquors, or to use profane or indecent language.
5. Every student must faithfully observe the general routine regulations, and must attend Sabbath school and preaching in the College chapel on the Sabbath."
* Trinity College is modern day Duke University. In 1869, it was located in the town of Trinity, NC and known as Trinity College.
Catalogue of Trinity College, North Carolina, 1868-69 (Baltimore, MD: Episcopal Methodist Office, 1869), 18. "Discipline," no. 4.

20

https://firearmslaw.duke.edu/assets/1869,-nc,-trinity,-catalogue-of-trinity-college,-discipline,-no.-4.pdf

HOWARD COLLEGE, ALABAMA, 1870
Student dismissed from the college for "carrying firearms, drawing a pistol on one of the students, and using profane language." Dated Nov. 1, 1870
Mitchell B. Garrett, "Sixty Years of Howard College," 1842-1902, *Howard College Bulletin*, LXXXV (October 1927): 81.
https://archive.org/details/sixtyyearsofhowa00garr/page/n7/mode/2up

VANDERBILT UNIVERSITY, TENNESSEE, 1874
Rules of First Faculty
"4. No student, during his connection with the University shall carry about his person, anywhere, any pistol, dirk, bowie knife or other deadly weapons."
Edwin Mims, *History of Vanderbilt University* (Nashville, TN: Vanderbilt University Press, 1946), p. 126.

WILLIAMS COLLEGE, MASSACHUSETTS, 1878
1878, Laws of Williams College, ch. 3, § 3.
"No student shall have or keep any gunpowder or fire-arms in his room, or in any building or other place on College grounds; nor shall he at any time use gunpowder or fire-arms within half a mile of the College grounds."
Laws of Williams College, Authorized by the Trustees at Their Meeting in July, 1878 (North Adams, MA: James T. Robinson & Son, 1878), 13. Chapter 3—Of Deportment and Discipline, § 3.
https://firearmslaw.duke.edu/wp-content/uploads/2023/08/1878-Williams-College.pdf

AGRICULTURAL & MECHANICAL COLLEGE OF KENTUCKY, 1882
1882, Regulations of the Agricultural & Mechanical College of Kentucky, art. 7, no. 156 (Major, Johnston & Barrett).
"ARTICLE VII.
Discipline and Police…
…Uniform, Arms and Accoutrements…
    …156. Students are forbidden to have in their possession any description of fire-arms or other deadly weapons not issued to them by proper authority."
Regulations of the Agricultural & Mechanical College of Kentucky: Adopted June 30, 1883 (Frankfort, KY: Major, Johnston & Barrett, 1882), 37. Article 7—Discipline and Police, no. 156. Adopted June 30, 1883.
https://firearmslaw.duke.edu/assets/1882,-ky,-regulations-of-the-agricultural-&-mechanical-college-of-kentucky,-art.-7,-no.-156.pdf

AGRICULTURAL AND MECHANICAL COLLEGE FOR THE COLORED RACE, N.C., 1896
1896, By-Laws Ordained by the Board of Trustees of the Agricultural and Mechanical College for the Colored Race, Admission and Deportment of Students, no. 14 (Reece & Elam).
"Admission and Deportment of Students…

…14. All games of hazard, wagers and betting are strictly forbidden within College limits. Students guilty of intoxication while connected with the College shall be dismissed. Students guilty of profane or obscene language shall be punished in such manner as the faculty may see proper. No student will be allowed to carry or keep in possession a deadly weapon while attending the College. Use of intoxicants is strictly forbidden, under pain of severe punishment." By-Laws Ordained by the Board of Trustees of the Agricultural and Mechanical College for the Colored Race: Rules and Regulations Made by the Trustees for the Organization and Government of the Agricultural and Mechanical College for the Colored Race (Greensboro, NC: Reece & Elam, 1896), 16. Admission and Deportment of Students, no. 14. Undated. https://firearmslaw.duke.edu/assets/1896,-nc,-by-laws-ordained-by-the-board-of-trustees-of-the-agricultural-and-mechanical-college-for-the-colored-race,-admission-and-deportment-of-students,-no.-14.pdf

SOURCE (unless otherwise noted): https://firearmslaw.duke.edu/repository/search-the-repository/