**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ZACHARY SUCCOW, ET AL<br>*Plaintiff*<br><br>v.<br><br>PAMELA J. BONDI, ET AL<br>*Defendants* | :<br>:<br>:<br>:<br>:<br>:<br>: | No. 3:25-cv-00250-SVN<br><br><br><br><br><br>FEBRUARY 10, 2026 |

# State Defendants' Proposed Findings of Fact, Conclusions of Law, and Legal Argument

Table of Contents

I. Introduction ... 1

II. Proposed Findings of Fact ... 1

III. Proposed Conclusions of Law ... 12

IV. Legal Argument ... 14

A. Succow Lacks Standing to Challenge the Age Restrictions ... 14

1. Succow had not sustained redressable injury-in-fact in February 2025 because he was physically unable to satisfy other statutory requirements for obtaining a pistol permit or eligibility certificate ... 15

2. Succow's testimony about his general intention to apply for a pistol permit or eligibility certificate is not credible. ... 17

3. Succow and Towne lack standing to challenge the alleged impediments on private transfers ... 23

B. The *Bruen* Test Delineates the Scope of the Second Amendment. ... 23

C. Minors Were Not Covered by the Plain Text of the Second Amendment Until Sometime After the Founding-Era. ... 24

D. The Relevant Historical Tradition of Firearm Regulation Requires Considering Principles and Analogues from the Founding and Reconstruction Eras. 26

E. Connecticut's Age Restrictions on Handguns Fit Comfortably Within the History and Tradition of Regulating Firearms. ... 27

1. The laws of domestic relations and age of majority established principles in support of a regulatory tradition restricting minors' ability to exercise legal rights on their own. ... 29

2. Founding-era analogues prohibited minors from possessing firearms outright or made possession subject to a parent or guardian's authority. ... 38

3. Analogous age restriction laws were enacted throughout the 19th century to protect against the dangers posed by minors with handguns. .............................. 41

4. Connecticut's age restriction laws impose a burden comparable to the founding era and 19th century analogues. ................................................................ 46

5. Connecticut's age restrictions and the historical analogues all burden the rights of minors to protect them from danger. ........................................................ 48

F. Plaintiffs' selective history cannot be reconciled with the well-understood principles of regulation and statutory interpretation in use since the founding-era. 53

1. Plaintiffs cannot succeed on their facial challenge because, consistent with founding-era principles, the age restriction laws are plainly legitimate as to individuals under 18. ........................................................................................ 53

2. Plaintiffs' analogues do not evidence a right to obtain or carry firearms outside of militia service. ................................................................................ 55

3. The weight of Circuit authority provides strong support here. ..................... 63

V. Conclusion ................................................................................................ 64

CERTIFICATE OF SERVICE ................................................................................ 66

## I. Introduction

Connecticut's age restriction statutes, General Statutes §§ 29-28(c)(10), 29-34(b), and 29-36f ("the age restriction laws"), which prohibit individuals under age 21 from purchasing or carrying handguns, fit comfortably with our Nation's history and tradition of regulating minors' access to firearms—a history and tradition that has been applied consistently for over 200 years.

As a preliminary matter, Defendants Ronnell Higgins, Margaret A. Kelley, and Paul J. Narducci (State Defendants) ask the Court to dismiss Plaintiff Zachary Succow's claims because he failed to establish standing to pursue these claims. With respect to the merits, State Defendants ask the Court to enter judgment for the State Defendants and uphold Connecticut's age restriction statutes.

## II. Proposed Findings of Fact

*Application process*

1. To apply for a temporary pistol permit, Connecticut law requires the applicant to first complete a firearm safety training course ("training course") in the use of pistols and revolvers. Tr. 1/12/26 at 176; Conn. Gen. Stat. § 29-28(c)(1)(A).
2. Connecticut law imposes a similar safety training requirement in order to apply for an eligibility certificate. Conn. Gen. Stat. § 29-36f(b)(1)(A).
3. In order for a training course to satisfy the requirements of state law, it must include certain minimum components, including a live-fire portion, and must be approved by the State. Tr. 1/12/26 at 176-77.

4. If someone applied for a temporary pistol permit with the Seymour Police Department but was statutorily ineligible, including because of their age, the Department will advise the applicant of their ineligibility so that they can withdraw the application before it is denied. Tr. 1/14/26 at 217-18.
5. The Norwich Police Department follows the same approach. Tr. 1/14/26 at 230.

*Succow's inability to take the required training course.*

6. When suit was filed, on February 18, 2025, Zachary Succow had not completed a training course that would satisfy the requirements of Connecticut law to apply for a temporary pistol permit or eligibility certificate. Tr. 1/12/26 at 177.
7. At the time suit was filed, Succow was physically unable to complete the training course—specifically the live-fire portion—because of serious injuries from a January 2025 snowboarding accident. Tr. 1/12/26 at 177, 178, 186.
8. In that incident, Succow broke his collar bone and sustained a torn ligament, a stuck tendon, and bruised cartilage in his right ankle. *Id.* at 177-78.
9. As a result of those injuries, Succow had a hard cast on his right ankle, needed crutches, and was unable to work for 4-5 months. *Id.* at 178.
10. When Succow was deposed on September 3, 2025, he still had not completed a firearm safety training course to satisfy the requirements for applying for a temporary pistol permit or eligibility certificate. *Id.* at 178-79.
11. At his deposition, Succow was still on crutches and had a cast on his ankle, and was still physically unable to complete the training course. *Id.* at 179.

12. At the time of his deposition, Succow did not know when he would be physically able to complete the training course. *Id.*
13. Succow was physically incapable of completing the training course until very recently before trial. *Id.* at 186.
14. Succow did not complete a training course until December 17, 2025. Ex. 33.
15. If Succow were to purchase a firearm, he would do so from a retailer, and would seek to purchase a firearm through a private transfer. Tr. 1/12/26 at 175.

*Plaintiff Succow's involvement in this lawsuit*

16. Succow turned 18 on January 12, 2024. *Id.* at 179.
17. Within a month or two of turning 18, Succow became aware that Connecticut law required applicants for temporary pistol permits and eligibility certificates to be at least 21 years old. *Id.* at 179.
18. At that time, Succow did not do anything to bring a lawsuit to challenge those age restriction laws, or to try and find someone who could assist him in doing so. *Id.* at 179-80.
19. Succow became involved in this lawsuit because his father, approached him about doing so. *Id.* at 180.
20. That conversation occurred shortly before Succow filed this lawsuit. *Id.*
21. Succow's father indicated that he had been in contact with people on social media who were looking for plaintiffs to bring this lawsuit. *Id.*

22. Succow's father encouraged Succow to become a plaintiff and told him it would be a good idea and an opportunity for Succow to learn about the laws and the legal process. *Id.* at 181.

23. Succow agreed with his father that becoming a plaintiff would be good learning experience. *Id.* at 181.

24. The first time Succow had considered becoming a plaintiff was when his father approached him and encouraged him to do so. *Id.* at 181-82.

25. Succow became a member of the Second Amendment Foundation ("SAF") in February 2025. *Id.* at 182.

26. Succow received a lifetime membership from SAF, which costs $500 and is the highest level of membership that SAF offers. *Id.* at 182-83.

27. Succow did not pay for that membership himself or tell anyone else to pay on his behalf. *Id.* at 182-83.

28. Succow is not aware of any other reason he would have received a $500 membership from SAF, other than that he had agreed to become a plaintiff in this lawsuit. *Id.* at 183.

29. Succow attempted to apply for a long-gun permit in 2025, but the application was returned to him because he sent it to the wrong address. *Id.* at 183-84.

30. After it was returned to him, Succow never attempted to resend his application to the correct address. *Id.* at 184.

31. Succow signed a sworn declaration on February 14, 2025, which he filed in support of his motion for a temporary restraining order and preliminary injunction. Ex. 1; *see also* ECF No. 4-4.
32. Succow did not draft the declaration himself. Tr. 1/12/26 at 185.
33. In Paragraphs 7 and 8 of that declaration, Succow testified that "[e]xcept for my age, I meet all of the federal and Connecticut requirements to obtain" a handgun eligibility certificate and temporary pistol permit. Ex. 3.
34. Those statements were false because Succow had not completed the required training course, which is required to apply for a temporary pistol permit or eligibility certificate. Tr. 1/12/26 at 185, 187.
35. Before he signed the declaration, Succow did not do anything to confirm the accuracy of those statements. *Id.*
36. Succow did not notice that the declaration is titled with the wrong name—"Declaration of Nathan Stackpole"— when he signed it. *Id.* at 185-86.

*Plaintiff Towne's involvement in this lawsuit*

37. Towne turned 18 on August 23, 2023. Tr. 1/12/26 at 139.
38. At that time, he was aware that applicants for temporary pistol permits and eligibility certificates had to be at least 21 years old. *Id.* at 139.
39. Towne completed a training course on March 17, 2024, which lasted an entire day, including live-fire training and instruction on firearms laws. *Id.* at 139-40.
40. The reason Towne signed up for and completed that training course was because he was interested in obtaining his long gun certificate. *Id.* at 140, 142.

41. If Towne were to purchase a handgun, it would be from a retailer; he has no intention to acquire a handgun through a private transfer. *Id.* at 153.

*Behavior of under-21-year-olds*

42. Compared to adults, minors under age twenty-one are more impulsive, likely to engage in risky and reckless behavior, influenced by peer pressure, and motivated by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations. Steinberg Decl., Ex. 507 ¶ 10.

43. Indeed, "many aspects of psychological and neurobiological immaturity characteristic of individuals between the ages of 14 and 17 . . . are also characteristic of those between ages 18 and 20." *Id.*, ¶ 10.

44. Adolescents and people in their early 20s are uniquely impulsive and insensitive to risk, including with firearms. *Id.*, ¶¶ 19, 24.

45. This tendency is "evidenced by studies of age differences in risk-taking . . . as well as participants' reports of involvement in both health-related risk-taking . . . and antisocial risk-taking . . . ." *Id.*, ¶ 19.

46. Moreover, "adolescents and individuals in their early 20s are less able than older individuals to control their impulses and consider the future consequences of their actions and decisions." *Id.*, ¶ 20.

47. "The combination of heightened attentiveness to rewards and still-maturing impulse control makes middle and late adolescence a time of greater risk-taking than any other stage of development." *Id.*, ¶ 23.

48. Arrests for violent crime increase over the course of adolescence, peak in the late teens and early 20s. *Id.*, ¶ 31; Spitzer Decl., Ex. 500 ¶¶ 31-32.

49. "[S]uicidal ideation and attempted suicide are higher during late adolescence and young adulthood, including during ages 18 to 20, than any other period of life. Firearms were used in more than half of all suicide attempts." Steinberg Decl., Ex. 507 ¶ 32.

50. Rates of deliberate self-injury peak in middle and late adolescence. *Id.*, ¶ 33.

51. "[B]inge drinking and 'high-intensity drinking' (drinking twice as much as that considered binge drinking) is more frequent during the late teens and early 20s than at any other age." *Id.*, ¶ 34.

52. "Intoxication is a particularly significant contributing factor to homicide and physical assault at all ages, especially in incidents involving personal confrontations, and even more so in those involving firearms. The psychological immaturity of individuals between 18 and 20, relative to those 21 and older . . . exacerbates the dangers of intoxication." *Id.*, ¶ 34.

53. With firearm homicides and mass shootings being perpetrated disproportionately by under-21-year-olds, the dangers presented by armed minors are well-known. *See* Spitzer Decl., Ex. 500 ¶ 30.

54. Scientific consensus confirms that "there is good reason to place limits on the permitting of handguns to individuals who are between 18 and 20, as they are members of an age group that is especially at risk for violence, suicide, nonsuicidal self-injury, and excessive drinking." Steinberg Decl., Ex. 507 ¶ 38.

