UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ZACHARY SUCCOW et al., | : | No.: 3:25cv250 (SVN) |
|    Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PAMELA JO BONDI et al., | : | |
|    Defendants. | : | February 10, 2026 |

### FEDERAL DEFENDANT'S POST-TRIAL BRIEF

Pursuant to the court's January 20, 2026 order (ECF 129), the federal defendant respectfully submits her post-trial brief.

The Second Amendment's right to keep and bear arms is a fundamental right that is essential to ordered liberty. Unjustifiable restrictions on that right present a grave threat to Americans' most cherished freedoms, and courts should exercise the utmost vigilance in guarding that right from legislative or regulatory infringement. There are, however, narrow circumstances in which the government may justifiably burden that right, and Section 922(b)(1) – and related statutes and regulations – arise out of such a circumstance. Specifically, the restrictions at issue here stand solidly within our Nation's history and tradition, which greatly restricted the rights, including firearm rights, of those under the age of twenty-one. The Second Circuit has not yet addressed the issue, but two circuits have affirmed the constitutionality of handgun restrictions on those under the age of twenty-one. See McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 140 F.4th 568, 580 (4th Cir. 2025) ("There plainly exists a robust tradition that supports the constitutionality of § 922(b)(1)."); Nat'l Rifle Ass'n v. Bondi, 133 F.4th 1108, 1130 (11th Cir. 2025) ("The Florida law that prohibits minors from purchasing firearms does not

violate the Second and Fourteenth Amendments because it is consistent with our historical tradition of firearm regulation."). But see Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 127 F.4th 583, 600 (5th Cir. 2025) ("18 U.S.C. §§ [922](b)(1), (c)(1) and their attendant regulations are unconstitutional in light of our Nation's historic tradition of firearm regulation.").[1]

The federal defendant respectfully urges this court to reach the same conclusion as the Fourth and Eleventh Circuits and to render judgment in favor of the federal defendant.

I.   **Facts and Procedural History**

On May 18, 2025, the plaintiffs – two individuals (Zachary Succow and Samuel Towne) and two advocacy groups (the Connecticut Citizens Defense League and the Second Amendment Foundation) – filed the operative amended complaint against various federal, state, and local defendants. (See ECF 49.) In relevant part, the amended complaint alleges that the individual plaintiffs are Connecticut residents between the ages of eighteen and twenty-one who are prohibited from lawfully purchasing or otherwise obtaining ownership of a handgun because of certain federal and state laws. (Am. Compl. ¶¶31-33, 41-44.) The advocacy group plaintiffs bring representational claims on

---

[1] Both McCoy (docket no. 25-24) and NRA v. Bondi (docket no. 24-1185) have pending cert. petitions at the Supreme Court. The Supreme Court has granted petitions for writs of certiorari in Wolford v. Lopez, No. 24-1046 (Oct. 3, 2025), and United States v. Hemani, No. 24-1234 (Oct. 20, 2025)—Second Amendment cases on other issues that could shed light on the proper resolution of this case and lead to the resolution of the circuit conflict. Wolford was argued on January 20, 2026, and Hemani is scheduled for argument on March 2, 2026.

2

behalf of their members who are similarly situated to the individual plaintiffs.[2]  (Id. ¶¶52, 58.)  As it pertains to the federal defendant, the amended complaint alleges a single count – count two – which alleges that the "federal handgun ban" (which the plaintiffs define as the applicable federal statutes and regulations, see id. ¶106) violates the plaintiffs' rights under the Second Amendment to the United States Constitution.  (Id. ¶147.)

For relief against the federal defendant, the amended complaint seeks:

- First, a "declaratory judgment that the provisions of 18 U.S.C. § 922(b)(1), 18 U.S.C. § 924(a)(1)(D), 18 U.S.C. § 922(c), [and] 27 C.F.R. § 478.99(b)(1) that operate to prohibit individuals between 18 years of age and 20 years of age from acquiring handguns and handgun ammunition are unconstitutional" facially and as applied to the plaintiffs.  (Id., Prayer for Relief, ¶C.)

