**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ZACHARY SUCCOW, et al., | ) | 3:25-CV-250 (SVN) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TODD BLANCHE, et al., | ) | |
| *Defendants*. | ) | July 23, 2026 |


## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 3

II.   STATUTORY & LEGAL FRAMEWORKS .......................................................... 5

  A.   Federal Framework .......................................................................................... 5

  B.   Connecticut Framework ................................................................................... 6

  C.   Challenged Background Check Framework ..................................................... 9

  D.   Legal Framework ........................................................................................... 11

    1.   Pre-*Bruen* Twenty-First Century Cases ........................................... 11

      a.   *Heller* .................................................................................... 11

      b.   *McDonald* .............................................................................. 12

    2.   *Bruen* and *Rahimi* .......................................................................... 14

    3.   Second Circuit Post-*Bruen* Developments....................................... 16

    4.   *Wolford v. Lopez* ............................................................................. 20

III.  FINDINGS OF FACT............................................................................................ 22

  A.   Relevant Parties ............................................................................................ 22

    1.   Samuel Towne .................................................................................... 22

    2.   Zachary Succow.................................................................................. 23

    3.   John Bucherati ................................................................................... 24

    4.   Patrick Daley....................................................................................... 24

    5.   Other Parties....................................................................................... 24

  B.   Connecticut Permit Approval Process ........................................................... 25

  C.   Status of Eighteen- to Twenty-Year-Olds at the Founding ........................... 27

  D.   Founding Era Militia Service......................................................................... 28

  E.   Nineteenth Century Societal Changes ........................................................... 28

F.    Behaviors of Individuals Under Twenty-One.................................................... 30
IV.    CONCLUSIONS OF LAW ...................................................................................... 30
A.    Summary of Conclusions.................................................................................... 30
B.    Standing .............................................................................................................. 32
    1.    Succow's Standing as to the Connecticut Framework.................................... 34
    2.    Towne's Standing as to the Connecticut Framework ..................................... 37
    3.    Succow's and Towne's Standing to Challenge Private Party Transfer Law ............... 38
    4.    Summary .................................................................................................... 42
C.    Nature of the Constitutional Challenges ........................................................... 42
D.    Count Two .......................................................................................................... 43
    1.    Circuit Court Precedent................................................................................ 44
    2.    Presumptive Permissibility .......................................................................... 45
    3.    Bruen Test:  Part One.................................................................................. 49
    4.    Bruen Test:  Part Two ................................................................................. 49
    5.    Alternative Request for an Injunction Regarding NICS Background Check ............... 55
E.    Count One ........................................................................................................... 56
    1.    Circuit Court Precedent................................................................................ 56
    2.    Bruen Test:  Part One.................................................................................. 57
    3.    Bruen Test:  Part Two ................................................................................. 58
        a.    Founding Era.......................................................................................... 60
        b.    New Circumstances and Modern Regulations........................................... 65
        c.    Reconstruction Era Laws ........................................................................ 67
V.    CONCLUSION........................................................................................................ 75

## RULING FOLLOWING BENCH TRIAL

Sarala V. Nagala, United States District Judge.

### I.     INTRODUCTION

Plaintiffs Zachary Succow and Samuel Towne (together, the "Individual Plaintiffs"), both nineteen-year-old citizens of Connecticut as of the filing of their amended complaint, allege that Connecticut and federal laws (together, the "State and Federal Handgun Restrictions") prohibiting the sale, possession, and/or carrying of handguns by individuals between the ages of eighteen and twenty violate their Second and Fourteenth Amendment rights. Joining them as Plaintiffs with respect to their challenge to the federal laws are the Connecticut Citizens Defense League, Inc. ("CCDL") and the Second Amendment Foundation ("SAF") (together, the "Organizational Plaintiffs"), two non-profit Second Amendment advocacy organizations.[1] Plaintiffs seek declaratory and injunctive relief against various federal and state officers sued in their official capacities.[2] After consolidating Plaintiffs' request for a preliminary injunction with the trial on the merits, the Court conducted a two-day bench trial, followed by post-trial briefing and oral argument. Having considered all the admissible testimony of the witnesses and all the admissible documentary evidence, the Court finds that the State and Federal Handgun Restrictions do not violate Plaintiffs' Second Amendment or Fourteenth Amendment rights, as they are consistent with this Nation's history and tradition of firearms regulation.

---

[1] The Court previously held that the Organizational Plaintiffs lack standing as to Count One of Plaintiffs' amended complaint challenging Connecticut's laws. *See Succow v. Bondi*, No. 25-CV-250 (SVN), 2025 WL 3677799 (D. Conn. Dec. 18, 2025) ("Standing Decision").

[2] Defendants are Acting United States Attorney General Todd Blanche; Connecticut Department of Emergency Services and Public Protection Commissioner Ronnell Higgins, Connecticut State's Attorney for the Ansonia/Milford Judicial District Margaret E. Kelley, and Connecticut State's Attorney for the New London Judicial District Paul J. Narducci (together, the "State Defendants"); and Seymour Police Chief John Bucherati and Norwich Police Chief Patrick Daley (the "Police Chief Defendants"). At closing argument on April 23, 2026, Plaintiffs moved to substitute Defendant Acting United States Attorney General Blanche for former United States Attorney General Bondi by oral motion, which the Court granted. *See* Minute Entry, ECF No. 151.

This ruling constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court notes that the distinction between a finding of fact and a conclusion of law "is anything but clear-cut." *March v. United States*, No. 3:17-CV-2028 (VAB), 2021 WL 848723, at *6 (D. Conn. Mar. 5, 2021) (internal quotation marks omitted) (quoting *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-CV-690 (JJM), 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016)). Accordingly, "for purposes of appellate review, the labels of fact and law assigned should not be considered controlling." *Id.*

Moreover, the Court bears in mind that, to prevail in a civil trial, Plaintiffs must prove each element of a claim by a preponderance of the evidence. *Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1120 (2d Cir. 1970); *Velasquez v. U.S. Postal Serv.*, 155 F. Supp. 3d 218, 227 (E.D.N.Y. 2016); *Moses v. St. Vincent's Special Needs Ctr.*, No. 3:17-CV-1936 (SRU), 2022 WL 972439, at *5 (D. Conn. Mar. 31, 2022). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (citation and internal quotation marks omitted); *accord Velasquez*, 155 F. Supp. 3d at 227. This standard "is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996); *accord Moses*, 2022 WL 972439 at *5. In considering whether the evidence proffered satisfies this standard, the Court, as the trier of fact, is entitled to assess the credibility of the witnesses, to believe some parts and disbelieve other parts of a witness' testimony, and to draw permissible inferences from the admissible evidence. *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012); *Clayton Servs. LLC v. Sun West Mortg. Co.*, No. 3:17-CV-172 (KAD), 2021 WL 2376619, at *1 (D. Conn. June 10, 2021).

II.    **STATUTORY & LEGAL FRAMEWORKS**

Plaintiffs challenge the constitutionality of two regulatory frameworks concerning the sale, possession, and carrying of handguns by individuals between the ages of eighteen and twenty:  one federal (the "Federal Framework") and one state (the "Connecticut Framework").  The Federal Framework limits the sale or delivery of handguns by federally licensed sellers to individuals under the age of twenty-one.  The Connecticut Framework, in turn, limits the sale, transfer, carrying, and/or possession of handguns—via both commercial sales and private party-to-party transfers— to individuals under the age of twenty-one.  Each framework is examined below.

A.  Federal Framework

In 1968, Congress enacted the Gun Control Act (the "GCA"), which prohibits individuals from "engag[ing] in the business of importing, manufacturing, or dealing in firearms" until they have received a license to do so from the Attorney General.  18 U.S.C. § 923; *see also generally* 18 U.S.C. §§ 921–931.  Congress passed the GCA primarily to "curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'"  *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 1501, 90th Cong., 2d Sess., at 22 (1968)); *see also McCoy v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 140 F.4th 568, 572 (4th Cir. 2025), *cert. denied*, --- S.Ct. ----, 2026 WL 1871297 (June 30, 2026) ("After years of investigation, Congress found a causal relationship between the easy availability of [handguns] and juvenile and youthful criminal behavior and sought to prohibit handgun sales to emotionally immature and thrill-bent juveniles and minors.") (internal citation and quotation marks omitted).

Federal Firearms Licensees ("FFLs") are subject to a number of restrictions.  As relevant here, 18 U.S.C. § 922(b)(1) prohibits an FFL from selling or delivering any firearm "other than a

5

shotgun or rifle" or ammunition for a shotgun or rifle to individuals under the age of twenty-one.

It reads in full as follows:

> It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

18 U.S.C. § 922(b)(1).  In turn, 18 U.S.C. § 922(c) requires individuals seeking to purchase a firearm other than a shotgun or a rifle from an FFL without "appear[ing] in person at the licensee's business premises" to submit a sworn statement attesting that the purchaser is twenty-one years or older.  Any FFL who "willfully violates" these provisions may be fined, imprisoned for a term not exceeding five years, or both.  18 U.S.C. § 924(a)(1)(D).

The Code of Federal Regulations contains a regulatory counterpart to 18 U.S.C. § 922(b)(1), which limits the selling or delivery of any firearm or ammunition "if the firearm, or ammunition, is other than a shotgun or rife, or ammunition for a shotgun or rifle," to individuals under the age of twenty-one.  27 C.F.R. § 478.99(b)(1).  Together, § 922(b)(1) and § 478.99(b)(1) operate to prohibit *licensed*—not private party-to-party—sales or deliveries of handguns by FFLs to individuals under the age of twenty-one.

B.  Connecticut Framework

In addition to the Federal Framework described above, Plaintiffs challenge Connecticut's statutory provisions limiting the purchase, transfer, possession, and/or carrying of handguns by individuals under the age of twenty-one.

Conn. Gen. Stat. § 29-34(b) provides that "[n]o person shall sell, barter, hire, lend, give, deliver, or otherwise transfer to any person under the age of twenty-one years any pistol or revolver."  That section provides one exception for the temporary transfer of a pistol or revolver

6

"to any person" solely for "target shooting or on a firing or shooting range, provided such use is otherwise permitted by law and is under the immediate supervision of a person eligible to possess a pistol or revolver." *Id.* Any individual who violates Section 29-34(b) is guilty of a Class C felony, punishable by a mandatory minimum two-year period of incarceration and $5,000 fine. Conn. Gen. Stat. § 29-34(a).

Further, "[n]o person may purchase or receive any pistol or revolver unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (c) of section 29-28," or can satisfy other criteria not salient to this case. Conn. Gen. Stat. § 29-33(b). For those who wish to personally carry a handgun outside of "such person's dwelling house, on land leased or owned by such person or within the place of business of such person," Connecticut law prohibits the "[c]arrying of pistol or revolver without permit." Conn. Gen. Stat. § 29-35. Those who possess a permit to carry a handgun in Connecticut may nevertheless not "knowingly carry any firearm with intent to display such firearm," meaning such person must take "reasonable measures to conceal the fact that such person is carrying a firearm." Conn. Gen. Stat. § 29-35(2).

Conn. Gen. Stat. § 29-28(c) establishes a two-step process for obtaining a temporary and, later, permanent permit to carry a pistol or revolver in the state. First, the person must apply for a temporary state carry permit with the local permitting authority[3] in the jurisdiction in which he has a permanent residence. *Id.* Under Section 29-28(c), a temporary or permanent state permit to carry a pistol or revolver cannot be issued if the applicant:

> has failed to successfully complete, not earlier than two years prior to the submission of such application, a course approved by the Commissioner of

---

[3] Under the statute, the local permitting authority is the chief of police for the jurisdiction, "or, where there is no chief of police, the chief executive officer . . . or, if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality." Conn. Gen. Stat. § 29-28(a). Conn Gen. Stat. § 29-28 was updated on October 1, 2025. As no party has argued that this updated version differs in any material respect from the version cited in Plaintiffs' amended complaint, the Court cites to the current version of this statute.

Emergency Services and Public Protection in the safety and use of firearms, which courses may include those certified by the National Rifle Association or other organizations, conducted by an instructor certified by the National Rifle Association or by the state, provided any such course includes instruction in state law requirements pertaining to safe storage in the home and in vehicles, lawful use of firearms and lawful carrying of firearms in public.

*Id.* The local permitting authority also may not issue a temporary or permanent permit if the applicant has: committed any felony or specific other types of crimes within a prescribed period of time, including certain misdemeanors, crimes of violence, and drug offenses; been convicted as delinquent of a serious juvenile offense; been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect; has been confined or voluntarily admitted to a hospital for persons with psychiatric disabilities within the preceding six months; is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person; is subject to a firearms seizure order issued prior to June 1, 2022; is prohibited from shipping, transporting, possessing or receiving a firearm; is an alien illegally or unlawfully in the United States; or—as relevant here—is under twenty-one years of age. *Id.*

Upon issuance of the temporary state permit, the local permitting authority will forward the application to the Commissioner of the Emergency Services and Public Protection ("DESPP Commissioner"). *Id.* Within sixty days of receiving the application, the holder of an approved temporary state carry permit may appear at a designated location to receive a permanent state permit from the DESPP Commissioner. *Id.*

Finally, Connecticut establishes an additional requirement before an individual may purchase a handgun, requiring such individual to obtain a pistol eligibility certificate. *See* Conn. Gen. Stat. § 29-36f. Persons under the age of twenty-one may not obtain a certificate. *Id.* Obtaining a pistol eligibility certificate is separate from Connecticut's two-step permitting

8

requirements under § 29-38(c), and allows an individual to purchase the handgun after he or she has already completed the requisite permitting process.[4]  Among other qualifications, § 29-36f(b) expressly requires the completion of "a course approved by the [DESPP Commissioner] in the safety and use of firearms."

C.  Challenged Background Check Framework

In the alternative to their requested relief as to the challenged State and Federal Handgun Restrictions, Plaintiffs seek to re-establish Connecticut's ability to rely on the National Instant Check System for private party-to-party handgun transfers.  *See* Am. Compl., ECF No. 49 at 35–36.  As such, the Court outlines the federal background check framework and how it intersects with Connecticut law here as well.

In 1993, the Brady Handgun Violence Prevention Act (the "Brady Act") established the National Instant Criminal Background Check System ("NICS") in order to prevent the transfer of firearms to individuals who are prohibited from possessing firearms under federal or state law. Pub. L. No. 103-159, 107 Stat. 1536 (1993).  Under the Brady Act, FFLs in licensed transactions must submit to the NICS certain identifying information for a buyer or transferee, which is then cross-referenced against a federal database to determine whether the purchaser or transferee is prohibited under federal law from possessing a firearm.  *See* 18 U.S.C. § 922(t)(1)(A)–(C).  These checks, while normally processed by the Federal Bureau of Investigation, may also be conducted by a state's law enforcement agency designated to be the point of contact, serving as an intermediary between an FFL and the federal database.  28 C.F.R. § 25.6(d).

---

[4] *See* https://portal.ct.gov/despp/knowledge-base/articles/frequently-asked-questions/slfu/state-pistol-permit-and-eligibility-certificate?language=en_US (last visited July 23, 2026).

While states may use the NICS index for checks required under the Brady Act, 28 C.F.R. § 25.6 limits use of the NICS for purposes unrelated to background checks required under the Brady Act. In relevant part, the regulation states:

> Access to the NICS Index for purposes unrelated to NICS background checks pursuant to 18 U.S.C. 922(t) shall be limited to uses for the purposes of:
>
> (1) Providing information to Federal, state, tribal, or local criminal justice agencies in connection with the issuance of a firearm-related or explosives-related permit or license, including permits or licenses to possess, acquire, or transfer a firearm, or to carry a concealed firearm, or to import, manufacture, deal in, or purchase explosives;
>
> (2) Responding to an inquiry from the Bureau of Alcohol, Tobacco, Firearms, and Explosives in connection with a civil or criminal law enforcement activity relating to the Gun Control Act (18 U.S.C. Chapter 44) or the National Firearms Act (26 U.S.C. Chapter 53); or,
>
> (3) Disposing of firearms in the possession of a Federal, state, tribal, or local criminal justice agency.

28 C.F.R. § 25.6(j). No NICS background check is required for private party-to-party transactions of firearms under the Brady Act.