*Founding-era regulation of minors*

55. At the founding, minors were "governed not as adults, but as 'infants.'" Spitzer Decl., Ex. 500 ¶ 21.

56. Until age 21, a minor was subject to the "empire of the father," which "continues even after his death; for he may . . . appoint a guardian to his children." 1 Blackstone, at *453; 2 James Kent, Commentaries on American Law *233 (12th ed. 1873).

57. Colleges in the colonial and founding eras, acting *in loco parentis*, assumed unquestioned authority over students, including the power to prohibit students from carrying firearms. Spitzer Decl., Ex. 500 ¶¶ 36, 39.

58. Under that authority, campus prohibitions on firearms were common, if not ubiquitous. The prohibitions also applied regardless of whether the college was public or private: beginning in 1655 and up through the late 19th century, firearms restrictions were imposed by at least 15 state university systems and at least 54 private colleges. *Id.* ¶¶ 41, 45; Ex. 504 (listing regulations).

59. Even in matters of public duty, like militia service, "members under 21 were treated as minors," and "arming obligations for militia members under 21 usually belonged to their parents or guardians." *Id.*, ¶ 46.

*Changes in the 18th and 19th Centuries*

60. In the 18th and early 19th centuries, minors "mostly lived with their parents in circumstances where they did not possess the means, ability, or right to obtain firearms on their own." Spitzer Decl., Ex. 500 ¶ 29.

61. In the 19th century, the United States transformed from a largely rural society to largely urban one. *Id.*, ¶ 28.

62. Industrialization led to an increased lethality of weapons and proliferation of repeating firearms across the nation. Rivas Decl., Ex. 505 ¶ 11.

63. Unlike muzzle-loaded arms of the founding era, by the 1830s manufacturers had begun developing handguns that were quick to fire and easy to conceal. *Id.*, ¶ 13.

64. In response to rising rates of interpersonal violence and crime, lawmakers and judges in the 19th century began identifying "deadly weapons", including handguns, that were deemed a threat to public safety and subject to strict regulation. *Id.*, ¶¶ 16-17.

65. These "deadly weapons" stood in contrast to weapons like fowling pieces, shotguns, and rifles, which were common in rural, agricultural places and used for hunting, militia, and local policing efforts, and which minors could have been trained to use by family and guardians. *Id.*, ¶ 18.

66. Industrial production of handguns grew significantly to accommodate military demands during the Civil War, and continued after. *Id.*, ¶ 13.

67. "[S]toked by military surpluses, manufacturers' investment in mass production, and their adoption of highly effective marketing techniques," an expanding civilian market for firearms emerged. *Id.*, ¶ 13.

68. Moreover, people seeking to purchase a handgun could do so much more easily because market was no longer limited to local shops. *Id.*, ¶ 29.

69. As costs of producing and transporting goods decreased, nation-wide distribution networks made all products, and specifically deadly weapons like handguns, "more easily accessible to customers than they had ever been before." *Id.*, ¶ 29.

70. That expanding market created more opportunities for firearm manufacturers to market specifically to minors and for minors to acquire firearms. *Id.*, ¶¶ 19, 21.

71. Minors working outside the home became more likely to keep their own wages and able to purchase deadly weapons, including handguns, regardless of whether their parents approved. *Id.*, ¶ 21.

72. Minors could "easily get their hands on" firearms and other deadly weapons at "pawn shops, gun stores, and hardware stores across the country." *Id.*, ¶ 21.

73. Juvenile crime increased throughout the 19th century. *Id.*, ¶ 12.

74. The effects of "slavery, poverty, urbanization, ethnic tension, labor conflict, and political corruption" fueled rising rates of homicide and violence. *Id.*, ¶ 12.

75. The Civil War "worsened" that trajectory, marking the start of a period of "horrific violence, turmoil, and political instability that divided Americans against one another on the basis of race, class, geography, and politics." *Id.*, ¶ 12.

76. Rapid urbanization disrupted families, resulting in overcrowding and an increase in crime, including crimes committed by children. Spitzer Decl., Ex. 500 ¶ 28.

77. Newspapers throughout the country described fatal accidents and careless shootings involving minors, and decried "the wretched practice of carrying concealed weapons" among boys. Rivas Decl., Ex. 505 ¶ 22.

*Historic laws regarding under-21-year-olds and firearms*

78. Societal and technological changes in the 19th century led to a proliferation of laws regulating minors and firearms. Spitzer Decl., Ex. 500 ¶ 30.

79. These laws were intended "to protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds." *Id.*, ¶ 30.

80. From 1763 through 1859, laws that restricted minors' ability to access and use firearms were enacted in ten states. *Id.*, ¶ 20; Ex. 502 (listing laws).

81. From there, restrictions on minors' possession and use of weapons proliferated, with over 100 laws restricting minors' access to firearms enacted between 1861 and 1933, across 46 states. Spitzer Decl., Ex. 500 ¶¶ 22-23; Ex. 502 (listing laws).

82. While some laws set age restrictions on firearms at 18 (or younger), the most common age limit by far was age 21. Spitzer Decl., Ex. 500 ¶ 23.

83. The age limits varied based on the nature of the restriction, for instance, with higher age limits on the age for carrying concealable weapons and lower age limits for hunting or possessing less lethal "toy guns". *Id.*, ¶ 25.

84. Founding-era principles still provided a basis in the 19th century for a parent, guardian, or master to control their dependents' access to weapons. *See* Rivas Decl., Ex. 505 ¶ 19.

85. Even so, states still enacted laws prohibiting all forms of sale or provision of deadly weapons to minors, including by their parents. *Id.*, ¶ 23; ECF No. 130 (supplemental table to Rivas Declaration listing laws).

86. In many cases, "regulating the point of sale was the most effective means of restricting minors' access to handguns." Rivas Decl., Ex. 505 ¶ 33.

87. Businesses that flouted the law risked not just the immediate criminal consequences, but also regulatory consequences like financial penalties or loss of license. *Id.*, ¶ 35.

88. From 1850-1900, at least 24 states and territories enacted age-based weapons restrictions. Rivas Decl., Ex. 505 ¶ 23; ECF No. 130.

89. Several of those states and territories laws prohibited the transfer of a handgun to a minor and/or penalized the seller. Rivas Decl., Ex. 505 ¶ 25; ECF No. 130.

90. Four states and territories enacted laws that banned the possession of a handgun by a minor, outright. Rivas Decl., Ex. 505 ¶ 24; ECF No. 130.

## III. Proposed Conclusions of Law

1. Succow does not have standing to bring this claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)

2. Succow and Towne do not have standing to challenge the alleged impediments on private transfers. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024).

3. As a general matter, no one may carry a handgun in public in Connecticut without a permit or eligibility certificate. General Statutes § 29-35.

4. In turn, an individual cannot purchase a handgun without either a permit or an eligibility certificate. General Statutes § 29-33(b).

5. Regardless of the default age of majority, Connecticut can establish different age-based restrictions for different activities, so that an individual may be an "adult" for most activities, but still a "minor" for others. *See* General Statutes § 1-1d

("Except as otherwise provided by statute . . . 'age of majority' shall be deemed to be eighteen years")

6. The carry of handguns is subject to one of the numerous statutory exceptions to the default "age of majority." An individual under age 21 cannot be issued or apply for a handgun permit or eligibility certificate. General Statutes §§ 29-28(c)(10), 29-36f(a). With narrow exceptions, no one may sell or transfer a handgun to a person under age 21. General Statutes § 29-34(b).

7. Plaintiffs fail to demonstrate when under-21-year-olds came within the scope of the Second Amendment and so fail to meet their burden at step one of the *Bruen* test. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

8. The Second Amendment, when it was ratified in 1791, "codified a *pre-existing* right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

9. As of 1791, under-21-year-olds were not "members of the political community," included among "the people" whose rights were protected under the Second Amendment. *NRA v. Bondi*, 133 F.4th 1108, 1130 (11th Cir. 2025).

10. At the time of the founding, the one articulated *right* an infant possessed was a right to receive maintenance from their parent, and the parent's duty of maintenance was limited to providing "necessaries." 1 William Blackstone, Commentaries on the Laws of England, at *447-49 (Chicago: Callaghan and Cockroft, 1871) (1765).

11. "Necessaries," were limited to "meat, drink, apparel, physic and such other necessaries." 1 Blackstone, at *465-66. "Necessaries" did not include handguns. *Saunders Glover & Co. v. Admr. Of Ott*, 12 S.C.L. (1 McCord) 572 (1822).
12. Connecticut's age restriction statutes, General Statutes §§ 29-28(c)(10), 29-34(b), and 29-36f, share the same justifications as the historical analogues of the 18th and 19th centuries, and burden the rights of minors in the same way, and so are consistent with the principles underlying our Nation's history of firearm regulation. *See United States v. Rahimi*, 602 U.S. 680, 698 (2024); Spitzer Decl., Ex. 500 ¶¶ 20, 22, 42-44; Ex. 502; Ex, 504; Rivas Decl., Ex. 505 ¶¶23, 24.
13. State Defendants have met their burden to demonstrate that the challenged laws are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

## IV. Legal Argument

### A. Succow Lacks Standing to Challenge the Age Restrictions

"[T]o get in the federal courthouse door," plaintiffs must have Article III standing. *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 379 (2024). To establish standing, plaintiffs must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing must exist "at the commencement of the litigation." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997). At trial, the elements of standing must be proven "by a preponderance of 'the evidence[.]'" *Am. Booksellers Found. v. Dean*, 202 F. Supp. 2d 300, 311 (D. Vt. 2002), *aff'd on other grounds*, 342

F.3d 96 (2d Cir. 2003) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

To establish standing to challenge the age restrictions in §§ 29-28(c) and 29-36f(b), Succow had to prove that "at the time he commenced the lawsuit" in February 2025, he was "able and ready" to apply for a pistol permit or eligibility certificate "in the reasonably foreseeable future." *Carney v. Adams*, 592 U.S. 53, 63 (2020). That requires "an intent that is concrete." *Id.*, at 64. "Some day intentions" are not enough. *Saba Capital CEF Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 111 (2d Cir. 2023) (*quoting Lujan*, 504 U.S. at 564). "A plaintiff's few words of general intent, without substantial evidence of plans, do not support a finding of an actual or imminent injury." *Id.*

**1. Succow had not sustained redressable injury-in-fact in February 2025 because he was physically unable to satisfy other statutory requirements for obtaining a pistol permit or eligibility certificate**

Succow conceded away his standing at trial. He admitted that when he sued in February 2025, he had not completed the training course that is a statutory prerequisite for applying for a temporary pistol permit or eligibility certificate. Tr. 1/12/26 at 177; *see* Conn. Gen. Stat. §§ 29-28(c)(1)(A) and 29-36f(b)(1)(A). Succow thus could not have been "able and ready" to apply at the time of suit because he was statutorily ineligible to apply. *See Variscite N.Y. Four, LLC v. N.Y. State Cannabis Control Bd.*, 152 F.4th 47, 56 (2d Cir. 2025) (plaintiff LLCs were not able and ready to apply because they were not organized until after application window closed); *Hafner v. Mills*, 2024 U.S. Dist. LEXIS 5707, at *5 (D. Me. Jan. 11, 2024) ("[b]ecause

Plaintiff is **ineligible** for reasons other than the relevant state laws, Plaintiff has not shown that he is ready and able to hold the office he purports to seek").

Nor would Succow be able and ready to apply "in the reasonably imminent future" after filing suit. *Carney*, 592 U.S. at 63. Succow had not completed the training course because he was "physically unable" to complete it—specifically the live-fire component—due to injuries he sustained in a pre-suit snowboarding accident. Tr. 1/12/26 at 177, 178. He broke his collar bone and sustained torn ligaments and other injuries to his right ankle. *Id.* at 177-78. Those injuries left him in a cast, on crutches, and unable to work for 4-5 months. *Id.* at 178. In September 2025 when Succow was deposed, he was still on crutches and in a cast, still had not completed the training course, and "still believed [that he was] physically unable" to complete it. *Id.* at 179. In fact, as of September 2025 Succow "*did not know when* [he] would be physically able" to complete the training. *Id.* (emphasis added). At trial on January 12, 2026, Succow confirmed that his physical incapacity persisted "until very recently[.]" *Id.* at 186. That deprives Succow of any actual or imminent injury-in-fact.