- Second, a "permanent injunction enjoining [the federal government] from enforcing the provisions of 18 U.S.C. § 922(b)(1), 18 U.S.C. §924(a)(l)(D), 18 U.S.C. § 922(c), [and] 27 C.F.R. § 478.99(b)(1) that operate to prohibit individuals between 18 years of age and 20 years of age from acquiring handguns and handgun ammunition" (id. ¶D); and

---

[2]As to associational standing, "when an association sues on behalf of its members, it must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 362 (2d Cir. 2016) (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).  The organizational plaintiffs do not appear to have offered proposed findings of fact (or evidence in the record) pertaining their burden to establish the second prong of this test.

- Third, in the alternative, "a declaratory judgment and a permanent injunction enjoining [the federal government] from prohibiting the State of Connecticut and the Connecticut state police from using the National Instant [Criminal Background] Check System ('NICS') for private party handgun transfers to eligible persons 18 to 20 years of age." (Id., ¶E.)

On January 12 and 14, 2026, the court conducted a bench trial with respect to the plaintiffs' claims against the various defendants. The trial record reveals the following background facts.[3]

The plaintiff, Samuel Towne, is a twenty-year-old resident of Norwich, Connecticut. (Tr. Jan. 12, 2026, 122:20-123:18.) Towne is a member of the Connecticut Citizens Defense League and the Second Amendment Foundation. (Tr. Jan. 12, 2026, 125:6-10.) Towne wishes to acquire a handgun for purposes of self-defense, but he cannot acquire a handgun now because he has not yet reached the age of twenty-one. (Tr. Jan. 12, 2026, 128:7-12.) Specifically, Towne does not have either a handgun eligibility certificate or a pistol permit, both prerequisites for his purchasing a handgun in Connecticut, because he has not yet reached the age of twenty-one, the minimum age to

---

[3] Other information from the trial record will be discussed in the context of the federal defendant's argument below. To the extent that the court finds it useful to have the proposed findings and conclusions listed in one standalone document, the federal defendant attaches that list to this brief.
  Nevertheless, the federal defendant reiterates her view that the historical inquiry set out in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), is a legal one, not a factual one, and therefore no specific findings of fact are necessary to support a judgment in favor of the federal government in this case. The federal defendant recognizes, however, that the court has concluded that the historical facts in this case are in dispute and that findings pertaining to those facts are necessary.

obtain those documents under Connecticut law.  (Tr. Jan. 12, 2026, 130:9-24.)  On March 17, 2024, Towne completed training that is a prerequisite for applying for a pistol permit under Connecticut law.  (Tr. Jan. 12, 2026, 131:19-132:5 & Ex. 18.)  Towne completed the training again on August 17, 2025, because Connecticut law had changed, requiring him to also obtain a certification of completion in connection with the training.  (Tr. Jan. 12, 2026, 133:24-134:135:16, 152:11-22 & Ex. 19.)  Towne intends to purchase a handgun from a retailer rather than through a private transfer.  (Tr. Jan. 12, 2026, 151:14-17, 153:17-22.)

The plaintiff, Zachary Succow, is a twenty-year-old resident of Seymour, Connecticut.  (Tr. Jan. 12, 2026, 155:5-6, 156:3-4.)  Succow is a member of the Connecticut Citizens Defense League and the Second Amendment Foundation.  (Tr. Jan. 12, 2026, 158:19-23.)  Succow wishes to acquire a handgun for purposes of self-defense, but he cannot acquire a handgun now because he has not yet reached the age of twenty-one.  (Tr. Jan. 12, 2026, 162:2-10, 163:19-20.)  Specifically, Succow does not have either a handgun eligibility certificate or a pistol permit, both prerequisites for his purchasing a handgun in Connecticut, because he has not yet reached the age of twenty-one, the minimum age to obtain those documents under Connecticut law.  (Tr. Jan. 12, 2026, 164:1-12.)  On December 17, 2025, Succow completed training that is a prerequisite for applying for a pistol permit under Connecticut law.  (Tr. Jan. 12, 2026, 170:4-12 & Ex. 33.)  That training had not been completed at the time that Succow filed this lawsuit in February 2025 because at the time he filed this lawsuit, he was physically unable to perform part of the training required.  (Tr. Jan. 12, 2026, 177:8-15.)  Succow intends to

purchase a handgun from a retailer rather than through a private transfer.[4] (Tr. Jan. 12, 2026, 174:25-175:9.)