In Connecticut, the "sale, delivery or other transfer of any pistol or revolver" is prohibited "until the person, firm, or corporation selling, delivering or transferring such pistol or revolver completes a transfer document on a form prescribed and furnished by the Commissioner of Emergency Services and Public Protection and obtains an authorization number from said commissioner." Conn. Gen. Stat. § 29-33(c). The DESPP Commissioner "shall perform the national instant criminal background check" and then "make a reasonable effort to determine whether there is any reason that would prohibit such applicant from possession a pistol or revolver." *Id.* If the DESPP Commissioner determines there is such a reason, he or she (1) "shall [] deny the sale, delivery or other transfer" of the pistol or rifle and (2) "inform the local permitting

authority" or relevant chief of police that "there exists a reason that would prohibit" the transferee from possessing a pistol or revolver.  *Id.*

Effective September 11, 2023, Connecticut's Special Licensing and Firearms Unit ("SLFU") no longer facilitates "the private sale of a firearm between two individuals," as Conn. Gen. Stat. § 29-33(c) requires a NICS background check, which, according to SLFU's website, "is not authorized by the FBI unless an FFL is involved."  SLFU Notice, Am. Compl., Ex. D, ECF No. 49-4 at 3.  Accordingly, SLFU's website states that "every private citizen sale to another private person must be facilitated through an FFL."  *Id.*

D.  Legal Framework

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Much ink has been spilled over these twenty-seven words, as courts have attempted to properly interpret and balance the rights protected under the Second Amendment against the panoply of different types of arms and regulations that developed concurrently with, and since, this Nation's founding (the "Founding").  Prior to *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Second Amendment's contours had been seldom explored by the Supreme Court, last being meaningfully addressed in *United States v. Miller*, 307 U.S. 174 (1939).  Now—in the twenty-first century—Second Amendment jurisprudence has undergone a swift and significant recalibration following a quintet of cases from the Supreme Court.  The Court recounts these cases here.

1.  *Pre-Bruen Twenty-First Century Cases*

a.  *Heller*

In 2008, the Supreme Court decided *Heller*, which held that the Second Amendment conferred "the individual right to possess and carry weapons in case of confrontation," and that such right was not limited solely to organized militia service.  554 U.S. at 592.  In *Heller*, the

11

plaintiff challenged the District of Columbia's laws banning handgun possession inside the home and imposing a trigger lock requirement on all weapons while inside the home. *Id.* at 574–76, 628.

Before turning to the restrictions at issue, the ruling examined the meaning and scope of the Second Amendment. The Supreme Court held that the Second Amendment did not *create* a right, but rather codified a *pre-existing* right meant to "protect[] against both public and private violence." *Id.* at 593–94. Further, while the Second Amendment contains a prefatory clause pertaining to militia service, the majority emphasized that the "*central component* of the right" was the right to self-defense. *Id.* at 599 (emphasis in original).

The Supreme Court was careful to acknowledge, however, that this right is "not unlimited" and was intended to protect the keeping and bearing of weapons "in common use at the time." *Id.* at 626–27 (internal citation omitted). Further, the ruling established three "presumptively lawful" categories of "regulatory measures" under the Second Amendment: "prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." *Id.*; *id.* at 627 n.26. As the Supreme Court noted, this was not an "exhaustive" list of permissible regulations on the right to keep and bear arms. *Id.* at 627 n.26. Then, turning to the regulations at issue, the Supreme Court held the challenged District of Columbia regulations violated the Second Amendment. *Id.* at 635.

b. *McDonald*

In 2010, the Supreme Court decided *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *McDonald* was a consolidated action concerning challenges to a Chicago city ordinance and an Oak Park, Illinois village code which effectively "bann[ed] handgun possession by almost all private citizens," for the purpose of protecting citizens in each community from harm to property and person as a result of handguns. *Id.* at 750. The respondents argued that the city and village

12

regulations did not run afoul of the Second Amendment because the amendment did not apply to the states through the Fourteenth Amendment. *Id.* at 753.

Turning again to the scope of the Second Amendment, a plurality of the Supreme Court held the amendment was "fully applicable to the States" by incorporation through the Fourteenth Amendment.[5] *Id.* at 750. As in *Heller*, the plurality opinion did not attempt to survey the full scope of the Second Amendment, but did emphasize that incorporation of the Second Amendment to the States would "not imperil every law regulating firearms." *Id.* at 780 (plurality op.). Accordingly, the plurality remanded the actions for further adjudication in light of its holding. *Id.* at 791.

Following the Supreme Court's decisions in *Heller* and *McDonald*, the Second Circuit— along with the majority of circuits—devised and applied a two-part test to adjudicate Second Amendment challenges (the "Circuit Test").[6] "At step one, [courts] asked whether a challenged law burdened conduct that fell within the scope of the Second Amendment based on its text and history. If so, [courts] proceeded to step two, assessing whether the challenged law burdened the core of the Second Amendment, defined by *Heller* as self-defense in the home." *Antonyuk v. James*, 120 F.4th 941, 963 (2d Cir. 2024), *cert. denied*, 145 S.Ct. 1900 (2024) (citing *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 118 (2d Cir. 2020)). "If the burden was *de minimis*, the law was subject to intermediate scrutiny; if the burden was substantial and affected the core of the right, the law was subject to strict scrutiny." *Antonyuk*, 120 F.4th at 963.

---

[5] The plurality opinion reached this conclusion through the Due Process Clause of the Fourteenth Amendment, while Justice Thomas reached this conclusion through the Privileges or Immunities Clause of the Fourteenth Amendment. *See McDonald*, 561 U.S. at 791; *id.* at 806 (Thomas, J., concurring in part and concurring in the judgment).
[6] Some circuits, like the Eighth Circuit for example, never adopted the two-step analytical framework that pre-dated the current *Bruen* framework. *See Worth v. Jacobson*, 108 F.4th 677, 687 (8th Cir. 2024).

13

2. *Bruen* and *Rahimi*

In 2022, the Supreme Court once again revisited the Second Amendment and did away with the Circuit Test. *New York State Rifle and Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022). The majority in *Bruen* set forth a new test:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 24 (internal citations omitted). "Under the first step of the *Bruen* analysis, the plaintiff bears the burden of demonstrating that 'the Second Amendment's plain text covers an individual's conduct.'" *New York State Firearms Assoc. v. James*, 157 F.4th 232, 244 (2d Cir. 2025) (quoting *Bruen*, 597 U.S. at 24). If it does not, the "inquiry ends and there is no Second Amendment protection." *Nat'l Assoc. for Gun Rights v. Lamont*, 153 F.4th 213, 231 (2d Cir. 2025), *cert. granted by Grant v. Higgins*, --- S.Ct. ---, 2026 WL 1871312 (Mem. June 30, 2026). But if the plain text of the Second Amendment does cover the individual's conduct, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. Then, it is the burden of the regulating party—whether that be the federal government, a state, or a municipality—to show "that the regulation is consistent with this Nation's historical tradition of firearms regulation." *Id.*; *see also Lamont*, 153 F.4th at 231.

In conducting the second step of the *Bruen* analysis, the Supreme Court acknowledged that some cases may require a "more nuanced approach" where "unprecedented societal concerns or dramatic technological changes" resulted in the development of the contemporary firearm regulation, obviating a "straightforward historical inquiry." *Bruen*, 597 U.S. at 27. When navigating these nuanced comparisons, the Supreme Court instructed courts not to attempt in vain

14

to search for a "historical twin," but rather to look for "a well-established and representative historical analogue." *Id.* at 30 (emphasis removed). In determining whether a modern regulation has a historical analogue, *Heller* and *McDonald* pointed toward "at least two metrics: *how* and *why* the regulations burden a law-ability citizen's right to armed self-defense." *Id.* at 29 (emphasis added). This analogical reasoning is "neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. Thus, even if "a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In *Bruen*, the challenged regulation was a New York state requirement that applicants seeking unrestricted licenses to carry handguns in public for self-defense needed to demonstrate proper cause for such license. *Id.* at 12. Applying this new framework, the Supreme Court held that the Second Amendment covered the plaintiffs' challenged conduct—"carrying handguns publicly for self-defense"—and that the New York regulation requiring an applicant to demonstrate cause before exercising his or her Second Amendment rights had no grounding in the history and tradition of firearms regulation in the United States. *Id.* at 32, 70–71.

The Supreme Court's next twenty-first century Second Amendment case—*U.S. v. Rahimi*—came in 2024, when the majority upheld a provision of 18 U.S.C. § 922(g)(8) that criminalizes possession of a firearm by individuals subject to certain types of domestic violence restraining orders. 602 U.S. 680, 688 (2024). In *Rahimi*, the majority reiterated that the Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." *Id.* at 691. Further, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," and is not "a law trapped in amber." *Id.* at 691–92. Courts "must ascertain whether the [challenged] new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck

15

by the founding generation to modern circumstances.'" *Id.* at 692 (citing *Bruen*, 597 U.S. at 29) (cleaned up).  The appropriate inquiry thus is to determine "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition."  *Id.* (internal quotation omitted and emphasis added).  "Why and how the regulation burdens the right are central to this inquiry." *Id.*  This analysis was vital to the *Rahimi* holding, where there was no directly analogous Founding era precedent to the challenged statute.  Nevertheless, in upholding the statute, the Supreme Court analogized the modern statute to two "relevantly similar"—but "by no means identical"—eighteenth century weapons regulations.  *Id.* at 698.

### 3.  Second Circuit Post-Bruen Developments

Following the Supreme Court's decision in *Bruen*, the Second Circuit applied and further refined the *Bruen* framework for application within the Circuit.

First, the Second Circuit has clarified that despite *Bruen's* new two-step analysis, *Heller's* presumptively lawful categories of restrictions—including regulation of the commercial sale of firearms—survive and "[n]othing in [*Bruen*] casts doubt on that understanding of the Second Amendment's scope." *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023), *cert. denied*, --- U.S. ----, 144 S. Ct. 2659 (2024); *see also United States v. Gomez*, 159 F.4th 172, 176 (2d Cir. 2025). Nevertheless, this presumption can be overcome by, for example, "a regulation on commercial firearms dealers as a class that has the effect of prohibiting law-abiding, responsible citizens from possessing common-use weapons." *Gazzola*, 88 F.4th at 196 n.6.  While the Second Circuit has not definitively stated at what step of the *Bruen* analysis this presumptively lawful determination should be made, *see id.*, other circuits have included it as part of the step-one analysis, where the burden falls on the regulation's challenger.  *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 120 (10th Cir. 2024) (noting the "apparent tension between the *Bruen* two-step framework and

16

the safe harbor list of presumptively lawful regulations," and choosing to analyze the safe harbor list at step one).

As to step one of the *Bruen* test, courts in the Second Circuit consider three issues: "'whether the conduct at issue is protected, whether the weapon concerned is in common use, and whether the affected individuals are ordinary, law-abiding, adult citizens and thus part of the people whom the Second Amendment protects.'" *Gomez*, 159 F.4th at 176 (quoting *Antonyuk*, 120 F.4th at 981). At this step, the plaintiff bears the burden of establishing that the Second Amendment's plain text covers the conduct of the individual at issue. *See Frey v. City of New York*, 157 F.4th 118, 127 (2d Cir. 2025) (quoting *Bruen*, 597 U.S. at 24). "If the plaintiff makes that showing, the burden shifts to the government to prove that the challenged law is 'consistent with the Nation's historical tradition of firearms regulation.'" *Christian v. James*, 176 F.4th 189, 194 (2d Cir. 2026) (quoting *Bruen*, 597 U.S. at 24).

The Second Circuit has also issued guidance to the lower courts on the historical analysis central to the second part of the *Bruen* test, recognizing that "'[w]hy and how the regulation burdens the right are central[.]'" *Id.* (quoting *Rahimi*, 602 U.S. at 692). "First, when used to interpret text, not all history is created equal." *Antonyuk*, 120 F.4th at 969 (internal citation omitted). America in 2026 faces different issues "than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction," and courts must be appropriately attuned to such differences. *Id.* at 970. At the same time, "historical practices that long predate or postdate codification of the relevant constitutional provision may not have much bearing on the provision's scope if the practices were obsolete or anomalous," such as "one-off and short-lived territorial law, military decree, or local law" that "contradicts the overwhelming weight of other evidence." *Id.* at 969.

Further, whether the societal problem being addressed by the regulation is one "'that has persisted since the 18th century'" is important to the analysis. *Id.* (quoting *Bruen*, 597 U.S. at 26–27). If there is such a history of the societal problem at issue, then a contemporaneous regulation addressing that societal problem "might more likely be unconstitutional if there is a 'lack of a distinctly similar historical regulation addressing that problem,' if 'earlier generations addressed the societal problem . . . through materially different means,' or if state courts struck down similar regulations addressing the same problem on 'constitutional grounds.'" *Id.* (quoting *Bruen*, 597 U.S. at 26–27). "Conversely, 'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide [a court's] interpretation of an ambiguous constitutional provision.'" *Id.* (quoting *Bruen*, 597 U.S. at 36).

However, "the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Id.* "Reasoning from historical silence is risky" and courts should not take the absence of "positive legislation from a particular time or place" as evidence that legislators at that time or place "deemed such a regulation inconsistent with the right to bear arms." *Id.* This is particularly the case where a case concerns "new circumstances and modern regulations that were unimaginable at the founding," making "the lack of Founding-Era history . . . an especially weak indicator of constitutionality." *Christian*, 176 F.4th at 206 (finding that lack of Founding era regulations on the carrying of arms in public parks was the "natural consequence" of the fact that "modern urban public parks . . . did not yet exist in significant numbers" at the Founding, and thus was a new circumstance) (internal citation omitted); *see also Bruen*, 597 U.S. at 27 ("[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach").

Further, "it is 'not dispositive whether comparable historical regulations exist in significant numbers.'" *Frey*, 157 F.4th at 128 (quoting *Antonyuk*, 120 F.4th at 971); *see also Christian*, 176 F.4th at 194–95.  "[W]here there is a lack of constitutional dispute regarding a type of gun regulation, or 'if courts during that period upheld similar governmental practices against similar constitutional challenges,' 'comparable historical laws need not proliferate to justify a modern prohibition.'" *Frey*, 157 F.4th at 128 (quoting *Antonyuk*, 120 F.4th at 969, 972).

As to the appropriate historical time period to consider, the Second Circuit has held that in analyzing state law, "'the understanding that prevailed when the States adopted the Fourteenth Amendment'—is, along with the understanding of that right held by the founders in 1791, a relevant consideration." *Antonyuk*, 120 F.4th at 973–74 (quoting *Nat'l Rifle Assoc. v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) and collecting cases).[7]  While the Second Circuit has not opined on "which era's understanding has primacy," it has noted that Supreme Court precedent has "approved looking to post-Founding history" even when a "1791 understanding primarily controls." *Frey*, 157 F.4th at 129.  When evidence from the period closer to 1791 differs from evidence from the period closer to 1868, "such discrepancy does not mean that the right to keep and bear arms was calcified in either 1791 or 1868"; rather, both eras "and the adjacent and intervening periods" present "fertile ground" for the court's analysis. *Antonyuk*, 120 F.4th at 974.  "Moreover, relying chiefly on later history is perfectly consistent with the originalist and liquidation theories espoused by the [Supreme] Court in *Heller* and *Bruen*." *Christian*, 176 F.4th at 195 (internal quotation and citation omitted).

---

[7] The Second Circuit has not squarely confronted whether the understanding of the Second Amendment that prevailed when the States adopted the Fourteenth Amendment is similarly relevant to a federal regulation, but at least one other Circuit has suggested that courts may permissibly consider nineteenth century understandings of the Second Amendment when analyzing federal regulations as well.  *See McCoy*, 140 F.4th at 575, 579.

To be sure, courts "cannot rely on later history if it 'contradicts what the [constitutional] text says.'" *Frey*, 157 F.4th at 130 (quoting *Bruen*, 597 U.S. at 36).  But it is equally clear under Second Circuit law that "even where there is an absence of Founding-era evidence supporting a historical tradition," the making of constitutional determinations based on later historical evidence, particularly Reconstruction era evidence, "cannot 'be characterized as *contradicting* the understanding of the right in 1791.'" *Christian*, 176 F.4th at 195 (quoting *Frey*, 157 F.4th at 130) (emphasis in original).

### 4.  *Wolford v. Lopez*

Finally, on June 25, 2026, the Supreme Court issued its most recent Second Amendment decision, *Wolford v. Lopez*, 609 U.S. ----, 2026 WL 1825723 (June 25, 2026).[8] *Wolford* concerned a challenge to certain of the state of Hawaii's property laws, enacted in the wake of *Heller*, that prohibited individuals from entering private property that is open to the public while carrying a firearm, absent express authorization.  *Id.* at *7–8.  The Supreme Court held that these laws implicated the Second Amendment and were unconstitutional, going against the history and tradition of firearms regulation.  *Id.* at *14.  In so holding, the Supreme Court further refined *Bruen*'s history and tradition-based test.

First, the majority reiterated *Bruen*'s familiar two-step framework, and clarified that step one requires three separate inquiries:  first, does the law apply to "the people"; second, does it concern any form of "Arms," "*i.e.*, any weapon customarily used for offensive or defensive purposes"; and third, "does the law place any restrictions on either the keeping (*i.e.*, possession)

---

[8] Earlier this term, the Supreme Court also issued a ruling in *United States v. Hemani*, 146 S. Ct. 1677 (June 18, 2026), which concerned a Second Amendment-based challenge to 18 U.S.C. § 922(g)(3), as-applied solely to Ali Hemani, the defendant in the district court case below.  *Hemani* was by its own terms a "narrow" decision, confined to its particular facts.  *Id.* at 1693.  The *Wolford* majority evidently shared this view, when it referred to *Rahimi* as the Supreme Court's "most recent Second Amendment case."  *Wolford*, 2026 WL 1825723 at *7.  Accordingly, the Court notes *Hemani's* existence here, but does not further elaborate upon it.

or the bearing (*i.e.*, carrying) of arms?"  *Id.* at *6 (cleaned up and internal citations omitted).