Succow's physical inability to complete the required training also undermines the redressability component of standing. His supposed injury—being unable to obtain a pistol permit or eligibility certificate—would not have been redressable by a ruling in his favor when he commenced his action because he would have been statutorily ineligible to obtain a permit even if there were no age restriction. *E.g. Cinicola v. Lamont*, 2026 U.S. Dist. LEXIS 592, at *8-9 (D. Conn. Jan. 5, 2026)

(redressability was lacking where plaintiff would have been ineligible for parole even if the challenged requirement were not in place).

That Succow completed the statutory training on December 17, 2025, and testified at trial that he "would apply immediately" if the age restriction were lifted is irrelevant. Ex. 33; Tr. 1/12/26 at 173. The Supreme Court has repeatedly emphasized that standing must be assessed *at the time suit is commenced*—here, February 2025. See *Carney*, 592 U.S. at 59 ("[w]e here must ask whether [plaintiff] established" an injury in fact "at the time of suit"); *id.* (courts must "keep[] in mind that [plaintiff] bears the burden of establishing standing as of the time he brought this lawsuit"); *id.* at 61 ("at the time he brought this lawsuit, [plaintiff] was not 'able and ready' to apply"). At that time, Succow had no personal stake in the outcome of this challenge to the age restrictions because he was physically unable to complete the required training course, and seven months later still did not know when he would be able to complete it. "Events occurring after the filing of the complaint cannot operate so as to create standing where none previously existed. Any other rule would permit lawsuits to be maintained in the mere hope that the lawsuit itself would generate a constitutional 'controversy' before the appellate process is complete." *Hartford v. Glastonbury*, 561 F.2d 1032, 1051 n.3 (2d Cir. 1977); *see also Carlone v. Lamont*, 2021 U.S. App. LEXIS 32440, at *8 n.3 (2d Cir. Nov. 1, 2021).

**2. Succow's testimony about his general intention to apply for a pistol permit or eligibility certificate is not credible.**

Even if Succow's physical inability to complete the required training were not enough on its own to deprive him of standing—which it is—the Court should still find

that he was not able and ready to apply at the time of suit. First, Succow's false statements under oath and incoherent explanations for those false statements undermine his credibility as a witness. Second, the evidence at trial shows that he got involved in this suit to vindicate his view of the Second Amendment, not out of a genuine desire to obtain a handgun before turning 21. *See Cifra v. General Electric Co.*, 252 F.3d 205, 215 (2d Cir. 2001) ("when the district court is sitting as the trier of fact," it "has no obligation" to "view the evidence in the light most favorable" to a particular party, but instead must "determine which of the witnesses it finds credible").

*Succow's testimony about his subjective intentions is not credible*

Succow is not a credible witness. He made numerous false statements under oath in this case, and that bears directly on the credibility of other aspects of his testimony on matters that are not independently corroborated, including his testimony about his subjective intention to apply for a handgun permit. *See Siewe v. Gonzales*, 480 F.3d 160, 170 (2d Cir. 2007). In the declaration he filed in support of his motion for temporary restraining order and preliminary injunction, Succow testified that "[e]xcept for my age, I meet all of the federal and Connecticut requirements to obtain" an eligibility certificate and pistol permit. Ex. 1 ¶¶ 7-8. Succow admitted at trial those statements were false. Succow did not meet "all" of the Connecticut requirements because he had not completed the training course.[1]

[1] Succow specifically admitted that paragraph 8 was false. But because § 29-36f(b)(1)(A) imposes a similar training requirement for an eligibility certificate, his failure to take that training means that paragraph 7 was false as well.

While Succow testified that he did not know the statements were false when he made them, he should have known. He surely knew he had not completed the safety training course, and even minimal diligence—such as reading the actual laws he was challenging or even a basic internet search—would have shown that the course is required by statute. But Succow admitted that he did not do "anything" to confirm the accuracy of those statements before swearing to them. Tr. 1/12/26 at 185. Giving sworn statements without making any effort to verify their accuracy is highly irresponsible and suggests a lack of appreciation for the significance of providing sworn testimony under oath.

Raising further doubts about his credibility, when the Court questioned Succow about his inaccurate statements, he gave no less than three versions of how they made it into the declaration. He first testified that he drafted the declaration (Tr. 1/12/26 at 190), even though he had admitted a few minutes earlier that he had not drafted it himself. *Id.* at 185. When the Court asked him again whether he wrote "[a]ll of the words" in the declaration himself, Succow corrected himself and testified: "*I spoke them*. They were written for me." *Id.* at 190 (emphasis added). That is demonstrably false. Succow did not speak the words that were used in his declaration. Several of the statements in his declaration, including paragraphs 7 and 8, are identical to the statements in Towne's declaration, which Towne executed several days before Succow executed his. Compare Ex's 1 and 2. Succow then appeared to correct himself a second time and testified that he was asked during a

phone call with counsel whether he met the requirements, and answered that he had. *Id.* at 191-92.

Adding to his muddled explanation, Succow elsewhere appeared to testify that he *knew* the training course was a requirement, but thought he could submit his application and complete the training later. *Tr.* 1/12/26 at 191 ("At the moment I had thought I met [the requirements]. I thought it was only an age requirement. *And after I put in – after I would put in my request to the state, then I would have to go through the course.* So I wasn't aware at that moment exactly what they were. I thought that I had met [the requirements] at that time.") (emphasis added). If that is what Succow thought, then he apparently knew he had not met all the requirements to "obtain" a pistol permit or eligibility certificate when testified in his declaration that he had.[2] Ex. 1 ¶¶ 7, 8.

On balance, it is unclear what Succow knew or believed when he testified he met all the requirements. But given that Succow made no effort to verify the truth of that sworn testimony before giving it, and his constant flip-flopping when pressed for an explanation, the Court should not credit his testimony.

*Succow brought this suit to vindicate his view of the law*

In *Carney*, the plaintiff testified that he "would apply" to be a judge if the party-affiliation requirement he was challenging did not make him ineligible. *Id.* at 61.

[2] Succow's testimony that he "review[ed]" the declaration before signing it is hard to believe, either. Tr. 1/12/26 ag 185. If he had done so, he would have noticed that it was titled with the wrong name in bolded, underlined, all-capitalized letters ("Declaration of Nathan Stackpole"). Ex. 1. But Succow did not notice that glaring defect. Tr. 1/12/26 at 185-86.

But the Court still determined that he was not "able and ready" to apply in light of other, objective evidence in the record: (1) the plaintiff failed to apply for past judgeships; (2) he read a law review article arguing the party requirement was unconstitutional, contacted the author and said, "I want to pursue this"; (3) he changed his party affiliation, thereby triggering the bar; and (4) he filed suit swiftly thereafter. *Id.* This evidence "show[ed] a desire to vindicate his view of the law" that the challenged restriction was unconstitutional, "not an actual desire to become a judge." *Id.*

The same is true of Succow. This case is the product of what Plaintiffs' counsel acknowledged was a more-than-a-year "search for individual plaintiffs" to challenge Connecticut's age restrictions. ECF No. 34 at 8. First, Succow showed little interest in obtaining a firearm on his own or taking the necessary preparatory steps to apply for one. He did not take the safety training course. He turned 18 on January 12, 2024, and became eligible to obtain a long-gun certificate. Tr. 1/12/26 at 172-73. But he did not apply for one until after filing suit, and when his application was returned to him because he mailed it to the wrong address, he never bothered to resubmit it. *Id.* at 183-84.

Second, Succow only got involved in this suit at the urging of others. He learned of the age restrictions a few months after turning 18 in January 2024, but did nothing to try to challenge them or seek assistance in doing so. *Id.* at 179-80. He only became involved in this suit because his father approached him, indicated he spoke with individuals on social media who were searching for plaintiffs to challenge

the age restrictions, and "encouraged" him to become a plaintiff. *Id.* at 180, 181. His father's reasoning was apparently unrelated to Succow's supposed desire to apply for a pistol permit. Instead, he told Succow that becoming a plaintiff would be a good learning experience and could teach him about the laws and legal process. *Id.* at 181. Succow "agreed" with his father that becoming a plaintiff would be a good learning experience. *Id.*

Third, Succow joined SAF in February 2025—just before filing this lawsuit. *Id.* at 182. That was plainly litigation driven. It enabled SAF to attempt to assert associational standing and bring suit on behalf of "itself, its members, supporters," and other "similarly situated members of the public." *Am. Compl.* ¶ 58. SAF apparently gave Succow a $500 lifetime membership—the highest-level membership SAF offers—free of charge. *Id.* at 182-83. Succow denied that he received that membership for being a plaintiff, but knew of no other reason why he might have received it. *Id.* at 183.

And after joining SAF, Succow quickly executed a declaration to support Plaintiffs' motion for a temporary restraining order and preliminary injunction, apparently without doing any due diligence to verify the accuracy of certain of the statements, and without even noticing that the declaration was titled with the wrong name. And he asserted in that declaration that he "intend[ed]" to obtain a handgun for self-defense "immediately," even though—as explained above—he had not taken the training course he needed to apply for a permit, was by then physically unable to take it, and had no idea when he would be physically able to take it. Ex. 1 at ¶ 9.

All of this evidence supports the inference that Succow was not able and ready to actually apply for a pistol permit, but that he simply agreed at the urging of others to participate in impact litigation to expand the scope of the Second Amendment. That is not a legitimate Article III injury. *Carney*, 592 U.S. at 63-64.

#### 3. Succow and Towne lack standing to challenge the alleged impediments on private transfers

Even if Succow and Towne had standing to challenge the age restrictions, they lack standing to sue over the supposed impediments to private transfers to under-21-year-olds under Conn. Gen. Stat. § 29-33(c). *Am. Compl.* ¶¶ 85-100; *see Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("plaintiffs must demonstrate standing for each claim that they press"). Towne testified that if he were to obtain a handgun, it would be through a retail purchase. *Tr.* 1/12/26 at 153. He "has no intention or plans of doing so through a private transfer[.]" *Id.* Similarly, Succow testified that if he obtains a pistol permit he would purchase a firearm from a retailer, and would not "look[] to purchase a handgun privately from an individual[.]" *Id.* at 175. Article III requires "an intent that is concrete." *Carney*, 592 U.S. at 63.. Since Succow and Towne admit they have no intention to avail themselves of a private party transfer, they lack standing to challenge the alleged impediments on such transfers.

### B. The *Bruen* Test Delineates the Scope of the Second Amendment.

This Court should uphold the age restriction laws as consistent with the Second Amendment. "Like most rights . . . the right secured by the Second Amendment is not unlimited." *Rahimi*, 602 U.S. at 690 (internal quotation marks omitted); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022);

*District of Columbia v. Heller*, 554 U.S. 570, 625, 627 (2008). Courts use a "two-step framework" to assess the constitutionality of firearms regulations: "first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk v. James*, 120 F.4th 941, 968 (2d Cir. 2024) (*quoting Bruen*, 597 U.S. at 19).

### C. Minors Were Not Covered by the Plain Text of the Second Amendment Until Sometime After the Founding-Era.

Turning to the merits, at step one, Plaintiffs bear the initial burden of demonstrating that "the Second Amendment's plain text covers" the *specific* conduct that Plaintiffs seeks to engage in, here, the possession and carry of handguns by a minor. *Bruen*, 597 U.S. at 24; *see Antonyuk*, 120 F.4th at 981. If they meet that burden, their conduct is "presumptively protect[ed]," and only then will the Court proceed to the next step. *See Bruen*, 597 U.S. at 24.

Defendants do not contest that handguns are protected "arms." *Heller*, 554 U.S. at 628-29. Likewise, courts have generally either held, or assumed without deciding, that individuals ages 18-20 are members of "the people" today. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 435-38 (3d Cir. 2025); *McCoy v. BATFE*, 140 F.4th 568, 575 (4th Cir. 2025); *Reese v. ATF*, 127 F.4th 583, 590-95 (5th Cir. 2025); *Worth v. Jacobson*, 108 F.4th 677, 688-92 (8th Cir. 2024); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114-16 (10th Cir. 2024); *NRA v. Bondi*, 133 F.4th 1108, 1130 (11th Cir. 2025).