## II. Argument

### A. Legal Framework

The Gun Control Act of 1968 ("GCA"), as amended, 18 U.S.C. §§ 921-931, establishes a comprehensive federal regulatory scheme governing the manufacture and distribution of firearms and ammunition. Congress's "principal purpose" in enacting this legislation was to "curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" Huddleston v. United States, 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 1501 at 22 (1968)). The GCA, as amended, thus prohibits, among other things, certain categories of persons from receiving or possessing firearms or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g). Among the prohibited categories are certain felons, persons who have been adjudicated as "mental defectives," noncitizens who are present in the country unlawfully, and persons who have been convicted of certain domestic violence crimes. Id. § 922(g)(1), (4), (5), (9), respectively. These provisions are paired with a prohibition on the transfer ("sell or otherwise dispose") of firearms to

---

[4] The final question on Succow's redirect examination was: "If it were legal for you to obtain a firearm from a private party, would you do so?" Succow responded: "If it was legal, yes." (Tr. Jan. 12, 2026, 190:5-7.) This somewhat-vague answer does not change the longer, more detailed question-and-answer during his direct examination indicating that Succow intends to purchase a firearm from a retailer and not from an individual. (Tr. Jan. 12, 2026, 174:25-175:9, 175:18-23.) To the extent that the court concludes that these answers are in conflict, the court should credit the testimony on direct examination and discredit the testimony on redirect.

certain classes of prohibited persons.  Id. § 922(d).  The GCA also prohibits federal firearms licensees from transferring firearms or ammunition to individuals under the age of eighteen.  Id. § 922(b)(1).  It further prohibits FFLs from transferring firearms and ammunition other than shotguns, rifles, and ammunition for shotguns and rifles to individuals under the age of twenty-one.  Id.

The GCA's restrictions do not, however, prevent 18-to-20-year-olds from possessing and using handguns, nor do the restrictions prevent those individuals from obtaining handguns "from parents or guardians" or "though unlicensed, private sales." Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 189-90 (5th Cir. 2012) (subsequent history omitted); see also 18 U.S.C. § 922(x)(2) (setting eighteen as the minimum age under federal law to possess a handgun).  The restrictions also do not prevent 18-to-20-year-olds from purchasing rifles or shotguns, even if sought through a federally licensed firearm dealer.

      B.     The Challenged Federal Restrictions are Constitutional

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  The Second Amendment secures a "general right" to possess and carry arms for lawful purposes such as self-defense.  NYSRPA v. Bruen, 597 U.S. 1, 31 (2022).  That right is among the "fundamental rights necessary to our system of ordered liberty."  McDonald v. City of Chicago, 561 U.S. 742, 778 (2010).  The founding generation believed that, when that right is infringed, "liberty, if not already annihilated, is on the brink of destruction."  District of Columbia v. Heller, 554 U.S. 570,

606 (2008) (citation omitted). Today, "millions of Americans" rely on that right in possessing and carrying arms for the "defense of self, family, and property." Id. at 624 n.24, 628.

"Under Bruen, the Supreme Court articulated a two-step framework to evaluate Second Amendment challenges." Giambalvo v. Suffolk Cnty., New York, -- F.4th --, No. 23-208-CV, 2025 WL 2627368, at *6 (2d Cir. Sept. 12, 2025). "First, we must ask whether 'the Second Amendment's plain text covers an individual's conduct.' . . . If it does not, the constitutional inquiry ends, and a plaintiff's challenge to the law fails." Id. (quoting Bruen, 597 U.S. at 24). "If the individual's conduct is covered, then 'the Constitution presumptively protects that conduct,' and '[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'"[5] Id. When the government regulates that right, it bears a significant burden in justifying its regulation. See Bruen, 597 U.S. at 17. "In considering the second inquiry, we must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the