*Wolford* reaffirmed that, "[i]f a challenged law falls within the plain text of the Second

Amendment, it is presumptively unconstitutional."  *Id.*

From there, courts proceed to the second step, where the relevant regulating body "may be

able to show that its challenged law did not infringe the historical understanding of the codified

right."  *Id.*  At the second step, "[a] variety of sources, including scholarship," can assist courts in

determining whether a law or regulation "infringe[s] the historical understanding" of the Second

Amendment, but "often, the best evidence" are "historical analogues."  *Id.*  "A party defending

against a Second Amendment claim may rely on a single analogue, or a group of analogues," but

courts should consider "the number of jurisdictions in which [the analogue(s)] were adopted," the

"extent to which they were well-accepted," and "whether any analogue or collection of analogues

is relevantly similar to the modern law."  *Id.*  (internal citations omitted).  Relevantly similar means

the analogue(s) restricted the keeping or bearing of arms in the same manner (how) and for the

same reason (why) as the modern law.  *Id.*  Again, the Supreme Court majority emphasized that

this does not mean the analogue(s) have to be a "dead ringer" or "historical *twin*," but they "must

be close enough to enable a court to say:  "Because this historical law was understood to be

compatible with the right codified by the Second Amendment, we can infer that the restriction

imposed by the modern law is likewise consistent with that right."  *Id.*  While this test is "not

mechanical," it "undeniably necessitates an exercise of judgment."  *Id.*

With the governing groundwork laid, the Court proceeds to its findings of fact and

conclusions of law.

21

## III.    FINDINGS OF FACT

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court finds the following facts.

### A.    Relevant Parties

#### 1.    Samuel Towne

Plaintiff Samuel Towne was born on August 23, 2005, and is a resident of Norwich, Connecticut.  Bench Trial Tr. 1/12/26, ECF No. 127, at 122–23.  Towne is a member of the CCDL and the SAF.  *Id.* at 125.  Towne wishes to acquire a handgun for purposes of self-defense both inside and outside of the home, but he cannot do so as he has not turned twenty-one yet, the minimum age required to acquire a handgun under Connecticut law.  *Id.* at 128–29.  Specifically, Towne does not have either a handgun eligibility certificate or a pistol permit—both prerequisites for his purchasing a handgun in Connecticut—because he is not yet twenty-one.  *Id.* at 130.  Towne has completed the NRA Basics of Pistol Shooting course, which satisfies the handgun safety training course requirement to apply for a pistol permit in Connecticut.  *Id.* at 131–33.  Towne meets the eligibility criteria under federal and Connecticut law for obtaining a pistol permit, except for his age.  *Id*. at 125–128.  Towne has never applied for a pistol permit, based on his understanding that his application would be denied automatically because of his age.  *Id.* at 137.  If Towne were to purchase a handgun, he would do so from a retailer rather than through a private transfer.  *Id.* at 151, 153.

In addition to obtaining a pistol, Towne has expressed that obtaining a long gun is important to him for self-defense inside his home.  *Id.* at 136.  But he has not submitted an application for a long gun eligibility certificate under Connecticut law.  *Id.*

> ### 2. *Zachary Succow*

Plaintiff Zachary Succow was born on January 12, 2006, and is a resident of Seymour, Connecticut. *Id.* at 155–56. Succow is a member of the CCDL and the SAF. *Id.* at 158. Succow wishes to acquire a handgun for purposes of self-defense both inside and outside of the home, but he cannot do so as he is not twenty-one yet, the minimum age required to acquire a handgun under Connecticut law. *Id.* at 162–63. Succow does not possess either a handgun eligibility certificate or a pistol permit, which are required under Connecticut law in order to legally purchase a handgun. *Id.* at 164. Succow has never applied for a pistol permit, on the understanding that his application would be denied automatically due to his age. *Id.* at 173. Succow would look to purchase a handgun through a retailer, but testified on redirect examination that he would also consider a private party transfer if it were legal. *Id.* at 175, 190.

As of the date of commencement of this lawsuit, Succow had not completed the required live fire portion of a safety training course that would satisfy Connecticut's statutory requirements for purposes of obtaining a pistol permit, due to serious injuries from a snowboarding accident in January of 2025 that required him to use crutches to maneuver. *Id.* at 176–78. As of September 2025, when he was deposed, Succow still had not taken the live fire portion of his training and did not know when he would be able to do so. *Id.* at 179.

In addition to obtaining a handgun for self-defense, Succow has expressed that obtaining a long gun is somewhat important to him. *Id.* at 173. Succow had previously submitted an application to secure his long gun permit after the start of this case, but it was returned to him because he sent it to the wrong address, and he failed to resubmit it. *Id.* at 183–84. Succow does not currently have a submitted or pending application for a long gun eligibility certificate. *Id.* at 173.

### 3. *John Bucherati*

Defendant John Bucherati is the Chief of Police for the town of Seymour, Connecticut. Bench Trial Tr. 1/14/26, ECF No. 128, at 213. Part of Defendant Bucherati's job as Chief of Police is to assess applications for pistol permits in Seymour, and ultimately approve any application that satisfies the requirements under Connecticut law. *Id.* at 215–16. In making his assessment, Defendant Bucherati's policy and procedure is to follow the requirements for approval under Connecticut law. *Id.* at 223.

### 4. *Patrick Daley*

Defendant Patrick Daley is the Chief of Police for the city of Norwich, Connecticut. Part of Defendant Daley's job as Chief of Police is to assess applications for pistol permits in Norwich, and ultimately approve any application that satisfies the requirements under Connecticut law. *Id.* at 229. In making his assessment, Defendant Daley's policy and procedure is to follow the requirements for approval under Connecticut law. *Id.* at 230.

### 5. *Other Parties*[9]

CCDL and SAF are non-profit organizations that seek to educate on and advocate for Second Amendment rights across the country. Standing Decision, 2025 WL 3677799 at *2. The Individual Plaintiffs are each members of both organizations. *Id.* The Organizational Plaintiffs have standing solely as to Count Two in this action. *Id.* at *6.

Defendant Todd Blanche is the Acting Attorney General of the United States, who is responsible for enforcing federal firearms laws. *See* ECF No. 49 ¶ 60. Defendant Ronnell Higgins is the DESPP Commissioner. *Id.* ¶ 62. In that role, he oversees the Connecticut State Police and exercises "sole and exclusive authority" over whether or not to issue handgun eligibility

---

[9] No representatives of these parties testified at trial. Thus, the Court cites to the allegations of Plaintiffs' amended complaint, as well the Court's Standing Decision, to describe their roles, which appear to be undisputed.

certificates to Connecticut residents. *Id.* ¶¶ 62–63. Defendants Margaret E. Kelley and Paul J. Narducci are State's Attorneys in the state judicial districts in which Succow and Towne reside, respectively. *Id.* ¶¶ 64–65.

B. Connecticut Permit Approval Process

If an individual were to apply for an initial temporary pistol permit under Connecticut law in Seymour, the application would go to Defendant Bucherati's department for processing and review. Tr. 1/14/26 at 215–16. When the Seymour Police department receives an application for a pistol permit, the department first looks to determine whether all statutory requirements have been satisfied for the application; if they have been, then the department will proceed to an investigation of the applicant's background. *Id.* at 216. If an individual between the ages of eighteen and twenty submitted an application for a pistol permit under Connecticut law, the department would first advise such an applicant to withdraw the application, as it would otherwise be denied. *Id.* at 217. If the applicant nevertheless chose to proceed, then the department would deny the application because of the applicant's age, based on the requirements under Connecticut law. *Id.* at 217–18.

If all statutory requirements are satisfied, then the application proceeds to the background investigation stage to determine suitability for a permit. *Id.* at 216. This investigation is usually conducted by a detective in the department, with Defendant Bucherati providing direction as needed, but largely not supervising the investigation. *Id.* at 216–17. As part of the investigation, the assigned detective would look to see whether there were documented examples of a person showing violent tendencies, encounters with the police, or problems with alcohol, and what steps a person took following such examples. *Id.* at 218–19. The investigating detective would then prepare a report for Defendant Bucherati to review, and Defendant Bucherati would make the final

decision to approve or deny the permit, or order additional follow-up on an applicant's background. *Id.* at 216.

If an individual were to apply for an initial temporary pistol permit under Connecticut law in Norwich, the application would go to Defendant Daley's department for processing and review. *Id.* at 229. The application process largely mirrors that of the process in Seymour, with the department first looking to determine whether all statutory requirements have been satisfied for the application; if they have been, the department proceeds to an investigation of the applicant's background. *Id.* at 229–30. As in Seymour, if an individual between the ages of eighteen and twenty submitted an application for a pistol permit under Connecticut law in Norwich, the department would first advise such an applicant to withdraw such application as it would be denied, but if the applicant elected to proceed regardless, Defendant Daley would reject the application under Connecticut law. *Id.* at 230.

If all statutory requirements have been satisfied, a detective will then review the application and conduct a background investigation on the application to evaluate suitability, looking for prior interactions with the police and issues with mental health, alcohol, or violence. *Id.* at 230–31. Defendant Daley would become involved with the investigation if there are issues with the application, such as undisclosed out-of-state charges or questions on how to proceed, but generally he only reviews the results of the investigation when it is complete and makes a final determination on whether to issue a permit. *Id.* at 229–30.

C.   Status of Eighteen- to Twenty-Year-Olds at the Founding

At the Founding, the near universal age of majority was twenty-one.  Tr. 1/12/26 at 28; Decl. of Robert J. Spitzer, Defs.' Ex. 500, ECF No. 105-5 ¶ 11.[10]  Up until the age of twenty-one, people were considered infants, who were not capable of acting for themselves and were under the care and supervision of their parents.  Spitzer Decl. ¶ 12.  With some exceptions, minors lacked the ability to form valid contracts for themselves.  *Id.* ¶¶ 8, 13.  One exception where minors could form valid and enforceable contracts was for the provision of necessaries, but necessaries did not include firearms.  *Soper v. The President and Fellows of Harvard College*, 1 Pick. 177, 183 (Sup. Jud. Ct. of Mass. 1822); *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. (1 McCord) 572, 572 (Const. Ct. App. 1822), State Defs.' Opp'n to Prelim. Inj., ECF No. 88-3 at 1 ("Lodging, clothing, good, medicine and education are necessaries to every infant.  Such articles, therefore, as come under these heads, must be allowed.  The others, such as liquor, *pistols*, powder . . . ought not to have been allowed.  A new trial must therefore be granted. . . .") (emphasis added).  As minors, individuals were generally subsumed into the identities of their parents, guardians, masters, or other patriarchal-like figures acting in a parent-like capacity.  Spitzer Decl. ¶ 13.

College was one of the rare circumstances where minors in the Founding era would live outside of their parent's, guardian's, or master's direct authority.  *Id.* ¶ 34.  In 1870, the Department of Education recorded 9,000 college degrees being awarded that year, as well as 63,000 students being enrolled in institutions of higher education, generally.  *Id.* ¶ 35.  But even living

---

[10] At trial, Defendants elected to rely on the declarations of expert witnesses Dr. Robert J. Spitzer, Dr. Brennan Rivas, and Dr. Laurence Steinberg as their direct examination testimony, rather than presenting their direct examinations live.  Accordingly, the Court cites to these expert witnesses' declarations, in addition to any cross-examination or re-direct examination testimony from the record.  Plaintiffs do not challenge the admissibility of the expert opinions; nor did they submit expert opinions of their own.  Dr. Robert J. Spitzer, one of Defendants' three expert witnesses, is a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland and is also currently an Adjunct Professor at the College of William and Mary School of Law.  Spitzer Decl. ¶ 4.  Professor Spitzer writes frequently on and is an expert in the history of gun laws and policy in American politics and related historical, legal, political, and criminological issues.  *Id.* ¶ 5.

independently at college, faculty and administrators functioned as, or were comparable to, parents for these student-minors, and acted as their guardians. *Id.* ¶¶ 38–39. College faculty and administrators exercised control and supervision over students' residence, diet, company-keeping, and manners while away from home. *Id.* ¶ 39. Both at the Founding and today, students were typically between the ages of eighteen and twenty-two. *Id.* ¶ 40; Tr. 1/12/26 at 47.

### D. Founding Era Militia Service

At the Founding, militia service was an obligation, not a right, that typically began at age eighteen and continued through the age of forty-five. Spitzer Decl. ¶ 47. In 1792, Congress enacted the Uniform Militia Act which set the age of militia service at eighteen to forty-five and required militia eligible men to provide their own military-grade weapons, at their own expense. *Id.* ¶ 48. Following the Uniform Militia Act, each of the thirteen states enacted their own militia laws, in conformity with federal law, but uniformly including special considerations for militia members under the age of twenty-one consistent with their minor status. *Id.* ¶ 50 n.146.[11] Ten of these thirteen state militia laws, largely enacted in the 1790s, placed the legal burden for arming militia members under the age of twenty-one onto parents, masters, other guardians, or local governments. *Id.* ¶ 51. Vermont and Maine, which were not original states, enacted similar laws during this time. *Id.*; *see also id.* ¶ 56.

### E. Nineteenth Century Societal Changes

During the nineteenth century, America transitioned from a primarily rural society to a more urban one. Spitzer Decl. ¶ 28. This transition tracked the industrial development of the

---

[11] The Court takes judicial notice of the state militia laws cited in Professor Spitzer's declaration. *See United States v. Vereen*, 152 F.4th 89, 101 n.3 (2d Cir. 2025), cert. denied sub nom. *Perez v. United States*, No. 25-6198, 2026 WL 79986 (U.S. Jan. 12, 2026) (noting that "nothing in *Bruen* suggests that it cabined a court's authority to take judicial notice of undisputed facts whose accuracy cannot reasonably be questioned" and stating that "judicial notice of historical evidence is admissible when there is 'no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible'" (quoting *Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982))).

Nation; such industrialization resulted in the development of repeating handguns like the revolver, which were quick to fire and easily concealed.  Decl. of Brennan Rivas, Defs.' Ex. 505, ECF No. 105-6 ¶¶ 11, 13, 15.[12]   While there had been prior attempts to create reliable repeating-fire weapons, it was not until the development of the revolver in the 1830s, and its commercial dominance in the 1850s, that a reliable, mass-produced multi-shot compact weapon became widely available.  *Id.* ¶ 13.  Judges and lawmakers quickly began to refer to these types of handguns as "deadly weapons."  *Id.* ¶¶ 16–17.

The nineteenth century was significantly more violent than the preceding one, with the convergence of three factors—increased violence generally, enhanced firearms lethality, and increased gun ownership rates—resulting in increased gun violence in the mid- to late-nineteenth century.  *Id.* ¶¶ 11–12.  Handguns—particularly multi-shot revolvers—became more widely available during the nineteenth century due to industrialization, military surplus from the Civil War, and the advent of widespread, effective marketing techniques for these handguns.  *Id.* ¶ 13. These weapons were also more accessible, at least initially, to minors, who became more likely to keep their own wages in the nineteenth century, compared to during the Founding era.  *Id.* ¶ 21. Because of increased degree of anonymity for buyers and consumers of commercial goods, minors had the ability to more easily purchase these weapons at pawn shops, gun, or hardware stores across the country.  *Id.*

In response to these developments, laws proliferated to specifically regulate minors' ability to access these new deadly weapons.  Spitzer Decl. ¶ 30; Rivas Decl., ¶ 23.  The purpose of these laws generally was to protect minors from harm to themselves by restricting their access to

---

[12] Dr. Rivas is a historian and Senior Postdoctoral Researcher at the Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut.  Rivas Decl. ¶ 4.  She is an expert in historical weapon regulations in the United States and has published many peer reviewed articles on the topic.  *Id.* ¶¶ 4–5.

handguns or deadly weapons, and to protect society from minors' misdeeds while in possession of such handguns or deadly weapons.  Spitzer Decl. ¶¶ 29–30; *see also* Rivas Decl., ¶¶ 20–23.

F.  Behaviors of Individuals Under Twenty-One

Compared to adults, minors under the age of twenty-one are more impulsive, more likely to engage in risky and reckless behavior, and more influenced by peer pressure; and are less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations.  Decl. of Laurence Steinberg, Defs.' Ex. 507, ECF No. 105-7 ¶ 10.[13]  Adolescents and individuals into their early twenties are uniquely impulsive and insensitive to risk, leaving them less able than older individuals to control their impulses and consider the future consequences of their actions and decisions.  *Id.* ¶¶ 19, 20, 24.  Individuals between the ages of eighteen and twenty are at especially high risk for violence, suicide, nonsuicidal self-injury, and excessive drinking.  *Id.* ¶ 38.