However, Plaintiffs have not demonstrated when minors were first considered among the people whose rights were protected. This is an important consideration, because "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*. . . . The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Bruen*, 597 U.S. at 34 (internal citation omitted). The Second Amendment, when it was ratified in 1791, "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. As of 1791, minors were not "members of the political community," included among "the people." *NRA*, 133 F.4th at 1130. Indeed, at that time, minors did not have more than the right to receive maintenance from their parents, 1 William Blackstone, Commentaries on the Laws of England, at *447-48 (Chicago: Callaghan and Cockroft, 1871) (1765)[3], and could not exercise "adult" rights except as described under the common law and consistent with their status as dependents. The condition of 18–20-year-olds has undoubtedly changed since then. But then (and for the most part, even now), states retained the power to set the age of majority and dependent classes of people were subject to different controls.

Plaintiffs have not demonstrated *when* minors came within the scope of the Second Amendment and should be required to as part of their burden at step one. Even so, based on the assumption that minors are among "the people" whose rights are protected today, applying step two of the *Bruen* test establishes that the age restriction laws are constitutional.

---

[3] Available at: https://repository.law.umich.edu/books/100.

### D. The Relevant Historical Tradition of Firearm Regulation Requires Considering Principles and Analogues from the Founding and Reconstruction Eras.

At step two, the government bears the burden to demonstrate that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. In *Rahimi*, the Supreme Court explained that this burden requires the government to demonstrate only that "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." 602 U.S. at 692 (emphasis added). The government need not identify "a dead ringer" or a "twin" for the challenged regulation for it to fit within this tradition of regulation. *Id.* The historical analogue need only be "'relevantly similar'" to the challenged restriction. *See id.* (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.* A challenged law survives attack if it imposes a "*comparable* burden on the right of armed self-defense and . . . that burden is *comparably* justified" when compared to historical analogues. *Bruen*, 597 U.S. at 29 (emphasis added). Even where a modern law is not identical to a founding or reconstruction-era law, a "shared principle" between the modern laws and historic laws "is sufficient." *Rahimi*, 602 U.S. at 704 (Sotomayor, J. concurring).

The Second Circuit requires considering historical laws encompassing the founding period and ratification of the Second Amendment in 1791, as well as the reconstruction period and ratification of the Fourteenth Amendment in 1868. *Antonyuk*, 120 F.4th at 974. Those analogues need not exist "in significant numbers." *Frey v. City of New York*, 157 F.4th 118, 128 (2d Cir. 2025). Since "[l]egislatures past and present have not generally legislated to their constitutional limits," the absence

of "positive legislation from a particular time or place" does not necessarily mean that the legislators "deemed such regulation inconsistent with the right to bear arms." *Id.* (*quoting Antonyuk*, 120 F.4th at 969). "There are many reasons why the historical record may not evidence statutory prohibitions" that are wholly unrelated to the legislators' thoughts about their legality, such as lack of "political demand" or if the restrictions were simply unnecessary. *Antonyuk*, 120 F.4th at 969-70. There is no "use or lose it" axiom for the exercise of legislative power in the Second Amendment context. *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). Moreover, the "lack of constitutional dispute regarding [the historical] regulation" because the absence of such disputes is strong evidence the regulation was believed to be lawful. *Frey*, 157 F.4th at 128; *see Bruen*, 597 U.S. at 30 (holding that, despite "relatively few" historical examples of firearm prohibitions in sensitive places, the Court could "assume it settled" that such restrictions were lawful because it was "aware of no disputes regarding the lawfulness of such prohibitions"); *Antonyuk*, 120 F.4th at 1022 (applying methodology to historical restrictions in parks).

### E. Connecticut's Age Restrictions on Handguns Fit Comfortably Within the History and Tradition of Regulating Firearms.

Applying the *Bruen* methodology here, Connecticut's age restrictions are constitutional. Since the founding, there is a long history and tradition of legislatures "categorically disarm[ing] groups whom they judged to be a threat to the public safety," *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting), even without a particularized finding that an individual member of that group is dangerous. *Zherka v. Bondi*, 140 F.4th 68, 78-79 (2d Cir. 2025). Infants, a class

encompassing 18-to-20-year-olds that has historically been recognized as dangerous to themselves and others, are one such group. At the founding, minors lacked the capacity to exercise any rights of their own, including any right to bear arms. Then during Reconstruction, dramatic societal and technological changes made firearms more dangerous and readily available to minors, which caused a surge in youth crime and gun violence. Responding to these unprecedented societal concerns, governments across the country broadly imposed restrictions on minors' access to firearms, many of which effectively disarmed minors completely.

Connecticut's age restriction laws follow a 200-year tradition of regulations on minors. These include: (1) common law restrictions reflecting a minor's incapacity to exercise legal rights of their own; (2) over 110 laws setting general age restrictions on weapons from the founding-era through the 20th century, Spitzer Decl., Exhibit 500 ¶¶ 20, 22 and Ex. 502[4] (listing laws by state); (3) over 12 laws that made minor's ability to obtain a firearm for militia service contingent on a parent or guardian in the founding and antebellum eras, *id.*, ¶ 51[5]; (4) over 20 laws that prohibited the sale or transfer of a handgun to a minor, Rivas Decl., Ex. 505 ¶ 23[6]; and (5) at least 4 statutes and over 70 university rules that prohibited minors from possessing arms or

---

[4] The specific laws are cited throughout Professor Spitzer's Declaration. The relevant language of those analogues is reprinted, alphabetically by state, in Exhibit 502.

[5] Each militia law, along with the relevant text of each law, is cited in the Spitzer Declaration and reprinted in footnotes.

[6] The specific analogues are cited throughout Professor Rivas's Declaration. The relevant language of those analogues is included in the table at ECF No. 130 and accessible online at the Duke Center for Firearms Law Repository of Historical Gun Laws: Repository of Historical Gun Laws | Duke Center for Firearms Law.

handguns, outright. *Id.*, ¶ 24; Spitzer Decl., ¶¶ 42-44 and Ex. 505[7]. "Taken together," these founding and reconstruction-era laws firmly establish that Connecticut's restrictions are consistent with the "principles" underlying the Nation's history of firearm restrictions. *Rahimi*, 602 U.S. at 698. Indeed, many of the State Defendants' historical analogues are not merely "relevantly similar" to Connecticut's restrictions but are "dead ringers," which is more than what *Bruen-Rahimi* requires.

**1. The laws of domestic relations and age of majority established principles in support of a regulatory tradition restricting minors' ability to exercise legal rights on their own.**

The age restriction laws are consistent with the principles underpinning the regulatory tradition governing minors and handguns. Courts have correctly relied on these principles of infancy as expressed in contract law to reach that conclusion, *see McCoy*, 140 F.4th at 575; *NRA*, 133 F.4th at 1123, but it bears emphasis that contract law is only one area of law that restricted minors based on of the principles of infancy. Before turning to contract law, a broader view of the common law and the limitations it placed on minors is instructive.

Minors are historically recognized as a class of people whose rights and privileges could be restricted *as to all things*. "[T]he rule that minors had not 'arriv[ed] at years of discretion' and lacked legal capacity applied during the [f]ounding era to all individuals under the age of 21." *NRA*, 133 F.4th at 1129, *citing* 1 Blackstone, at *452-53. Indeed, "laws from seventeenth century England, the

[7] The university rules are cited in the Spitzer Declaration. The relevant text of each rule is reprinted in Ex. 505.

American Colonies, and the early United States, establish that it has long been permissible to regulate firearms possession through legislative proscription on a class-wide basis, without a particularized finding that the individuals disarmed pose a threat to society." *Zherka*, 140 F.4th at 78-79; *see, e.g.*, Cooley, General Principles of Constitutional Law, 319 (1880)[8] ("[T]he general laws of the State may . . . prescribe different rules for the different classes of people who compose the State. The rules of civil capacity and criminal responsibility are justly and properly made for different classes of people; for minors and adults . . . .")

***i. Minors in the founding era were members of a dependent and strictly regulated class.***

Connecticut's statutory age-restrictions on the purchase and carry of handguns are rooted in historical principles, namely, laws governing the dependent private classes of people and laws governing the age of majority. As a result of those overlapping laws, minors were one of several classes of people—along with African Americans (enslaved and free before the Civil War) and servants—whose liberties could be restricted based solely on their status. Spitzer Decl., ¶ 19.

"The Founders' generation shared [that] view that minors lacked the reason and judgment necessary to be trusted with legal rights." *NRA*, 133 F.4th at 1117. "Gouverneur Morris warned that these individuals 'want prudence' and 'have no will of their own.'" *Id.* (quoting 4 The Writings of James Madison 119 (Gaillard Hunt ed.,

[8] Available at: https://repository.law.umich.edu/books/47/. Cooley was "the most famous" legal scholar of the late-19th century, whose work was discussed in *Heller* by both the majority opinions, *Heller*, 554 U.S. at 618, and the dissent, *id.*, at 707 (Stevens, dissenting). Cooley also edited the 1871 edition of Blackstone's Commentaries cited herein.

1903) (Constitutional Convention, August 7, 1787)). Thomas Jefferson wrote that "'infants' [were] akin to 'maniacs,' 'drunkards,' and others who 'cannot take care of themselves.'" *Id.* (*quoting* Letter from Thomas Jefferson to Samuel Smith (May 3, 1823)). And John Adams explained, with respect to voting, that minors "were not 'fit to be trusted by the [p]ublic' because of their lack of '[j]udgment' and '[w]ill.'" *Id.* (*quoting* Letter from John Adams to James Sullivan (May 26, 1776)).

Those views found application in a comprehensive legal regime, based on a minor's dependent status and age, within which their liberties were subject to near total restraint. Those restraints could be imposed on an individual minor by anyone empowered to act *in loco parentis*, including the government. In addition to the limitations imposed by a minor's dependent status, minors were regulated as a class by the legislatively-determined age of majority, when minors could exercise "adult" rights and interact with the outside world.

#### ii. *The laws of domestic relations empowered parents or authorities acting* **in loco parentis** *to restrict a minor's liberties, including the ability to obtain or carry arms.*

Until an infant reached the age of majority, an authority could totally control and deprive a minor's liberty, including any ability to obtain or carry arms. At the founding, minors were "governed not as adults, but as 'infants.'" Spitzer Decl., ¶ 21. The laws of infancy then, as now, were part of the laws of domestic relations, which was reserved to the states. *See, e.g.*, *In re Burrus*, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."); *United States v. Bainbridge*, 24 F. Cas. 946, 949 (Cir. Ct. Mass, 1816) (parents' rights to the custody

and services of their children, are subject to the "municipal rules of the state," and may be altered "as the wisdom or policy of the times may dictate, unless the legislative power be controlled by some constitutional prohibition."); 1 Blackstone, at *453 (age of majority subject to common law age of discretion or other age established by law). "[E]very aspect" of a minor's life was shaped by their status as a dependent of "a parent, guardian, or the state." Walsh & Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049, 3069 (2024).

Per Blackstone, the one articulated *right* an infant possessed was a right to receive maintenance from their parent. 1 Blackstone, at *447-48 ("And thus children will have the perfect *right* of receiving maintenance from their parents" [emphasis in original]). That right did not extend far. Parents owed their infant child a corresponding duty to provide for the infant's maintenance, as well as separate duties to provide their education and protection.[9] *Id*. But that duty of maintenance was limited to providing "necessaries." *Id.*, at *449. An infant's right to necessaries did not encompass a right to a handgun.