---

[5]"To determine whether [a challenged] law is consistent with our regulatory tradition, we must first decide what tradition is relevant to that inquiry." NRA v. Bondi, 133 F.4th at 1115 (emphasis in original). The Second Circuit has observed that the regulatory tradition at the time of the Founding is relevant to the court's consideration, though that court also has held that the Reconstruction era is "relevant to state regulations." Zherka v. Bondi, 140 F.4th 68, 78 n.14 (2d Cir. 2025). The court has not decided – and given that Founding-era regulations support the federal defendant's position in this case, this court also need not reach – "whether historical traditions post-dating 1791 are relevant to the Amendment's restrictions on Congress." Id.

balance struck by the founding generation to modern circumstances.'" Giambalvo, 2025 WL 2627368, at *6 (quoting Bruen, 597 U.S. at 29 & n.7).

"[W]hen a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'"[6] United States v. Rahimi, 602 U.S. 680, 692 (2024). That is a rigorous test, not a "regulatory blank check"; Bruen, 597 U.S. at 30; and is one that permits certain narrow restrictions but prohibits laws that "broadly restrict arms use by the public generally." Rahimi, 602 U.S. at 698.

Under that standard, federal restrictions that prevent FFLs from transferring handguns to those under the age of twenty-one comply with the Second Amendment. The federal defendant does not dispute that the conduct at issue here is implicated by the

---

[6]Notably, "[w]ithout first holding that the statute implicated unprecedented societal concerns or dramatic technological changes, Rahimi applied the 'relevantly similar' framework." United States v. Vereen, 152 F.4th 89, 99 (2d Cir. 2025) (quoting Rahimi, 602 U.S. at 692), cert. denied sub nom. Perez v. United States, No. 25-6198, 2026 WL 79986 (U.S. Jan. 12, 2026). In any event, however, the Second Circuit previously has observed that "Congress passed . . . the Gun Control Act to address the unprecedented scale of gun violence in the years around [its] adoption." Zherka, 140 F.4th at 79; see also id. & n.15 (quoting literature regarding increased supply of and demand for handguns and increase in violence in the 1800s). The trial record establishes similar changes throughout the latter half of the 19th Century. (Rivas Decl., Ex. 505, ¶¶11-13, 21-23 (generally observing impacts of industrialization with respect to supply of firearms and lethality of the same, as well as increase in juvenile crime.) In other words, even if such a finding were a precursor to application of the "relevantly similar" test, that finding is appropriate in this case.

Second Amendment, but the federal scheme nevertheless passes constitutional muster at step two of Bruen. Specifically, federal age-based restrictions only apply to some firearm transfers to a group of prospective transferees that, in large part, lacked legal rights at the time of the Founding because of their age.

"At the Founding, a person was an 'infant[]' or a 'minor[ ]' in the eyes of the law until age 21." Nat'l Rifle Ass'n v. Bondi, 133 F.4th 1108, 1117 (11th Cir. 2025) (citing 1 Zephaniah Swift, a System of the Laws of the State of Connecticut 213 (1795)); see also 1 William Blackstone, Commentaries on the Laws of England 451 (1765) ("So that full age in male or female, is twenty one years[] . . . who till that time is an infant, and so styled in law."). Consistent with the common law understanding, the "'American colonies, then the United States, adopted age twenty-one as the near universal age of majority.'" (Spitzer Decl., Ex. 500, ¶11 (quoting Vivian E. Hamilton, Adulthood in Law and Culture, 91 Tul. L. Rev. 55, 64 (2016))); see also Spitzer Decl. ¶13 & 2 James Kent, Commentaries on American Law 101 (1827) (confirming that "the inability of infants to take care of themselves[] . . . continues, in contemplation of law, until the infant has attained the age of twenty-one years").