IV.  **CONCLUSIONS OF LAW**

A.  Summary of Conclusions

The Court concludes as a matter of law that both the Federal Framework and the Connecticut Framework do not violate the Second Amendment on an as-applied basis.

First, Defendants have established by a preponderance of the evidence that Plaintiff Succow lacks standing to challenge the Connecticut Framework and that both Plaintiffs Towne and Succow lack standing as to their alternative requested relief, challenging Connecticut law's impediments on private party transfers.  Plaintiff Towne has standing to challenge the Connecticut Framework, and all Plaintiffs have standing to challenge the Federal Framework.

---

[13] Dr. Steinberg is the Distinguished University Professor and the Laura H. Carnell Professor of Psychology and Neuroscience at Temple University.  Steinberg Decl. ¶ 2.  He is a developmental psychologist specializing in adolescence, broadly defined as the second decade of life.  *Id.* ¶ 3.

Second, Plaintiffs have not demonstrated, by a preponderance of the evidence, that either the Federal Framework or the Connecticut Framework are facially unconstitutional. Accordingly, Plaintiffs' challenge may proceed solely on an as-applied basis.

Third, the Federal Framework is constitutional as applied to Plaintiffs. While Plaintiffs have carried their burden at step one of the *Bruen* analysis, Defendant Blanche has proven by a preponderance of the evidence that the Federal Framework's prohibition on the commercial sale and delivery of handguns to individuals between the ages of eighteen and twenty is consistent with the Nation's history and tradition of firearms regulation.

Fourth, the Connecticut Framework is constitutional as applied to Towne. The Court assumes without deciding that Towne is included in "the people" at step one of the *Bruen* analysis, and because the other factors at step one of the *Bruen* analysis are not in dispute, Towne has carried his burden at step one by a preponderance of the evidence. But the State Defendants have, in turn, proven by a preponderance of the evidence that the Connecticut Framework's prohibition on the sale, possession, or carrying of handguns by those under the age of twenty-one is consistent with the Nation's history and tradition of firearms regulation through Reconstruction era historical analogues. Accordingly, Plaintiffs' Second Amendment challenges and requests for permanent injunctive relief fail.

Before proceeding to the legal analysis, the Court takes judicial notice of the historical laws and regulations concerning the sale, possession, or carrying of handguns contained in the bodies of Dr. Spitzer's and Dr. Rivas' declarations, as well as at the following sources: Historic Weapons Restrictions on Minors by State, State Defs.' Ex. 502, ECF No. 105-5 at 95–145; College Campus Weapons Restrictions, *id.* at 147–67; and Dr. Rivas' Table of Historical Laws, ECF No. 130 at 1–10. The Court may properly take judicial notice of this historical evidence as it is limited to laws

31

whose accuracy cannot be reasonably questioned, and whose authenticity is not subject to dispute. *See Vereen*, 152 F.4th at 101 n.3.

B. Standing

All Defendants save Defendant Blanche challenge either Plaintiff Succow's or Plaintiff Towne's standing in this action. The State Defendants argue: (1) Succow lacks standing to challenge the Connecticut Framework given his failure to complete the live-fire component of his mandatory firearms training course as of the commencement of this action and (2) both individual Plaintiffs lack standing as to their alternative relief, challenging the alleged impediments on private party handgun transfers under Conn. Gen. Stat. § 29-33(c). State Defs. FoF & CoL, ECF No. 137 at 16–25. Defendant Bucherati likewise challenges Succow's standing to assert any claims as against him based on Plaintiff's failure to complete a mandatory firearms safety course at the time this action was commenced. Bucherati FoF and CoL, ECF No. 139 at 4–6. Finally, Defendant Daley challenges both Individual Plaintiffs' standing to challenge the Connecticut Framework. Daley FoF & CoL, ECF No. 136 at 12.[14]

The Court finds that Succow lacks standing to challenge the Connecticut Framework but Towne has standing to do so, and both Succow and Towne lack standing to challenge any alleged impediments on private party handgun transfers under Connecticut law.

Under Article III of the Constitution, federal courts may decide only actual cases and controversies. U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role[.]" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation omitted). When invoking federal jurisdiction, a plaintiff must establish that he has standing under Article III—that is to say, "a

---

[14] The Court previously found that the Organizational Plaintiffs had standing solely as to Count Two of Plaintiffs' amended complaint. *See* Standing Decision. No party challenged this determination either at trial, or in the post-trial briefing.

personal stake in the outcome of the controversy[.]" *Faculty v. New York Univ.*, 11 F.4th 68, 74 (2d. Cir. 2021) (internal citations and alterations omitted).  The "'irreducible constitutional minimum' of standing consists of three elements . . . [(1)] an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  If a plaintiff does not demonstrate standing under Article III, the federal court lacks subject matter jurisdiction to adjudicate the dispute. *Cortlandt Street Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015).

The Second Circuit has differentiated between challenges to "a rule that limits *eligibility* for a [firearms] license," and challenges to "a component of the [license] application process itself." *Antonyuk*, 120 F.4th at 978 (emphasis in original).  The Second Circuit characterized *Bruen*'s challenge to New York's proper cause requirement as one of eligibility.  *Id.* at 979.  In eligibility challenges, because a challenging plaintiff's injury "stems from his personal ineligibility for a license," "the plaintiff must prove up that premise either by applying for a license or by making a substantial showing of futility." *Id.*; *see also U.S. v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) ("[a]s a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy," or make a "substantial showing that submitting an application would have been futile" (internal citations and quotations omitted)). Futility, in this context, refers to the "*outcome* of the contemplated application, *i.e.*, whether the result is preordained." *Antonyuk*, 120 F.4th at 979 (emphasis in original) (citing *Decastro*, 682 F.3d at 164).  On the other hand, when the challenge is "that a portion of the application *process* is unconstitutional," the "injury flows from the application itself, not from [a plaintiff's] asserted

ineligibility for a license," and thus the plaintiff need not "first apply for and be refused a license" to have standing. *Id.* at 979–80.

Plaintiffs' challenge in this action, like the proper cause requirement in *Bruen*, challenges a rule limiting eligibility for, not a component of, the application process itself. Plaintiffs seek to invalidate the eligibility criteria of both the Connecticut and Federal Frameworks that require individuals seeking to purchase, possess, or carry handguns to be above the age of twenty-one. *See* ECF No. 49 at 34–35. This goes to eligibility: so long as the Individual Plaintiffs are under the age of twenty-one, "the result is preordained," as they will not be granted the requisite license or eligibility certificate. *See Antonyuk*, 120 F.4th at 979; *see also* Tr. 1/14/26 at 217–18, 230. Accordingly, the individual Plaintiffs must have either applied for the license or made a substantial showing of futility. To show an application would be futile, a plaintiff need only "demonstrate that they are able and ready to apply, but a[n unconstitutional] policy prevents them from doing so on equal footing." *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, 152 F.4th 47, 56 (2d Cir. 2025) (internal citation omitted).

### 1. *Succow's Standing as to the Connecticut Framework*

First, the Court agrees with the State Defendants and Defendant Bucherati that because Plaintiff Succow "had not completed the training course that is a statutory prerequisite for applying for a temporary pistol permit or eligibility certificate," at the commencement of this action given his leg injury, he was not able and ready to apply for a permit and therefore cannot establish the futility of his application, for standing purposes. ECF No. 137 at 17; ECF No. 139 at 4–6.

A plaintiff seeking standing to challenge a discriminatory policy must either apply despite the unconstitutional policy or demonstrate futility by showing that he is "able and ready" to apply, and only the "*[unconstitutional] policy prevents them from doing so* on an equal footing." *Variscite*, 152 F.4th at 56 (emphasis added). Standing is assessed at the commencement of the

34

action; thus, a plaintiff must be "able and ready" to apply at that time. *Carney v. Adams*, 592 U.S. 53, 59 (2020) (holding that a plaintiff who could not demonstrate he was able and ready to apply for a vacant judgeship position at the commencement of the suit did not possess a concrete, particularized "injury in fact" to demonstrate standing as to his First Amendment claim); *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).

Here, Succow has not applied for a state temporary or permanent pistol permit pursuant to Conn Gen. Stat. § 29-28(c). Tr. 1/12/2026 at 173. Accordingly, he must demonstrate that submitting an application would have been futile due to his age, but that he was otherwise able and ready to submit one at the start of this action. *Variscite*, 152 F.4th at 56. The parties do not dispute that it would have been futile for Succow to apply for a such a permit, given that Conn Gen. Stat. § 29-28(c) *requires* that an applicant be at least twenty-one years of age and Defendants Bucherati and Daley both testified at trial that they would be required by law to deny any application they received by any applicant under the age of twenty-one. Tr. 1/14/26 at 218, 230.

Accordingly, Succow must demonstrate that he was "able and ready" to apply for a temporary or permanent license at the outset of this action, but that Connecticut's allegedly unconstitutional requirement prevented him from doing so. *Variscite*, 152 F.4th at 56. Plaintiff's testimony at trial revealed the exact opposite. Completion of the live-fire component of a training course is a necessary prerequisite to the issuance of a temporary or permanent license under Connecticut law. *See* Conn Gen. Stat. § 29-28(c). Plaintiff was "physically unable" to complete the live-fire component of his training course as of the date this suit was filed on February 18, 2025, because, in January of 2025, he suffered a broken collar bone, torn ligaments, and other injuries to his right ankle from a snowboarding accident, leaving him in a hard cast, on crutches, and unable to work for a period of four to five months. Tr. 1/12/2026 at 177–178. Thus, because

Succow could not complete the live-fire component of his training course, he was neither ready nor able to challenge the Connecticut Framework at the start of this action. In fact, as late as September of 2025, Succow "did not know" when he would be physically able to complete this requirement. *Id.* at 179. Accordingly, Succow cannot be said to have been ready and able to apply for a handgun permit even "in the reasonably imminent future," in February of 2025. *See Carney*, 592 U.S. at 64.

Succow argues "the relevant inquiry for determining [his] standing is not whether he was physically able to complete live-fire training, but rather whether he was physically ready and able to apply for a pistol permit." Pl.'s Standing Brief, ECF No. 147 at 5. But this argument elides the perhaps obvious point that in order to be physically ready and *able* to apply for a pistol permit, Succow must necessarily have been physically ready and able to *complete* the live-fire component of his training course, lest his application be automatically denied for a reason other than his age. Tr. 1/14/26 at 217 ("if somebody applies that has a . . . statutorial [sic] disqualifier, we'll . . . explain to them that [their application is] not going to be granted based on that"). Thus, even if Succow was physically ready and able to *submit* an application, he was not physically ready and able to submit an application that satisfied all the other statutory criteria, save for the allegedly unconstitutional one. *Variscite*, 152 F.4th at 56.

Succow further cautions that finding he lacks standing because he could not complete the live-fire safety training required by statute would impermissibly raise the "able and ready" standard to a "but-for" standard, which the Supreme Court has rejected with respect to standing. ECF No. 147 at 5–6 (citing *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another

group," then a plaintiff "need not allege that he would have obtained the benefit but for the barrier in order to establish standing" because the injury is the "denial of equal treatment resulting from imposition of the barrier, not the ultimate inability to obtain the benefit")). Not so. Succow's failure to satisfy a requirement that would *automatically* result in the denial of his application does not translate to requiring him to show that he would ultimately have prevailed and obtained his permit, which is the "but for" test the Supreme Court rejected. *See Northeastern Fla. Chapter*, 508 U.S. at 666. Additionally, Succow's alleged injury in fact—the inability to have his application considered on the merits—cannot be said to have been caused by Connecticut's age restriction when he had not satisfied an independent criteria required to obtain such consideration; nor would a permanent injunction prohibiting enforcement of Connecticut's age restriction be able to redress his injury, for the same reason.

Accordingly, the Court finds that Succow lacks standing to challenge the Connecticut Framework.[15]

### 2. *Towne's Standing as to the Connecticut Framework*

Defendant Daley alone contests Towne's standing to challenge the Connecticut Framework. ECF No. 136 at 12–14. But Towne, unlike Succow, has completed the prerequisite training course, *see* Tr. 1/12/26 at 135, and is otherwise "able and ready" to apply for a temporary

---

[15] In light of this holding, the Court does not reach the State Defendants' and Defendant Bucherati's alternative arguments for Succow's lack of standing, including his inconsistent statements on the stand at trial. ECF No. 137 at 19–25; ECF No. 139 at 6. The Court notes, however, that Succow falsely declared, under penalty of perjury in a declaration sloppily titled "Declaration of Nathan Stackpole," that, "[e]xcept for [his] age, [he] meet[s] all of the federal and Connecticut requirements" to obtain a handgun eligibility certificate and a Connecticut pistol permit. Succow Decl., Ex. C, ECF No. 4-4 ¶¶ 7–8. Plaintiffs make much of Succow's "consistent and candid" honest responses once confronted by opposing counsel and the Court with this issue, ECF No. 147 at 11; but candidness and honesty are the Court's *expectation* in such situations. Further, this explanation does nothing to explain why Plaintiffs' *counsel* permitted such flagrantly incorrect statements concerning Succow's satisfaction of the statutory prerequisites to be filed with the Court, and then go uncorrected until Succow was cross-examined at trial. Attorneys Cameron Atkinson, Doug Dubinsky, and Craig Fishbein are squarely at fault for allowing their client to submit a false declaration to the Court. The Court has contemplated whether referral of these counsel to the Federal Grievance Committee for this conduct is appropriate, but has concluded that this admonishment is sufficient.

and permanent pistol permit; the only reason he has not applied is Connecticut's age restriction, which would result in the automatic denial of his application. *Id.* at 130. This is sufficient to establish futility. *See Variscite*, 152 F.4th at 56. While Defendant Daley also argues that "[t]here is no telling whether [Towne] would be disqualified on another statutory ground or whether he would be deemed suitable by Chief Daley based on the numerous individualized factors the chief is required to consider," ECF No. 136 at 13–14, denying Towne standing on these attenuated hypotheses is exactly the kind of "but-for" standing requirement the Supreme Court has cautioned against. *See Northeastern Fla. Chapter*, 508 U.S. at 666.

### 3. *Succow's and Towne's Standing to Challenge Private Party Transfer Law*

Next, the Court concludes that both Succow and Towne lack standing to challenge Connecticut's restrictions on private party transfers of firearms.

The State Defendants contest both individual Plaintiffs' standing to challenge alleged impediments to private transfers of handguns to individuals under the age of twenty-one pursuant to Conn. Gen. Stat. § 29-33(c). ECF No. 137 at 25.[16]

At trial, Towne testified that he had "no intention or plans" of obtaining a handgun through private party transfer. Tr. 1/12/26 at 153. Accordingly, he has conceded his standing to challenge this regulation, as he cannot demonstrate a concrete intent to try to receive a handgun through private transfer and therefore lacks a particularized injury—a point Plaintiffs do not contest. *See Carney*, 592 U.S. at 60; ECF No. 147 at 14 ("Towne's testimony may deprive him of standing to challenge impediments on private party transfers, but Succow has standing . . . "); Closing Arg. Tr. 4/23/26, ECF No. 152 at 10–11.

---

[16] The State Defendants do not specifically discuss the statement on the SLFU's website that it will "no longer facilitate the private sale of a firearm between two individuals." ECF No. 49-4 at 3. But because the Court concludes that both Plaintiffs lack standing to challenge Connecticut's restrictions on private-party transfers, the Court need not address the SLFU's position.

Further, it is not clear that Succow intends to pursue a private party transfer. In his direct examination, he was asked who he would be looking to purchase a firearm from, and he answered with "a registered store, a firearms dealer. . . [a] retailer, yeah." Tr. 1/12/2026 at 175. When he was asked whether he would be "looking to purchase a handgun privately from an individual," he responded "[n]o." *Id.* Then, on redirect examination, in response to a leading question from his counsel, he stated that if it were legal for him to obtain a firearm from a private party, he would do so. *Id.* at 190 (Plaintiffs' counsel: "If it were legal for you to obtain a firearm from a private party, would you do so?" Succow: "If it was legal, yes"). The Court finds Succow's first answer on direct examination more credible, as it was to a non-leading, open-ended question; his answer on redirect examination, on the other hand, appeared to be the result of his counsel transparently attempting to salvage standing for a challenge to the private party transfer statute by asking a leading question. Moreover, even Succow's redirect examination answer does not suggest a concrete intention to purchase a handgun privately; he simply stated that, hypothetically, *if* it were legal to do so, he would. *See Carney*, 592 U.S. at 60 (requiring an "intent that is concrete"). His testimony did not provide any details about from which private party he might seek a transfer, when he might do so, or how, or even suggest that he had taken any steps to inquire about doing so. Thus, the Court finds that Succow lacks standing to pursue a challenge to Connecticut's private party transfer law. *See id.*

In any event, because Succow lacks standing to challenge the Connecticut Framework *generally* given his failure to complete the live fire component of his firearms safety course, he lacks standing to challenge Conn. Gen. Stat. § 29-33(c) as well, regardless of whether his testimony at trial suggested an intent to acquire a handgun through a private party transfer. Under Connecticut law, "[n]o person may purchase or receive any pistol or revolver unless such person

39

holds a valid permit to carry a pistol or revolver issued pursuant to subsection (c) of section 29-28," or can satisfy other criteria not salient to this case. Conn. Gen. Stat. § 29-33(b). Because Succow could not satisfy the firearms safety certification course requirement to receive a permit under Conn. Gen. Stat. § 29-28 at the commencement of this action and therefore lacks standing to challenge Connecticut's age-restriction for handguns, he likewise does not have standing to challenge Conn. Gen. Stat. § 29-33(c) as no person may purchase or *receive* a handgun—including via private transfer—without a permit under Connecticut law. Conn. Gen. Stat. § 29-33(b) (emphasis added).