As an "infant," a minor was subject to the power of the authority upon whom they were legally dependent, beginning with the minor's father. During that time, "[b]y the common law, the father has a right to the custody of his children during their infancy." *Bainbridge*, 24 F. Cas. at 949. During that time, "[p]arents 'ha[d] the benefit' and 'receive[d] the profits' of their children's labor. *NRA*, 133 F.4th at 1117

[9] The power and reciprocal duty of a guardian and ward were the same as that of a parent and child. 1 Blackstone, at *462.

(*quoting* 1 Blackstone, at *453). Until age 21, a minor was subject to the "empire of the father," which "continues even after his death; for he may . . . appoint a guardian to his children." 1 Blackstone, at *453; 2 James Kent, Commentaries on American Law *233 (12th ed. 1873)[10] ("T[he] necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years.")

The "empire of the father" corresponded with certain long-recognized restraints on an individual's liberty, regardless of age. At common law, proper restraints on liberty divided into two classes: public, derived from "the duties and obligations of the citizen to society and his fellow-citizen," and private, springing from "the helpless or dependent condition of individuals in the various relations of life." Cooley, A Treatise on the Constitutional Limitations 418-19 (4th ed. 1878) [11]. The private class, in turn, comprehensively laid out the relationships where the liberties of dependents—minors—were subject to the parent or other authority acting *in loco parentis*: parent-child, guardian-ward, master-apprentice, teacher-pupil. *Id.*, at 420; see also, 1 Blackstone, at *421 (dividing "rights and duties in private economical relations" into four categories: master and servant, husband and wife, parent and child, and guardian and ward).

Within the private class of restraints on liberty, the common law clearly

[10] Available at: #7 - Commentaries on American law v.2. - Full View | HathiTrust Digital Library. Kent was a prominent legal scholar and judge whose Commentaries were published throughout the 19th century and relied on extensively in judicial opinions.

[11] Available at: https://repository.law.umich.edu/books/70.

delineated the rights and duties of an authority and its dependent, beginning with a parent and child. "The father of an infant, being obliged by law to support his child, has a corresponding right to control his actions and to employ his services during the continuance of legal infancy." Cooley's Const. Lim., at 420. But a minor's legal incapacity remained in place even when their parents were unavailable. If a child was orphaned, the parent-child relationship was replaced with guardian and ward. "The guardian has a power of control over his ward, corresponding in the main to that which the father has over his child," including over a ward's property *Id.*, at 420-21. If a minor entered an apprenticeship, whether by choice or binding, the master assumed authority *in loco parentis*: "the power to control the apprentice is assimilated to that of the parent by the statute law." Cooley's Const. Lim., at 421; 1 Blackstone, at *428-29 (describing master and servants). That dynamic also extended to students. "The relation of teacher and scholar places the former more nearly in the place of the parent . . . . While the pupil is under his care, he has a right to enforce obedience to his commands law fully given in his capacity of teacher, even to the extent of bodily chastisement or confinement." Cooley's Const. Lim., at 421; 1 Blackstone, at *453 ("He may also delegate part of his parental authority to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz.: that of restraint and correction, as may be necessary to answer the purposes for which he is employed.")

Finally, the government's separate parental authority over minors as dependents was unquestioned. *See, e.g.*, *Farnham v. Pierce*, 141 Mass. 203, 204 (1886)

("It is a provision by the Commonwealth, as parens patrioe, for the custody and care of neglected children, and is intended only to supply to them the parental custody which they have lost.") (citing cases); *Ex parte Crouse*, 4 Whart. 9, 11 (Pa. 1839) (legislature acts as parens patriae, or common guardian of the community). Thus, the government, acting as the minor's legal guardian, was empowered to compel minors be bound as servants or apprentices until age 21 if they did "not hav[e] any visible livelihood[.]" 1 Blackstone, at *425; 2 Kent's Commentaries, at *262.

As a regulatory principle, the laws of domestic relations afforded parental authority wide discretion to control the actions of minors both inside and outside the home. Consistent with that principle, a parental authority's power over an individual minor was exercised in several different ways, including by preventing a minor from possessing a firearm.

***iii.Age of majority laws strictly limited a minor's ability to exercise "adult" rights outside of parental control.***

In addition to the laws of domestic relations, a minor's ability to act outside of the control of parental authority, including the ability to obtain a firearm, was regulated through age of majority laws. At common law, the age of majority started at twenty-one years. Spitzer Decl., ¶¶ 12-13; 1 Zephaniah Swift, A System of the Laws of the State of Connecticut 213 (1795). The age of majority, and the scope of a minor's privileges and disabilities, was subject to legislative control. 1 Blackstone, at * 453 (parent's control over an infant and when the minor can exercise discretion is subject to control of the law); James Schouler, A Treatise on the Law of Domestic Relations

(4th Ed. 1889)[12] (Schouler's Domestic Relations), § 391 ("All persons are infants, in legal contemplation, until they have arrived at majority. The period of majority differs in different States and countries; but this general principle remains the same."); Tapping Reeve, The Law of Baron and Femme, at 227 (2nd ed. 1846)[13] (Reeve's Domestic Relations) ("ANY person, male or female, under the age of twenty-one years, is an infant. Such persons are in a situation very different from adults, both as it respects their contracts and their liability to punishment for crimes".) These privileges and disabilities "secure[d] [minors] from hurting themselves by their own improvident acts." 1 Blackstone, at *464.

Thus, consistent with the age of majority laws, a minor could undertake certain acts, even as the general legal significance of infancy remained. For instance, a minor could: at age 14 decide to marry (with a parent's consent), choose a guardian, or dispose of personal property by will; at age 17 discharge the duties of an executor. 1 Blackstone, at *463. A minor could also hold certain ministerial offices and be made liable to do duty in the militia at an age determined by the legislature. *See Moore v. Graves*, 3 N.H. 408, 410-12 (1826) (citing treatises and statutes). However, a minor did not have access to the courts: an infant could not be sued except under the protection of a guardian and could only bring suit through a guardian or next friend.

---

[12] Available at https://books.google.com/books?id=zwc9AAAAIAAJ. James Schouler was a lawyer and historian whose treatises were referenced extensively in judicial opinions through the late 19th and 20th centuries.

[13] Available at http://www.archive.org/details/lawofbaronfemmeo00reev. Reeve's Law of Baron and Femme, first published in 1816, was one of the most commonly cited treatises on domestic relations in the 19th century.

1 Blackstone, at *464. An infant could not be punished for a capital offense before age 7, was entitled to a rebuttable presumption of innocence depending on whether they could discern good and evil until age 14, after which they could be punished for capital offenses. *Id.* Other than those express exceptions, a minor could not independently exercise "adult" rights outside a parent's control.

Critically, as other courts addressing challenges to age restrictions have recognized, minors generally lacked the capacity to contract. *McCoy*, 140 F.4th at 575-76; *NRA*, 133 F.4th at 1118-19; 1 Blackstone, at *464. To the extent a minor entered into a contract, it was voidable at the minor's privilege. Reeve's Domestic Relations, at *227. There were very few instances where a minor could enter into a contract, and even those retained a minor's status as a dependent. For instance, a minor could contract to bind themselves into servitude or apprenticeship. 2 Kent's Commentaries, at *262 (citing Laws of New York of 1788, at 621; Statutes of Connecticut of 1838, at 413). A minor could also sign a contract to enlist in service of the U.S. military. *Bainbridge*, 24 F. Cas. at 951. Consistent with a minor's right to education, they could also contract for "good teaching and instruction whereby he may profit himself afterwards." 1 Blackstone, at *466. Finally, consistent with a minor's right to maintenance, when a minor was no longer under the care of a parent, master, or guardian, they could contract for "necessaries," which were limited to "meat, drink, apparel, physic and such other necessaries." 1 Blackstone, at *465-66; see also Reeve's Domestic Relations, at *228.

The privileges and disabilities of infants were discussed extensively in the

common law, but not in terms of any "right to bear arms" that may have existed past the age of majority. Rather, the only discussion of infants and handguns concerned the "necessaries" an infant could or could not obtain. And by the antebellum period, the law was clear: "necessaries" did not include pistols or powder. *Saunders Glover & Co. v. Admr. Of Ott*, 12 S.C.L. (1 McCord) 572 (1822). That unquestioned holding, excluding "pistols and powder" from the category of necessaries, continued in the reconstruction and the 20th century, even as handguns became more common. *See McKanna v. Merry*, 61 Ill. 177, 179 (1871) ("The courts have generally excluded from the term 'necessaries,' horses, saddles, bridles, pistols, liquors, fiddles, chronometers, etc."); *Johnson v. Newberry*, 267 S.W. 476, 480 (Tex. 1924) (same).

The common law generally operated to restrain the liberty of minors through the immediate authority of parents, and then guardians, masters, teachers, and the government acting *in loco parentis*. Governments could separately impair or expand the liberties of minors as a class by setting the age of majority for particular acts and offices. Even if the common law was silent about a particular issue, like whether a minor could obtain or possess a firearm, it did not mean that minors had the right to do so. *Antonyuk*, 120 F.4th at 969-70. To the contrary: the laws of domestic relations and age of majority laws presumed that minors could not exercise any "adult" rights, except in a few instances, and never with regards to handguns. These principles have underpinned the laws regarding minors and firearms since the founding era.

**2. Founding-era analogues prohibited minors from possessing firearms outright or made possession subject to a parent or guardian's authority.**

Consistent with the broad authority of the common law, at least two categories

of historic laws from the founding era explicitly regulated a minor's possession of arms: university rules and militia laws that made a minor's service in a militia (including any obligation to bear arms) subject to parental control.

First, with university rules, the common law was clear that "[t]he relation of teacher and scholar places the former more nearly in the place of the parent[.]" Cooley's Const. Lim., p. 421. Thus, colleges in the colonial and founding eras, acting *in loco parentis*, assumed unquestioned authority over students. Spitzer Decl., ¶ 39 (footnote and quotation marks omitted). Under that authority, campus prohibitions on firearms were common, if not ubiquitous. *Id.*, ¶ 45. The prohibitions also applied regardless of whether the college was public or private: beginning in 1655 and up through the late 19th century, firearms restrictions were imposed by at least 15 state university systems and at least 54 private colleges. *Id.*, ¶ 41. In other words, the firearms prohibition could be imposed by state actors as well as private ones. See *id.*, ¶ 43 (describing the University of Virginia's restriction, enacted by a Board of Visitors including Thomas Jefferson and James Madison, among others). Ultimately, the college rules were "a microcosm of societal attitudes concerning the rights (or lack of rights) pertaining to young people" and, given the widespread understanding that students were subject to the authority of universities, indicated that an authority's power *in loco parentis* included the power to prohibit dependents from carrying firearms. *Id.*, ¶ 36.

Second, the militia laws, though enacted for a distinct purpose and pursuant to different sources of authority, were but one more exercise of the government's

power to adjust the age of majority for a specific purpose and to compel an individual to assume a dependent status in service of the public interest. Courts explicitly recognized that militia laws and enlistment laws could only be enacted with the rights of parents and capacity of minors, in mind. *Bainbridge*, 24 F. Cas. at 951-52. Thus "whenever the rights of parents were intended to be saved, a special proviso was uniformly introduced for that purpose." *Id.*, at 952.

The militia laws are not relevant to demonstrating how minors could access arms *outside* of militia service, *see* Section F.2.i, *infra*, but they are relevant in demonstrating the degree of control and liability natural guardians still enjoyed even when their dependents were under militia service. "[M]ilitia members under 21 were treated as minors," and "arming obligations for militia members under 21 usually belonged to their parents or guardians." Spitzer Decl., ¶ 46. The states enacted their own militia laws in conformity with the federal Militia Act of 1792, and all of the state militia laws required special consideration for enrolled militia members consistent with their status as minors. *Id.*, ¶ 50. A minor was not liable for providing their own arms because the common law left them with no means or ability to obtain a firearm independent of their parent or guardian. Instead, nearly all of the states placed the legal liability for arming militiamen under age 21 onto parents, masters, guardians, or local governments—not on the minors, themselves. *Id.*, ¶ 51.