"[I]t was widely understood that minors lacked the capacity to make certain decisions for themselves or enter into contracts . . . ." (Spitzer Decl. ¶8.) Indeed, "English law set the age of majority at 21 years of age because of the relative lack of maturity and judgment of younger individuals." NRA v. Bondi, 133 F.4th at 1117 (citing Blackstone at 453). The Founders concurred, emphasizing their view that reason and judgment are not fully developed before age 21. For example, John Adams observed that

individuals under that age could not vote because they lack "[j]udgment" and "[w]ill" and are not "fit to be trusted by the [p]ublic."  Letter from John Adams to James Sullivan, May 26, 1776, https://perma.cc/CE79-RA8K (on file with the National Archives).  (See also Spitzer Decl. ¶11 n.4.)  Gouverneur Morris, a signer of the Constitution and drafter of its Preamble, likewise warned that under-21-year-olds "want prudence" and "have no will of their own."  James Madison's Notes of the Constitutional Convention, August 7, 1787, Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4.  Similarly, although at the Founding citizens generally had a duty to serve as peace officers, among those ineligible for such service were "infants" – that is, individuals under the age of 21.  John Faucheraud Grimké, The South Carolina Justice of Peace 117 (3d ed., 1810).

      Those attitudes regarding the capacity of minors to make certain decisions for themselves reflect historical norms concerning parental supervision of 18-to-20-year-olds; specifically, "such decisions were properly left to minors' parents or other authorities acting in loco parentis."  (Spitzer Decl. ¶8); see also NRA v. Bondi, 133 F.4th at 1117 ("[b]ecause of their lack of reason, infants were subject to the 'power' of their parents until they reached age 21").  "Under common law, and under later statutory revisions of the common law, minors enjoyed few rights that could be asserted in court; the law subsumed the legal identity of minors almost entirely within their parents, guardians, or masters, with a few well-defined exceptions."  (Spitzer Decl. ¶13 (quoting Walsh and Cornell, "Age Restrictions and the Right to Keep and Bear Arms," 3064); see also Blackstone at 447-48 (acknowledging right of minors only to "maintenance"), The case law cites other similar historical sources:

11

> [p]arents "ha[d] the benefit" and "receive[d] the profits" of their children's labor. 1 Blackstone, supra, at *453. Minors could not sue to vindicate their rights without joining their guardians or some other "next friend" who was not their guardian. Id. at *464. Parents controlled children's access to information, including books. Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 831-32 . . . (2011) (Thomas, J., dissenting). Nor could they enlist in the military without parental consent. Act of March 16, 1802, 2 Stat. 132, 135 ("[N]o person under the age of twenty-one years shall be enlisted by any officer, or held in the service of the United States, without the consent of his parent."). Families in New England were arranged so that the "[p]atriarchal household heads sp[oke] for their dependents in dealings with the larger world." Toby L. Ditz, Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750-1820, 47 Wm. & Mary Q. 235, 236 (1990). Dependent minors "lacked the formal capacity to participate in public life and [were] subject to the authority of household heads." Id. at 237.

NRA v. Bondi, 133 F.4th at 1117-18.; see also id. at 1118 (observing that "[t]he inability to contract impeded minors from acquiring firearms during the Founding era"). Several laws in the trial record in this case reflect the same principle. (See Spitzer Decl. ¶¶20-21 (citing statutes and concluding that "[a]ll of these early laws, whether pertaining to minors and firearms discharge or measures to penalize making firearms available to minors, make clear that they are governed not as adults, but as 'infants' under the control of their parents, exercising in loco parentis authority over their children"). "These early laws both reflected and presaged the effort to keep dangerous weapons out of the hands of minors in populated areas, and because of their minor status, to hold their parents, guardians, or employers legally responsible for any of the minors' illegal actions." (Spitzer Decl. ¶21.)

Ultimately, then, Founding-era laws and norms reflect a tradition that parents had an extraordinary degree of control over the lives of their minor children, which control extended to the minors' access to firearms, and that minors as a general matter simply had few legal rights at all. And relatedly, many colleges and universities in early American history – including the time of the Founding – directly regulated student access to firearms, indicating that minors at the time required consent to possess them. See NRA v. Bondi, 133 F.4th at 1120 ("University regulations from the Founding era also confirm that minors needed parental consent to access firearms."). Specifically, the trial record establishes that "[c]ollege was one of the very few circumstances where minors lived outside of their parents' or a guardian's direct authority. As a matter of law, minors attending college traded strict parental authority for an equally restrictive rule of in loco parentis." (Spitzer Decl. ¶34 (quoting Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment."); see also Spitzer Decl. ¶38 ("college faculty and administrators functioned in the manner of, and with authority comparable to, parents").) Utilizing this authority, several public universities, and even more private institutions, "enacted weapons restrictions . . . during the Founding period." (Spitzer Decl. ¶36 (collecting policies).) Moreover, "[t]he age range of college students in the late 1700s and 1800s generally coincided with the age range of college students today: roughly 18-22." (Spitzer Decl. ¶40.) In sum, there exists a long tradition of firearm regulation applicable to those subject to in local parentis authority, including and especially to those minors under the age of twenty-one.