At closing argument, Plaintiffs' counsel raised a new argument, not previously briefed at any point in this action, that if the record were to reflect that Succow had obtained the proper permitting for a *long gun* prior to the commencement of this action, then he would retain standing to challenge Connecticut's restrictions on private party transfers under Conn. Gen. Stat. § 29-33(b), regardless of his lack of standing to otherwise challenge the Connecticut Framework. Tr. 4/23/26 at 12–15; 20–22. This argument fails for a number of reasons.

First, because the argument was raised for the first time at closing argument in an action which has been pending since February of 2025, the Court considers the argument waived. *See United States v. Marrero*, No. 22-2030, 2024 WL 1253643, at *3 n.4 (2d Cir. Mar. 25, 2024) (summary order) ("arguments not raised in a principal brief—let alone not raised even in the reply—are considered waived"); *Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) (finding that an argument not raised by a plaintiff in his opposition to the defendant's summary judgment motion was waived).

Moreover, Plaintiffs' amended complaint did not challenge the private party transfer regulations relevant to long guns. Plaintiffs' amended complaint states that they challenge

40

Connecticut's private party transfer regulations "as codified in Conn. Gen. Stat. § 29-33(c)." ECF No. 49 ¶ 96. But § 29-33(c) regulates solely the "sale, delivery or other transfer of any pistol or revolver" and does not govern transfer procedures with respect to long guns. Regulation of the transfer of long guns under Connecticut statute is governed by Conn Gen. Stat. § 29-37a, which is not cited in Plaintiffs' amended complaint, or their briefing. Plaintiffs' challenge to Connecticut's regulation of private party transfers is thus clearly limited to the transfer of handguns, not long guns.

Further, even assuming Plaintiffs had invoked the correct statute to challenge Connecticut's private party regulations with respect to long guns, Succow would *still* nevertheless lack standing to do so as, at trial, he testified that he had "not currently" submitted an application for a long gun certificate, which is one of the prerequisites to obtain a permit to possess a long gun in Connecticut. Tr. 1/12/26 at 173; Conn. Gen. Stat. § 29-37a(c).[17] Under Connecticut law, individuals eighteen and older are eligible to obtain a permit to possess a long gun, unlike with handguns. *See* Conn Gen. Stat. § 29-37a. Accordingly, because Succow made no attempt to apply for a long gun permit prior to the commencement of this action—or even submit a *proper* application shortly after the commencement of this action—and has otherwise not argued futility— he lacks standing to challenge Conn. Gen. Stat. § 29-33(c).

Accordingly, as neither Individual Plaintiff has standing to pursue a challenge to Conn. Gen. Stat. § 29-33(c), and the Organizational Plaintiffs only have standing as to Count Two, Count One of Plaintiffs' amended complaint is dismissed insofar as it seeks to challenge Conn. Gen. Stat.

---

[17] Succow further testified that at one point *after* the commencement of this action he had submitted an application to obtain a long gun permit, but when it was returned because Succow had "sent it to the wrong address," he took no further steps to resubmit the application to the right address. Tr. 1/12/26 at 183–84.

§ 29-33(c) and the SLFU's statement on its website that it will no longer facilitate non-FFL private party transfers.

### 4. *Summary*

In sum, the Court finds Succow lacks standing to challenge the Connecticut Framework in Count One, but Towne has standing to do so.  Both Individual Plaintiffs lack standing to challenge Connecticut's private party transfer regulations, and Plaintiffs' amended complaint is dismissed as to this challenge on private party transfers.  As Defendant Blanche does not challenge the individual Plaintiffs' standing as to any of their claims against him in Count Two of the amended complaint, the Individual Plaintiffs and the Organizational Plaintiffs have standing to pursue Count Two of the amended complaint.

### C.  Nature of the Constitutional Challenges

Plaintiffs challenge the constitutional validity of the Federal and Connecticut Frameworks on both a facial and as-applied basis.  ECF No. 141 at 21–22.  Because both Frameworks prohibit *all* individuals under the age of twenty-one from purchasing, possessing, and or/carrying a handgun, yet Plaintiffs' constitutional challenge is made only as to individuals aged eighteen through twenty, their facial challenge necessarily fails.

"A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019).  Accordingly, "[t]o mount a successful facial challenge, the plaintiff 'must establish that no set of circumstances exists under which the law would be valid' or show that the law lacks 'a plainly legitimate sweep.'" *Antonyuk*, 120 F.4th at 983 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).  "These general principles of constitutional adjudication apply in the context of Second Amendment litigation, as they do in cases involving other constitutional provisions." *Id.*; *see also Rahimi*, 602

U.S. at 693 ("[a facial challenge] is the most difficult challenge to mount successfully") (internal citation omitted).

Plaintiffs fall far short of their burden here. Both the Federal Framework and the Connecticut Framework ban the sale, possession, and/or carrying of handguns by or to anyone under the age of twenty-one. *See* 18 U.S.C. § 922(b)(1); 27 C.F.R. § 478.99(b)(1); Conn. Gen. Stat. § 29-34(b); *see also* Conn. Gen. Stat. § 29-28(c) (applicants for a state pistol permit must be at least twenty-one). But Plaintiffs challenge the Federal and Connecticut Frameworks solely as applied to individuals *between the ages of eighteen and twenty* and have advanced no argument that either Framework is unconstitutional as-applied to individuals under the age of eighteen. *See* ECF No. 49 at 34–35; ECF No. 141 at 28–29 ("Defendants have failed to carry their historical burden of identifying a longstanding tradition of analogous regulations to the federal ban *on adult 18-20-year-olds* . . . and Connecticut's complete prohibition against *adult 18-20-year-olds* . . .") (emphasis added). Plaintiffs have failed to show, or even argue, there are "no set of circumstances" under which the Federal and Connecticut Frameworks are constitutional, or that they lack a "plainly legitimate sweep." *Antonyuk*, 120 F.4th at 983 (internal citations and quotations omitted). Thus, their facial challenge necessarily fails. The Court will proceed to analyze Plaintiffs' arguments solely on an as-applied basis.

Having addressed these threshold issues, the Court turns to Plaintiffs' constitutional challenges to both the Federal Framework and the Connecticut Framework. The Court takes the counts out of numerical order to address the Federal Framework's alleged unconstitutionality in Count Two first, and then the Connecticut Framework's alleged unconstitutionality in Count One.

D. Count Two

The Individual and Organizational Plaintiffs challenge the Federal Framework, which regulates only the commercial *sale or delivery* of handguns by FFLs, not their actual possession,

43

or carry by individuals, as "impermissibly infring[ing] upon the right of all law-abiding adults aged 18 to 20, including the Plaintiffs to keep and bear arms by foreclosing the primary method of acquiring a handgun—commercial purchase—which results in a total a total ban on the ability to acquire handguns and handgun ammunition[.]" ECF No. 49 ¶ 147. For the reasons set forth below, the Federal Framework does not violate the Second Amendment, as it is consistent with the Nation's history and tradition of firearms regulation, based on Founding era laws.

### 1. *Circuit Court Precedent*

Based on the Court's research and the parties' briefing, it is aware of two post-*Bruen* federal appellate cases that have squarely addressed whether the Federal Framework at issue here is consistent with the nation's history and tradition of firearms. *See McCoy*, 140 F.4th at 572–80; *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 127 F.4th 583 (5th Cir. 2025).[18] These cases reached conflicting conclusions on the Federal Framework's constitutionality.

In *McCoy*, the Fourth Circuit found the Federal Framework was constitutional, as it matched the same how and why as historical regulations on the commercial sale of firearms. Specifically, the Fourth Circuit concluded that at the Founding, infancy doctrine limited the ability of those under the age of twenty-one from making commercial purchases, including for firearms, and did so for the same reasons as the Federal Framework, chiefly because of "a recognition that

---

[18] On June 30, 2026, the Supreme Court denied cert. in *McCoy*, as well as in *Lara v. Comm'r. Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025), *cert. denied*, --- S.Ct. ---, 2026 WL 1871315 (June 30, 2026), and *Brown v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 23-2275, 2025 WL 1704429 (4th Cir. June 18, 2025) (per curiam), *cert. denied*, --- S.Ct. ---, 2026 WL 1871319 (June 30, 2026). *Lara* concerned a challenge to Pennsylvania state law banning individuals between eighteen and twenty from acquiring a permit to carry concealed firearms on public streets and property during declared states of emergency, which the Third Circuit found to violate the Second Amendment. *Lara*, 125 F.4th at 446. *Brown* was a challenge to the Federal Framework, appealing the district court's ruling that the Federal Framework violated the Second Amendment; the Fourth Circuit reversed and remanded the case to the district court with directions to dismiss the case in light of its ruling in *McCoy*. *Brown*, 2025 WL 1704429 at *1.

44

individuals under the age of 21 lack good judgment and reason." *McCoy*, 140 F. 4th at 576–78. Later nineteenth-century history provided a "confirmation" of its conclusion. *Id.* at 578–80.

In *Reese*, the Fifth Circuit reached the opposite conclusion, resting primarily on historical Founding-era militia laws which required eligible male individuals between the ages of eighteen and twenty to serve in the militia and furnish their own weapons, and distinguishing historical laws restricting the ability of individuals between the ages of eighteen and twenty to carry or possess weapons on college campuses as differing from the Federal Framework in the reasons why they prohibited these individuals from possessing weapons. *Reese*, 127 F.4th at 593–600. In so holding, *Reese* found the government had presented "scant evidence" of similar age restrictions in the Founding era, and that the government's "19th century evidence" failed to provide "much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 600 (citing *Bruen*, 597 U.S. at 66). Notably, the Fifth Circuit did not consider whether Founding era infancy doctrine, and the inability of minors to contract for non-necessary goods, could serve as a historical analogue for the Federal Framework.

The Court is not aware of any binding Second Circuit precedent pertaining to the Federal Framework's constitutionality as-applied to individuals between the ages of eighteen and twenty.

### 2. *Presumptive Permissibility*

At closing argument, the Court asked Plaintiffs and Defendant Blanche at what step of the *Bruen* analysis the presumptive constitutional permissibility of the Federal Framework should be examined, given that it regulates the commercial sale of arms. Tr. 4/23/26 at 33–37, 48–50. In *Heller*, the Supreme Court identified a non-exhaustive set of "longstanding prohibitions" that are "presumptively lawful" limitations on an individual's Second Amendment rights, including "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27; *id.* at 627 n.26. In and since *Bruen*, the Supreme Court has confirmed the continued viability

of these presumptively lawful restrictions,[19] and the Second Circuit has also expressly confirmed that "[n]othing in [*Bruen*] casts doubt on that understanding of the Second Amendment's scope." *Gazzola*, 88 F.4th at 195; *but see id.* at 196 ("commercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment rights, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms"). Because the Federal Framework imposes an age minimum on the commercial sale of handguns, it falls squarely within one of *Heller's* presumptively lawful categories:  conditions and qualifications on the commercial sale of arms.  But neither the Supreme Court nor the Second Circuit have decided how *Heller*'s presumptively lawful firearms regulations fit into the *Bruen* framework.  At oral argument, the parties seemed to agree it fits somewhere in step two, with Defendant Blanche suggesting it is no more than "icing on the cake," done at the end of step two. 4/23/26 Tr. at 36, 50.

The Tenth Circuit has addressed this issue head-on, concluding that laws fitting into *Heller*'s presumptively lawful categories fall outside the scope of the Second Amendment's right to keep and bear arms, and thus fail at *Bruen*'s step one. *Rocky Mountain Gun Owners*, 121 F.4th at 119–20.  There, the Tenth Circuit upheld Colorado's law establishing the age of twenty-one as the minimum age to purchase firearms, finding that "conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment." *Id.* at 120.  The Ninth Circuit has agreed with the Tenth Circuit. *See B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024) ("commercial restrictions presumptively do not implicate the plain text of the

---

[19] *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) (stating the Court had not "disturbed anything that [it] said" in *Heller* or *McDonald* about presumptively lawful restrictions); *id.* at 80–81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*'s discussion of presumptively lawful regulations); *Rahimi,* 602 U.S. at 699 (citing *Heller*, "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'").

Second Amendment at the first step of the *Bruen* test"). The Second Circuit, for its part, seems to have suggested—at least implicitly—that it agrees, as well. *Vereen*, 152 F.4th at 103 (holding that § 922(a)(3), which allows only licensed persons to import into a state firearms purchased or obtained out of state, is "a presumptively lawful commercial sale regulation").

The Court finds the Tenth and Ninth Circuit views on this issue persuasive, but ultimately holds that it need not decide this issue for purposes of this decision. In tracing the development of the Circuit Test, *Bruen* itself noted that at step one of the Circuit Test, the government could "justify its regulation by establish[ing] that the challenged law regulates activity falling *outside the scope* of the right as originally understood." *Bruen*, 597 U.S. at 18 (emphasis added) (internal quotation omitted). *Bruen* then adopted the Circuit Test's first step as its first step, because it was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. The first step of the *Bruen* test is thus a gatekeeping one: does the challenged conduct fall within the scope of the Second Amendment or not? *See Wolford*, 2026 WL 1825723, at \*6 ("First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language."). When discussing the presumptively lawful restrictions in *Heller*, the Supreme Court similarly relied on gatekeeping language, emphasizing that the Second Amendment "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," but rather that certain longstanding restrictions were presumptively lawful—the implication being that the conduct prohibited by these restrictions fell outside the "scope" of the Second Amendment's protection. *Heller*, 554 U.S. at 626–27. Thus, if the presumptively lawful inquiry goes to whether a regulation falls within the *scope* of the Second Amendment, it makes sense that presumption should be made—and any rebuttal be offered—at

the gatekeeping step one of the *Bruen* analysis, not once it has already been determined that the conduct at issue implicates the Second Amendment.

Finally, the Tenth Circuit recognized the difficulty in reconciling the presumption that is afforded to *Heller*'s "safe harbor" categories with *Bruen*'s holding that, if a challenged law falls within the plain text of the Second Amendment, it is "presumptively unconstitutional." *Wolford*, 2026 WL 1825723, at *6 (citing *Bruen*, 597 U.S. at 24); *Rocky Mountain Gun Owners*, 121 F.4th at 121 ("The government must satisfy either a lesser burden by showing its regulation is 'longstanding' and covered by the safe harbor or a heavier burden by proving its regulation is 'consistent with the principles that underpin our' Nation's historical tradition of firearm regulation") (citing *Rahimi*, 602 U.S. at 692).  As *Bruen* is currently formulated, there is a presumption of unconstitutionality—albeit a rebuttable one—that applies to any law once step one is satisfied.  But a law cannot simultaneously be *both* presumptively *lawful* and presumptively *unconstitutional*, as the Federal Framework's restrictions on the commercial sale of firearms would have to be if *Heller*'s safe harbor categories were considered at step two of the *Bruen* analysis. Plaintiffs suggested at oral argument that *Zherka v. Bondi*, 140 F.4th 68, 75–80 (2d Cir. 2025) could be read to suggest that the presumptively lawful analysis occurs at step two.  *See* Tr. 4/23/26 at 34–36.  But this precise issue was not before the Court in *Zherka*, and was never explicitly addressed or discussed by the opinion.  Rather, the Second Circuit's decision in *Vereen*, 152 F.4th at 98–99, seems to suggest that the constitutional analysis for presumptively lawful restrictions on the commercial sale of firearms can end at step one.

Ultimately, the Court need not decide this thorny issue today as, even if the presumptively lawful analysis properly belongs at step one, Defendant Blanche concedes that Plaintiffs have met their burden at this step.  Rather than attempting to read through tea leaves, the Court takes the

more prudent path of following the text of *Bruen*'s test, until directed otherwise.  And even without applying a presumption of lawfulness to the Federal Framework, Plaintiffs' challenge fails.