The militia laws had to be interpreted narrowly in derogation of the common law. *Bainbridge*, 24 F. Cas. at 949-52. Taken together, "[t]hat common-law regime restricted minors' ability to purchase firearms. The state statutes that obligated

parents to provide firearms for minors' militia service confirm that minors had limited access, and the many university regulations that restricted firearm possession by students confirm that minors' access was a matter of parental consent." *NRA*, 133 F.4th at 1129. Thus, founding-era practice and tradition was to strictly control minors' access to firearms. That practice and tradition expanded with time.

**3. Analogous age restriction laws were enacted throughout the 19th century to protect against the dangers posed by minors with handguns.**

The historical analysis does not end in the founding era. Because 1791, 1868, and "the adjacent and intervening periods" are all "fertile ground" to "seek evidence of our national tradition of firearm regulation," *Antonyuk*, 120 F.4th at 974, the Court must "continue [its] march through history" and consider evidence from the Reconstruction Era. *Frey*, 157 F.4th at 130. Indeed, following the founding era, societal and technological changes made legislation limiting the ability of minors to possess handguns more urgent. Consistent with the principles underlying the age of majority and dependency, state and municipal governments did just that.

*i.* ***Minors with handguns were increasingly dangerous because of industrial, technological, commercial, and societal changes.***

Throughout the 18th and early 19th centuries practical constraints, as well as legal constraints, operated to restrict minors access to firearms. This is because minors "mostly lived with their parents in circumstances where they did not possess the means, ability, or right to obtain firearms on their own." Spitzer Decl., ¶ 29. Additionally, the country operated on a credit economy, not cash, and minors, because of their incapacity to contract, could not access credit. *McCoy*, 140 F.4th at 575-76;

*NRA*, 133 F.4th at 1118-19. That started to change in the 19th century as our nation transformed from a largely rural society to largely urban one. Spitzer Decl., ¶ 28. Industrialization led to an increased lethality of weapons and proliferation of repeating firearms across the nation. Rivas Decl., ¶ 11. Unlike the "muzzle-loaded arms from the Founding Era [that] were ill-suited to impulsive acts of violence," *Pinales v. Lopez*, 765 F. Supp. 3d 1024, 1043 (D. Haw. 2025), by the 1830s manufacturers had begun developing handguns that were quick to fire and easy to conceal. Rivas Decl., ¶ 13.

Industrial production of handguns grew significantly to accommodate military demands during the Civil War, but, despite slumping government demand, continued afterwards. Rivas Decl., ¶ 13. "[S]toked by military surpluses, manufacturers' investment in mass production, and their adoption of highly effective marketing techniques," an expanding civilian market for firearms emerged. *Id.* Moreover, people seeking to purchase a handgun could do so much more easily because market was no longer limited to local shops. *Id.*, ¶ 29. As the costs of producing and transporting goods decreased, nation-wide sales, and distribution networks made all products, and specifically deadly weapons like handguns, "more easily accessible to customers than they had ever been before." *Id.*

That expanding market, in turn, created more opportunities for firearm manufactures to market specifically to minors and for minors to acquire firearms. Rivas Decl., ¶¶ 19, 21. Minors working outside the home became more likely to keep their own wages and able to purchase deadly weapons, including handguns,

regardless of whether their parents approved. *Id.*, ¶ 21. Minors could now "easily get their hands on" firearms and other deadly weapons at "pawn shops, gun stores, and hardware stores across the country." *Id.*, ¶ 21.

Juvenile crime was on the rise, too. "As a general rule, the [19th Century] was significantly more violent than the preceding one." Rivas Decl., at ¶ 12. The effects of "slavery, poverty, urbanization, ethnic tension, labor conflict, and political corruption" fueled rising rates of homicide and violence. *Id.* The Civil War "worsened" that trajectory, marking the start of a period of "horrific violence, turmoil, and political instability that divided Americans against one another on the basis of race, class, geography, and politics." *Id.* This societal turmoil led to "'an increased number of youth on the streets' who in turn 'became involved in juvenile crime.' Stated differently, '[r]apid urbanization disrupted families, resulting in overcrowding and an increase in crime, including crimes committed by children.'" Spitzer Decl., ¶ 28. Heightened concerns about newly-armed youths rippled through the nation. Newspapers throughout the country described fatal accidents and careless shootings involving minors, and decried "the wretched practice of carrying concealed weapons" among boys. Rivas Decl., ¶ 22.

***ii. 19th century legislatures responded by broadly preventing minors from obtaining and possessing handguns.***

In response to those unprecedented societal concerns, "governments were entitled to address those changes, consistent with the common law principles defining the rights of minors and access to dangerous and unusual weapons." Spitzer Decl., ¶ 29. And governments did. From 1763 through 1859, laws that restricted minors'

ability to access and use firearms were enacted in ten states. Spitzer Decl., ¶ 20; *id.*, Exhibit C (state-by-state list of historical laws). From there, restrictions on minors' possession and use of weapons proliferated, with over 100 laws restricting minors' access to firearms enacted between 1861 and 1933, across 46 states. Spitzer Decl., ¶¶ 22-23; *id.*, Ex. 502. These "[p]ost-ratification interpretations and applications by government actors," liquidated the founders understanding of the right. *See Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring).

"The rise in laws restricting minors' access to weapons arose because of the proliferation of mass produced, cheaper firearms, which spread to minors in rapidly growing urban areas in the latter part of the nineteenth century and contributed to rising juvenile crime." Spitzer Decl., ¶ 30. These laws were intended "to protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds." *Id.*

While some laws set age restrictions on firearms at 18 (or younger), the most common age limit by far was age 21. Spitzer Decl., ¶ 23. The age limits varied based on the nature of the restriction, for instance, with higher age limits on the age for carrying concealable weapons and lower age limits for hunting or possessing less lethal "toy guns". *Id.*, ¶ 25.

Several states and territories enacted laws that banned the possession of a handgun by a minor, outright. Rivas Decl., ¶ 24 (citing laws in Wisconsin, Arizona, Nevada, and Kansas). Other states enacted laws prohibiting all forms of sale or provision of deadly weapons to minors, including by their parents. *Id.*, ¶ 23 (citing

laws in Alabama, Tennessee, Ohio, and Kansas); *see also NRA*, 133 F.4th at 1121. While the prohibition was placed on the seller rather than the minor, that was not because lawmakers perceived any constitutional problem with penalizing minors for possessing arms. Rather, "regulating the point of sale was the most effective means of restricting minors' access to handguns." *Id.*, ¶ 33. Businesses that flouted the law risked not just the immediate criminal consequences, but also regulatory consequences like financial penalties or loss of license. *Id.*, ¶ 35. Thus, laws prohibiting the transfer of a handgun to a minor and penalizing the seller were common. *Id.*, ¶ 25 (citing laws in twenty-two states); *see, e.g.*, *Carter v. Towne*, 98 Mass. 567, 567 (1868) (at common law an adult is liable in tort if he causes or authorizes another person to use a dangerous instrument, in such a manner or under such circumstances that he has reason to know that it is likely to produce injury); *Binford v. Johnston*, 82 Ind. 426, 432 (1882) (discussing prohibition on transfer of handgun ammunition, Ind. 1875 ch. 40 p. 59); *Evans v. Waite*, 83 Wis. 286 (1892) (minor violating Wisc. 1883 ch. 329 p. 290 was strictly liable for any injuries caused by handgun); *Shaffer v. Mowery*, 265 Pa. 300, 303 (1919) (seller violated Penn. Act of June 10, 1881, P.L. 111 by selling ammunition to child younger than 16); *McMillen v. Steele*, 275 Pa. 584, 587 (1923) ("The Act of 1881 merely substitutes, for the proof necessary to show lack of capacity, the hard and fast rule of sixteen years of age. Children under that age have been legislatively declared utterly unfit to handle firearms. The negligent act is solely referable to the unlawful sale to a minor under sixteen."); *Parman v. Lemmon*, 120 Kan. 370, 373 (1926) (citing prohibition on

transfer of dangerous weapons to minors, Kan. 1883 ch. 105, with approval).

The 19th century saw a dramatic need for, and increase in, weapons laws, including laws pertaining to minors. Spitzer Decl., ¶ 27. Notably, founding-era principles still provided a basis for a parent, guardian, or master to control their dependents' access to weapons. *See* Rivas Decl., ¶ 19. Similarly, states retained the power to define the age of majority. And handguns, which *at the time* were restricted as "deadly weapons" regardless of the bearer's age, *id.*, ¶¶ 16-17, had already been and continued to be excluded from the "necessaries" to which a minor could claim a right as a matter of law. *Saunders Glover & Co.*, 12 S.C.L. 572. Age-based restrictions in the 19th century were uncontroversial, and, as evidenced by the proliferation of those restrictions throughout the country and into the 20th century, extraordinarily popular. Importantly, these laws liquidated the understanding that governments could prevent minors from obtaining and possessing handguns, consistent with the Second Amendment.

#### 4. Connecticut's age restriction laws impose a burden comparable to the founding era and 19th century analogues.

Connecticut's age restrictions on a minor's ability to possess and carry a handgun impose a "comparable burden" to the laws and rules existing in the 18th and 19th centuries. *See Bruen*, 597 U.S. at 29. As discussed above, the regulatory tradition of restraint on a minor's possession and carry of firearms stemmed from two principles: (1) a minor's status as a dependent, as reflected in the laws of domestic relations; and (2) a minor's incapacity, as imposed by the legislated age of majority. Under those doctrines, a minor was subject to the power of parental authority and

that authority could totally deprive the minor of liberty. In turn, the minor depended on the authority's consent to exercise rights and deal with others in society. *NRA*, 133 F.4th at 1118 ("We draw two lessons from the legal treatment of minors at the Founding. First, minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor. Second, minors were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society.").

As a result, at common law, the scope of disarmament could effectively be total: If a parent chose not to provide a minor with a firearm, the minor had no right to demand it from their parent, 1 Blackstone, at *447-48, nor ability to obtain it as a "necessary" elsewhere, 1 Blackstone, at *465-66. Minors fared no better as dependents outside of direct parental control: the university rules, exercising authority *in loco parentis*, prohibited *all firearms*, not just handguns. Spitzer Decl., ¶¶ 41, 45. The militia laws likewise operated in consideration of the laws of domestic relations, and largely left parents or guardians liable to decide whether to arm a dependent minor. *Id.*, ¶¶ 46, 50, 51. The militias themselves strictly regulated how a minor could possess and use a firearm, subject to the rules of military discipline and orders of superior officers. *Id.*, ¶ 49.

Analogues from the 19th century treated handguns similarly, including outright prohibitions on possession, carry, and transfer. Rivas Decl., ¶¶ 23-25. Even if our nation's founding era history and tradition of firearms regulation of minors did not contain "dead ringers"—which it does—*Bruen* does not demand this level of

mirroring anyway. *Rahimi*, 602 U.S. at 692. Since prohibiting minors from purchasing firearms "necessarily implicates their ability to possess and carry them," restrictions on purchase are "historical analogues relevantly similar to laws regulating the ability of [minors] to possess or carry firearms." *Picon v. United States*, 343 A.3d 57, 65-66 (D.C. 2025) (upholding law requiring applicants for license to carry firearms in public to be over 21); *Pinales*, 765 F. Supp. 3d at 1030 (upholding statutes "that require people to be 21 years or older to acquire, own, or—in effect—possess firearms"). Plus, those historical laws proscribed the sale not because the legislatures perceived any constitutional issues with proscribing carry or possession, but simply because "regulating the point of sale" was seen as "the most effective means of restricting minors' access to handguns." Rivas Decl., ¶ 33. The focus on sellers reflected policy, not constitutional, concerns.

As a practical matter, regardless of whether a law criminalized possession or sale, the effect was the same: minors could be totally disarmed of handguns, consistent with history and tradition. In light of those regulatory principles and compared to the historical analogues Connecticut's age restrictions, which in certain respects impose fewer restrictions than the analogues, impose a comparable burden on a minor's right to bear arms. See Spitzer Decl., ¶ 23.