The plaintiffs' position that "Founding-era militia statutes throughout the seventeenth and eighteenth centuries not only permitted, but affirmatively mandated that persons aged eighteen to twenty acquire and keep arms" (Am. Compl., ¶149) does not change the analysis. It is true that "[t]he age for militia service in the late 1700s and 1800s was typically defined as beginning at age 18." (Spitzer Decl. ¶48.) It is also true that the Militia Act "required militia eligible men to obtain, at their own expense, the necessary military-grade weaponry and accoutrements." (Id.) That said, "[e]ven the portion of the 1792 Militia Act that required militia-eligible men to keep and maintain 'a good musket or firelock' at their own expense did so as one of the requirements attendant to military service but . . . for the most part did not apply to minors." (Id.); see also McCoy, 140 F.4th at 578 ("the Militia Act did not mandate 18 as the universal age of militia eligibility" and instead "explicitly allowed states to exempt individuals from militia service 'notwithstanding their being above the age of eighteen'" (quoting 1 Stat. at 272)). Moreover, "[a]ll of these state militia laws included wording that provided some kind of special consideration for militia members under the age of 21 that was consistent with their status as minors." (Spitzer Decl. ¶50.) Specifically, "of the thirteen original states, ten—Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island—had laws (mostly enacted in the 1790s) that placed the legal burden for arming militiamen under the age of 21 onto parents, masters (employers), other guardians, or local governments." (Spitzer Decl. ¶51); see also NRA v. Bondi, 133 F.4th at 1119 ("members of Congress recognized that individuals between the ages of 18 and 21 would need their parents to provide them

14

weapons to comply with the Act"); id. at 119-20 (observing that "[s]tates addressed the problem of providing minors the firearms necessary for militia service in different ways" and collecting statutes); id. at 120 ("By 1826, at least 21 of the 24 states admitted to the Union . . . had enacted laws that placed the onus on parents to provide minors with firearms for militia service. These laws reflected that, at common law, minors could not purchase weapons for themselves."). Put simply, contrary to the plaintiffs' claim, there is a comparable tradition at the Founding of regulation of the commercial purchase of firearms by those under the age of twenty-one irrespective of the Militia Act and state-enacted laws that followed it.

With this history in mind, this court should "draw two lessons from the legal treatment of minors at the Founding. First, minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor. Second, minors were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society." NRA v. Bondi, 133 F.4th at 1118; see also McCoy, 140 F.4th at 577 ("In sum, the infancy doctrine demonstrates that there was an early American tradition of burdening the ability of 18- to 20-year-olds to purchase goods, including firearms.").

Moreover, the "[w]hy and how"; see Rahimi, 602 U.S. at 692; of current federal restrictions on the commercial purchase of handguns by those under the age of twenty-one comport with that historical tradition. Specifically, § 922(b)(1) and related restrictions have "the same 'why' as the Founding-era limitations," namely, congressional judgment that "individuals under the age of 21 have not reached the age of

15

reason and lack the judgment and discretion to purchase firearms responsibly." NRA v. Bondi, 133 F.4th at 1122-23.  And current federal regulations also are "consistent with our regulatory tradition in 'how' [they] burden[] the right" because they "prohibit[] purchase but preserve[] access to firearms with parental consent."[7]  Id. at 1123.

Because the challenged federal laws are consistent with historical tradition, they comport with the Second Amendment, and the court should render judgment in favor of the federal defendant on count two of the amended complaint.