### 3.  Bruen Test:  Part One

First, the Court must determine whether Plaintiffs have established by a preponderance of the evidence that "the Second Amendment's plain text covers an individual's conduct[.]" *Bruen*, 597 U.S. at 24.  If so, then "the Constitution presumptively protects that conduct," and the burden shifts to the government to demonstrate the regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.*  *Wolford* confirms the Second Circuit's precedent that step one requires three separate inquiries:  first, does the law apply to "the people"; second, does it concern any form of "Arms," "*i.e.*, any weapon customarily used for offensive or defensive purposes"; and third, "does the law place any restrictions on either the keeping (*i.e.*, possession) or the bearing (*i.e.*, carrying) of arms?" *Wolford,* 2026 WL 1825723 at *6 (cleaned up and internal citations omitted).

Defendant Blanche "does not dispute that the conduct at issue here is implicated by the Second Amendment."  Blanche FoF & CoL, ECF No. 142 at 9–10.  Because Defendant Blanche does not contest that part one of the *Bruen* test has been satisfied, the Court finds that Plaintiffs have demonstrated by a preponderance of the evidence that the conduct at issue here implicates the Second Amendment.  Accordingly, the Court proceeds to the second step of the analysis.[20]

### 4.  Bruen Test:  Part Two

At step two, the burden shifts to Defendant Blanche to demonstrate by a preponderance of the evidence "that the challenged law is 'consistent with the Nation's historical tradition of firearm

---

[20] To the extent that the Federal Framework benefits from a presumption of lawfulness under *Heller* at step one, the Court assumes, without deciding, that any such presumptive lawfulness was rebutted, given that Defendant Blanche does not dispute that Plaintiffs' have carried their burden on part one of the *Bruen* test.  Thus, based on Blanche's position in this litigation, the Federal Framework falls within the scope of the Second Amendment.

regulation.'" *Christian*, 176 F.4th at 194 (quoting *Bruen*, 597 U.S. at 24). "'Why and how the regulation burdens the right are central[.]'" *Id.* (quoting *Rahimi*, 602 U.S. at 692). The Court holds that Defendant Blanche has proven by a preponderance of the evidence that the Federal Framework fits comfortably within the Nation's history and tradition of firearms regulation because it is analogous in both "how" it burdens Plaintiffs' Second Amendment rights and "why," when compared to Founding era laws restricting minors' ability to contract.

Before turning to the merits, the Court addresses Plaintiffs' argument in their opposition to Defendant Bondi—now Blanche's—second motion to dismiss, as well as at closing argument, that the Court need not engage in any "nuanced" historical reasoning, as such reasoning is appropriate only "in 'cases implicating unprecedented societal concerns or dramatic technological changes.'" Pls.' Opp'n to Second Mot. to Dismiss, ECF No. 100 at 6 (quoting *Bruen*, 597 U.S. at 27); Tr. 4/23/26 at 41–42. Plaintiffs' argument stems from *Bruen's* language that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" than did the historical analogies at issue in *Bruen* and *Heller*. *Bruen*, 597 U.S. at 27.

But all *Bruen* appears to mean by this language is that the historical analysis may be more complicated in some cases than in others. The Supreme Court did not suggest that a court must make some type of predicate finding of unprecedented societal concerns or dramatic technological changes in order to conduct a fulsome historical analysis, as Plaintiffs suggest. Indeed, the Supreme Court has now twice proceeded with historical analysis without such a predicate finding. *See Rahimi*, 602 U.S. at 692–700 (analyzing historical analogues without first holding that the statute in question implicated unprecedented societal concerns or dramatic technological changes); *Wolford*, 2026 WL 1825723 at *7 ("often, the best evidence may be . . . historical analogues," and describing the "how" and "why" requirements). Taking the Supreme Court's cues, the Second

Circuit has similarly recognized that a lack of similar historical regulations does not doom a modern one, because the absence of a regulation in history may simply reflect the absence of "the particular issue" during those time periods. *See Christian*, 176 F.4th at 194; *Vereen*, 152 F.4th at 99 (quoting *Rahimi*, 602 U.S. at 692) ("Without first holding that the statute implicated unprecedented societal concerns or dramatic technological changes, *Rahimi* applied the 'relevantly similar' framework."). Accordingly, the Court conducts the historical analysis required by *Bruen*'s step two, employing "nuanced" reasoning as necessary.

Proceeding to the merits, first, the Federal Framework's prohibition on the commercial sale and delivery of handguns to individuals between the ages of eighteen and twenty is consistent with the historical inability at the Founding for minors under the age of twenty-one to enter into contracts for the sale of commercial goods, given that minors were deemed to lack  appropriate judgment and discretion.  As discussed extensively by Professor Spitzer, individuals between the ages of eighteen and twenty were not considered adults at the Founding and were severely restricted in their ability to participate in certain activities, including the ability to contract for goods. *See e.g.,* Spitzer Decl. ¶¶ 12–13; *Soper*, 1 Pick. at 183 ("The common law renders void any promise made by an infant, the consideration of which is not for necessaries").  While minors could contract for necessaries, "liquor, pistols, [and] powder, . . ." were "not to be allowed" to be necessaries for which a minor could validly contract. *Saunders Glover & Co. v. Ott's Adm'r*, 1 McCord at 572; *McCoy*, 140 F. 4th at 576 (recognizing same); ECF No. 141 ¶ 77.  Similarly, the Federal Framework restricts the commercial transfer of handguns through the point of sale (FFLs), rather than through a ban on possession or carrying.

Additionally, the Federal Framework's "why" is the same as that for the Founding era's restrictions on minors' ability to contract:  a societal consensus that individuals under the age of

twenty-one lacked the requisite judgment and maturity.  That infants lacked maturity and judgment was well established at the Founding.  *See* Letter from John Adams to James Sullivan, May 26, 1776, https://perma.cc/CE79-RA8K (on file with the National Archives) (infants lack "[j]udgment" and "[w]ill" and are not "fit to be trusted by the [p]ublic"); James Madison's Notes of the Constitutional Convention, August 7, 1787, Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4 (those under twenty-one "want prudence" and "have no will of their own."param).  This deemed lack of maturity and judgment is further supported by the degree of authority parents, or other adult figures acting *in loco parentis*, exercised over minors at the Founding. Similarly today, psychological studies and evaluation have confirmed the Founders' thoughts, and has found that eighteen- to twenty-year-olds are impulsive, and at especially high risk for violence, suicide, nonsuicidal self-injury, and excessive drinking.  Steinberg Decl. ¶ 38.  Accordingly, in light of the known tendencies of this age group, Congress made the determination that individuals under the age of twenty-one lack the requisite reason and judgment to responsibly purchase handguns, and prohibited them from doing so through the Federal Framework.

To be sure, Founding era infancy doctrine prohibiting minors from contracting for non-essential goods is not a "dead ringer" for the Federal Framework.  *Bruen*, 597 U.S. at 30.  But that is of no matter, as courts need not search in vain for such a "historical twin," when there exists a sufficient analogue that "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.

Plaintiffs attempt to refute Defendant Blanche's showing through two main arguments: (1) Defendant Blanche has identified no historical laws prohibiting *adults* from acquiring handguns; and (2) minors' historical service in the militia establishes a historical tradition of their

52

ability to purchase weapons.  ECF No. 141 at 27–31; Closing Tr. 4/23/26 at 41–46.  Neither of these arguments are persuasive.

As to the first argument, Plaintiffs point to no caselaw—other than broad gestures to *Bruen* and *Rahimi* for the mistaken proposition that a nuanced analysis is impermissible here—to support their argument that because eighteen to twenty-year-olds are considered adults today, any historical analogue must pertain to the regulation of the conduct of adults, not minors.  This argument denies the realities of history.  The common law doctrine of infancy tied the ability to contract—including for firearms—to a specific age:  twenty-one.  Spitzer Decl., ¶¶ 12–14.  The Federal Framework does the exact same and ties the ability to purchase a firearm from an FFL to the same age:  twenty-one.  Whether eighteen- to twenty-year-olds should be considered adults or minors in society at large is a broader policy question that is not the question before the Court.  The issue here is much narrower:  does the Federal Framework burden eighteen-to twenty-year-olds' ability to commercially acquire handguns in a way that is consistent with the why and how of analogous historical burdens on that same age group?  The answer is yes.

Second, Plaintiffs argue that mandatory militia participation at the Founding establishes that individuals between the ages of eighteen and twenty could necessarily purchase arms.  Tr. 4/23/26 at 44–46.  Plaintiffs' militia laws argument conflates evidence of the use and carrying of arms in specific, regulated contexts with the general historical ability to purchase them.  The fact that an eligible male between the ages of eighteen and twenty was expected to *bear* arms as part of militia service at the Founding is not proof that he then had the ability to *acquire* any such weapon independently at the Founding.  In fact, the historical militia laws in the record explicitly highlight this distinction.  For example, Delaware's 1793 militia law, which applied to males who were under the age of twenty-one, expressly removed the onus of purchasing firearms from such

53

males. *See* Spitzer Decl. ¶ 53 ("all young men under the age of twenty-one years, and all servants purchased bona fide, and for a valuable consideration, though enrolled agreeable to the first section of this law, *shall be exempted from furnishing the necessary arms*, ammunition and accoutrements as are required by the fourth section thereof" (citing *Laws of the State of Delaware*, 1793, Chap. 36, Sect. 2, 1135) (emphasis added)). Connecticut's own 1796 militia statute imposed the penalty for a failure to comply with the requirements of the statute by males under twenty-one—including provision of a military grade weapon—upon his parent/guardian. *Id.* ¶ 52. Thus, it can be inferred from the historical record that Connecticut's minors could serve in a militia without personally purchasing their service weapon, because the law placed the penalty for failure to possess a military grade weapon not on the minor, but on the person who would have been expected to purchase the weapon and provide it to the minor for militia service. *Id.* In total, ten of the original thirteen states enacted laws that placed the burden of arming militia men under the age of twenty-one on their parents/guardians. *Id.* ¶ 51.[21] Thus, the militia laws are at least consistent with—and certainly not contradictory to—Founding era regulation of the commercial purchase of firearms by persons under the age of twenty-one. *See McCoy*, 140 F.4th at 578.

And although the Court need not go further than these Founding era historical analogues, it notes that, as discussed in *McCoy*, later history confirms the national tradition of regulating the purchase of firearms by individuals under the age of twenty-one. *See McCoy*, 140 F.4th at 578–79 ("Beginning in 1856, at least twenty jurisdictions enacted laws criminalizing the sale of

---

[21] Plaintiffs' militia laws argument also suffers from another fundamental flaw: militia laws only applied to eligible *males* of that era. Spitzer Decl. ¶ 48. *See also Reese*, 127 F.4th at 593 ("At the founding, the militia in colonial America consisted of a subset of the people—those who were male, able bodied, and within a certain age range") (internal citation omitted). Accordingly, even were the Court to find Plaintiffs' militia laws argument persuasive, the argument would still only support the proposition that eligible *males* could acquire firearms for themselves at the Founding, not females. Plaintiffs' as-applied challenge is made to *all* individuals between eighteen and twenty, male and female alike. Accordingly, Plaintiffs' militia laws argument can only get them halfway, even were the Court to credit it.

firearms, often handguns specifically, to individuals under the age of 21."); *see also* ECF No. 130 at 6 (citing, *e.g.*, 1882 Maryland state statute making it "unlawful for any person, be he or she licensed dealer or not, to sell barter or give away any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces, and rifles, to any person who is a minor under the age of twenty-one years").

Accordingly, the Court finds that Defendant Blanche has demonstrated by a preponderance of the evidence that the Federal Framework imposes a constitutional burden on the ability of individuals between the ages of eighteen to twenty to purchase handguns that is consistent with the Nation's history and tradition of firearms regulation.  Thus, the Federal Framework does not violate the Second Amendment.[22]

### 5.  Alternative Request for an Injunction Regarding NICS Background Check

In the alternative to their request that the Court permanently enjoin Defendant Blanche from enforcing the Federal Framework, Plaintiffs request that the Court permanently enjoin Defendant Blanche and his officers, agents, employees, and others acting in concert with him from prohibiting Connecticut and its State Police from using the NICS background check system for private party handgun transfers to eligible persons eighteen to twenty years of age.  *See* ECF No. 49 at 35–36.  No witness testified about this issue at trial, but Plaintiffs introduced an exhibit—a printout from the Connecticut State Police's website, stating that the SLFU would "no longer facilitate the private sale of a firearm between two individuals" effective September 11, 2023, as "[t]he State statute for a firearm sale requires a query of the FBI-NICS system, which is not authorized by the FBI unless an FFL is involved."  Pl.'s Ex. 5; *see also* ECF No. 49-4 at 3.  The

---

[22] As discussed above, the Court finds persuasive the Tenth and Ninth Circuits' view that regulations falling within *Heller*'s presumptively lawful safe harbor list are properly analyzed at step one of the *Bruen* analysis.  But were the analysis to occur at step two, the Federal Framework's presumptive lawfulness would further bolster Defendant Blanche's historical support for the Framework's constitutionality, adding icing to the cake.  4/23/26 Tr. at 50.

Court assumes, without deciding, that this exhibit suffices to meet Plaintiffs' burden of showing the existence of a policy enforced by Defendant Blanche that prohibits Connecticut's State Police from using the NICS background check system for private party transfers. In any event, however, as the Court has found above that no Plaintiff has standing to challenge Connecticut's restrictions on private party transfers, Plaintiffs likewise lack standing to request an injunction requiring Defendant Blanche to lift the restriction on use of the NICS background checks for such transfers.

E.   Count One

In Count One, Plaintiffs challenge the Connecticut Framework which—unlike the Federal Framework—prohibits the carrying and/or possession of handguns by individuals under the age of twenty-one, in addition to their commercial purchase and transfer. While the Connecticut Framework is broader in scope than the Federal Framework, the Court holds that the State Defendants have, too, proven by a preponderance of the evidence that the Connecticut Framework is consistent with the Nation's history and tradition of firearms regulation.[23] Specifically, although the State Defendants have not identified historical analogues to Connecticut's carry/possession laws from the Founding era, analogous Reconstruction era laws were compatible with the right codified by the Second Amendment, allowing for an inference that Connecticut's analogous modern laws are likewise consistent with that right. *See Wolford*, 2026 WL 1825723, at *6.

1.   *Circuit Court Precedent*

While the Connecticut Framework's constitutionality is a matter of first impression in this Circuit, a number of Circuits post-*Bruen* have considered challenges to comparable state laws restricting the sale, possession, and/or carrying of handguns by individuals under the age of

---

[23] While Defendant Bucherati has joined the State Defendants' findings of fact and conclusions of law, *see* ECF No. 138, neither Police Chief Defendant makes any independent arguments in support of the constitutionality of the Connecticut Framework. Thus, the Court will refer solely to the State Defendants with respect to its analysis of Count One, for simplicity's sake.

twenty-one, reaching various conclusions as to the constitutionality of such laws. *See Lara*, 125 F.4th at 431 (holding that Pennsylvania state laws prohibiting individuals under the age of twenty-one from acquiring a permit to carrying firearms—even during states of emergency—was unconstitutional as inconsistent with the Nation's history and tradition of firearms regulation); *Worth v. Jacobson*, 108 F.4th 677, 683–84 (8th Cir. 2024) (holding that Minnesota state laws prohibiting individuals under the age of twenty-one from securing a carry permit and thus prohibiting them from carrying firearms in public was unconstitutional as inconsistent with the Nation's history and tradition of firearms regulation); *Rocky Mountain Gun Owners*, 121 F.4th at 127–28 (holding that Colorado state law prohibiting the sale and purchase of handguns by individuals under the age of twenty-one was presumptively lawful under *Heller* and did not fall within the scope of the Second Amendment at *Bruen*'s step one); *Nat'l Rifle Assoc. v. Bondi*, 133 F.4th 1108, 1130 (11th Cir. 2025) (en banc) (holding that Florida state law prohibiting the sale or purchase of handguns by individuals under the age of twenty-one was constitutional as consistent with the Nation's history and tradition of firearms regulation).   None of these circuit-level decisions have addressed the constitutionality of state laws that prohibit both the sale/purchase *and* the possession/carrying of handguns by those under the age of twenty-one, however.

### 2. Bruen Test: Part One

Unlike Defendant Blanche, the State Defendants argue that Plaintiffs have not satisfied their burden at step one of the *Bruen* test because they have not "demonstrated *when* minors came within the scope of the Second Amendment and should be required to as part of their burden at step one." ECF No. 137 at 27.[24]  But, as the State Defendants recognize, the Court need not decide this issue to resolve the constitutional dispute, as it may assume, without deciding, that Plaintiffs

---

[24] The State Defendants do not contest that handguns are protected arms for purposes of step one of the *Bruen* test. ECF No. 137 at 26.

have met their step one burden.  *See Frey*, 157 F.4th at 131; *id.* at 138 n.11; *McCoy*, 140 F.4th at 575; *Nat'l Rifle Assoc.*, 133 F.4th at 1129–30.  Accordingly, the Court assumes without deciding that eighteen- to twenty-year-olds are part of "the people" for purposes of the Second Amendment.[25]  As the State Defendants do not otherwise dispute that the conduct at issue here implicates the Second Amendment, the Court finds that Plaintiffs have satisfied the first step of the *Bruen* test by a preponderance of the evidence with respect to the Connecticut Framework.