**5. Connecticut's age restrictions and the historical analogues all burden the rights of minors to protect them from danger.**

Just as Connecticut's age restrictions burden the rights of minors comparably to historical analogues, they are also comparably justified: to protect minors from hurting themselves or others. *See Bruen*, 597 U.S. at 29. As with any other age-of-

majority law, that justification for age-restrictions on minors was obvious as a matter of common sense in the 18th and 19th centuries. In the 20th century, the centuries-old societal concerns about the harms minors posed to themselves and others in nearly all activities, and especially with respect to handguns, were validated by science.

***i. Common sense concerns about the unique dangers posed by minors with firearms have supported age restriction laws since the founding era.***

In the 18th and 19th centuries, the legal status of minors and distinctions between adults and adolescence were grounded in observation and common sense without the benefit of modern brain science, see Steinberg Decl., Ex. 507 ¶ 11, but were no less important to society. An infant's legal privileges and disabilities "secure[d] [minors] from hurting themselves by their own improvident acts." 1 Blackstone, at *464. The common law accomplished this by ensuring that minors, as a dependent class, were guaranteed maintenance, education, and protection. 1 Blackstone, at *447-48; Cooley's Const. Lim., p. 420-21. Moreover, minors could be shielded from the consequences of their poor decisions under contract and criminal law. 1 Blackstone, at *464; Reeve's Domestic Relations, at *227. But parental authority operated to protect them from danger.

As the 19th century went on, industrialization, urbanization led to a proliferation of affordable firearms, especially handguns, and created more opportunities for minors to acquire and use them outside the traditional boundaries of authority. Rivas Decl., ¶¶ 19, 21; see also *NRA*, 133 F.4th at 1139 (11th Cir. 2025) (Rosenbaum, J., concurring) ("Industrialization and 'the loss of fathers and older brothers' in the Civil War resulted in less family 'control' over Under-21s"). Faced

with an increase in juvenile crime and societal outrage, legislatures across the country enacted the age-based restrictions "to protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds." Spitzer Decl., ¶¶ 28, 30.

In the 20th century, the importance and rationale of age-based restrictions on the purchase and sale of handguns was unchanged. Early 20th century legislatures continued to enact age restriction laws. Spitzer Decl., ¶¶ 22-23. As the years went on, the Gun Control Act of 1968 "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). To that end, the Gun Control Act criminalized the sale or delivery of handguns or ammunition by licensed dealers to individuals under age twenty-one. 18 U.S.C. § 922(b)(1) and (c); *see Bruen*, 597 U.S. at 73 (Alito, J., concurring) ("Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U. S. C. §§922(x)(2)-(5), and bars the sale of a handgun to anyone under the age of 21, §§922(b)(1), (c)(1)"). The legislative history of the Act explained that "[i]n contributing to our ever-increasing crime rates, juveniles account for some 49 percent of the arrests for serious crimes in the United States and minors account for 64 percent of the total arrests in this category." S. REP. NO. 90-1097, at 77 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2165. Thus, common sense concerns about the dangers posed by armed minors underscored the need for legislation.

### ii. *Modern behavioral science validated those common-sense concerns.*

Science further confirms the wisdom of Connecticut's laws. Compared to adults, minors under age twenty-one are "more impulsive, more likely to engage in risky and reckless behavior, more influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations." Steinberg Decl., ¶ 10; *see also NRA*, 133 F.4th at 1148 (Rosenbaum, J., concurring). Indeed, "many aspects of psychological and neurobiological immaturity characteristic of individuals between the ages of 14 and 17 . . . are also characteristic of those between ages 18 and 20." Steinberg Decl., ¶ 10.

Adolescents and people in their early 20s are uniquely impulsive and insensitive to risk, including with firearms. Steinberg Decl., ¶¶ 19, 24. This tendency is "evidenced by studies of age differences in risk-taking . . . as well as participants' reports of involvement in both health-related risk-taking (e.g., smoking, drinking while driving, having unprotected sex) and antisocial risk-taking (e.g., fighting, stealing, vandalizing)[.]" *Id.*, ¶ 19. Moreover, "adolescents and individuals in their early 20s are less able than older individuals to control their impulses and consider the future consequences of their actions and decisions." *Id.*, ¶ 20. "The combination of heightened attentiveness to rewards and still-maturing impulse control makes middle and late adolescence a time of greater risk-taking than any other stage of development." *Id.*, ¶ 23.

Several documented forms of risk-taking are particularly alarming if under 21-

year-olds have greater access to handguns. First, statistically, "arrests for violent crime increase over the course of adolescence, peak in the late teens and early 20s[.]" Steinberg Decl., ¶ 31; see also, Spitzer Decl., ¶¶ 31-32. Second, "suicidal ideation and attempted suicide are higher during late adolescence and young adulthood, including during ages 18 to 20, than any other period of life. Firearms were used in more than half of all suicide attempts." Steinberg Decl., ¶ 32. Third, "numerous studies have documented that rates of deliberate self-injury, which . . . also peak in middle and late adolescence." *Id.*, ¶ 33. Finally, "binge drinking and 'high-intensity drinking' (drinking twice as much as that considered binge drinking) is more frequent during the late teens and early 20s than at any other age." *Id.*, ¶ 34. "Intoxication is a particularly significant contributing factor to homicide and physical assault at all ages, especially in incidents involving personal confrontations, and even more so in those involving firearms. The psychological immaturity of individuals between 18 and 20, relative to those 21 and older, especially with respect to self-control, exacerbates the dangers of intoxication." *Id.*, ¶ 34.

Departures from a presumptive age-of majority are typical when, based on the needs of society and circumstances known to lawmakers at the time, an age-restriction should be raised or lowered in the best interests of young people. As demonstrated by ongoing cycles of violence, with firearm homicides and mass shootings being perpetrated disproportionately by under-21-year-olds, the dangers presented by armed minors are well-known. *See* Spitzer Decl., ¶ 30, *see also NRA*, 133 F.4th at 1152-53 and n. 11 (Rosenbaum, J., concurring) (describing 7 mass

shootings and the high rate of overall firearm crime perpetrated by minors). Ultimately, scientific consensus confirms that "there is good reason to place limits on the permitting of handguns to individuals who are between 18 and 20, as they are members of an age group that is especially at risk for violence, suicide, nonsuicidal self-injury, and excessive drinking." Steinberg Decl., ¶ 38.

The founding-era justifications for age restriction laws never went away, and additional justifications continued to reveal themselves as time went on, underscoring the necessity of regulation. Connecticut's age-restrictions share the same justifications as the historical analogues, and burden the rights of minors in the same way. The Court should uphold Connecticut's laws restricting the carry and purchase of handguns by individuals under age twenty-one.

**F. Plaintiffs' selective history cannot be reconciled with the well-understood principles of regulation and statutory interpretation in use since the founding-era.**

Based on the record at bar, State Defendants are entitled to judgment. Nevertheless, Plaintiffs' arguments will be addressed briefly.

**1. Plaintiffs cannot succeed on their facial challenge because, consistent with founding-era principles, the age restriction laws are plainly legitimate as to individuals under 18.**

Plaintiffs' arguments are directed to a narrow subset of 18-20-year-olds, but they seek to enjoin enforcement of General Statutes §§ 29-28(c)(10), 29-34(b), and 29-36f, in their entirety. But Connecticut's age-restriction laws apply to all individuals under 21, not just the narrow class of "18-20-year-olds" whose interests Plaintiffs seek to assert. "[F]acial challenges are the most difficult to mount successfully." *Antonyuk*, 120 F.4th at 983 (quotation marks omitted); *see also Nastri v. Dykes*, 3:23-cv-56 (VAB)

(ECF No. 94, p. 50) (upholding Connecticut's prohibition on carry of firearms in state parks and forests). To prevail, Plaintiffs "must establish that no set of circumstances exists under which the [law] would be valid, or show that the law lacks a plainly legitimate sweep." *Antonyuk*, 120 F.4th at 983 (quotation marks omitted).

Despite Plaintiffs' expansive request for injunctive relief, there is no meaningful argument that could support a facial challenge to the age-restriction laws, which apply to all individuals under age 21, not just 18-20-year-olds. Plaintiffs do not even attempt to argue for a different conclusion because admitting that an infant can be prohibited from carrying or purchasing a firearm at any age would require acknowledging some principle that would have supported the regulation of minors and firearms at the founding. Instead, Plaintiffs reject any principle that could support a regulatory tradition for younger minors. But Plaintiffs' argument avoids the full implications of their position, which, if correct, would mean that age is *never* a valid basis for disarming anyone. That contention flies in the face of common sense and the history and tradition of firearm regulation. *See McCoy*, 140 F.4th at 581 (Heytens, J., concurring) ("arguments for why 18-year-olds have a constitutional right to buy handguns suggest that younger people do too—a startling result that the plaintiffs seek to obscure and for which they offer no defense.")

As explained above, the laws of domestic relations and the age of majority control the inquiry, and undoubtedly support the application of the age restriction laws to minors younger than 18. The reasons that individuals under age 18 can be constitutionally disarmed are the same as the reasons individuals under age 21 can

be constitutionally disarmed—because it is consistent with history and tradition. Because Connecticut's age restriction laws are constitutional with respect to under-18-year-olds, Plaintiffs' facial challenge must fail. *See Rahimi*, 602 U.S. at 692.

For these same reasons, and as discussed further below, the Court should not credit the selective history and constitutional doctrine Plaintiffs rely on to support Plaintiffs Succow and Towne's as-applied challenge.

**2. Plaintiffs' analogues do not evidence a right to obtain or carry firearms outside of militia service.**

Plaintiffs' attempt to hold up the militia laws of the colonial and founding eras, and specifically the federal Militia Act of 1792, as evidence of an implied right to bear handguns.[14] That argument fails for three reasons: First, it ignores the *Heller* and *McDonald* Courts' treatment of militia laws, as well as founding-era society's understanding (and disregard) of militia duties. Second, it is incompatible with the rules of statutory interpretation. Finally, other constitutional doctrines identified by Plaintiffs that impact age restrictions are irrelevant to the history and tradition of firearm regulation.

***i. The individual right to bear arms is unconnected with militia service.***

Plaintiffs' interpretation of the militia laws still does not evidence an unconstrained constitutional right by minors to obtain and carry handguns. The

[14] Plaintiffs' recitation of colonial and founding-era militia laws largely paraphrases a law review article by Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019), which is not in evidence and contains contested historical facts and historical arguments that were not subject to the adversarial process. The Court should not consider that article when weighing any historical facts or reaching legal conclusions.

*Heller* Court made clear that at the time of the founding, the Second Amendment was understood "to protect an individual right *unconnected with militia service*." *Heller*, 554 U.S. at 605 (emphasis added). Since "*Heller* stands for the premise that the right to bear arms is not connected to militia service," it would be "odd to say that militia service helps define the right." *Pinales*, 765 F. Supp. 3d at 1047.

"By the 1850's, the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense" *McDonald v. City of Chicago*, 561 U.S. 742, 770 (2010). And by 1868, the disconnect was total, with Congress disbanding the militias of southern states. *Id.*, 779-80 (citing Act of Mar. 2, 1867, § 6, 14 Stat. 485, 487). In light of *Heller* and the post-1791 history of militias, it makes no sense to source an individual right in the militias, which could be disbanded by the government. *See also Presser v. Illinois*, 116 U.S. 252, 267 (1886) ("Military organization and military drill and parade under arms" are not independent rights, but rather "are subject to the regulation and control of the State and Federal governments, acting in due regard to their respective prerogatives and powers.").