  C. The Plaintiffs Have Not Met Their Burden Regarding the Alternative Claim for Relief

As noted above, the challenged federal laws and regulations at issue are constitutional, and judgment therefore should enter in favor of the federal defendant on count two.  The plaintiffs' alternative claim for relief against the federal government does not require a different result.  Specifically, the plaintiffs' alternative request for relief seeks "a declaratory judgment and a permanent injunction enjoining [the federal government] from prohibiting the State of Connecticut and the Connecticut state police from using the National Instant [Criminal Background] Check System ('NICS') for private party handgun transfers to eligible persons 18 to 20 years of age."  (Am. Compl., Prayer for Relief, ¶E.)

---

[7]The plaintiffs appear to believe that subsequent developments, including those post-dating the enactment of the Gun Control Act, whereby the age of majority was assessed to be 18 for some purposes, changes the analysis.  It does not.  There is a long tradition of regulation of the behavior and conduct – including pertaining to firearms – of those under the age of twenty-one, and those under that age at the time of the relevant regulations were characterized as minors.  It simply does not logically follow that later decisions to provide certain rights to those who have reached the age of eighteen somehow change the historic regulation of those under the age of twenty-one.

16

But that alternative request for relief is legally deficient, because the plaintiffs lack standing to prosecute it. "To establish Article III standing, a plaintiff must demonstrate '(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.'" Davis v. Dynata, LLC, No. 3:22-CV-1062 (SVN), 2023 WL 6216809, at *7 (D. Conn. Sept. 25, 2023) (quoting Thole v. U. S. Bank N.A., 140 S. Ct. 1615, 1618 (2020)). Here, at trial, both individual plaintiffs testified that if allowed, they intended to purchase handguns from retailers, not through private sales. The individual plaintiffs, therefore, have not established that they are suffering injuries in fact that are caused by allegedly unconstitutional conduct on the part of the federal government – at least as it pertains to the alternative request for relief – because they have expressly disavowed any intention of acquiring handguns in the manner raised by that claim for relief. Put another way, where the plaintiffs do not seek to obtain handguns through private-party sales, they cannot invoke this court's jurisdiction to try to obtain relief that would impact only "private party handgun transfers." Any other result would result in the court issuing an improper advisory opinion. See, e.g., F. X. Maltz, Ltd. v. Morgenthau, 556 F.2d 123, 125 (2d Cir. 1977) ("Under Article III of the Constitution, the jurisdiction of federal courts is limited to actual cases and controversies, as distinguished from 'advisory opinions.'").

Moreover, apart from any standing issues, and even assuming arguendo that the plaintiffs properly have pleaded that federal law prohibits the State of Connecticut from using NICS for private-party handgun transfers (which, generally, it does not), the

plaintiffs have failed to establish the constitutional infirmity of that law. Specifically, they simply do not explain how a federal regulation limiting State use of a national background check system violates the text of the Second Amendment.

In any event, it is solely because of Connecticut's requirements that: (A) certain licensure be secured before obtaining certain firearms; and (B) that general licensing requirement being compounded by state law requiring those firearm license applicants be at least 21 years of age, that a NICS query is not currently authorized. Even if Connecticut's state-mandated general firearm licensing requirements were still in place, but those state laws allowed persons 18, 19, or 20 years old to apply for those firearm-related licenses, then NICS <u>could</u> be queried by any criminal justice agency (like Connecticut State Police) authorized to issue those firearm-related licenses. <u>See</u> 28 CFR 25.6(j)(1). To be sure, federal law does not require NICS checks be conducted by agencies issuing firearm-related licenses or permits; the ability to conduct such checks, however, is allowed by federal regulation. Moreover, if Connecticut state law mirrored federal law and generally allowed individuals 18, 19, or 20 to obtain handguns through, for example, private transfers, then the declaratory remedy sought (NICS background checks of the plaintiffs and organizational members of plaintiffs) would be irrelevant.

### III.    Conclusion

For the foregoing reasons, the federal defendant respectfully urges the court to render judgment in her favor on count two of the amended complaint.

        David X. Sullivan
        United States Attorney

         /s/
        John W. Larson (ct28797)
        Assistant United States Attorney
        District of Connecticut
        450 Main Street, Room 328
        Hartford, CT 06103
        T:  (860) 947-1101
        F:  (860) 760-7979
        john.larson@usdoj.gov