   3. *Bruen Test:  Part Two*

  At step two, the State Defendants have proven by a preponderance of the evidence that the Connecticut Framework is consistent with the Nation's history and tradition of firearms regulation both in how and why it regulates the sale, possession, and carrying of handguns by those under the age of twenty-one, based on Reconstruction era laws.

  First, as Plaintiffs have neither alleged nor proven that the commercial sale and transfer portions of the Connecticut Framework operate in any different manner than the Federal Framework in restricting the sale and/or delivery of handguns at the point of sale, and as the State Defendants have demonstrated by a preponderance of the evidence that the Connecticut Framework regulates the commercial sale and transfer of handguns to minors for the same reasons as the Federal Framework—in order to protect minors from harm to themselves or others based on their deemed immaturity, *see* Conn. Gen. Stat. § 29-34(b); ECF No. 137 at 50–51—the Court finds that the State Defendants have established that the commercial sale and transfer provisions of the Connecticut Framework are constitutional for the same reasons it found the Federal Framework

---

[25] The Court notes the tension between the State Defendants' argument that Plaintiffs must demonstrate minors were part of the people "[a]s of 1791," or at the latest 1868, ECF No. 137 at 27, and Supreme Court and other Circuit precedent applying step one of the *Bruen* analysis.  *See Bruen*, 597 U.S. at 32 (noting "handguns are weapons 'in common use' *today* for self-defense" at step one) (emphasis added); *Lara*, 125 F.4th at 437 ("[W]e are not limited to looking through [step two's] retrospective lens at the first step.  If, at step one, we were rigidly limited by eighteenth-century conceptual boundaries, 'the people' would consist solely of white, landed men, and that is obviously not the state of the law").

constitutional.  Additionally, as the Court has held that no Plaintiff has standing to challenge Connecticut's private party transfer laws, it need not reach the question of the constitutionality of those particular regulations.

That leaves the question of whether there are portions of the Connecticut Framework that regulate neither the commercial sale of handguns nor the transfer of handguns by a private party. Conn. Gen. Stat. § 29-34(b) provides that "[n]o person shall sell, barter, hire, lend, give, deliver, or otherwise transfer to any person under the age of twenty-one years any pistol or revolver." Conn. Gen. Stat. § 29-33(c) provides that "[n]o person, firm, or corporation shall sell, deliver or otherwise transfer" any pistol or revolver without obtaining authorization from the DESPP Commissioner.  The parties have not briefed the issue of whether there are circumstances falling between commercial sale (the regulations for which the Court has found are constitutional) and private party transfers (which no Plaintiff has standing to challenge here).  The Court assumes that there could theoretically be a circumstance where, for instance, a commercial FFL-authorized retailer or corporation might seek to *give* or *deliver* a person under the age of twenty-one a handgun, without selling it; this circumstance would be neither a commercial sale nor a private party transfer, and would seem to come within Plaintiffs' challenge to the Connecticut Framework. Additionally, to the extent that Plaintiffs challenge as unconstitutional those portions of the Connecticut Framework that prevent individuals under the age of twenty-one from obtaining either a temporary or permanent pistol permit or a pistol eligibility certificate, independent of *how* such individuals might subsequently obtain a handgun, the Court must reach *Bruen*'s step two to decide the constitutionality of Connecticut's laws that effectively ban the possession and carrying of handguns by persons under the age of twenty-one.

The Court thus turns to whether Connecticut's regulations prohibiting carrying and possessing handguns by persons under twenty-one are "consistent with the principles that underpin our regulatory tradition," keeping in mind the relevant guideposts set forth in *Antonyuk* and subsequent precedent. *Antonyuk*, 120 F.4th at 969 (citing *Rahimi*, 602 U.S. at 692). The Court holds that they are, based on Reconstruction era analogues.

> a. Founding Era

To start, the State Defendants have not sustained their burden of showing Founding era historical analogues that, standing alone, demonstrate Connecticut's prohibition on the carrying and possession of firearms by eighteen- to twenty-year-olds is consistent with the Second Amendment.

The Court agrees with the State Defendants that minors lacked significant levels of independence at the Founding, as discussed above. But it does not necessarily follow from that premise that, at the Founding, either the common law or specific state laws regulated a minor's ability to possess and carry arms. First, the State Defendants contend that minors' status as dependents of their parents/guardians or other parental figures empowered parents to restrict such minors' ability to obtain or carry arms. ECF No. 137 at 34–37. The trouble with this argument is that it equates parental authority with state or legal authority. It is clear from the record that minors were subsumed into their parent's or guardian's legal and social identity on many issues until they reached twenty-one. Accordingly, should the parent of an eighteen-year-old wish that his minor not possess a weapon inside the home, he would have the authority to make that decision, and to bind the minor to it within the confines of the home. But parental control over a minor's actions does not necessarily equate to a *governmental* or common law requirement that minors could not possess handguns. To use an example, as discussed above, Connecticut's militia law placed the penalty for a minor's failure to possess a military grade weapon on the parent/guardian. Spitzer

60

Decl. ¶ 53.  If a father did not want his son to carry a weapon for whatever reason, then he could,

in theory, simply pay the penalty imposed by the militia law for failing to supply a firearm.  But

the father's personal rule would have no bearing on the implication of the Uniform Militia Act and

the various state militia laws that persons between eighteen and forty-five years old would

ordinarily possess and carry a gun when necessary for militia service.  *See* Spitzer Decl. ¶ 48.[26]

Second, the State Defendants argue that Founding era analogues in the form of university

campus laws and militia laws provide explicit support for the proposition that minors were

restricted not just from acquiring handguns, but from possessing and carrying them as well.  ECF

No. 137 at 40–43.  As to the university laws, setting aside the question of whether these laws are

properly considered Founding era or Reconstruction era support, *see* Spitzer Decl. ¶ 43 (citing

campus laws as late as 1896), these laws again do not reflect a general legal or statutory prohibition

on the carrying of arms by minors, but rather reflect the judgment of guardians acting as stand-ins

for minors' parents while they were living outside of the home in defined settings.  *See* ECF No.

137 at 41 ("colleges in the colonial and founding eras, acting *in loco parentis*, assumed

unquestioned authority over students" (citing Spitzer Decl. ¶ 39)); Spitzer Decl. ¶ 36 (recognizing

that "[t]he numerous rules governing private campuses *are not public law*, to be sure") (emphasis

added).

Additionally, while college students during the Founding era tended to be the same age as

college students today, ranging from eighteen to twenty-two years old, their numbers were far

---

[26] At the same time, the requirement that minors carry arms when engaged in militia service does not mean that they could possess and carry arms in all situations.  Founding era militia laws that *expected* minors to carry weapons in connection with militia service go no further than establishing that minors were expected to carry arms in the highly regulated context of militia service.  *Heller* itself specifically distinguished the individual's right to keep and bear arms for self-defense from a duty or obligation to carry arms in connection with militia service.  *Heller*, 554 U.S. at 581, 586, 605.  Militia laws therefore do not demonstrate that minors—outside of the specific and regulated context of militia service—either had a general right to keep and bear arms, or lacked such a right, at the Founding.  Spitzer Decl. ¶ 57.

smaller. Spitzer Decl. ¶ 35. As late as 1870, only 9,000 college degrees were awarded nationwide, while in 2022, more than 37% of the approximately 333 million Americans possessed a four-year college degree. *Id.* ¶ 35.[27] Indeed, it would be strange to find that Founding era university laws, applicable only to the exceedingly small subset of individuals who attended college then, serve as a historical analogue to the Connecticut Framework that seeks to ban the carrying and possession of handguns by *all* individuals under the age of twenty-one. And the university laws applied to all students regardless of age, "meaning that such rules might say more about historical restrictions of guns in sensitive locations than they do about restricting firearms to minors." *Pinales v. Lopez*, 765 F. Supp. 3d 1024, 1045 (D. Haw. 2025); Spitzer Decl. ¶ 40 ("while some college students were over the age of 21, the fact that these [firearms] restrictions *applied to them as well* further validates the *in loco parentis* powers of colleges" (emphasis added)).

Further, these university laws necessarily applied only while minors were students, calling into question their ability to serve as a meaningful historical analogue to Connecticut's broader Framework. Aside from one 1810 example from the Georgia public universities and colleges that prohibited students from being "allowed to keep any gun, pistol . . . or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever," there is no evidence that such restrictions would apply to the student once he returned to his hometown at the end of a given school year, even if they applied to students living both on campus and off campus during the school year. Spitzer Decl. ¶ 37. And presumably—even for Georgia's far-reaching example—if the eighteen- to twenty-

---

[27] The Court takes judicial notice of the fact that the total U.S. population in 2022 was 333,287,557. *See Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic*, U.S. Census Bureau (Dec. 22, 2022, at 15:15 p,m. EST) (available at https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html (last accessed July 23, 2026); *Chabad Lubavitch of Litchfield Cnty, Inc. v. Borough of Litchfield, CT*, 213 F. Supp. 3d 329, 339 n.9 (D. Conn. 2016) (taking judicial notice of U.S. Census Bureau population data).

year-old were to unenroll, or cease to be a *student*, there is no evidence the university regulation would continue to prevent him from possessing or carrying a handgun generally in society.  In any event, a history and tradition cannot be based "upon a law in effect in a single State, or a single city."  *Bruen*, 597 U.S. at 67.  Accordingly, as with the State Defendants' parental authority argument, university laws cannot support a finding that minors, *generally speaking*, were prohibited from possessing or carrying arms at the Founding, as they are under the Connecticut Framework.

Finally, the State Defendants argue that there are "several founding-era rules and laws that confirmed the limits on a minor's ability to bear arms."  ECF No. 137 at 60 (citing Spitzer Decl. ¶ 20, 42–44, 51).  Setting aside the university laws and militia laws the Court addressed above, the State Defendants advance eighteen "Founding era" state law analogues in support of their position, some of which date as late as 1861.  Spitzer Decl. ¶ 20.  The Court does not attempt to parse what the dividing line between what can be considered Founding era support and what is Reconstruction era support (to the extent there exists such a clear-cut divide), because none of these laws can be said to serve as clear historical analogues for the Connecticut Framework's prohibition on the possession and carrying of handguns by eighteen-to twenty-year olds.

The earliest of these laws, a New York City law from 1763, prohibits "any Children, Youth, apprentices, Servants, or other persons," from being able to "fire and discharge any gun, pistol, leaden-gun . . . at any mark or at random against any fence, pales or other place in any street, lane, or alley, or within any orchard, garden, or other inclosure, or in any place where persons frequent to walk."  *Id*.  While it is clear that children and youth could not *discharge* weapons in specific places under this law, the law makes no comments about the ability of children or youth to otherwise carry or possess such a weapon in those places or more generally; nor have the State

63

Defendants provided any support for that proposition. Indeed, Professor Spitzer testified on cross examination this law was not one that "prohibited minors from possessing firearms." Tr. 1/12/26 at 35. But neither is there evidence in the record to support an inference in the other direction: that minors were otherwise legally able to carry and possess weapons so long as they were not discharged in violation of the law. Accordingly, the Court will not draw conclusions from what is otherwise legislative silence. *See Antonyuk*, 120 F.4th at 969.

The State Defendants' other cited Founding era laws function much the same way, explicitly prohibiting youths from discharging weapons, or imposing a *general* ban on the discharging of weapons under certain conditions, with in some cases the parent bearing the burden for paying any fine a minor incurred as a result of discharging the firearm. *See* Spitzer Decl. ¶ 20; Historic Weapons Restrictions on Minors by State at 95–140 (collecting laws). None of these laws, however, explicitly regulated the possession or carrying of handguns by minors, and cannot definitively be understood to stand for the further proposition that because a minor could not discharge a weapon in specific instances, or because their parent was forced to pay the fine for any violation of a discharge law, minors categorically could not possess or carry such weapons. In other words, the "how" of these historical laws was a restriction on the discharging of firearms, not the ability to possess or carry them. Accordingly, none of these historical laws regulating the discharge of firearms provide a clear historical analogue for the Connecticut Framework regarding possession and carrying of handguns by minors, given that they differ in "how" they regulated minors' conduct.[28]

---

[28] An argument could be made that the ability to carry or possess a firearm means little without the ability to discharge it, particularly in the context of self-defense. Taking that view, it is possible to read the statutes prohibiting discharge of weapons by minors as *effectively* prohibiting the carrying and possession of arms by minors. The State Defendants do not go this far, however, so the Court does not either. In any event, insofar as these Founding era restrictions on the discharge of weapons were tied to particular areas such as public streets, they could be read more as sensitive place restrictions, like the college regulations. *See Pinales*, 765 F. Supp. 3d at 1045.

64

Thus, having reviewed the Founding era analogues placed into the record, the Court concludes they do not provide a definitive historical analogue for the Connecticut Framework's prohibition on the possession and carrying of handguns. While it is clear that, at the Founding, certain subsets of minors were prohibited from possessing and carrying handguns in certain instances (such as in the university context) and in others were *expected* to do so (such as in the militia context), there are no laws or restrictions that demonstrate a *general* societal restriction nor a *general* societal acceptance on minors possessing or carrying arms.

That does not necessarily mean, however, that the Connecticut Framework is *incompatible* with the Founding era's understanding of the Second Amendment's scope. The Second Circuit has cautioned that courts should not take the absence of "positive legislation from a particular time or place" as evidence that legislators at that time or place "deemed such a regulation inconsistent with the right to bear arms," "even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today." *Antonyuk*, 120 F.4th at 969–70. Instead, where a case concerns "new circumstances and modern regulations that were unimaginable at the founding," "the lack of Founding-Era history" is "an especially weak indicator of constitutionality." *Christian*, 176 F.4th at 206 (quoting *Antonyuk*, 120 F.4th at 970).

b.  New Circumstances and Modern Regulations

By the mid-nineteenth century, America was rapidly changing, with minors more able to keep and spend their wages while mass-produced repeat-fire handguns that were far more accurate and lethal than their predecessors proliferated in the commercial market. Spitzer Decl. ¶ 28; Rivas Decl., ¶¶ 13, 29.[29] With the rise of industrialization also came increased urbanization, which led

---

[29] Connecticut played a central role in these developments, as the home of Samuel Colt, one of the preeminent firearms manufacturers of the period, and his factory. *See* Rivas Decl. ¶ 13. Colt patented his six-shot revolver in 1836 and by 1873 had sold one million guns, approximately 850,000 of which were revolvers. *Id.*

to the disruption of families and overcrowding in the cities, leading in turn to increases in crime generally and crime committed by minors. Spitzer Decl. ¶ 28; Rivas Decl. ¶ 12.

At trial and in their briefing, Plaintiffs attempt to argue that these are not new or changed circumstances because interpersonal violence and immaturity on the part of minors are issues that have been well-known since the Founding. *See* ECF No. 141 at 32. But Plaintiffs miss the forest for the trees. The State Defendants do not dispute that the Founding generation was aware of the general immaturity of minors; indeed, some of their arguments that the Connecticut Framework is similar in its "why" to historical handgun regulations *rest* on such a finding. Instead, the State Defendants have argued, and Plaintiffs have failed to sufficiently contest, that the urbanization and industrialization of the Nation were the changed conditions that spurred a slew of Reconstruction era legislation—unnecessary at the Founding—to respond to an increase in new, deadly, and easily concealable handguns becoming accessible in dense urban environments to an age group that was known to possess a lack of maturity. The Second Circuit recently examined the application of changed conditions to the *Bruen* step two analysis and found that a lack of Founding era regulations on the carrying of arms in public parks was the "natural consequence" of the fact that "modern urban parks . . . did not yet exist in significant numbers" at the Founding. *Christian*, 176 F.4th at 206. Similarly, here, the Industrial Revolution created a maelstrom of dense urban populations, minors with disposable income, and the proliferation of deadly repeat-fire handguns—factors which, either alone or in combination, did not exist at the Founding. Indeed, it is hard to imagine a clearer example of "unprecedented societal concerns or dramatic technological changes" than the Industrial Revolution, which led to the urbanization of America and the technological advances in firearms technology that came with it. *See Bruen*, 597 U.S. at 27. Accordingly, the Court finds that Founding era silence on the question of the possession or carrying of handguns by minors to

66

be an "especially weak" indicator here, when the Industrial Revolution created a set of unprecedented conditions that the Founding generation could not foresee. *See Christian*, 176 F.4th at 206.

c.    Reconstruction Era Laws

With this in mind, the Court turns to the Reconstruction era laws that the State Defendants have placed into the record.   The Second Circuit has held that in analyzing state laws, "the understanding that prevailed when the States adopted the Fourteenth Amendment—is along with the understanding of that right held by the founders in 1791, a relevant consideration." *Antonyuk*, 120 F.4th at 973–74 (internal citation omitted).   Both the Founding and Reconstruction eras, along with "the adjacent and intervening periods," present "fertile ground" for the Court's analysis. *Id.* at 974.   While the Second Circuit has not opined on "which era's understanding has primacy," it has noted that Supreme Court precedent has "approved looking to post-Foundation history" even if the "1791 understanding primarily controls," in order "to discern that meaning." *Frey*, 157 F.4th 118 at 129.   To be sure, courts "cannot rely on later history if it 'contradicts what the [constitutional] text says.'" *Id.* at 130 (quoting *Bruen*, 597 U.S. at 36).   But relying on later history in the absence of Founding era support "cannot 'be characterized as *contradicting* the understanding of the right in 1791.'" *Christian*, 176 F.4th at 195 (quoting *Frey*, 157 F.4th at 130) (emphasis in original).   And the Supreme Court has confirmed, at least implicitly, the appropriateness of considering Reconstruction era laws alongside Founding era laws. *See Wolford*, 2026 WL 1825723 at 13–14 (considering 1893 Oregon state law and 1865 Louisiana state law alongside Founding era examples, but ultimately finding them unpersuasive).