That certain States may have imposed a *duty* on minors to carry arms in the highly regulated context of militia service sheds no light whatsoever on whether minors had an unfettered, constitutional *right* to carry outside of those narrow circumstances. *NRA*, 133 F.4th at 1127; *see* Spitzer Decl., ¶ 49 (describing limitations

on an individual's use of arms and other rights during militia service). And Plaintiffs have not identified any evidence of minors' unencumbered "right" to possess arms outside the militia context. Plaintiffs' isolated examples of minors obtaining goods on credit highlight the legal problems and societal disapproval of extending credit to minors. *See Soper v. President & Fellows of Harv. Coll.*, 18 Mass. 177 (1822); *Saunders Glover & Co.*, 12 S.C.L. 572.[15]

Even if the plain language of the militia laws could be understood as granting a right—which they cannot—in practice the Militia Act did not correspond to a societal expectation that anyone had a right or obligation to bear arms. There is "no evidence that the duties described in the militia statutes corresponded with a broad societal practice of arming minors." Spitzer Decl., ¶ 57. To the contrary, it was obvious as early as 1794 that the states felt little compulsion to enforce this or any militia duty, regardless of a militiaman's age. *See* Letter from George Washington to the U.S. Senate and House of Representatives (19 November 1794), Founders Online, National Archives[16] ("the militia-laws have exhibited such striking defects, as could not have been supplied but by the zeal of our Citizens. Besides the extraordinary expence and waste, which are not the least of the defects, every appeal

[15]*Saunders* hardly stands for the proposition that there was a common commercial practice of merchants giving pistols to minors without ever getting paid for them. Likewise, *Soper* does not embrace the practice of extending credit to minors—it condemns it. In *Soper*, if Harvard enacted a rule prohibiting the extension of credit to its students, then it would have been enforceable under the statute. *Soper*, 18 Mass. at 179 ("The object of it is clearly within legislative sanction, being relative to the discipline of public seminaries of learning). The problem was that Harvard had not done so. *Id.*

[16] https://founders.archives.gov/documents/Washington/05-17-02-0125

to those laws is attended with a doubt on its success."). In other words, the Militia Act of 1792 was not even strong evidence of society's belief about the value of militia service, let alone a right to bear arms at age eighteen or during infancy. Its value as a historical analogue is negligible and it certainly is not sufficient to overcome the overwhelming historical record establishing the tradition of strictly regulating minors' access to firearms at the time of founding.

Plaintiffs' attempt to downplay the reconstruction era laws (they mention only a fraction of them) by arguing that they were not passed for "more than 80 years after the ratification of the Second Amendment" in 1791. ECF No. 4-1 at 28. But that does not work for several reasons. First, there were several founding-era rules and laws that confirmed the limits on a minor's ability to bear arms. Spitzer Decl., ¶¶ 20, 42-44, 51. Second, even if those laws did not exist, under Second Circuit precedent, "1868" and any "adjacent . . . periods" are "fertile ground" to "seek evidence of our national tradition of firearm regulation." *Antonyuk II*, 120 F.4th at 974. Third, any purported absence of affirmative statutory proscriptions at the founding says nothing about their constitutionality because there was no need for statutory proscriptions at the founding. *Antonyuk II*, 120 F.4th at 969-70. As such, a "more nuanced approach" to the historical inquiry is required. *Bruen*, 597 U.S. at 27. "[W]hatever that later history bears out, the conclusions we derive from it could not be characterized as contradicting the understanding of the right in 1791 if the Founding-era history does not point with some certainty in one direction or another." *Frey*, 157 F.4th at 130.

The drastic societal changes that prompted antebellum and reconstruction-era

restrictions were "unprecedented" and thus could not have been considered at the founding. *Bruen*, 597 U.S. at 27. Minors were already effectively prohibited from acquiring or carrying arms outside their parents' supervision by virtue of laws of domestic relations and age of majority. Nor was there any concern about youth gun violence at that time because minors—like virtually all Americans—lived at home and worked on the family farm. And when the efficacy of those common-law limitations faded by the reconstruction era, and urbanization and the proliferation and increased lethality of firearms created unprecedented concerns regarding youth gun violence, statutes stepped in to do the work. *See Pinales*, 765 F. Supp. 3d at 1043-44 (such changes qualified as "unprecedented societal concerns" under *Bruen*).

Thus, from the founding through the reconstruction eras, states limited minors' ability to purchase and carry firearms. While *Bruen* does not require historical analogues "in significant numbers," *Antonyuk*, 120 F.4th at 971, the State Defendants produced more than 100. As these laws were being enacted, the principles of regulation espoused by Blackstone in the founding-era remained at the core of legal scholarship and practice, as reflected by Kent's and Reeve's treatises in the antebellum period and Cooley's and Schouler's treatises in the reconstruction era, among numerous others. These regulatory principles were applied consistently and never used to question the validity of laws restricting minors and handguns. And because those restrictions were wholly uncontroversial, the Court may "assume it settled" that they were lawful. *Bruen*, 597 U.S. at 30.

### *ii. Militia laws should not be applied in derogation of the common law principles that restrained minors.*

Second, the common law principles that severely restricted minors' access to firearms were well-established by the time the federal Militia Act and its state equivalents were enacted. Courts applying the common law flatly rejected any contention that a minor had a "right" to a handgun. The only "right" a minor had was to maintenance, and, relatedly, the provision of necessaries. *See* 1 Blackstone, at *447-49. The colonial and state militia laws, which were construed narrowly in derogation of the common law, demonstrated, at most, that a minor, may, subject to their status as infants and dependents, bear arms in defense of the state. *See NRA*, 133 F.4th at 1127. The militia laws were an exception to the common law that did not even apply to all 18-to-20-year-olds. "Many state laws set the age of militia service at 21[.]" *McCoy*, 140 F.4th at 578 (citing statutes from Ohio, Virginia, New Jersey, and Georgia). A minor's legal capacity to keep and bear arms remained subject to the conditions contained within the militia statutes, namely, that they had to be within the statutory age range and that it was the responsibility of a parent or guardian to arm them. Spitzer Decl., ¶¶ 50, 51, 57. Those exemptions existed even before passage of the Second Amendment. *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 180 (1939) (citing General Court of Massachusetts, January Session 1784, which exempted soldiers "under the control of parents, masters or guardians" from the arming requirement.)

There is no way to reconcile the limitations that the common law imposed on minors with Plaintiffs' interpretation of the militia laws here. Plaintiffs' argument

that the militia laws established an implicit, unencumbered right to handguns *sub silentio* violates a core tenet of statutory interpretation. *See United States v. Texas*, 507 U.S. 529, 534 (1993) ("statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."). Whatever public duty they reflected, the militia laws were subject to the same narrow construction as any other statute passed in derogation of the common law. Thus, the public duty imposed on minors by the militia laws was considered a "slight interference" with the rights of parents to custody and control over their children. *Bainbridge*, supra, 24 F. Cas. at 949. There was no legal basis to extend the militia laws to imply some legal privilege of minors to carry outside of their militia duties and independently of a parent's right to custody and control.

***iii. Modern age-based regulations in other contexts do not inform the right incorporated by the Second Amendment.***

The constitutional rights of eighteen-year-olds in the present day have no bearing on the contours of the right to bear arms as it existed in 1791 and 1868. Whatever relevance constitutional developments occurring after 1791 may have to our modern understanding of the constitution, Plaintiffs cannot rely on constitutional doctrine that did not exist in the founding-era to explain the founding-era understanding of whether minors could obtain and carry handguns consistent with the Second Amendment.

"The written laws of the Founding era must be understood in the light of that predominant common-law regime." *NRA*, 133 F.4th at 1128. For instance, modern

voting rights, which Plaintiff holds up as evidence of 18-20 year-olds' inclusion in the political community, are irrelevant to their status in 1791. Under-21-year-olds did not earn the right to vote in federal elections until 1971, with ratification of the 26th Amendment to the U.S. Constitution, which lowered the voting age to 18. But it required a constitutional amendment to make this change. *See Oregon v. Mitchell*, 400 U.S. 112, 118 (1970) (federal statute lowering the voting age to 18 was unconstitutional as pertaining to state and local elections). And the 26th Amendment, pointedly, did not otherwise lower the age of majority, which was a power left to the states. *See* March 23, 1971 Congressional Record, p. 7568 (rejecting proposed amendment that would have lowered the age of majority to 18).

Modern constitutional doctrine cannot be retrofitted to support Plaintiffs' interpretation of the Second Amendment. States define the age at which minors can exercise "adult" rights. *See* Conn. Gen. Stat. § 1-1d (permitting exceptions to the general age of majority). "[E]ven where there is an invasion of protected freedoms the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Ginsberg v. New York*, 390 U.S. 629, 638 (1968) (cleaned up). Consistent with that power, states retain broad discretion to restrict (or not restrict) activities based on age, subject to other constitutional provisions, for instance, the equal protection clauses. *See, e.g.*, *United States v. Skrmetti*, 145 S. Ct. 1816, 1829 (2025) (age-based classification are subject to rational basis review under the equal protection clause). But Plaintiffs chose not to pursue an equal protection challenge here. They should not be allowed to contort the Second Amendment to subvert

founding and modern-era constitutional principles that control the rights of minors.

**3. The weight of Circuit authority provides strong support here.**

Finally, the caselaw considering restrictions on minors' ability to purchase and possess firearms provides strong support for the State Defendants' position. Most courts considering such restrictions have found them to be constitutional. *McCoy*, 140 F.4th at 568; *NRA*, 133 F.4th at 1111; *Pinales*, 765 F. Supp. 3d at 1024; *Picon*, 343 A.3d at 67; *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) (upholding age-based restriction on purchase under step one). And the courts that have held otherwise did so largely based on a methodological approach to the *Bruen-Rahimi* test that does not apply in the Second Circuit—that the historical inquiry should be pegged to 1791, and not 1868.[17] Those courts thus discounted the significance of the Reconstruction Era laws as coming too late, despite acknowledging that they otherwise may be considered relevantly similar and thus entitled to substantial weight. *See Lara*, 125 F.4th at 441 (holding that the right "should be understood according to its public meaning in 1791," and thus that Reconstruction Era restrictions thus "do not provide as much insight"); *Reese*, 127 F.4th at 599 (noting that "19th century laws . . . appear to be 'relevantly similar' to the current handgun purchase ban," but "were passed too late in time"); *Worth*, 108 F.4th at 696 ("it is questionable whether the Reconstruction-era sources have much weight" because the right is "pegged" to the public understanding in "1791").

[17] The Supreme Court declined to resolve this question in both *Bruen* and *Rahimi*. 597 U.S. at 38; 602 U.S. at 692 n.1.

Even the Eleventh Circuit, which does not pin interpretation of the right to bear arms to 1868, like the Second Circuit does, still rejected a 1791-only approach as incompatible with *Bruen* and *Rahimi*. *See NRA*, 133 F.4th at 1128 ("The recent contrary decision of our sister circuit—which ignored how the common-law regime restricted minors' access to firearms—also fails to persuade us"). The Eleventh Circuit's sound reasoning and supports the constitutionality of age restriction laws.

Of course, Second Circuit precedent rejecting the 1791-only approach is controlling. *Antonyuk*, 120 F.4th at 972. In so doing, the Second Circuit explicitly "part[ed] ways" with the Third Circuit. *Id.* So while *Lara*, *Reese*, and *Worth* considered only evidence around 1791 to the exclusion of 1868, this Court should not follow those Circuit opinions.

## V. Conclusion

The 200-year history and tradition of regulating a minor's ability to obtain and carry a handgun demonstrates that Connecticut's age restriction laws are constitutional. For the foregoing reasons, Plaintiffs' motion for permanent injunctive relief must be denied and, at the conclusion of any evidentiary hearing, judgment should enter for the State Defendants.

STATE DEFENDANTS,

RONNELL HIGGINS, MARGARET A. KELLEY AND PAUL J. NARDUCCI

WILLIAM TONG
ATTORNEY GENERAL

BY: *<u>/s/Blake T. Sullivan</u>*
Blake T. Sullivan (ct30289)
Timothy J. Holzman (ct30420)
James M. Belforti (ct30449)
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue, 5th Floor
Tel.: (860) 808-5020
Fax: (860) 808-5347
Blake.Sullivan@ct.gov
Timothy.Holzman@ct.gov
James.Belforti@ct.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/Blake T. Sullivan*
Blake T. Sullivan
Assistant Attorney General