The State Defendants have placed into the record a number of Reconstruction era laws that operate to completely prohibit the possession and carrying of handguns by individuals under the age of twenty-one. For example, in 1883, Wisconsin passed a total prohibition on minors, defined

67

as individuals under the age of twenty-one,[30] from "go[ing] armed" with "any pistol or revolver," and requiring any law officer to "take from any minor, any pistol or revolver, found in his possession." Rivas Decl. ¶ 24 (citing Wisc. 1883 ch. 329 p. 290, §1); ECF No. 130 at 7. That same year, Kansas passed a law making the possession of a pistol or revolver by a minor in any place a criminal misdemeanor. ECF No. 130 at 6–7; *see also Burgett v. Barrick*, 25 Kan. 526, 527 (1881) (explaining that when a plaintiff entered a contract he "was a[ minor], under the age of twenty-one years"). And Nevada, in 1885, similarly passed a law making the wearing or carrying of any "pistol . . . or other dangerous or deadly weapon concealed upon" a person under the age of twenty-one a criminal misdemeanor. ECF No. 130 at 8. As Defendants' experts explained, these laws were enacted to combat the rising tide of juvenile crime and accidental shootings spurred by the increased availability of mass-produced, multi-firing, concealable handguns. [31] Spitzer Decl., ¶ 30; Rivas Decl. ¶¶ 15–16, 21–24. They thus serve as "dead ringer[s]" for Connecticut's current prohibitions on the carrying and possession of handguns by minors. *Bruen*, 597 U.S. at 30.

Other state laws that prohibited the *sale* of concealable pistols and other deadly weapons to minors further support this conclusion, given their underlying rationale. In 1875, Indiana prohibited "any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol . . . or other deadly weapon *that can be worn, or carried, concealed upon or about the person*." ECF No. 130 at 2 (citing Ind. 1875 ch. 40 p. 59 § 1) (emphasis added). In 1890, Wyoming passed a nearly identical law. ECF No. 105-5 at 140. While these state laws explicitly address the sale or transfer of handguns, the record before the Court demonstrates that these laws regulated at the point of sale because it was "the most effective means of restricting minors' *access*

---

[30] *See Hepp v. Huefner*, 61 Wis. 148, 20 N.W. 923, 924 (1884) (referring to those under twenty-one years as minors).
[31] Professor Rivas also references Arizona as a state that prohibited the possession of certain weapons by minors, *see* Rivas Decl. ¶ 24, but the text of the Arizona laws she cites does not appear to distinguish on the basis of age. *See* ECF No. 130 at 1–2.

to handguns," *i.e.*, their possession and carrying of them.  Rivas Decl. ¶ 33 (emphasis added).

Thus, these laws effectively worked to prohibit the same behavior (the carrying and possession of

handguns by individuals under the age of twenty-one) that the Connecticut Framework prohibits,

doing so through the means lawmakers considered most effective at the time.  The Connecticut

Framework does the same, through the means today's lawmakers have deemed most effective:  a

prohibition on sale *and* permitting.  Further, these laws do so for the same reasons as the

Connecticut Framework:  to protect minors from themselves and society from minors' actions with

dangerous weapons due to minors' perceived lack of judgement and maturity.  *See* Steinberg Decl.

¶ 11; Spitzer Decl. ¶¶ 28, 30.  Thus, they match both the "how" and the "why" of Connecticut's

current restrictions.

The State Defendants also provide a number of additional Reconstruction era laws that

further affirm the Connecticut Framework comfortably fits within the Nation's history and

tradition of firearms regulation.  Several states passed laws that prohibited the carrying and

concealment of pistols and revolvers by *anyone*, both over and under the age of twenty-one.  An

1873 Kentucky state law prohibited "any person" from carrying "concealed a deadly weapon upon

or about his person other than an ordinary pocket knife," subjecting violators to a fine and up to

thirty days in county jail for a violation.  ECF No. 105-5 at 109 (citing 1873 Ky. Acts 359, Ky.

Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873, ARTICLE

XXIX, Deadly Weapons, § I).  An 1879 Missouri law prohibited any person from "carry[ing]

concealed, upon or about his person, any deadly or dangerous weapon," and subjected violators to

a monetary fine and up to six months in a county jail.  *Id.* at 114–15 (citing MO. REV. STAT. §

1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A.

Hockaday et al. eds. 1879); 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879), 1883 Mo. Laws

76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1).  An 1881 Delaware state law with virtually the exact same language as the Kentucky law prohibited "any person" from "carry[ing] concealed a deadly weapon upon or about his person other than an ordinary pocket knife," and subjected violators to a monetary fine and up to thirty days in a county jail.  *Id.* at 98–99 (citing 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1).  Likewise, an 1882 West Virginia state law prohibited any person to "carry about his person any revolver or other pistol . . . or any other dangerous or deadly weapon of like kind or character," and subjected violators to a monetary fine and time in jail.  *Id.* at 135 (citing 1882 W. Va. Acts 421–22).  Finally, Washington, D.C. enacted a similar law in 1892, applying to "deadly or dangerous weapons, such as daggers, air-guns, pistols . . ." and prohibiting anyone in the District from having them "concealed about their person."  *Id.* at 100 (citing Washington D.C. 27 Stat. 116 (1892) CHAP. 159).

All of these laws restrict not only the ability of those under twenty-one to possess and carry handguns, but are even more restrictive than the Connecticut Framework in that they eliminate the ability of *anyone* at all to do so.  Accordingly, while these laws are generally applicable, they also functioned to "protect minors, by restricting their access to firearms and other dangerous weapons, and to protect society from minors' consequent misdeeds," and therefore share, at least in part, the same "why" as the Connecticut Framework.  Spitzer Decl. ¶ 30; Rivas Decl. ¶¶ 15–16, 21–22.[32]

---

[32] The Court need not and does not define at what point the "Reconstruction era" concludes for purposes of historical analogues, but notes that all of the State Defendants' historical analogues fall within what other Circuits have considered the scope of Reconstruction era support.  *See McCoy*, 140 F.4th at 578 n.3 (compiling state laws reaching as late as 1897); *Bondi*, 133 F.4th at 1121–22 (same); *see also Antonyuk*, 120 F.4th at 974 ("adjacent and intervening periods" to Founding and Reconstruction eras are "fertile ground" for historical analysis).

At trial, Plaintiffs seized on one 1868 law from Oregon to support the argument that even Reconstruction era law supported an eighteen- to twenty-year old's right to carry and possess a handgun.  Tr. 1/12/26 at 44–45.  Oregon's law reads as follows:

> Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore . . . § 1. *Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms*, to wit: either or any one of the following-named guns, *and one revolving pistol*: a rifle, shot-gun (double or single barrel), yager, or musket; the same to be exempt from execution, in all cases, under the laws of Oregon. § 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state.

ECF No. 105-5 at 126 (citing Or. Laws 18-19, An Act to Protect the Owners of Firearms, §§ 1-2 (emphasis added).  Oregon's law was approved on October 24, 1868.[33]  But this law cannot support the Connecticut Framework's unconstitutionality for a number of reasons.  First, Oregon's law is the *only* law in the entire trial record that makes reference to the Second Amendment's scope as supporting the right of individuals under the age of twenty-one to carry revolvers.  It is thus a historical outlier—"a law in effect in a single State"—and not something courts may permissibly "stake [their] interpretation upon."  *Bruen*, 597 U.S. at 67.

And even were Oregon's approach sufficiently widespread, the law on its face is clearly discriminatory along racial and gender lines.  In 1868, the nation was in the midst of Reconstruction, and the Thirteenth and Fourteenth Amendments had been enacted, the latter being ratified on July 9, 1868.[34]  Oregon's later-enacted law applied the Second Amendment with respect

---

[33] *See* https://firearmslaw.duke.edu/laws/an-act-to-protect-the-owners-of-fire-arms-1-2-1868-or-laws-18-18-19-w-a-mcpherson (last accessed July 23, 2026).
[34] *See* U.S. Const. amend. XIV, § 1.

*only* to "white male citizen[s]" of the state above the age of sixteen, and was thus facially discriminatory. ECF No. 105-5 at 126. In examining an 1865 law from Louisiana's Black Codes in *Wolford*, the Supreme Court noted in no uncertain terms that such a "tainted artifact" could not "be taken seriously" to "illuminate[] the original understanding of the right to keep and bear arms." *Wolford*, 2026 WL 1825723 at *14; *see also id.* at *19 (Barrett, J., concurring) ("It is beyond me why Hawaii could claim that these vile laws can justify its present-day restriction."); *see also* Pls.' Supp. Br. re *Wolford*, ECF No. 161 at 5 (recognizing *Wolford*'s holding). Here too, then, Oregon's "tainted artifact" can no more support Plaintiffs' arguments than any other racially discriminatory law.[35]

Finally, the Court rejects Plaintiffs' argument that because the State Defendants' Reconstruction era laws apply to "dangerous and unusual weapons," these laws cannot serve as analogues for the Connecticut Framework, which regulates handguns in common use today. ECF No. 161 at 6; ECF No. 141 ¶ 71 (citing Tr. 1/12/26 at 115). As an initial matter, Plaintiffs' reframing of the phrase "deadly weapons" in the Reconstruction era laws as "dangerous and unusual weapons" finds no footing in the testimony given at trial. *See* Tr. 1/12/26 at 115 (Dr. Rivas referring only to "deadly weapons"). Further, it is clear from Dr. Rivas' trial testimony and declaration that the term "deadly weapons" was applied to weapons who were "carried and used

---

[35] The Supreme Court's precedent is clear and the Court dutifully applies it. But the Court notes that America's history is at times ugly, with some of its historical laws reflecting values we now strive to cast aside. As Justice Jackson has recognized, however, the Supreme Court has not yet set forth a principled reason to excise these warts from what constitutes "history" for the purposes of Second Amendment challenges, separate and apart from their disturbing nature. *See Wolford*, 2026 WL 1825723 at *34–35 (Jackson, J., dissenting); *id.* at *19 (Barrett, J., concurring) ("We can put aside the question whether [racially discriminatory laws] are legitimate evidence of the Second Amendment's scope"). Whether there is a history and tradition to support a particular modern regulation is a wholly separate question from whether the laws that shaped such a history and tradition would pass Fourteenth Amendment muster today. *See id.* Thus, the Court recognizes that holding up a mirror to our past and shuddering at what we see may not be a principled reason to excise those historical realities entirely, absent guidance from the Supreme Court on what types of problematic history should and should not be excised. *Id.* at *34, n.16.

by ruffians, burglars, and assassins," and had a great "suitability for concealment." Rivas Decl. ¶ 16. Therefore, setting aside Plaintiffs' verbal variation, it is clear that "deadly weapons" were characterized more by who used them and by their ability to be concealed—a categorization that cleanly matches the concealed nature of handguns today—rather than any novel or unusual nature of the weapons themselves. Further, while Dr. Rivas draws a distinction between deadly weapons and "fowling pieces, shotguns, and rifles," which were "used . . . for militia service[,]" Plaintiffs have not explained in their briefing why suitability for militia use is synonymous with whether a weapon should be considered in common use during the Reconstruction era. Indeed, Reconstruction era laws recognize, as Plaintiffs do today, that handguns and revolvers are "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629; *see also* Rivas Decl. ¶¶ 16–17. It was this popularity that led to the Reconstruction era's proliferation of restrictions on such weapons. Rivas Decl. ¶¶ 16–17. Thus, far from being unusual, these deadly weapons were a popular choice for many people during the Reconstruction era, despite their danger, and thus society reacted to limit their use and proliferation—especially with respect to individuals under the age of twenty-one. Accordingly, Plaintiffs' argument is unpersuasive.

Finally, the Court recognizes that the Eighth and Third Circuits have reached a different conclusion than it reaches with respect to state laws that prohibit possession and carrying of handguns by persons between the ages of eighteen and twenty. *See Lara*, 125 F.4th at 445; *Worth*, 108 F.4th at 698. But both cases are distinguishable. First, the Eighth Circuit in *Worth* found that the 1886 Nevada law referenced above prohibiting the concealed carry of pistols on a person under the age of twenty-one—among other similar Reconstruction era laws—did not support Minnesota's handgun carry ban for eighteen- to twenty-year-olds. *See Worth*, 108 F.4th at 696–98. But *Worth's* holding is inapplicable here for a number of reasons (besides the fact that Eighth

73

Circuit precedent is not binding on this Court). First, in the Eighth Circuit, "it is questionable whether the Reconstruction-era sources have much weight," and "postenactment history of the Fourteenth Amendment is not given weight." *Id.* at 696 (citing *Bruen*, 597 U.S. at 35). This is not the case in the Second Circuit, where both the Founding and Reconstruction eras, "and the *adjacent and intervening periods*," present "fertile ground" for the court's analysis. *Antonyuk*, 120 F.4th at 974 (emphasis added); *see also Christian*, 176 F.4th at 195 ("relying chiefly on later history is perfectly consistent with . . . *Heller* and *Bruen*"). Further, the Eighth Circuit drew a line between historical laws prohibiting the carrying of weapons and the *concealed* carrying of weapons, s*ee Worth*, 108 F.4th at 697, but Plaintiffs have drawn no such distinction here. Even assuming the distinction applied here, a carry permit under Connecticut law permits only the *concealed* carry of a handgun, not the carrying of a firearm "with intent to display," and thus historical laws addressing concealed carry would be eminently applicable. *See* Conn. Gen. Stat. § 29-35; ECF No. 141 at 6. Accordingly, *Worth* is not persuasive here. As to *Lara*, the Second Circuit has expressly declined to follow its reasoning with respect to its relegation of Reconstruction era history, and thus *Lara* is similarly unpersuasive. *See Antonyuk*, 120 F.4th at 974 ("We respectfully part ways with the Third Circuit, which held . . . that the Second Amendment should be understood accordingly to its public meaning in 1791, and not 1868") (internal citation omitted).

In sum, several states' laws during the Reconstruction era operated as historical analogues for the Connecticut Framework's prohibition on the possession and carrying of handguns by individuals under the age of twenty-one. These regulations share the same how and why as the Connecticut Framework. While these laws vary at times in their breadth, or the exact penalty imposed for violation, these laws are sufficiently close in method to the current Connecticut Framework, supporting its constitutionality. *Rahimi*, 602 U.S. at 692. Further, "it is 'not

74

dispositive whether comparable historical regulations exist in significant numbers,'" *Frey*, 157 F.4th at 128 (quoting *Antonyuk*, 120 F.4th at 971); *see also Christian*, 176 F.4th at 195, but several analogues stretching geographically across the Nation during the Reconstruction era assuredly provide a sufficient historical sampling. *See Wolford*, 2026 WL 1825723 at *7 ("A party defending against a Second Amendment claim may rely on a single analogue or a group of analogues"); *Rahimi*, 602 U.S. at 692, 698–99 (two historical analogues sufficient to support modern restriction).

Accordingly, the Court finds that the State Defendants have carried their burden of establishing by a preponderance of the evidence that the Connecticut Framework is consistent with the Nation's history and tradition of firearms regulation, in the how and why of its regulation of the ability of eighteen- to twenty-year olds to possess, carry, or otherwise purchase handguns.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that the Defendants have proven by a preponderance of the evidence that the Federal Framework and the Connecticut Framework are constitutional and do not violate Plaintiffs' Second or Fourteenth Amendment rights.

The Clerk is directed to enter judgment in favor of the State Defendants and the Police Chief Defendants on Count One, and in favor of Defendant Blanche on Count Two. Defendant Blanche's second motion to dismiss and objection to Plaintiffs' motion for a preliminary injunction

at ECF No. 91 is denied as moot.  Following entry of judgment, the Clerk is directed to close this case.

        **SO ORDERED** at Hartford, Connecticut, this 23rd day of July, 2026.

                                    _/s/ Sarala V. Nagala_
                                    SARALA V. NAGALA
                                    UNITED STATES DISTRICT JUDGE